UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STACEY K SHARPE            )
                          )
        Plaintiff,        )
                          )
    v.                    )
                          )
                          )    Civil Action No. 06-1743 (RBW)
SHEILA C. BAIR, Chairman   )
Federal Deposit Insurance  )
Corporation                )
                          )
        Defendant.        )
                          )
                          )

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Richard L. Swick
D.C. Bar # 936930
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email: rlswick@swickandshapiro.com

Attorneys for Plaintiff

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Ms. Sharpe's Supervisor Does Not Support
            Her Professional Development. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Ms. Sharpe's Supervisor Favors a White
            Employee Over Ms. Sharpe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      D.    Ms. Sharpe is Forced to Leave the Counsel's
            Office So That Ms. Vosburg Can Receive a
            Permanent Position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      E.    The FDIC Gives Conflicting Statements
            About the Reasons for Ms. Sharpe's Directed
            Reassignment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      F.    The FDIC Gives Conflicting Statements About
            When Ms. Vosburg Received a Permanent
            Position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      G.    The Mechanisms Used in Ms. Sharpe's Directed
            Reassignment Were Against FDIC Policies. . . . . . . . . . . . . . . . . . 15

      H.    Only African-Americans in OIG Headquarters
            Lost Their Jobs or Suffered Directed Reassignments
            After Their Jobs Were Designated Surplus. . . . . . . . . . . . . . . . . . 17

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.    This Court has Subject Matter Jurisdiction to
            Hear Ms. Sharpe's Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.    Ms. Sharpe's Complaint Sufficiently States a
            Cause of Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C.    Ms. Sharpe Has Raised an Inference of Race
      Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      1.    Legal Standard on Summary Judgment
            in the Title VII Context. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      2.    Ms. Sharpe Has Made Out a *Prima Facie*
            Case of Race Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            a.    Ms. Sharpe has Shown She is a
                  Member of a Protected Class. . . . . . . . . . . . . . . . . . . . . . 22

            b.    Ms. Sharpe has Presented Sufficient
                  Evidence for a Finding That She
                  Suffered an Adverse Action. . . . . . . . . . . . . . . . . . . . . . . 22

            c.    Ms. Sharpe Has Presented Sufficient
                  Evidence to Raise an Inference of
                  Race Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      3.    Ms. Sharpe Has Presented Evidence to Rebut
            Defendant's Asserted Non-Discriminatory
            Reasons for Its Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            a.    There are Questions of Material Fact
                  About the FDIC's Stated Reasons for
                  Directing Ms. Sharpe's Transfer. . . . . . . . . . . . . . . . . . 28

                  (i)    There are Issues of Material
                         Fact About the FDIC's Assertion
                         that Ms. Sharpe Did Not Have
                         Enough Work to Perform at
                         the OC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                  (ii)   There are Issues of Material
                         Fact About the FDIC's
                         Assertion that Ms. Sharpe was
                         Needed in the HR position. . . . . . . . . . . . . . . . 32

                  (iii)  There are Issues of Material
                         Fact about Mr. Gibson's Assertion
                         that He Had Nothing to do With
                         Ms. Sharpe's Transfer. . . . . . . . . . . . . . . . . . . 33

    (iv) **There are Issues of Material Fact about The FDIC's Assertion that Ms. Sharpe's Directed Reassignment Had Nothing to do with Ms. Vosburg's Appointment to a Permanent Position.** . . . . . . . . . . . . . . . . . . . . . . . . . 34

   **b.** **The FDIC's Manipulation of Its own Policies and Procedures When Transferring Ms. Sharpe Raises an Inference of Discrimination.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   **c.** **Ms. Sharpe has Presented Additional Evidence That Supports an Inference of Racial Discrimination.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**IV. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

Title VII of the Civil Rights Act of 1964 ("Title VII"),
42 U.S.C. §§ 2000e-1 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18, 22, 24, 25, 37**

Title VII 42 U.S.C. § 2000e-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

Rule 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18, 19, 20**

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

**Cases:**
*Adickes v. S.H. Kress & Co.,*
398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

*Aka v. Washington Hospital Center,*
156 F.3d 1284 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

*Amiri v. Stoladi Property Group,*
407 F. Supp. 2d 119 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20, 21**

*Atchinson v. Dist. of Columbia,*
73 F.3d 418 (D.C. Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Barbour v. Merrill,*
48 F.3d 1270 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Brown v. Brody,*
199 F.3d 446 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22, 23**

*Burlington Indus., Inc. v. Ellerth,*
524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20, 21**

*Conley v. Gibson,*
355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Czekalski v. Peters,*
475 F.3d 360 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22, 23, 26**

*Faragher v. City of Boca Raton,*
524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Forkkio v. Powell,*
306 F.3d 1127 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Freedman v. MCI Telecomm. Corp.,*
255 F.3d 840 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*George v. Leavitt,*
407 F.3d 405 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

*Ginger v. District of Columbia,*
477 F. Supp. 2d 41 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*Glymph v. District of Columbia,*
180 F. Supp. 2d 111 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

*Greene v. Dalton,*
164 F.3d 671 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

*Haynesworth v. Miller,*
820 F.2d 1245 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Holcomb v. Powell,*
433 F.3d 889 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

*Hunter v. Rice,*
480 F. Supp. 2d 125 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

*Hussain v. Principi,*
344 F. Supp. 2d 86 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Int'l Bhd. of Teamsters v. United States v. United States,*
431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21, 26**

*Johnson v. Lehman,*
679 F.2d 918 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

*Judicial Watch, Inc. v. Clinton,*
880 F. Supp. 1 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Krieger v. Fadely,*
211 F.3d 134 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Lathram v. Snow,*
336 F.3d 1085 (D.C. Cir. 2003)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21, 27, 28**

*Medina v. District of Columbia,*
2007 WL 1656281 (D.D.C. June 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25, 26**

*Miree v. DeKalb County, Georgia,*
433 U.S. 25 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Miller v. Poretsky,*
595 F.2d 780 (D.C. Cir. 1978)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*O'Connor v. Consolidated Coin Caterers Corp.,*
517 U.S. 308 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*Parker v. U.S. Department of Housing and Urban Development,*
891 F.2d 316 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

*Phillips v. Bureau of Prisons,*
591 F.2d 966 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Pinnacle Airlines, Inc. v. National Mediation Bd.,*
2003 WL 23281961 (D.D.C., Nov 05, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Reeves v. Sanderson Plumbing Products, Inc,*
530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22, 28**

*Scheuer v. Rhodes,*
416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Shager v. Upjohn,*
913 F.2d 398 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

*Sparrow v. United Air Lines, Inc.,*
216 F.3d 1111 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19, 20**

*St. Mary's Honor Center v. Hicks,*
509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21, 28, 32**

*Stewart v. Ashcroft,*
211 F. Supp. 2d 166 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24, 26**

*Stewart v. Ashcroft,*
352 F.3d 422 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2, 23, 25**

*Swierkiewicz v. Sorema N.A.,*
534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Texas Dep't. of Cmty. Affairs v. Burdine,*
450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21, 27**

*Townshend v. Washington Metropolitan Area Transit Auth.,*
746 F. Supp.178 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

*Ware v. Billington,*
344 F. Supp. 2d 56 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Washington Post Co. v. U.S. Dep't of Health and Human Srvs.,*
865 F.2d 320 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

## I.    INTRODUCTION

Stacey Sharpe, an African-American, brought this complaint of race discrimination against her employer, the Federal Deposit Insurance Corporation (FDIC), Office of Inspector General (OIG), Office of Counsel (OC), contending that because she is an African-American, the FDIC discriminated against her by involuntarily transferring her from her job and placing her in a job for which she was not even minimally qualified so that a white person could be placed in her slot.  Indeed, at the time of the transfer, the FDIC claimed that this reassignment was necessary because there was insufficient work for her in the OC, yet at the same time the FDIC justified hiring a white employee to a permanent position in the same small office based on projections that the work of the OC would increase.

The FDIC has now moved to Dismiss plaintiff's Complaint, or in the alternative, for Summary Judgment on Ms. Sharpe's race discrimination claim asserting that this Court does not have subject matter jurisdiction to hear this claim, that Ms. Sharpe fails to state a claim upon which relief can be granted, and that Ms. Sharpe cannot make out a prima facie case of discrimination or show that the FDIC's asserted legitimate non-discriminatory reasons for its actions are a pretext for discrimination.  These arguments fail, however, because Ms. Sharpe's claim that she was involuntarily transferred out of her field because of her race is actionable under Title VII and there are significant issues of material fact surrounding the circumstances of Ms. Sharpe's forced transfer and the veracity of the FDIC's justifications for its actions.

First, the FDIC's claim that Ms. Sharpe can only establish a prima facie case if she identifies a comparable employee outside her protected class that was treated more favorably is incorrect as a matter of law.  Instead, in order to make out a prima facie case of race discrimination, Ms. Sharpe must identify circumstances that give rise to an inference of

discrimination. *See Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003). Ms. Sharpe has

more than met her burden in this regard, given that Ms. Sharpe has presented evidence that (1)

white employees are treated more favorably than African-American employees in the OIG, (2)

her immediate supervisor favored his white employees over Ms. Sharpe, the only African-

American employee in the OC, (3) a white employee became a permanent employee of the OC

because work was projected to increase, yet at the same time Ms. Sharpe was transferred out of a

predominantly white office and placed in a predominantly black office, based on the justification

there was not enough work for her to perform, (4) the circumstances of her transfer did not

comport with the FDIC's Human Resources policy, and (5) the FDIC claims the reason for the

involuntary transfer was the need for an HR specialist in the employee benefits section, but Ms.

Sharpe was not even minimally qualified for that position, and someone else was hired for that

position before Ms. Sharpe was transferred.

Second, there are significant questions of material fact about the truthfulness of the

alleged reasons provided by the FDIC and Ms. Sharpe's supervisors for the involuntary transfer.

Ms. Sharpe has presented evidence that directly contradicts the FDIC's proffered reason for her

transfer. While the FDIC asserts that Ms. Sharpe did not have enough work to do in the

Counsel's Office, it justified hiring a white employee to do the same kind of work based on an

increasing workload in the same small office. There are also significant questions of material

fact about the FDIC's allegations that Ms. Sharpe was needed in the Human Resources office,

that her supervisor, Mr. Gibson, had nothing to do with the directed transfer, and that the

placement of the white employee in the OC was prior to Ms. Sharpe's transfer and was unrelated

to her directed reassignment. In contrast to the FDIC's allegations, there is evidence that Ms.

Sharpe was not qualified for the HR position, that the director of HR did not want Ms. Sharpe to be transferred to that division, and that the white employee who was hired to a permanent position in the OC was placed there as soon as Ms. Sharpe was moved out of her slot.

Third, there are significant issues of material fact about the FDIC's manipulation of its own HR policy when forcing Ms. Sharpe from her position in the OC. The FDIC claims that it appropriately directed Ms. Sharpe's transfer to a position she was unqualified to hold by using an "In-Service" placement mechanism. However, the evidence shows that FDIC policy allowed directed transfers only when the skills of an employee are needed in a different area, and In-Service Placements are reserved for voluntary re-assignments where the employee has the skills and background necessary to succeed in the new position. Since Ms. Sharpe has presented evidence that she did not have the skills necessary for the new position and that the HR director has testified that she was not qualified for the position, a reasonable jury could infer that the reasons given by the FDIC are a pretext to cover for race-based discrimination.

Finally, other evidence in the record raises an inference that Ms. Sharpe's forced reassignment was based on race discrimination. The evidence shows that Ms. Sharpe's supervisor, Mr. Gibson, treated his white and African-American employees disparately and that 100% of the OIG Headquarters' employees who lost their jobs or were subject to a directed transfer as a result of their jobs being designated as surplus, were African-American.

Because there are genuine issues of material fact in the record, this case cannot be decided without a trial. Accordingly, the Defendant's Motion must be denied.

3

## II.     STATEMENT OF FACTS

### A.     Background.

Stacey Sharpe is an African-American with a B.A. in Journalism from the University of the District of Columbia and a B.A. in Paralegal Studies from the University of Maryland. Plaintiff's Exhibit ("PX") 2 at 6-7; PX 20 at 1.  She has also completed two semesters of law school at the University of the District of Columbia.  PX 2 at 6-7.  Ms. Sharpe began working for the OC to the OIG as a Paralegal Specialist GC-950 in 1998.  The OC is currently comprised of only white attorneys and an African-American assistant, and for at least 15 years has had only white attorneys in its office.  *See* PX 3 (Gibson Depo.) at 15-16; PX 8 (Fewell Depo.) at 12-18; PX 4 (Black Depo.) at 10-11, 30.  When Ms. Sharpe joined the Counsel's Office as a paralegal, she was the first African-American to hold a professional series grade in the OC.  PX 1 (Sharpe Decl. 6/7/06) at ¶ 8.  Throughout Ms. Sharpe's time at the Counsel's Office, her supervisors never claimed that there were problems with her job performance.  PX 3 (Gibson Depo.) at 83-84.  To the contrary, she was considered a diligent and hard worker.  *Id.*  Despite the quality of work which Ms. Sharpe produced, her attempts to advance her career were continually thwarted. *See* PX 1 (Sharpe Decl.) at ¶¶ 7-14.  Ultimately, Ms. Sharpe was removed from the Counsel's Office against her will and was forced to accept a directed reassignment to the HR Branch, where the majority of the employees are African-American and where the only African-American Director of the OIG is employed.  *See id.* at ¶14.

### B.     Ms. Sharpe's Supervisor Does Not Support Her Professional Development.

When Ms. Sharpe began working for the OC as a paralegal, her first-line supervisor was Larry Froehlich, Counsel to the IG.  PX 4 (Black Depo.) at 39.  However, when the OC

4

reorganized in 2000, Fred Gibson became the Acting, and then Permanent, Counsel to the IG and took over as Ms. Sharpe's immediate supervisor. PX 2 (Sharpe Depo.) at 16-17; PX 3 (Gibson Depo.) at 28. Mr. Gibson was the supervisor that assigned Ms. Sharpe most of her work and was responsible for providing oversight during the completion of those assignments. PX 3 (Gibson Depo.) at 118-19. Mr. Gibson did not make himself available to Ms. Sharpe, however, and Ms. Sharpe often had to seek him out repeatedly in order to get feedback about her performance. PX 1 (Sharpe Decl.) at ¶9.

Although Ms. Sharpe aggressively sought out opportunities for career development and growth, Mr. Gibson has not been supportive of Ms. Sharpe's desire for growth in the legal field. *Id.* at ¶¶ 9-14; *see generally* PX 34 (Addendum to Aff. of Stacey Sharpe). For example, Mr. Gibson rejected Ms. Sharpe's request to take graduate courses in legal studies at Marymount University. PX 1 (Sharpe Decl.) at ¶ 11. He also refused Ms. Sharpe's requests to become more involved in litigation work in the OC. *Id.* at ¶ 10. Furthermore, when Ms. Sharpe realized that she would not receive the support for her professional development from Mr. Gibson, she sought out an opportunity for a position outside the OC as a Criminal Investigator, a position held by an overwhelming majority of white employees.[1] Mr. Gibson, unsupportive of Ms. Sharpe's desire for career development, refused to approve this career development plan. *Id.* at ¶¶ 12, 13; *accord* PX 34 (Addendum to Aff. of Stacey Sharpe). Indeed, although Ms. Sharpe repeatedly sought out Mr. Gibson's assistance with career development in the legal field, the only position that Mr. Gibson would assist Ms. Sharpe in getting was a position in the HR Branch, the only branch in

---

[1] In 1992 there were no African- American Criminal Investigators, and in 2004 there were 30 white Investigators and only three African-American Investigators. PX 10 (Chandler Decl.) at ¶4

the OIG that is predominantly African-American.  PX 34 at ¶¶ 14, 15.

##### C.    Ms. Sharpe's Supervisor Favors a White Employee Over Ms. Sharpe.

In May of 2000, Mr. Gibson hired Adriana Vosburg, a white[2] female, as a full-time

summer law clerk in the OC.  PX 6 (Vosburg Depo.) at 8, 15.  On Mr. Gibson's suggestion, she

continued working for the OC part-time as a law clerk during the fall and spring of 2000-2001.

*Id.* at 32.  Mr. Gibson then hired Ms. Vosburg as a full-time contractor for the OC as a Law Clerk

in September of 2001.  *Id.* at 40-41; PX 3 (Gibson Depo.) at 21.  In November of 2001, after Ms.

Vosburg had been working as a contractor for the OC for three months, a vacancy announcement

was posted for a Law Clerk/Attorney position, and Ms. Vosburg was selected for the position

without an interview.  PX 6 (Vosburg's Depo.) at 42-44; PX 3 (Gibson Depo.) at 30, 42 (stating

that there was a large number of people that applied for the position, but that he did not conduct

interviews).  The Law Clerk/Attorney position was a term appointment not to exceed (NTE) one

year.  Defendant's Exhibit ("DX") 8a; PX 6 (Vosburg Depo.) at 45; *see also* PX 3 (Gibson

Depo.) at 32-33.  Prior to the expiration of  Ms. Vosburg's term appointment in 2002, Mr.

Gibson requested that Ms. Vosburg's position be extended to a four-year appointment, the

maximum allowable appointment for term employees.[3]  DX 8b; PX 6(Vosburg Depo.) at 46.  Mr.

Gibson justified this extension by stating that he, "anticipate[d] that the workload demands on

our office [the OC] will increase over the next several years, as a consequence of the

---

[2]Ms. Vosburg identified herself as white on a human resources personnel form.  PX 6 (Vosburg Depo.) at 5.  She speaks with no accent.  PX 3 (Gibson Depo.) at 30.

[3]Mr. Gibson also requested that Ms. Vosburg be promoted from a GS-9 Law Clerk to a GS-11 Attorney in December of 2001 and that there be a desk audit so that she could be promoted to a GS-12 attorney without competition in February of 2003.  PX 6 (Vosburg Depo.) at 48, 50, 53-55, 127-28.

restructuring of the OIG and conditions in the banking industry." PX 11 (Memorandum of 4/10/2002 by Fred Gibson justifying Ms. Vosburg's term extension).

Ms. Vosburg, like Ms. Sharpe, was supervised by Mr. Gibson and received the majority of her assignments from him. PX 3 (Gibson Depo.) at 149-50. However, Ms. Vosburg had a very different experience working with Mr. Gibson than Ms. Sharpe; Ms. Vosburg characterized her relationship with Mr. Gibson as "very good" and stated that Mr. Gibson was very supportive of her work and "supportive of [her] continuing to learn the practice of law." PX 6 (Vosburg Depo.) at 31-32.

Ms. Sharpe witnessed Mr. Gibson's efforts to support Ms. Vosburg's career development. From 2003 through 2004, Ms. Sharpe personally observed that Mr. Gibson was assigning Ms. Vosburg many of the kinds of projects that she would typically have worked on. PX 1 (Sharpe Decl.) at ¶22. While she was a law clerk, Ms. Vosburg was given the opportunity to work on employee relations cases at the OC with Mr. Cosgrove while Ms. Sharpe was not, despite the fact Ms. Sharpe was told she would be involved in this work. *Id.* Moreover, Mr. Gibson assigned many of the research assignments that previously would have been assigned to Ms. Sharpe to Ms. Vosburg, and even re-assigned some of the projects that Ms. Sharpe was already working on. *Id.* (stating that at staff meetings Ms. Vosburg often described research projects she was working on that Ms. Sharpe had been assigned in the past, and that Mr. Gibson took projects from Ms. Sharpe and reassigned them to Ms. Vosburg in Ms. Sharpe's presence).

D.    **Ms. Sharpe is Forced to Leave the Counsel's Office So That Ms. Vosburg Can Receive a Permanent Position.**

Sometime prior to the summer of 2004, Mr. Gibson informed Ms. Black that he considered Ms. Sharpe's position in the OC surplus, and that it could be abolished. *See* PX 22 (Aff. of Fred Gibson) at 5; PX 3 (Gibson Depo.) at 78, 81. In July or August of 2004, Mr. Gibson informed Ms. Sharpe that there was a position as a Human Resources Specialist in HR and suggested she discuss this position with Trina Petty, the Human Resources Director. PX 3 (Gibson Depo.) at 76-85; PX 1 (Sharpe Decl.) at ¶15. Mr. Gibson told Ms. Sharpe that it would be her choice whether she wanted to transfer to the HR department. PX 2 (Sharpe Depo.) at 44; *but see* PX 3 (Gibson Depo.) at 106-108 (denying that he told Ms. Sharpe that she would not be forced to take this position). When Ms. Sharpe went to discuss the position with Ms. Petty, she was told that she was not qualified for the position and that it would be difficult for her to advance in this position given her lack of background in Human Resources. PX 1 (Sharpe Decl.) at ¶16; *see also* PX 5 (Petty Depo.) at 49-50 (testifying that she was reserved with Ms. Sharpe when she spoke with her because she did not think she was qualified for the position in HR).

Ms. Petty also informed Ms. Sharpe that the position in HR was an employee benefits position, an area that was not relevant to her legal background and in which she had no interest. PX 1 (Sharpe Decl.) at 4-5. Ms. Petty informed Ms. Sharpe that because Benefits is such a specialized area, Ms. Petty wanted the person who filled the position to have specific experience in benefits. PX 5 (Petty Depo.) at 32-33. In fact, Ms. Petty had advertised the position before and had considered anyone who lacked the background in benefits unqualified for the position, even if the candidate had human resources experience. *See id.* at 36. After speaking with Ms.

8

Petty, Ms. Sharpe decided that the HR position was not a good fit for her and told Mr. Gibson she was not interested in the position.  PX 1 (Sharpe Decl.) at ¶ 17; *accord* PX 3 (Gibson Depo.) at 89.  Mr. Gibson informed Ms. Black that Ms. Sharpe was turning down the offer for the position in HR.  PX 3 (Gibson Depo.) at 98; PX 4 (Black Depo.) at 75.

About one week after Ms. Sharpe rejected the offer for the HR position, Mr. Gibson called Ms. Sharpe into his office and told her that she should reconsider the position in the HR department.  During this meeting, Mr. Gibson threatened Ms. Sharpe by telling her that if the FDIC had a RIF, her job might be considered surplus and she might lose her job because she would not have any bump or retreat rights.  PX 1 (Sharpe Decl.) at ¶ 18; *but see* PX 3 (Gibson Depo.) at 94 (stating that he told Ms. Sharpe that he did not know where the OIG was going but that they were down-sizing).  Ms. Sharpe was surprised to hear that her job was at risk, as this was the first time that Mr. Gibson mentioned that her job might be considered surplus.  PX 1 (Sharpe Decl.) at ¶ 18; *but see* PX 3 (Gibson Depo.) at 83-85 (stating that he spoke with Ms. Sharpe about the concern he had about her job disappearing in 2003-2004, and indicated to Ms. Sharpe that she should be concerned about the FDIC down-sizing).  Under the threat that she might lose her job, Ms. Sharpe told Mr. Gibson that she would reconsider taking the position in employee benefits. PX 1 (Sharpe Decl.) at ¶ 18.  However, after thinking about the offer again, Ms. Sharpe sent an email on August 24, 2004, to Mr. Gibson, Ms. Petty, and Ms. Black declining the offer to move to the HR department.  *Id*. at ¶ 19; PX 42.  In her email, she stated that she was not qualified for the position, that it did not match her skill set or interest, and that she was not interested in taking the position.  PX 42.

Despite her express rejection of the HR position to both Mr. Gibson and Ms. Black, and

9

the fact that Ms. Petty wished to hire someone with experience in employee benefits to the HR

position, Ms. Sharpe was reassigned to the HR branch as Human Resources Specialist (Benefits)

by a letter dated September 23, 2004.  PX 44; DX 19.  Ms. Sharpe's position as paralegal was

never formally declared surplus by the FDIC nor was it subjected to a RIF, and Ms. Sharpe was

never given the opportunity to take a buyout.  PX 1 (Sharpe Decl.) at ¶20; *but see* PX 4 (Black

Depo.) at 54-55.  Ms. Sharpe's only options were to take the position or be fired.  PX 44; PX 5

(Petty Depo.) at 75.  She therefore agreed to take the directed reassignment on October 1, 2004.

PX 44; DX 26.

Mr. Gibson repeatedly claimed that he had nothing to do with Ms. Sharpe's reassignment.

*See e.g.* PX 3 (Gibson Depo.) at 76 ("I did not participate in the decision to move Ms. Sharpe to

the benefits office."); PX 22 (Aff. of Fred Gibson) at 1.  However, Mr. Gibson admits that he is

the only one that told Ms. Black that Ms. Sharpe's position was surplus in the OC, and that he

was the sole person who discussed the transfer with Ms. Sharpe prior to her reassignment.  *See*

PX 22 (Aff. of Fred Gibson); PX 3 (Gibson Depo.) at 78, 81 (stating that he told Ms. Black that

there was not enough work to keep a paralegal busy in the office); *accord* PX 4 (Black Depo.) at

51, 72 (agreeing that she never spoke to Ms. Sharpe about taking the HR job but that she asked

Mr. Gibson to inquire about it); PX 3 (Gibson Depo.) at 76-80.

Despite the FDIC's assertion that one of the main reasons for her transfer was that HR

desperately needed someone to fill the employee benefits position, HR had already advertised a

Human Resources Specialist (Benefits) position and promoted another individual, Gloria Hill, to

this position.  PX 1 (Sharpe Decl.) at ¶ 26; PX 5 (Petty Depo.) at 23-24.  Unlike Ms. Sharpe, Ms.

Hill had the requisite experience for this position, as she had been performing the benefits

position for some time in the HR Branch, had training in benefits, and had been working in the

HR Department for approximately 5 years. PX 1 (Sharpe Decl.) at ¶ 26; PX 5 (Petty Depo.) at

30. Therefore, when Ms. Sharpe was reassigned to the Benefits position, she filled the same

position as Ms. Hill. PX 5 (Petty Depo.) at 30 (explaining that she had two people in the benefits

position after Ms. Sharpe's transfer).

   Additionally, Ms. Sharpe's directed reassignment became effective just two weeks after

Ms. Sharpe agreed to take the involuntary transfer rather than being terminated. *See* PX 39

(Notification of Personnel Action- Sharpe's reassignment to HR Specialist position). Ms. Petty

requested that Ms. Sharpe's reassignment be delayed because there was no space for her in HR.

PX 24 (Aff. of Trina Petty) at 4; PX 5 (Petty Depo.) at 87-88. Ms. Petty was denied her request

for a delay in Ms. Sharpe's transfer. *Id.* Therefore, although Ms. Sharpe was effectively

reassigned to HR on October 17, 2004, she continued to work in her old office in the OC for

approximately 6 weeks. PX 24 (Aff. of Trina Petty) at 4; PX 3 (Gibson Depo.) at 103.

   Less than two weeks after Ms. Sharpe was reassigned to HR based on the allegation that

the workload of the OC was diminishing, Mr. Gibson wrote a memorandum to Ms. Petty

requesting that a permanent GS-13 position be advertised for the Counsel's Office. *See* PX 12

(Petty Decl). A vacancy was posted for this position on November 11, 2004. PX 13 (Vacancy

Announcement 2004-OIG-2694) at 165 (agreeing that by the time the GS-13 position was

advertised, Ms. Sharpe had already been transferred to HR). Eleven days later, Mr. Gibson chose

Ms. Vosburg for the position without an interview. *See* PX 13; PX 15; PX 14; PX 3 (Gibson

Depo.) at 129-130, 132, 165-66. According to Mr. Gibson, Ms. Sharpe's departure had nothing

to do with his request for an additional hire in the OC. PX 3 (Gibson Depo.) at 141. Mr. Gibson

claims the timing of the posting, just two weeks after Ms. Sharpe's directed reassignment, was pure coincidence. PX 3 (Gibson Depo.) at 136-37, 140-41, 148.

Despite Mr. Gibson's allegations that Ms. Vosburg's hiring was unrelated to Ms. Sharpe's reassignment, the record reveals that in 2005, the Counsel's Office was authorized only five slots for employees and that this was the OC's "core" staffing number.[4] *See* PX 35 (Staffing Table by Organization); PX 5 (Petty Depo.) at 114-15; PX 12 (Petty Decl.) at 2. Since there were only 5 slots available in 2005, Ms. Vosburg could not have been brought on as a permanent employee during that year unless someone else in the OC was transferred out of the unit. PX 2 (Sharpe Depo.) at 48; PX 5 (Petty Depo.) at 114, 121, 123; *see also* PX 7 (Gieseler Depo.) at 47-48. As such, Ms. Sharpe's directed reassignment in 2004 made it possible for Mr. Gibson to hire Ms. Vosburg as a permanent employee. PX 5 (Petty Depo.) at 114.

> E.    **The FDIC Gives Conflicting Statements About the Reasons for Ms. Sharpe's Directed Reassignment.**

The Defendant has asserted that Ms. Sharpe was given a directed transfer because there was not enough work in the Counsel's Office for a person to occupy a paralegal position and that Ms. Sharpe was needed in the HR department. PX 3 (Gibson Depo.) at 3; Def.'s Motion for Summary Judgment at 3. In the letter directing her reassignment to the HR position, Ms. Sharpe was told, "the work that you were hired to do has decreased to the point where it is substantially less than a full time position." PX 44. It was Mr. Gibson who informed Ms. Black that Ms. Sharpe did not have enough work to do and that her position could be considered surplus. PX 3

---

[4]Core staffing numbers represent the number of positions allocated in the OIG. Each unit has a core staffing number, which is the maximum number of employees that the OIG can have in that function area. PX 5 (Petty Depo.) at 1-3; PX 7 (Gieseler Depo.) at 39-40.

(Gibson Depo.) at 76, 81.  However, the same month that Ms. Sharpe received the letter directing

her transfer to HR because there was allegedly not enough work for her to do, Ms. Fewell, the

Legal Assistant in the OC, received approval from Ms. Black to begin a paralegal certification

program on September 8, 2004.  PX 18; *but see* PX 8 (Fewell Depo.) at 10-12.

Additionally, Ms. Sharpe's testimony raises an issue of fact regarding the FDIC's

assertion that she did not have enough work to do in the OC to keep her fully employed.  Ms.

Sharpe testified that she was responsible for opening FOIA matters, researching issues for

attorneys, and summarizing and indexing EEO cases, which kept her busy each day while she

worked in the OC.[5]  PX 2 (Sharpe Depo.) at 26-27; PX 1 (Sharpe Decl.) at ¶¶ 2-4; *accord* PX 2

(Sharpe Depo.) at 28; *but see* PX 3 (Gibson Depo.) at 52-53; PX 22 (Aff. of Fred Gibson) at 2.

Indeed, after Ms. Sharpe left the OC, Chris Geiseler, the attorney she worked with on the FOIA

requests, called seeking Ms. Sharpe's help on a new FOIA project, but Ms. Sharpe's supervisor

had told him that she could not work on this project.  PX 1 (Sharpe Decl.) at ¶ 4.  The fact that

Mr. Gieseler came to Ms. Sharpe for help after she left the OC contradicts the FDIC's assertion

that Ms. Sharpe did not have enough work to do and that, "Plaintiff's ongoing assignments could

easily be absorbed by the office's Legal Technician and the Associate Counsel responsible for

information law issues, Christian Gieseler."  Def.'s Motion for Summary Judgment at 18.

Notably, during the same time the defendant asserts that the workload in the OC was

decreasing and Ms. Sharpe did not have enough work, Mr. Gibson justified extending Ms.

Vosburg's position based on the projection that the "work loads of [the OC] will *increase* over

_____

[5]In fact, Mr. Gibson never told Ms. Sharpe that there was a shortage of work before July
or August of 2004, when he threatened that she could lose her job if she did not take the HR
Benefits position.  PX 1 (Sharpe Decl.) at ¶¶ 5-6; *but see* PX 3 (Gibson Depo.) at 83-85.

the next several years, as a consequence of the restructuring of the OIG and conditions of the

banking industry." PX 11 (Emphasis added). This was confirmed by Ms. Black, who stated that

in 2004, when Ms. Vosburg was converted to a permanent position, there was "ample work for a

permanent position." PX 4 (Black Depo.) at 80; *but see* PX 4 (Black Depo.) at 30-32; PX 3

(Gibson Depo.) at 54-56, 92.

F.     **The FDIC Gives Conflicting Statements About When Ms. Vosburg Received
       a Permanent Position.**

       The defendant claims that Ms. Vosburg was converted from a contract employee to a

permanent employee in July of 2004. *See* PX 16 (Agency's Response to Complainant's

Discovery Requests). However, according to Ms. Vosburg, her first permanent position with the

Defendant was the GS-13 position that was announced just two weeks after Ms. Sharpe's forced

transfer out of the OC. PX 6 (Vosburg Depo.) at 60; *see also* DX 8e (Personnel Form for Ms.

Vosburg which promotes her from a GS-12 to a GS-13); PX 5 (Petty Depo.) at 154-55, 159. Ms.

Vosburg was converted from a contract position to a permanent position without an interview

and despite the fact she was the only candidate for the position. PX 3 (Gibson Depo.) at 43, 124-

125. This occurred even though the FDIC's own guidelines require such a conversion to be

made through a competitive application process. PX 5 (Petty Depo.) at 165-166.

       The FDIC has only provided one form that documents Ms. Vosburg's conversion to a

permanent position in July of 2004. *See* DX 8d. There are no memoranda or other paperwork

justifying the conversion on this date. PX 3 (Gibson Depo.) at 147, 163. In fact, Mr. Gibson

admits that he did not make a written request for Ms. Vosburg's conversion. *Id.* at 163. This is a

violation of the FDIC's own HR policies, which require that written documentation be made

14

from management for these types of personnel decisions.  *See* PX 1 (Sharpe Decl.) at ¶ 24.

**G.    The Mechanisms Used in Ms. Sharpe's Directed Reassignment Were Against FDIC Policies**.

Ms. Sharpe received a directed reassignment to the Human Resources Specialist

(Benefits) position, even though she was not qualified for the position.[6]  PX 24 (Aff. of Trina

Petty) at 3; PX 5 (Petty Depo.) at 51-52.  In fact, Trina Petty, the Human Resources Director,

acknowledged that if Ms. Sharpe had competed for the position, she would not have qualified for

the job and would not even have been considered by the rating panel.  PX 5 (Petty Depo.) at 51-

52.  The FDIC asserts that Ms. Sharpe pursued a graduate degree in the field of Human

Resources Management at the FDIC's expense and asserts that this is evidence that she, "did not

object to the idea of being transferred to work in the field of Human Resources Management."

Def.'s Motion for Summary Judgment at 14.  However, Ms. Sharpe *did* object to the transfer

from the OC to the Human Resources Branch because she was not qualified for the position and

did not have any interest in pursuing a career in benefits.  PX 42.  The reason that Ms. Sharpe

had to be involuntarily reassigned was because she did not voluntarily agree to take the HR

position.

It was because Ms. Sharpe was not qualified for the HR position that the Defendant had

to expend thousands of dollars for her training.  PX 5 (Petty Depo.) at 85; *see also* PX 40 (OIG

Training and Professional Development System).  Ms. Sharpe had to take 35 separate courses at

_____

[6]Trina Petty testified that prior to Ms. Sharpe's directed reassignment, she raised concerns that Ms. Sharpe was not qualified for the Human Resources Specialist position because Ms. Sharpe's resume did not reflect any qualifying work experience.  PX 24 (Aff. of Trina Petty) at 4; *see also* PX 5 (Petty Depo.) at 51-52; PX 43 (email from Ms. Black dated 9/20/04) (requesting Ms. Sharpe's directed reassignment and acknowledging that "Ms. Sharpe is not presently trained to fully handle the Human Resources Specialist job").

a cost of $11, 943 to the Defendant just to become minimally qualified for the position of Human

Resources Specialist. PX 40; PX 5 (Petty Depo.) at 85. This exceeded the usual training

requirements for an individual joining the HR department as a GS-11. PX 5 (Petty Depo.) at 87.

Typically, for a benefits job where the applicant needs a significant amount of training, the entry

level for the position is GS-5/7. *Id.* at 41. Ms. Petty even needed to rewrite the position

description for Ms. Sharpe's new job because Ms. Sharpe was not able to perform the duties of

the position as it was originally intended. PX 5 (Petty Depo.) at 40. Because Ms. Sharpe was not

qualified for the HR position, she should not have been transferred to the position using an "In-

Service Placement." PX 25 (In-Service Placement Provisions) The use of the "In-Service

Placement" for Ms. Sharpe's directed reassignment was contrary to the regulations of the FDIC.

*Id.* The proper method for recruitment for an In-Service Placement is the use of a Solicitation of

Interest (SOI). *Id.* This is a voluntary method of recruitment used when an employee wishes to

transfer to a position for his or her own personal development but does not meet the minimum

qualifications. PX 5 (Petty Depo.) at 79. Ms. Sharpe made it clear that she did not wish to be

transferred to the HR department. PX 42.

    Additionally, according to the FDIC regulations, an employee can only be reassigned

through an In-Service Placement if the, "applicant's background include[s] related experience

that provide[s] the knowledge, skills, and abilities necessary for successful job performance."

PX 25 (In-Service Placement Provisions) However, Ms. Sharpe did not have the skills required

for the position of Human Resources Specialist. *See* PX 43; PX 5 (Petty Depo.) at 71; PX 22

(Aff. of Fred Gibson) at 3; PX 24 (Aff. of Trina Petty) at 3; PX 23 (Aff. of Rex Simmons) at 2-3

("I am not aware of any relationship these [HR] duties and responsibilities have to the

Complainant's prior education, training, and work experience...Her education would not have

qualified her for the CG-11 or anything higher in human resources"); *compare* PX 37 (Position

Description for Human Resources Specialist Position ) *with* PX 2 (Sharpe Depo.) at 25-26.

This is additional evidence that the In-Service Placement was inappropriately used to effect Ms.

Sharpe's involuntary transfer.

### H.     Only African-Americans in OIG Headquarters Lost Their Jobs or Suffered Directed Reassignments After Their Jobs Were Designated Surplus.

Ms. Black has been Deputy Inspector General since April of 2002.  During the Reduction

on Forces (RIFs) implemented between 2002 and 2005 at OIG Headquarters, while Ms. Black

was Deputy Inspector General, the only employees who were subject to RIFs were African-

American.  PX 4 (Black Depo.) at 45, 57, 62-63; PX 9 (Mitchell Declaration) at ¶¶2-3.  When all

secretary positions were abolished, two African-American Employees were terminated and three

others were forced into retirement.  PX 9 (Mitchell Declaration) at  ¶¶2-3.  Aside from being

subject to RIFs, African-American employees were the only employees at the OIG that were

forced to accept directed reassignments. *Id.* at 60, 63-64 (indicating that one African-American

employee was moved from the Office of Investigation to the Office of Audit, and the other was

moved from the Counsel's Office). Trina Petty testified that the only person other than Ms.

Sharpe who was subject to a directed reassignment at Headquarters during her seven years of

employment with the Defendant was Annette Chandler, an African-American.  PX 5 (Petty

Depo.) at 73-74, 77; *see also* PX 10 (Chandler Decl.) at ¶¶2-3, 6 (stating that Patricia Black

directed her reassignment in 2004 because she was African-American.)

### III.     ARGUMENT

#### A.     This Court has Subject Matter Jurisdiction to Hear Ms. Sharpe's Complaint.

In its motion, defendant asserts that plaintiff's claims in this action should be dismissed under Rule 12(b)(1) because this Court does not have subject matter jurisdiction to hear Plaintiff's Complaint. Def.'s Motion for Summary Judgment at 1. Defendant does not put forth any bases for this assertion. However, this Court does have jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e-1 *et seq.* Plaintiff has exhausted her administrative remedies by filing a timely administrative complaint of discrimination. FDIC rendered a final defendant decision rejecting plaintiff's complaint on July 14, 2006, and this decision was subsequently served on plaintiff some time after that date. This complaint was timely in that it was filed on October 12, 2006, within 90 days of the date of the receipt of the final defendant decision on plaintiff's administrative complaint of discrimination. Since defendant has failed to advance any legitimate reason why this Court lacks subject matter jurisdiction to hear plaintiff's claims, Defendant's Motion to Dismiss under Rule 12(b)(1) should be denied.

#### B.     Ms. Sharpe's Complaint Sufficiently States a Cause of Action.

Defendant has also asserted that plaintiff's case should be dismissed under Rule 12(b)(6) because she has failed to state a claim upon which relief can be granted. Def.'s Motion for Summary Judgment at 1. However, this motion must be denied because plaintiff has stated a claim upon which relief can be granted. The purpose of a motion to dismiss is not to test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. *Glymph v. District of Columbia*, 180 F.Supp.2d 111, 113 (D.D.C. 2001). The plaintiff's

18

burden to survive a Rule 12(b)(6) motion to dismiss is to provide a complaint with a short and plain statement of the claim and the grounds on which it rests. *See* Fed.R.Civ.P. 8(a)(2); *see also Pinnacle Airlines, Inc. v. National Mediation Bd.*, 2003 WL 23281961 * 1 (D.D.C., Nov 05, 2003) (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Thus, dismissal is appropriate only if defendant demonstrates that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46; *accord Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987) (citations omitted); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979); *Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 7 (D.D.C. 1995). In determining whether Ms. Sharpe has properly stated a claim, the allegations in the complaint must be presumed true and liberally construed in her favor. *Phillips*, 591 F.2d at 968 (*citing Miree v. DeKalb County, Georgia*, 433 U.S. 25, 27 n. 2 (1977)). In addition, Ms. Sharpe must be given every favorable inference that may be drawn from her allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

More specifically, Ms. Sharpe is not required to set forth the elements of a *prima facie* case in her complaint. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (a complaint "need not plead law or match facts to every element of a legal theory"); *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 421-22 (D.C. Cir.1996) (a complaint "need not allege all that a plaintiff must eventually prove"). To be sufficient, her complaint need only put the defendant on fair notice of the claim against it so it has an opportunity to file a responsive answer and to prepare an adequate defense. *Swierkiewicz*, 534 U.S. at 514. Put more simply, all her complaint needs to say is that she suffered damages at the hand of her employer

19

based on her membership in a protected class. *See Sparrow*, 216 F.3d at 1115 (explaining that "'I was turned down for a job because of my race' is all a complaint has to say to survive a motion to dismiss under Rule 12(b)(6).") (internal citation omitted). Ms. Sharpe has so alleged. *See* Complaint at ¶ 15 ( by "shifting plaintiff's duties to a white employee who was paid more than plaintiff for the same work and then involuntarily transferring plaintiff to a position for which she was not qualified and in which she had no interest, defendant has discriminated against plaintiff on the basis of her race in violation of Title VII of the Civil Rights Act, as amended.") Accordingly, Defendant's Motion to Dismiss under Rule 12(b)(6) must be denied.

### C.    Ms. Sharpe Has Raised an Inference of Race Discrimination.

#### 1.    Legal Standard on Summary Judgment in the Title VII Context.

Summary judgment is proper only against "a party who fails to make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). Accordingly, to make the determination on a motion for summary judgment, the court must evaluate all of the evidence before it. *Celotex*, 477 U.S. at 323. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court ruled that disputes over facts, which might affect the outcome of the suit under the governing law, will preclude the entry of summary judgment. *Id.* at 248. Indeed, the evidence presented must always be construed in favor of the party opposing the motion for summary judgment, and it is that party who is also to be accorded the benefit of all favorable inferences that can be drawn from the record evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Washington Post Co. v. U.S. Dep't of Health and Human Srvs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). Thus, the moving party

20

must demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 323. If, and only if, the moving party meets this burden, then the burden passes to the nonmoving party to establish the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the motion for summary judgment cannot be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Title VII prohibits employers from discriminating against employees by taking actions which affect the "terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) Therefore, in an employment discrimination case, the Court must focus on whether a genuine issue exists as to whether the defendant intentionally discriminated against the plaintiff. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993); *Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C. Cir. 1995). Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In discrimination cases, the Court evaluates the case using the *McDonnell Douglas* burden shifting paradigm. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This provides that a plaintiff establish a *prima facie* case by presenting evidence that her employer took an adverse action against her under circumstances that raise an inference of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977).

Then, the burden shifts to the defendant to articulate a non-discriminatory reason for the adverse action. *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If defendant

21

meets this burden, plaintiff can establish discrimination by showing that the proffered reason is not true. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147-48 (2000). The Supreme Court has unanimously held that a plaintiff may survive a motion for summary judgment solely by offering evidence that the reason articulated by the defendant was false. *Id.* ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). According to the D.C. Circuit, the *McDonnell Douglas* framework "was never intended to be rigid, mechanized, or ritualistic." *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005).

### 2.    Ms. Sharpe Has Made Out a *Prima Facie* Case of Race Discrimination.

To establish a *prima facie* case of discrimination, Ms. Sharpe must show (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*,199 F.3d 446, 452 (D.C.Cir.1999). Ms. Sharpe has satisfied that burden.

#### a.    Ms. Sharpe has Shown She is a Member of a Protected Class.

As a black woman, Ms. Sharpe is a member of a protected class.

#### b.    Ms. Sharpe has Presented Sufficient Evidence for a Finding That She Suffered an Adverse Action.

Defendant has alleged that summary judgment must be granted in this case because plaintiff cannot show she has suffered an adverse action. Defendant's Motion for Summary Judgment at 2. This is not the case. First, "whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question." *Czekalski v.*

*Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007). Second, the D.C. Circuit Court of Appeals has

established that, "reassignment with significantly different responsibilities generally indicates an

adverse action." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("[A]ctions such as

demotion, reassignment with significantly different responsibilities, or the loss of economic

benefits can also count as adverse."); *accord Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761

(1998) (emphasis added) ("[R]eassignment with significantly different responsibilities" may

constitute a "tangible employment action."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 790

(1998) (finding that employer liability results from "discriminatory employment actions with

tangible results, like . . . [changes in] work assignment."); *Ware v. Billington*, 344 F. Supp. 2d 56,

71 (D.D.C 2004); *Hussain v. Principi*, 344 F. Supp. 2d 86, 95 (D.D.C. 2004) ("a tangible

employment action constitutes a significant change in employment status, such as... reassignment

with significantly different responsibilities").

In addition, the Court of Appeals decision in *Stewart v. Ashcroft* unequivocally

established that a transfer without diminution in pay or benefits constitutes an adverse action

where "there are some other materially adverse consequences affecting the terms, conditions, or

privileges of her employment or her future employment opportunities." 352 F.3d 422, 426 (D.C.

Cir. 2003). Thus, a "reassignment with significantly different responsibilities" is an adverse

action. *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *accord Freedman v. MCI

Telecomm. Corp.,* 255 F.3d 840, 843 (D.C. Cir.2001) ("It is not enough to ask whether the

transfer was purely lateral. We must also ask if other changes in terms, conditions, or privileges

followed from the transfer."); *Ware,* 344 F. Supp. 2d at 72.

While "minor changes in opportunities or work-related duties" are not sufficient to find

adverse action, if a reasonable finder of fact could determine that a plaintiff has "suffered

objectively tangible harm," then the second prong of the *prima facie* case has been satisfied.

23

*Stewart v. Ashcroft*, 211 F. Supp. 2d 166, 173 (D.D.C. 2002); *Amiri v. Stoladi Property Group*, 407 F. Supp. 2d 119 (D.D.C. 2005) ("Discharge, demotion, or undesirable reassignment are recognized examples of adverse employment action for which an employee can bring a Title VII Claim."). The evidence demonstrates that the directed reassignment required Ms. Sharpe to take on significantly different responsibilities and duties, and that as a result of her directed reassignment, her future employment opportunities were appreciably altered.

Ms. Sharpe did not wish to leave the paralegal field. PX 20 at 2; PX 34 at 4 ("I felt harassed and forced to accept the reassignment to the ruination of my career in paralegal work and destruction of my chances for advancement and personal fulfillment.") Because of her interest in the legal field, she pursued a B.S. in Paralegal Studies. PX 20 at 1. She had also worked as a Legal Technician before she became a paralegal. While she had the educational background to perform her job as a paralegal, she had to attend 35 separate courses just to attain the minimum knowledge and skills to perform her new job. *Id.* at 4; PX 40 (OIG Training and Professional Development System); PX 23 (Aff. of Rex Simmons) ("We have spent a lot of time in training the Complainant to get her up to speed in the position [of Human Resources Specialist.]"). Because Ms. Sharpe was forced to take a directed reassignment to the Human Resources Specialist position, she is out of her chosen career field and is pursuing a career that she has no interest in. PX 20 (Aff. of Stacey Sharpe) at 4. The forced transfer was devastating to Ms. Sharpe, who was aware that she was not wanted in the HR department because of her lack of qualifications. PX 1 (Sharpe Decl.) at ¶ 27. Learning the skills necessary for the HR position was extremely difficult for Ms. Sharpe; she was forced to become an expert in a highly specialized area of benefits that had no relation to her previous work experience or education. *Id.* The defendant admits that Ms. Sharpe's reassignment involved a change in duties. Def.'s Motion for Summary Judgment at 13. This admission alone should be sufficient to raise an issue of fact regarding whether there has been an adverse action. Furthermore, despite the Defendant's

claims that Ms. Sharpe had previously expressed interest in personnel work (Def.'s Motion for Summary Judgment at 9), Ms. Sharpe made it perfectly clear to her employer that she had no interest whatsoever in a career in Benefits.  PX 42.

Ms. Sharpe had to attend a structured training program in order to accomplish the most basic of tasks in her new job.  PX 1 (Sharpe Decl.) at ¶27-28.  This extensive training lasted at least a year and was difficult for Ms. Sharpe to complete because she had to put so much energy into something she had no interest in.  *Id*; *see generally* PX 20.  Furthermore, Ms. Sharpe was pregnant at the time of the training, and the strain of her schedule and the requirements of her new position took a toll on Ms. Sharpe and her family.  PX 1 (Sharpe Decl.) at 7.  Even after her training, Ms. Sharpe was not able to do any work on her own because her training classes only taught her about federal benefits, not FDIC benefits.  *Id.*

From the evidence in the record, it is clear that Ms. Sharpe's directed transfer was a hardship to her and caused a major change in "the terms and conditions of her employment."  *Stewart*, 352 F.3d at 426.  Defendant claims that the forced transfer was not an adverse employment action because it did not affect Ms. Sharpe's prospects for promotion.  Def.'s Motion for Summary Judgment at 14.  There are issues of fact regarding this claim.  While Ms. Sharpe had the potential to be promoted in her new position, the transfer deprived her of any chance to advance in her chosen career path.  As such, the reassignment was "more disruptive to the conditions of employment than a mere inconvenience or an insignificant alteration of job responsibilities," and therefore at a minimum, Ms. Sharpe has raised a jury question regarding whether she was subjected to an adverse action by her employer.  *Hunter v. Rice*, 480 F. Supp. 2d 125, 133 (D.D.C. 2007).  A reasonable finder of fact could find that being forced to take a job in a field in which she had no experience and which required her to attend over a year's worth of training constitutes the type of "objectively tangible harm" contemplated by the courts in analyzing whether an action is adverse under Title VII.  *See Medina v. District of Columbia,*

2007 WL 1656281 (D.D.C. June 6, 2007) (finding a genuine issue that should be resolved by a jury as to whether plaintiff's forced reassignment constituted adverse action because plaintiff provided concrete examples of how working in his previous position provided opportunities, training, and skills not available in his new position); *Stewart*, 211 F. Supp. 2d at 173. It is generally within the purview of the jury to determine whether an action is adverse under Title VII. (*Czekalski*, 475 F.3d at 365) and Ms. Sharpe has produced sufficient evidence for a jury to find that her forced transfer to the Human Resources Specialist position constituted an adverse action sufficient to survive summary judgment.

c.    **Ms. Sharpe Has Presented Sufficient Evidence to Raise an Inference of Race Discrimination.**

A *prima facie* case of discrimination "requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.'" *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). According to the defendant, the plaintiff's case should be dismissed because she, "has asserted that the treatment accorded to her, a grade 11 paralegal, should be compared to the treatment accorded to Adriana Rojas Vosburg, then a grade 12 attorney." Def.'s Motion for Summary Judgment at 14. However, this is not the case. The plaintiff can and has raised an inference of discrimination without, "identifying a comparable employee outside of her protected group who was treated more favorably than she." *Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 51 (D.D.C. 2007). As long as the plaintiff presents evidence from which a reasonable juror could infer discrimination, that evidence need not take any particular form. *See Int'l Bhd. of Teamsters*, 431 U.S. at 358. In this case, there is ample evidence that Ms. Sharpe's directed reassignment from the OC to the HR Branch was a result of race discrimination.

The record clearly establishes that despite the overwhelmingly white makeup of the office: (1) between 2002 and 2004, only African-American employees in OIG Headquarters were

fired or forced to take directed reassignments; (2) Mr. Gibson treated white and black employees in the OC differently when he not support Ms. Sharpe's development in the legal field, but did support his white employee's development; (3) the OC permanently hired a white employee based on projections the work of the OC would increase but forced a black employee to transfer based on the allegation that there was not enough work in the same small office; (4) at the same time that Ms. Sharpe was told that there was not enough paralegal work for her to do in the OC, the Legal Assistant in the OC received approval to begin a paralegal certification program; (5) Ms. Sharpe was transferred from an office where the employees were mainly white to the only office in the OIG where African-American employees are the majority; (6) Ms. Sharpe was not even minimally qualified for the position to which she was forced to transfer; (7) despite the claims of the defendant that Ms. Sharpe was transferred because the HR department desperately needed someone to take the Benefits position, another employee was hired to perform this position at the same time as Ms. Sharpe's directed reassignment; (8) the FDIC's directed transfer of Ms. Sharpe and the use of the "In-Service Placement" did not comport with the FDIC's established policy; and (9) there are significant questions of material fact about whether there was enough work for Ms. Sharpe do to in the OC before she was transferred.

The above listed facts at issue more than sufficiently raise an inference that the circumstances of Ms. Sharpe's directed reassignment were discriminatory. *See e.g. Miller v. Poretsky*, 595 F.2d 780, 784 (D.C. Cir. 1978) ("[P]roffered evidence of past acts of racial discrimination [towards others] was relevant to prove the landlord's motive in his action towards appellant").

### 3.    Ms. Sharpe Has Presented Evidence to Rebut Defendant's Asserted Non-Discriminatory Reasons for Its Actions.

The *McDonnell-Douglas* and *Burdine* allocations of burdens of proof and production specifically provide that the plaintiff can establish discrimination by attacking the defendant's

justification and showing that the alleged explanation is unworthy of credence. In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), the Supreme Court provided specific guidance about how a jury can find discrimination when it rejects the employer's explanation for its actions:

> The fact finders' disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is required."

509 U.S. at 511-512. Therefore, Ms. Sharpe may meet her burden of establishing pretext and survive judgment as a matter of law by showing that the employer's proffered reason was not the real reason for the employer's action. *Reeves v. Sanderson Plumbing Products, Inc,* 530 U.S. 133, 146 (2000); *Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998) *(en banc).*

In the current case, plaintiff has presented overwhelming evidence to show that each of the Defendant's asserted reasons for its actions is false. The record in this case abounds with inconsistencies and contradictions. As such, the plaintiff has met her burden under the *McDonnell Douglas* framework and the case should proceed to trial.

        **a.**      **There are Questions of Material Fact About the FDIC's Stated Reasons for Directing Ms. Sharpe's Transfer.**

        **(i)**      **There are Issues of Material Fact About the FDIC's Assertion that Ms. Sharpe Did Not Have Enough Work to Perform at the OC.**

The FDIC provides two reasons for Ms. Sharpe's reassignment. The first is that there was not enough work for Ms. Sharpe to do in the OC to keep her fully employed.[7] *See* Def.'s

---

[7]The defendant's main argument about why Ms. Sharpe's workload had decreased is based on the fact that there were less FOIA and Privacy Act Requests for her to process in 2004

Motion for Summary Judgment at 9. This assertion conflicts with Ms. Sharpe's testimony that she was fully employed and worked a full 40 hours per week in the Counsel's Office. *Compare* PX 3 (Gibson Depo.) at 52-53 *with* PX 2 (Sharpe Depo.) at 27; PX 1 (Sharpe Decl.) at ¶ 2, 3 (stating that even when she was transferred she had outstanding work to complete). "In deciding whether there is a genuine issue of material fact before it, the court must assume the truth of all statements proffered by the party opposing summary judgment... this is the standard even when the court entertains grave doubts about such a statement." *Greene v. Dalton*, 164 F.3d 671, 674 (D.C. Cir.1999).

Ms. Sharpe's statements and detailed descriptions about the work she was performing in the Counsel's Office should be sufficient on their own to survive summary judgment. This is because her statements directly conflict with the FDICs proffered reasons for its actions and therefore, "like the weighing of evidence generally, the task of determining the credibility of a witness is the exclusive domain of the trier of fact." *Id.* However, there is additional evidence in the record upon which a finder of fact could conclude that the FDIC's asserted reason for transferring Ms. Sharpe is false. The defendant has repeatedly provided conflicting statements about the workload of the OC during the time frame in dispute. The defendant has indicated that the work of the OC and the OIG was both declining and increasing during the same time frame. Indeed, during the same time that the defendant asserts there was not enough work to keep Ms. Sharpe fully employed at the OC and that the OIG was downsizing, it justified adding a position

---

than when she began her position. *See e.g.* Def.'s Motion for Summary Judgment at 18. However, Ms. Sharpe explains that her work in this area did not decrease because as she became more experienced processing these requests, her involvement in the substantive work for these requests actually increased. *See* PX 1 (Sharpe Depo.) at ¶2.

due to the increasing workload of the same small office.[8]  Mr. Gibson's justification for the

extension of Ms. Vosburg's term appointment in 2002 was that the, "workload of our office will

*increase* over the next several years, as a consequence of the restructuring of the OIG and

conditions in the banking industry," PX 11 (emphasis added).  A jury could therefore conclude

that Ms. Sharpe's workload would also increase as a consequence of the restructuring of the OIG

and conditions in the banking industries as it was the job of the paralegal to "provide assistance,

as necessary, to members of the legal staff in handling OIG legal matters."  PX 36 (Position

Description- Paralegal Specialist)

Additionally, when Ms. Vosburg was converted to a permanent position in 2004, it was

based on the justification that there was "ample work for a permanent position." PX 4 (Black

Depo.) at 80.  To counter this inconsistency, the defendant later asserted that, "in general, only

the work in the areas of Advice and Counseling and Litigation increased." Def.'s Motion for

Summary Judgment at 22; *see also* PX 3 (Gibson Depo.) at 59. However, upon review of

defendant's own exhibits, a reasonable fact-finder could conclude this is simply not the case for

the 2000-2004 time period at issue during this case.  The chart below summarizes the

information regarding the matters the OC actively litigated or monitored through the Counsel's

Office from 2000-2005, and shows that contrary to the FDIC's assertion, these matters remained

relatively constant over time.

---

[8]It should be noted that the FDIC's statements do not indicate that it was the paralegal
work that was decreasing at the OC, but just that the work in the OC and the OIG overall was
shrinking.  PX 4 (Black Depo.) at 30-32; PX 3 (Gibson Depo.) at 54-56, 92.

| Reporting Period | Matters Actively Litigated or Monitored by the Office of Counsel |
|---|---|
| April 1, 2000-September 30, 2000 | 21 Matters[9] |
| October 1, 2001- March 31, 2002 | 16 Matters[10] |
| April 1, 2002-September 30, 2002 | 23 Matters[11] |
| October 1, 2002-March 31, 2003 | 23 Matters[12] |
| April 1, 2003- September 30, 2003 | 24 Matters[13] |
| October 1, 2003- March 31, 2004 | 22 Matters[14] |
| April 1, 2004- September 30, 2004 | 24 Matters[15] |
| October 1, 2004- March 31, 2005 | 22 Matters[16] |

Indeed, in April 2002 when Mr. Gibson wrote the memorandum justifying Ms. Vosburg's term extension by claiming that the OC's work was increasing, the October 2001-March 2002 reporting period just prior to his memorandum shows that the OC was involved in litigating and monitoring the smallest number of cases in the 2000-2005 period. *See* DX 12(d) at 24. This was confirmed by Ms. Black, who testified during her deposition that the OIG was in downsizing mode from 2000 through 2005, the same time frame that Ms. Vosburg's term appointment was

---

[9] DX 12(c) at 13.

[10] DX 12(d) at 24.

[11] DX 12(e) at 26.

[12] *Id.* at 28.

[13] *Id.* at 30.

[14] DX 12(f) at 32.

[15] DX 12(g) at 34.

[16] DX 12(h) at 36.

31

extended based on representations of an increasing work load, and then hired permanently for the same reason. PX 4 (Black Depo.) at 7; PX 11.

Looking at the evidence in the light most favorable to Ms. Sharpe, as is required at the summary judgment stage, a fact-finder could conclude that the defendant's stated reasons for Ms. Sharpe's transfer were untrue and a pretext for discrimination. Indeed, based on these shifting and inconsistent explanations for Ms. Sharpe's directed reassignment, a jury could conclude that the employer's explanations for its actions are unworthy of credence. As such, there is sufficient evidence of pretext to survive summary judgment. *Hicks*, 509 U.S. at 511-512.

> **(ii)    There are Issues of Material Fact About the FDIC's Assertion that Ms. Sharpe was Needed in the HR position.**

The second reason the FDIC gives for Ms. Sharpe's directed reassignment was that the Human Resources Department needed to fill the position of Human Resources Specialist (Benefits) and had been unable to find a suitable candidate. *See* Def.'s Motion for Summary Judgment at 9. There is a question of material fact about whether this assertion is true. Ms. Petty testified that at the time that Ms. Sharpe was reassigned, a vacancy announcement had been advertised for a Human Resources Specialist (Benefits) position, and Ms. Hill, an employee that had already been working in HR, had applied for and received this position. PX 5 (Petty Depo.) at 23-24, 30, 62. The fact that someone else had been promoted to the position raises significant doubts about whether the FDIC's stated reasons for the forced transfer are true and may lead a reasonable fact-finder to the conclusion that the FDIC's true motivation for reassigning Ms. Sharpe was discriminatory. *St. Mary's Honor Center v. Hicks*, 509 U.S. at 511-512.

There is also evidence that Ms. Sharpe was not even minimally qualified for the HR

position to which she was transferred. PX 24 (Aff. of Trina Petty) at 3. Ms. Petty confirmed

that "prior to [Ms. Sharpe's] directed reassignment [Ms. Petty] raised some concerns that she was

not qualified for the position of Human Resources Specialist," and that the resume that Ms.

Sharpe provided her with "did not reflect *any* qualifying work experience." *Id.; see also* PX 5

(Petty Depo.) at 51-52 (emphasis added). In light of the fact that a different employee had

recently been promoted to Human Resources Specialist and Ms. Sharpe was unable to perform

the duties of the new position without extensive and costly training, a finder of fact could infer

that the FDIC misrepresented the facts when it asserted that Ms. Sharpe was needed to perform

the HR benefits work. Because a fact-finder could find that the FDIC's reasons for reassigning

Ms. Sharpe are pretext, the Defendant's Motion for Summary Judgment must be denied.

**(iii)    There are Issues of Material Fact about Mr. Gibson's Assertion that He Had Nothing to do With Ms. Sharpe's Transfer.**

Although Mr. Gibson, Ms. Sharpe's first-line supervisor, claims he did not play a role in

the decision to transfer Ms. Sharpe, there is evidence in the record to contradict this assertion.

*See* PX 3 (Gibson Depo.) at 76; PX 22 (Aff. of Fred Gibson) at 1. While Mr. Gibson claims to

have had no involvement *at all* in the transfer of Ms. Sharpe to the HR position, he also states

that he was the person who told Ms. Black that he did not think there was sufficient work to

justify Ms. Sharpe's position. PX 22 (Aff. of Fred Gibson) at 5; PX 3 (Gibson Depo.) at 78, 81;

*accord* PX 4 (Black Depo.) at 51; PX 24 (Aff. of Trina Petty) at 2. Mr. Gibson was the only one

who talked to Ms. Sharpe about the possibility of moving to the HR Specialist position prior to

the directed reassignment. PX 1 (Sharpe Decl.) at ¶ 21; *accord* PX 31 at 1; *see also* PX 22 (Aff.

of Fred Gibson) at 5; PX 3 (Gibson Depo.) at 76-80; PX 4 (Black Depo.) at 72; *but see* PX 22

33

(Aff. of Fred Gibson) at 4.

Given the evidence surrounding Ms. Sharpe's directed transfer and Mr. Gibson's obvious involvement, a fact-finder could reasonably conclude that Mr. Gibson's assertion that he played no role in the decision to force Ms. Sharpe from her position in the OC is false and pretext for discrimination. Only a credibility determination by the fact-finder can resolve this issue. Accordingly, the Court must deny summary judgment because Mr. Gibson's own testimony raises issues about whether he denied that he was involved in Ms. Sharpe's transfer in order to hide his discriminatory animus. *See Shager v. Upjohn,* 913 F.2d 398, 405 (7th Cir. 1990) (finding an issue of material fact regarding whether the defendant was liable for discrimination when there was evidence that the supervisor was hostile towards older workers and may have been involved in the decision to fire the plaintiff).

> **(iv)**   **There are Issues of Material Fact about The FDIC's Assertion that Ms. Sharpe's Directed Reassignment Had Nothing to do with Ms. Vosburg's Appointment to a Permanent Position.**

The defendant claims that Ms. Sharpe's directed reassignment from the OC had nothing to do with Ms. Vosburg's appointment to a permanent GS-13 position in the OC. *See* PX 3 (Gibson Depo.) at 141. However, there is evidence that the OC had to clear a slot to hire Ms. Vosburg, and the FDIC has provided no reason why a permanent position matching Ms. Vosburg's qualifications was advertised in November of 2004, just two weeks after Ms. Sharpe's transfer from the OC. *See* PX 3 (Gibson Depo.) at 136-37; 140-41, 48.

Additionally, the defendant has provided highly conflicting statements about the actual timing of Ms. Vosburg's first position in the OC. Trina Petty, the Director of Human Resources,

stated that a transfer from a term position to a permanent one could not be accomplished without competition. PX 5 (Petty Depo.) at 165-66. Ms. Petty also testified that Ms. Vosburg's first permanent position with the OC was the GS-13 position which was approved in November of 2004. *Id.* at 154-55, 159. This was confirmed by Ms. Vosburg herself. PX 6 (Vosburg Depo.) at 60. Nevertheless, the defendant asserts that in July of 2004, Ms. Vosburg received a permanent position in the Counsel's Office without competition and with no written justification for her transfer to the position. *See* DX 16 (Petty Decl.); *see also* PX 16 (Agency's Response to Complainant's Discovery Requests) at 4. These conflicting accounts about the timing of Ms. Vosburg's appointment are suspicious in light of the forced transfer of Ms. Sharpe out of the OC.

Finally, despite claims by the defendant to the contrary, the Counsel's Office went from having an authorized number of six slots in 2004 to an authorized number of five slots in 2005. *See* PX 35 (Staffing Table by Organization); PX 5 (Petty Depo.) at 114-15; *accord* DX 16 (Petty Decl.) Given this restriction on the "core" number of people allowed to work in the OC, the fact that Ms. Vosburg was given a permanent position in the OC just two weeks after Ms. Sharpe's transfer to the HR Specialist position supports a conclusion that Ms. Sharpe was moved out to make room for Ms. Vosburg.

> **b.    The FDIC's Manipulation of Its own Policies and Procedures When Transferring Ms. Sharpe Raises an Inference of Discrimination.**

An employer's failure to follow its own procedures and regulations may be probative when determining the true motivation behind an employer's decision. *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982). This is because where an defendant departs from its normal

process without justification, a jury may draw an inference of discrimination. *Lathram v. Snow*, 336 F.3d 1085, 1093-04 (D.C. Cir. 2003).

In Ms. Sharpe's case, the defendant manipulated two of its own HR placement procedures to orchestrate her reassignment to the HR Branch. First, it directed Ms. Sharpe's reassignment to the HR position despite the fact that directed transfers are used when the skills of an employee are needed in a different area, and Ms. Sharpe did not have HR skills. *See* PX 5 (Petty Depo.) at 68, 77, 80, 117; PX 24 (Aff. of Trina Petty) at 3; PX 43; PX 5 (Petty Depo.) at 51-52.

Second, the defendant placed Ms. Sharpe in the HR position through an "In-Service" Placement assignment, despite the fact that the regulations for this type of placement require that, (1) the recruitment be done through an SOI, and (2) the "applicant's background include related experience that provide the knowledge, skills, and abilities necessary for successful job performance." PX 25, 26. Neither of these regulation guidelines were followed during Ms. Sharpe's forced reassignment. Management did not issue an SOI for the benefits position to find interested candidates, instead directing Ms. Sharpe's transfer to the position with the knowledge she did not wish to be moved to that department. PX 39 (Notification of Personnel Action); PX 44. The statements of defendant's own managers are sufficient for a jury to conclude that despite the regulations, management was well aware that Ms. Sharpe was unqualified for the position, and that her past experience was not relevant to the position. *See* PX 22 at 3; PX 24 (Aff. of Trina Petty) at 2; PX 23 (Aff. of Rex Simmons) at 2-3.

Not only did the defendant manipulate its own procedures when it reassigned Ms. Sharpe to HR, but the FDIC also failed to follow procedure when it hired Ms. Vosburg as a permanent employee in July of 2004. Ms. Vosburg was converted from a contract position to a permanent

36

position without an interview, as she was the only candidate for the position. PX 3 (Gibson Depo.) at 43, 124-125. This occurred even though the FDIC's own guidelines require such a conversion to be made through a competitive application process. PX 5 (Petty Depo.) at 165-166. Mr. Gibson admits that he did not make a written request for Ms. Vosburg's conversion. *Id.* at 163. This is a violation of the FDIC's own HR policies, which require that written documentation be made from management for these types of personnel decisions. *See* PX 1 (Sharpe Decl.) at ¶ 24.

In this case, where the record establishes several incidences of an employer's failure to follow its own procedures, there is an even stronger inference that the forced reassignment of Ms. Sharpe from a predominantly white office to a predominantly African-American office was discriminatory. As such, the Defendant's Motion for Summary Judgment should be denied.

> **c.     Ms. Sharpe has Presented Additional Evidence That Supports an Inference of Racial Discrimination.**

"A Plaintiff in a Title VII case is not limited to challenging the employer's explanation she can also avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination." *Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006). Other evidence that permits an inference of discrimination include, "the facts surrounding the employer's treatment of the plaintiff during the term of employment" and "the employer's general policy and practice with respect to the employment of minorities and women." *Parker v. U.S. Department of Housing and Urban Development*, 891 F.2d 316, 321 (D.C. Cir. 1989); *Townshend v. Washington Metropolitan Area Transit Auth.*, 746 F. Supp.178, 185 (D.D.C. 1990) (concluding that a "discriminatory atmosphere" can be circumstantial proof of individual discrimination.")

In this case, Ms. Sharpe has brought forth both types of evidence. She has presented

evidence that her supervisor, Mr. Gibson, did not support her career development in the legal area, despite repeated requests for assistance. *See* PX 1 (Sharpe Decl.) at ¶¶ 7, 9-13.  A jury could therefore conclude that Mr. Gibson did not support Ms. Sharpe's development in the legal field, but he was supportive of Ms. Vosburg's career development.  See PX 6 (Vosburg Depo.) at 31-32.  Because Mr. Gibson supervised both Ms. Sharpe and Ms. Vosburg and assigned them both their daily duties, a fact finder could infer that Mr. Gibson preferred to work with a white employee and displaced a black employee so that a white employee could be given a permanent position.  This is especially true given that Mr. Gibson told Ms. Black that Ms. Sharpe's position was surplus, while at the same time recommending that a white employee have her term extended with the FDIC.

Additionally, Ms. Sharpe has presented evidence that African-Americans at OIG Headquarters disproportionately suffered from the FDIC's downsizing efforts.  The evidence shows that while Ms. Black has been Deputy IG, despite the overwhelming absence of African-American employees, the only employees to lose their jobs or be involuntarily transferred by the OIG's downsizing efforts have been African-American. *See* PX 4 (Black Depo.) at 62-63. Indeed, in the OIG, which is a nearly all-white institution, the only two individuals who lost their jobs because of RIFs were African-American, and the only two employees involuntarily transferred were African-American. *Id.* at 60, 63-64; PX 10 (Chandler Decl.) at ¶¶ 6; PX 5 (Petty Depo.) at 73-74, 77; PX 9 (Mitchell Decl.) at ¶ 3.  Given the proportion of the FDIC that is African-American, a reasonable fact-finder could infer that because 100% of the employees who suffered an adverse employment action at OIG Headquarters were African-American, the OIG's decisions about which positions to declare surplus were based on discriminatory animus.

## IV. CONCLUSION

As the evidence has established, there are numerous questions of material fact regarding Ms. Sharpe's claim of race discrimination. Therefore, this case must proceed to a jury trial to appropriately determine the true motivation for Ms. Sharpe's forced reassignment. As such, the plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

Richard L. Swick
D.C. Bar # 936930
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email: rlswick@swickandshapiro.com

Attorneys for Plaintiff

39