## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **STACEY K SHARPE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | **Civil Action No. 06-1743 (RBW)** |
| **SHEILA C. BAIR, Chairman** | ) | |
| **Federal Deposit Insurance** | ) | |
| **Corporation** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

### STATEMENT OF GENUINE ISSUES

Pursuant to Local Rule 7.1(h), plaintiff hereby submits his statement of genuine issues in response to the "Statement of Material Facts Not in Dispute" filed by defendant in support of its Motion for Summary Judgment.

**I.      General Response to Defendant's Statements.**

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Mitchell v. DCX, Inc.*, 274 F.Supp. 2d 33, 39 (D.D.C. 2003).  In a discrimination action such as this, the material issues are the defendant's motives, whether defendant took adverse employment actions against Sharpe, and the legitimacy of any alleged non-discriminatory reasons for those actions. Yet, for the most part, the facts recited in defendant's statement are not "material" to these issues.  Thus, even if those facts are accepted, they do not entitle defendant to judgment.  *See United States v. Winstead,* 74 F.3d 1313, 1320 (D.C.Cir. 1996) ("material fact" defined as "a fact that would be of importance to a reasonable

person in making a decision about a particular matter or transaction"). As such, defendant's statements do not satisfy the requirement of Local Rule 7 (h) that defendant provide, "a statement of *material* facts as to which the moving party contends there is no genuine issue." Therefore, Defendant's Motion for Summary Judgment must be denied.

## II.    Genuine Issues of Fact

*1. Whether Mr. Gibson favored white employees in the OC over African-American employees.*

Both Ms. Sharpe and Ms. Vosburg were supervised by Mr. Gibson and received a majority of their assignments from him. PX 3 (Gibson Depo.) at 149-150. However, Ms. Vosburg had a very different experience working with Mr. Gibson than Ms. Sharpe did. Mr. Gibson did not make himself available to Ms. Sharpe, and Ms. Sharpe often had to seek him out repeatedly in order to get feedback on her performance. PX 1 (Sharpe Decl. 6/7/2006) at ¶ 9. Additionally, even though Ms. Sharpe aggressively sought out opportunities for career development and growth, Mr. Gibson was not supportive of Ms. Sharpe's desire for growth in the legal field. *Id.* at ¶¶ 9-14. For example, Mr. Gibson rejected Ms. Sharpe's request to take graduate courses in legal studies at Marymount University. *Id.* at ¶11. He also refused Ms. Sharpe's requests to become more involved in litigation work in the OC. *Id.* at ¶10. When Ms. Sharpe realized she would not receive the support for her professional development from Mr. Gibson, she sought out an opportunity for a position outside the OC as a Criminal Investigator, a position held by an overwhelming majority of white employees. Mr. Gibson refused to approve this career development plan. *Id.* at ¶¶ 12-13; *accord* PX 34. The only position Mr. Gibson would assist Ms. Sharpe in getting was a position in HR, the only branch in the OIG that is predominantly African-American.

2

Ms. Vosburg, who began in the OC as a law clerk and not an attorney, characterized her relationship with Mr. Gibson as "very good" and stated that Mr. Gibson was very supportive of her work and "supportive of [her] continuing to learn the practice of law." PX 6 (Vosburg Depo.) at 31-32. Furthermore, Ms. Sharpe witnessed Mr. Gibson's efforts to support Ms. Vosburg's career development. From 2003 through 2004, Ms. Sharpe personally observed that Mr. Gibson was assigning Ms. Vosburg many of the projects that she would have normally worked on. PX 1 at ¶ 22 While she was a clerk, Ms. Vosburg was given the opportunity to work on employee relations cases with Mr. Cosgrove while Ms. Sharpe was not, despite the fact Ms. Sharpe was told she would be involved in this work. *Id.* Moreover, Ms. Vosburg was given many of the research assignments that had previously been assigned to Ms. Sharpe, and was re-even assigned some of the projects that Ms. Sharpe was already working on. *Id.* Since Mr. Gibson was responsible for assigning work to both Ms. Vosburg and Ms. Sharpe, he could easily have assigned these projects to Ms. Sharpe. *Id.* at ¶ 6. The disparate treatment of Ms. Sharpe and Ms. Vosburg creates an issue of material fact about whether Mr. Gibson favored white employees in the OC over African-American employees.

2.    *Whether Ms. Vosburg was converted from a contract to employee to a permanent employee before or after Ms. Sharpe was transferred to the HR employee benefits position.*

The Defendant claims that Ms. Vosburg was converted from a contract employee to a permanent employee in July of 2004. *See* PX 16 (Agency's Response to Complainant's Discovery Requests). However, according to Ms. Vosburg, her first permanent position with the FDIC was the GS-13 position that was announced just weeks after Ms. Sharpe's forced transfer out of the OC. PX 6 (Vosburg Depo.) at 60; *see also* DX 8e (Personnel Form for Ms. Vosburg

3

which promotes her from a GS-12 to a GS-13); PX 5 (Petty Depo.) at 154-55, 159.  Ms. Petty,

the Director of Human Resources, confirms that Ms. Vosburg's first permanent position with the

OC was the GS-13 position which was approved in November of 2004.  PX 5 (Petty Depo.) at

154-155, 159.  Furthermore, Ms. Vosburg was converted from a contract position to a permanent

position without an interview and despite the fact she was the only candidate for the position.

PX 3 (Gibson Depo.) at 43, 124-125.  This occurred even though the FDIC's own guidelines

require such a conversion to be made through a competitive application process.  PX 5 (Petty

Depo.) at 165-166.  The FDIC has only provided one form that documents Ms. Vosburg's

conversion to a permanent position in July of 2004.  *See* DX 8d.  There are no memoranda or

other paperwork justifying the conversion on this date.  PX 3 (Gibson Depo.) at 147, 163.  In

fact, Mr. Gibson admits that he did not make a written request for Ms. Vosburg's conversion.  *Id.*

At 163.  As such, if Mr. Gibson really did effect Ms. Vosburg's conversion in July of 2004, he

violated FDIC HR policies, which require that written documentation be submitted from

management for these types of personnel decisions.  *See* PX 1 (Sharpe Decl.) at ¶ 24.

3.    *Whether Ms. Sharpe was forced to leave the OC so that Ms. Vosburg could receive a
      permanent position.*

     Less than two weeks after Ms. Sharpe was reassigned to HR based on the allegation that

the workload of the OC was diminishing, Mr. Gibson requested that a permanent GS-13 position

be advertised for the Counsel's office.  *See* PX 12 (Petty Decl).  A vacancy was posted for this

position on November 11, 2004.  PX 13 (Vacancy Announcement 2004-OIG-2694) at 165.  Just

11 days later, Mr. Gibson selected Ms. Vosburg for the position.  *See* PX 13; PX 15; PX 14; PX

3 (Gibson Depo.) at 129-130, 132, 165-66.  According to Mr. Gibson, Ms. Sharpe's departure

4

had nothing to do with his request for an additional hire in the OC.  PX 3 (Gibson Depo.) at 141.

Mr. Gibson claims the timing of the posting, just two weeks after Ms. Sharpe's directed

reassignment, was pure coincidence.  PX 6 (Gibson Depo.) at 136-37, 140-41, 148.  However,

the evidence in the record shows that there is a dispute about whether Ms. Sharpe was transferred

to make room for Ms. Vosburg in the OC.

Despite Mr. Gibson's allegations that Ms. Vosburg's hiring was unrelated to Ms.

Sharpe's reassignment, the record reveals that in 2005, the Counsel's office had only five slots

for employees and that this was the OC's "core" staffing number[1].  *See* PX 5 (Petty Depo.) at

114-15, PX 12 (Petty Decl.) at 2.  Since there were only 5 slots available in 2005, Ms. Vosburg

could not have been brought on as a permanent employee during that year unless someone else in

the OC was transferred out of the unit.  PX 2 (Sharpe Depo.) at 48; PX 5 (Petty Depo.) at 114,

121, 123; *see also* PX 7 (Gieseler Depo.) at 47-48.  As such, Ms. Sharpe's directed reassignment

in 2004 was necessary for Ms. Vosburg to be hired.  PX. 5 (Petty Depo.) at 114.

4.     *Whether Mr. Gibson was involved in the decision to reassign Ms. Sharpe.*

Mr. Gibson, Ms. Sharpe's first line supervisor, repeatedly claimed that he had nothing to

do with Ms. Sharpe's reassignment.  *See e.g.* PX 3 (Gibson Depo.) at 76 ("I did not participate in

the decision to move Ms. Sharpe to the benefits office").  However, Mr. Gibson admits that he is

the only one that told Ms. Black that Ms. Sharpe's position was surplus in the OC, and that he

was the sole person who discussed the transfer with Ms. Sharpe prior to her reassignment.  *See*

PX 22 (Aff. of Fred Gibson); PX 3 (Gibson Depo.) at 78, 81 (stating that he told Ms. Black that

---

[1]Core staffing numbers represent the number of positions allocated in the OIG.  Each unit
has a core staffing number, which is the maximum number of employees that the OIG can have
in that function area.  PX 5 (Petty Depo.) at 1-3; PX 7 (Gieseler Depo.) at 39-40.

there was not enough work to keep a paralegal busy in the office); *accord* PX 4 (Black Depo.) at

51; PX 3 (Gibson Depo.) at 76-80; PX 4 (Black Depo.) at 72 (agreeing that she never spoke to

Ms. Sharpe about taking the HR job but that she asked Mr. Gibson to inquire about it).  Because

there is evidence that Mr. Gibson treated his white employees differently than his African-

American employees, Mr. Gibson's role in Ms. Sharpe's transfer is material.

5.      *Whether Ms. Sharpe was transferred to the HR Specialist position because HR needed
        someone to fill the position and could not find a suitable candidate.*

        Despite the defendant's assertion that one of the main reasons for her transfer was that

HR desperately needed someone to fill the employee benefits position, HR had already

advertised a Human Resources Specialist (Benefits) position and promoted another individual,

Gloria Hill, to this position.  PX 1 (Sharpe Decl.) at ¶27; PX 5 (Petty Depo.) at 23-24.  Unlike

Ms. Sharpe, Ms. Hill had the requisite experience for this position, as she had been performing

the benefits position for some time in the HR Branch, had training in benefits, and had been

working in the HR Department for approximately 5 years.  PX 1 (Sharpe Decl.) at ¶27; PX 5

(Petty Depo.) at 30.  Therefore, when Ms. Sharpe was reassigned to the Benefits position, she

filled the same position as Ms. Hill.  PX 5 (Petty Depo.) at 30 (explaining that she had two

people in the benefits position after Ms. Sharpe's transfer).  The fact that someone else had been

promoted to the position raises significant doubts about whether the Defendant's asserted reason

for transferring Ms. Sharpe is true.

        Additionally, there is evidence that Ms. Sharpe was not even minimally qualified for the

HR position to which she was transferred.  PX 24 (Aff. of Trina Petty) at 3.   Ms. Petty confirmed

that, "prior to [Ms. Sharpe's] directed reassignment [Ms. Petty] raised some concerns that she

was not qualified for the position of Human Resources Specialist," and that the resume that Ms.

Sharpe provided her with "did not reflect any qualifying work experience." *Id.*; *see also* PX 5

(Petty Depo.) at 51-52. In light of the fact that a different employee had recently been promoted

to Human Resources Specialist and Ms. Sharpe was unable to perform the duties of the new

position without extensive and costly training, a reasonable jury could find that the Defendant's

asserted reasons for transferring Ms. Sharpe are false.

6.    *Whether Ms. Sharpe had enough work to do in the OC to justify a paralegal position.*

The Defendant has asserted that Ms. Sharpe was given a directed transfer because there

was not enough work in the Counsel's Office for a person to occupy a paralegal position. PX 3

(Gibson Depo.) at 3; Def.'s Motion for Summary Judgment at 3. It was Mr. Gibson who

informed Ms. Black that Ms. Sharpe did not have enough work to do and that her position could

be considered surplus. PX 3 (Gibson Depo.) at 76, 81. However, the same month that Ms.

Sharpe received the letter directing her transfer to HR because there was allegedly not enough

work for her to do, Ms. Fewell, the Legal Assistant in the OC, received approval from Ms. Black

to begin a paralegal certification program on September 8, 2004. PX 18; *But see* PX. 8 (Fewell

Depo.) at 10-12.

Furthermore, Ms. Sharpe's testimony contradicts Defendant's claims that she did not have

sufficient work to do as a paralegal to justify a full-time position. Ms. Sharpe testified that she

had plenty of work to keep her busy each day while she worked in the OC. PX 2 (Sharpe Depo.)

at 26-27; PX 1 (Sharpe Decl.) at ¶¶2-4; *but see* PX 3 (Gibson Depo.) at 52-53. Ms. Sharpe stated

in her deposition that she worked a full 40 hours per week in the Counsel's Office. PX 2 (Sharpe

Depo.) at 27. According to the plaintiff, when she left the OC, she had open FOIA matters,

research assignments, and a backlog of EEO cases to summarize and index.[2] PX 1 (Sharpe

Decl.) at ¶ 4; *accord* PX 2 (Sharpe Depo.) at 28; *but see* PX 22 (Aff. of Fred Gibson). Ms.

Sharpe also states that despite the decrease in FOIA requests in the OC, her work in this area did

not decrease because as she became more experienced processing these requests, her

involvement in the substantive work for these requests actually increased. PX 1 (Sharpe Decl.) at

¶ 2.

Indeed, after Ms. Sharpe left the OC, Chris Geiseler, the attorney she worked with on the

FOIA requests, called seeking Ms. Sharpe's help on a new FOIA project, and Ms. Sharpe's

supervisor had to let him know she could not handle this project. PX 1 (Sharpe Decl.) at ¶ 4.

The fact that Mr. Gieseler came to Ms. Sharpe for help after she left the OC contradicts the

defendant's assertion that Ms. Sharpe did not have enough work to do and that "Plaintiff's

ongoing assignments could easily be absorbed by the office's Legal Technician and the Associate

Counsel responsible for information law issues, Christian Gieseler." Def.'s Motion for Summary

Judgment at 18.

Notably, during the same time the defendant asserts that the workload in the OC was

decreasing and Ms. Sharpe did not have enough work, Mr. Gibson justified extending Ms.

Vosburg's position based on the projection that the "work loads of [the OC] will *increase* over

the next several years, as a consequence of the restructuring of the OIG and conditions of the

---

[2]In fact, Ms. Sharpe was never told that there was any concern about her workload before
July or August of 2004, when Mr. Gibson threatened that Ms. Sharpe could lose her job if she
did not take the HR Benefits position. PX. 1 (Sharpe Decl.) at ¶¶ 5-6; *but see* PX 3 (Gibson
Depo.) at 83-85.

banking industry." PX 11 (emphasis added). This was confirmed by Ms. Black, who stated that in 2004, when Ms. Vosburg was converted to a permanent position, there was "ample work for a permanent position." PX 4 (Black Depo.) at 80; *but see* PX 4 (Black Depo.) at 30-32, PX 3 (Gibson Depo.) at 54-56, 92. If this was true, Ms. Sharpe's workload would also increase because it is the job of a paralegal to, "provide assistance, as necessary, to members of the legal staff in handling OIG legal matters." PX 36 (Position Description- Paralegal Specialist)

7.      *Whether the workload of the OC was decreasing during the time frame in dispute.*

        During the same time that the defendant asserts there was not enough work to keep Ms. Sharpe fully employed at the OC and that the OIG was downsizing, it justified adding a position due to the increasing workload of the same small office. Mr. Gibson's justification for the extension of Ms. Vosburg's term appointment in 2002 was that, the "workload of our office will *increase* over the next several years, as a consequence of the restructuring of the OIG and conditions in the banking industry," PX 11 (emphasis added). Additionally, when Ms. Vosburg was converted to a permanent position in 2004, it was based on the justification that there was "ample work for a permanent position." PX 4 (Black Depo.) at 80. To counter this inconsistency, the defendant asserts that "in general, only the work in the areas of Advice and Counseling and Litigation increased." Def.'s Motion for Summary Judgment at 22; *see also* PX 3 (Gibson Depo.) at 59. However, an examination of Defendant's own exhibits show this is simply not the case for the 2000-2004 time period at issue during this case. The record shows that contrary to the FDIC's assertion, these matters remained relatively constant over time. During the time frame in question, the Counsel's Office litigated or monitored the following number of

matters:

April 1, 2000-September 30, 2000:  21 matters (DX 12(c) at 13),

October 1, 2001- March 31, 2002: 16 matters (DX 12(d) at 24),

April 1, 2002-September 30, 2002: 23 matters (DX 12(e) at 26),

October 1, 2002-March 31, 2003: 23 matters. (*Id.* at 28),

April 1, 2003- September 30, 2003: 24 matters (*Id.* at 30),

October 1, 2003- March 31, 2004: 22 matters (DX 12(f) at 32),

April 1, 2004- September 30, 2004: 24 matters ( DX 12(g) at 34)

October 1, 2004- March 31, 2005, 22 matters (DX 12(h) at 36).

Indeed, in April 2002 when Mr. Gibson wrote the memorandum justifying Ms. Vosburg's term extension by claiming that the OC's work was increasing, the October 2001-March 2002 reporting period just prior to his memorandum shows that the OC was involved in litigating and monitoring the smallest number of cases in the 2000-2005 period. *See* DX 12(d) at 24.  Since the record contradicts the justifications given by the employer for their actions, there is clearly an issue of material fact that must be decided by a jury.

8.    *Whether the Defendant followed the FDIC's stated policies when it transferred Ms. Sharpe through a directed reassignment.*

There is an issue of material fact regarding whether the defendant followed its own procedures when it directed Ms. Sharpe's transfer to the HR department.  Ms. Sharpe received a directed reassignment to the Human Resources Specialist (Benefits) position, even though she was not qualified for the position.  PX 24 (Aff. of Trina Petty); PX 5 (Petty Depo.) at 51-52.  In fact, Trina Petty, the Human Resources Director, acknowledged that if Ms. Sharpe had competed

for the position, she would not have qualified for the job and would not even have made it to the panel. PX 5 (Petty Depo.) at 51-52.  Because Ms. Sharpe was not qualified for the HR position, she should not have been transferred to the position using an "In-Service Placement."  PX 25 (In-Service Placement Provisions).  The use of the "In-Service Placement" for Ms. Sharpe's directed reassignment was contrary to the regulations of the FDIC.  *Id*.  The proper method for recruitment for an In-Service Placement is the use of a Solicitation of Interest (SOI).  *Id*.  This is a voluntary method of recruitment used when an employee wishes to transfer to a position for his or her own personal development but does not meet the minimum qualifications.  PX 5 (Petty Depo.) at 79.  Ms. Sharpe made it clear that she did not wish to be transferred to the HR department.  PX 42.

Additionally, according to the regulations of the FDIC, and employee can only be reassigned through an In-Service Placement if the, "applicant's background include[s] related experience that provide[s] the knowledge, skills, and abilities necessary for successful job performance.'  PX 25 (In-Service Placement Provisions)  However, Ms. Sharpe did not have the skills required for the position of Human Resources Specialist.  *See* PX 42; PX 5 (Petty Depo.) at 71; PX 22 (Aff. of Fred Gibson) at 3; PX 24 (Aff. of Trina Petty); PX 23 (Aff. of Rex Simmons) at 2-3 ("I am not aware of any relationship these [HR] duties and responsibilities have to the Complainant's prior education, training, and work experience...Her education would not have qualified her for the CG-11 or anything higher in human resources"); *compare* PX 39 (Position Description for Human Resources Specialist Position) *with* PX 2 (Sharpe Depo.) at 25-26.   This is additional evidence that the In-Service Placement was inappropriately used to effect Ms. Sharpe's involuntary transfer.  Ms. Sharpe's reassignment to a position for which she was not qualified was also contrary to the FDIC's stated use for directed reassignments.  Ms. Petty

11

testified that directed reassignments are used when a person's skills are needed in another division and it would be convenient for the FDIC if the person is transferred. PX 5 (Petty Depo.) at 68, 77, 80, 117. Ms. Sharpe's reassignment was abnormal because she did not have any of the required skills for the Benefits position. *Id.* at 71, 78, 80.

8.      *Whether the Defendant failed to follow FDIC procedures when it hired Ms. Vosburg as a permanent employee of the OC.*

There is also an issue of material fact regarding whether the defendant followed its own procedures when permanently hiring Ms. Vosburg in November of 2004. The record reflects that Ms. Vosburg was converted from a contract position to a permanent position without an interview and despite the fact she was the only candidate for the position. PX 3 (Gibson Depo.) at 43, 124-125. This occurred even though the FDIC's own guidelines require such a conversion to be made through a competitive application process. PX 5 (Petty Depo.) at 165-166. Mr. Gibson admits that he did not make a written request for Ms. Vosburg's conversion. PX 3 (Gibson Depo.*)* at 163. This is a further violation of the defendant's own HR policies, which require that written documentation me made from management for these types of personnel decisions. *See* PX 1 (Sharpe Decl.) at ¶24.

9.      *Whether Plaintiff was harmed by her directed reassignment to the HR department.*

The evidence demonstrates that the directed reassignment required Ms. Sharpe to take on significantly different responsibilities and duties, and that as a result of her directed reassignment, the terms and conditions of her employment were appreciably altered. Ms. Sharpe did not wish to leave the paralegal field. PX 20 at 2; PX 34 at 4 ("I felt harassed and forced to accept the reassignment to the ruination of my career in paralegal work and destruction of my changes for advancement and personal fulfillment.") Because of her interest in the legal field she

12

pursued a B.S. in Paralegal Studies. PX 20 at 1. She had also worked as a Legal Technician before she became a paralegal. While she had the educational background to perform her job as a paralegal, she had to attend 35 separate courses just to attain the knowledge and skills to perform her new job. *Id.* at 4; PX 40 (OIG Training and Professional Development System); PX 23 (Aff. of Rex Simmons) ("We have spent a lot of time in training the Complainant to get her up to speed in the position [of Human Resources Specialist.]")

Because Ms. Sharpe was forced to take a directed reassignment to the Human Resources Specialist position, she is out of her chosen career field and is pursuing a career that she has no interest in. PX 20 (Aff. of Stacey Sharpe) at 4. The forced transfer was devastating to Ms. Sharpe, who was aware that she was not wanted in the HR department because of her lack of qualifications. PX 1 (Sharpe Declaration) at 7. Learning the skills necessary for the HR position was extremely difficult for Ms. Sharpe; she was forced to become an expert in a highly specialized area of benefits that had no relation to her previous work experience or education. *Id.* Furthermore, despite the Defendant's claims that Ms. Sharpe had previously expressed interest in personnel work (Def.'s Motion for Summary Judgment at 9), Ms. Sharpe made it perfectly clear to her employer that she had no interest whatsoever in a career in Benefits. PX 42.

Ms. Sharpe had to attend a structured training program in order to accomplish the most basic of tasks in her new job. PX 1 (Sharpe Decl.) at 7. This extensive training lasted at least a year and was difficult for Ms. Sharpe to complete because she had to put so much energy into something she had no interest in. *Id.*, *see generally* PX 20. Furthermore, Ms. Sharpe was pregnant at the time of the training, and the strain of her schedule and the requirements of her new position took a toll on Ms. Sharpe and her family. PX 1 (Sharpe Decl.) at 7. Even after her training, Ms. Sharpe was not able to do any work on her own because her training classes only

taught her about federal benefits, not FDIC benefits. *Id.* Finally, while Ms. Sharpe had the potential to be promoted in her new position, the transfer robbed her of any chance to advance in her chosen career path. Despite this evidence, the defendant asserts that Ms. Sharpe did not suffer any harm when she was transferred to the HR position. *See e.g.* Def.'s Motion for Summary Judgment at 2. This dispute between the plaintiff and the defendants centers on a material issue in the case (i.e. whether there was an adverse action) and therefore summary judgment is inappropriate in this circumstance.

10.     *Whether African-American employees in the OIG Headquarters were disproportionately terminated and reassigned.*

During the Reduction on Forces (RIFs) implemented between 2002 and 2005 at OIG Headquarters, while Ms. Black was Deputy Inspector General, the only employees who were subject to RIFs were African-American. PX 4 (Black Depo.) at 45, 57, 62-63; PX 9 (Mitchell Declaration) at ¶¶ 2-3. When all secretary positions were abolished, two African-American Employees were terminated and three others were forced into retirement. PX 9 (Mitchell Declaration) at ¶¶ 2-3. Aside from being subject to RIFs, African American employees were the only employees at the OIG that were forced to accept directed reassignments. *Id.* at 60, 63-64 (indicating that one African-American employee was moved from the Office of Investigation to the Office of Audit, and the other was moved from the Counsel's Office). Trina Petty testified that the only person other than Ms. Sharpe who was subject to a directed reassignment at Headquarters during her seven years of employment with the FDIC was Annette Chandler, an African-American. PX 5 (Petty Depo.) at 73-74, 77; *see also* PX 10 (Chandler Decl.) at ¶¶ 2-3, 6 (stating that Patricia Black directed her reassignment in 2004 because she was African-American.)

14

### III.    Specific Responses to "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue."

Most of the statements listed in "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue" do not address these material questions, but merely mention background information or restate the claims of defense witnesses. To the extent that defendant's statements touch on the material facts in this case, there is ample evidence to dispute those.

**Statement No. 4:**    There is no specific educational requirement for the position of Paralegal. **Response: In dispute**. The defendant fails to support this assertion with any documentation. The Position Description for the Paralegal Specialist position does not discuss whether or not there was an educational requirement. DX 6 (Position Description- Paralegal Specialist) Furthermore, the plaintiff disputes that no educational requirement is necessary to accomplish the position of paralegal as it is described in the position description requires a paralegal to have: (1) knowledge of policies, practices and regulations of the OIG and FDIC, (2) the ability to identify factual and legal issues and relevant evidence and draft summaries of cases, (3) knowledge of and experience in working with the Inspector General Act, FOIA, the Privacy act, the Right to Financial Privacy Act, and the False Claims Act, (4) knowledge of and experience in legal research and the ability to interpret facts, and (5) knowledge of and the ability to use the law library, LEXIS, and Westlaw. *Id.* With all of these requirements, plaintiff disputes that someone without a legal education or background could carry out the responsibilities of a Paralegal Specialist at the OC. Furthermore, Ms. Sharpe, who was selected for this position after working as a Legal Technician, *did* have a related educational background, as she attended two semesters of law school at the University of the District of Columbia (PX 2 at 6-7) and got her B.S. in

15

Paralegal Studies.  PX 20 at 1.

**Statement No. 5:**     In May 2000, approximately six weeks after promoting Plaintiff to a grade 11, Counsel to the Inspector General Patricia M. Black hired Adriana Rojas Vosburg, a Hispanic law student, as a law clerk.

**Response: In dispute.** Plaintiff disputes that Patricia M. Black was the person who hired

Adriana Vosburg to the position as a law clerk in May of 2000.  Ms. Vosburg herself testified

that she was hired by Fred Gibson for this position.  PX 6 (Vosburg Depo.) at 8, 15.

Furthermore, Plaintiff objects to the characterization of Ms. Vosburg as a "Hispanic" law

student.  Ms. Vosburg identified herself as white on a human resources personnel form.  PX 6

(Vosburg Depo.) at 5.  Additionally, she speaks with no accent.  PX 3 (Gibson Depo.) at 30.

**Statement No. 9:**     Ms. Vosburg was converted from a term excepted service employee to a permanent excepted service employee in July 2004, and has been promoted through to grade 14 as an FDIC lawyer.

**Response: In dispute.**  According to Ms. Vosburg, her first permanent position with the

defendant was the GS-13 position that was announced in November 2004, just two weeks after

Ms. Sharpe's forced transfer out of the OC.  PX 6 (Vosburg Depo.) at 60; *See also* DX 8e

(Personnel Form for Ms. Vosburg which promotes her from a GS-12 to a GS-13); PX 5 (Petty

Depo.) at 154-55, 159.  Ms. Petty, the Director of Human Resources, also testifies that Ms.

Vosburg's first permanent position with the OC was the GS-13 position which was approved in

November of 2004.  PX 5 (Petty Depo.) at 154-155, 159.

**Statement No. 12:**     Plaintiff was hired by the Office of Counsel in 1998.  At that time, the Office of Inspector General was comprised of approximately 230 employees.

**Response: Non material.**   While the size of the OC is relevant to this case, the size of the OIG

as a whole is immaterial because it reveals nothing about whether Ms. Sharpe was moved out of

the OC to make room for Ms. Vosburg.  The record reveals that despite claims by the defendant

to the contrary, the Counsel's Office went from having an authorized number of six slots in 2004

to an authorized number of five slots in 2005.  *See* PX 35 (Staffing Table by Organization); PX 5

(Petty Depo.) at 114-15; *accord* DX 16 (Petty Decl.)  Plaintiff contends that given this restriction

on the "core" number of people allowed to work in the OC in 2005, Ms. Vosburg could not have

been brought on as a permanent employee during that year unless someone else in the OC was

transferred out of the unit.  PX 2 (Sharpe Depo.) at 48; PX 5 (Petty Depo.) at 114, 121, 123; *see*

*also* PX 7 (Gieseler Depo.) at 47-48.  This is one of the bases for Plaintiff's contention that Ms.

Sharpe's directed reassignment in 2004 made it possible for Mr. Gibson to hire Ms. Vosburg as a

permanent employee.  PX 5 (Petty Depo.) at 114.


**Statement No. 13.**    In 1998, there was a significant amount of Paralegal work because the
Office of Counsel was processing a large backlog of FOIA and discovery
work remaining from the banking crisis of the early 1990's

**Response: In dispute.**  Plaintiff disputes that the amount of work for a paralegal in the OC in

2004 was any less than it was in 1998.  Plaintiff also disputes the contention that the amount of

paralegal work at the OC depended on the number of FOIA and discovery requests.  Ms. Sharpe's

position required that she provide assistance, as necessary, to members of the legal staff in

handling OIG legal matters.   PX 36 (Position Description- Paralegal Specialist)  In her position

as a Paralegal, Ms. Sharpe did more than process FOIA requests, she also conducted legal

research, drafted memoranda, prepared briefs on EEO related cases, and commented on policies.

PX 33.  Furthermore, despite the fact that there were fewer FOIA requests in 2004 than there had

been when Ms. Sharpe began at the OC, Ms. Sharpe had open FOIAs, research assignments, and

a backlog of EEO cases to summarize and index at the time of her directed transfer to HR.  PX 1

(Sharpe Decl.) at ¶ 4; *accord* PX 2 (Sharpe Depo.) at 28; *But see* PX 22 (Aff. of Fred Gibson).

Additionally, despite the decrease in FOIA requests in the OC, her work in this area did not

decrease because as she became more experienced processing these requests, her involvement in

the substantive work for these requests actually increased.  PX 1 (Sharpe Decl.) at ¶ 2.   Finally,

Mr. Gibson justified extending Ms. Vosburg's position based on the projection that, " the work

loads of [the OC] will *increase* over the next several years, as a consequence of the restructuring

of the OIG and conditions of the banking industry." PX 11 (Emphasis added).  Since her job was

to support the attorneys in their work in the OC, Ms. Sharpe's workload would have grown along

with the work load of the OC.


**Statement No. 14.**    In the first year of Plaintiff's employment as a Paralegal, April 1998 to
March 1000, OIG Counsel's Office responded to 48 FOIA Requests and/
or appeals.

**Response: Non material**.  The number of FOIA requests is immaterial in this case because

Plaintiff disputes that the amount of work for a paralegal at the OC depended on the amount of

FOIA requests.   *See* Response to Statement No. 13.


**Statement No. 15.**    In the second year of Plaintiff's employment, Aprill 1999 through March
2000, OIG Counsel's Office responded to 39 FOIA Requests/ and or
appeals.

**Response. Non material**.  *See* Response to Statement No. 14


**Statement No. 16.**    In the third year of Plaintiff's employment, April 2000 through March

18

2001, the number of FOIA requests and/ or appeals declined to 31.

**Response: Non material**.   *See* Response to Statement No. 14.


**Statement No. 17.**    Between April 2001 and March 2002, the number of FOIA matters processed by the OIG Counsel's Office dropped to 11.

**Response: Non material**.   *See* Response to Statement No. 14


**Statement No. 18.**    The next year of Plaintiff's employment, April 2002 through March 2003, saw a slight increase, to 15, in the number of FOIA matters processed by the OIG Counsel's Office.

**Response: Non material**.   *See* Response to Statement No. 14


**Statement No. 19.**    The OIG Counsel's Office processed 10 FOIA matters in the year from April 2003 through March 2004.

**Response: Non material**.   *See* Response to Statement No. 14


**Statement No. 20.**    Between April and September 2004, 7 FOIA matters were processed by the OIG Counsel's Office.

**Response: Non material**.   *See* Response to Statement No. 14


**Statement No. 21.**    During the 12 month period following Plaintiff's transfer to Human Resources, OIG Counsel's Office responded to 14 FOIA matters, compared to the 48 FOIA matters responded to during Plaintiff's first year of employment as a paralegal in the OIG Counsel's Office.

**Response: Non material**.   *See* Response to Statement No. 14


**Statement No. 22:** By fall of 2004, the OIG workforce had declined to approximately 168

employees due to both attrition and Agency downsizing efforts.

**Response: Non material**. As discussed in Response to Statement No. 12, it is the size of the OC which is material. The size of the OIG is irrelevant.

**Statement No. 23.**    The backlog of FOIA requests that existed at the time of Plaintiff's hiring in 1998 had been resolved and current FOIA and litigation discovery requests had decreased.

**Response: Non material**. *See* Response to Statement No. 14

**Statement No. 24:**    After the elimination of the FOIA backlog and reduction in FOIA and litigation discovery requests, Plaintiff was significantly underemployed as a Paralegal in the Counsel's Office

**Response: In dispute.** There is significant evidence in the record to dispute the claim that Ms. Sharpe was underemployed in the OC. First, the same month that Ms. Sharpe received the letter directing her transfer to HR because there was allegedly not enough work for her to do, Ms. Fewell, the Legal Assistant in the OC, received approval from Ms. Black to begin a paralegal certification program on September 8, 2004. PX 18; *But see* PX. 8 (Fewell Depo.) at 10-12. The fact that the OC was training someone else in the department tp do paralegal-type work raises significant doubt that there was not sufficient work for a paralegal to do in the OC.

Second, Ms. Sharpe's testified that she had plenty of work to keep her busy each day while she worked in the OC. PX 2 (Sharpe Depo.) at 26, 27; PX 1 (Sharpe Decl.) at ¶¶ 2-4. Ms. Sharpe stated in her deposition that she worked a full 40 hours per week in the Counsel's Office and when she left the OC, she had open FOIAs, research assignments, and a backlog of EEO cases to summarize and index. PX 1 (Sharpe Decl.) at ¶ 4; *accord* PX 2 (Sharpe Depo.) at 27-28; *but see* PX 22 (Aff. of Fred Gibson). Ms. Sharpe also states that despite the decrease in FOIA

requests in the OC, her work in this area did not decrease because as she became more experienced processing these requests, her involvement in the substantive work for these requests actually increased.  PX 1 (Sharpe Decl.) at ¶ 2.

Third, after Ms. Sharpe left the OC, Chris Geiseler, the attorney she worked with on the FOIA requests, called seeking Ms. Sharpe's help on a new FOIA project, and Ms. Sharpe's supervisor had to let him know she could not handle this project.  PX 1 (Sharpe Decl.) at ¶ 4.  The fact that Mr. Gieseler came to Ms. Sharpe for help after she left the OC contradicts the defendant's assertion that Ms. Sharpe did not have enough work to do and that "Plaintiff's ongoing assignments could easily be absorbed by the office's Legal Technician and the Associate Counsel responsible for information law issues, Christian Gieseler."  Def.'s Motion for Summary Judgment at 18.

Finally, at the same time that the defendant claimed the work of the OC was decreasing and Ms. Sharpe did not have sufficient work to justify a paralegal position, Mr. Gibson justified extending Ms. Vosburg's position based on the projection that, "the work loads of [the OC] will *increase* over the next several years, as a consequence of the restructuring of the OIG and conditions of the banking industry." PX 11 (Emphasis added).  This was confirmed by Ms. Black, who stated that in 2004, when Ms. Vosburg was converted to a permanent position, there was "ample work for a permanent position." PX 4 (Black Depo.) at 80.  If the attorneys in the OC's work was projected to increase,  Ms. Sharpe's workload would also increase because it is the job of a paralegal to "provide assistance, as necessary, to members of the legal staff in handling OIG legal matters." PX 36 (Position Description- Paralegal Specialist).

**Statement No. 26:**    The Counsel to the Inspector General determined that the position of a full-time Paralegal was no longer required as there was not enough work to justify the position in his Office and that the Plaintiff's ongoing assignments could be absorbed by the Office's Legal Technician and Associate Counsel responsible for information law issues, Christian Gieseler.

**Response: In dispute.** Plaintiff disputes that the Office of Counsel truly determined that a full time paralegal was no longer required in the OC. While this is the reason the defendant has given for transferring Ms. Sharpe out of the OC, Plaintiff contends that this is pretext for the true motivation behind Ms. Sharpe's forced reassignment is discrimination. First, defendant's assertion that Ms. Sharpe was not sufficiently employed in the OC conflicts with Ms. Sharpe's testimony that she spent 40 hours a week doing paralegal work such as processing FOIA requests, factual and legal research, and summarizing and indexing EEO cases, and that she had a backlog of work when she left the OC. PX 1 (Sharpe Decl.) at ¶ 2- 4 (stating that even when she was transferred she had outstanding work to complete); PX 2 (Sharpe Depo.) at 26, 27; *accord* PX 2 (Sharpe Depo.) at 28; *but see* PX. 3 (Gibson Depo.) at 52-53; PX 22 (Aff. of Fred Gibson). Indeed, even after Ms. Sharpe left the OC, Chris Geiseler, the attorney she worked with on the FOIA requests, called seeking Ms. Sharpe's help on a new FOIA project, but Ms. Sharpe's supervisor would not let her work on this project. PX 1 (Sharpe Decl.) at ¶ 4.

There is additional evidence in that support the contention that the FDIC's asserted reason for transferring Ms. Sharpe is false. Indeed, the defendant has repeatedly provided conflicting statements about the workload of the OC during the time frame in dispute. The defendant has indicated that the work of the OC and the OIG was both declining and increasing during the same time frame. Indeed, during the same time that the defendant asserts there was not enough work to keep Ms. Sharpe fully employed at the OC and that the OIG was downsizing, it justified

adding a position due to the increasing workload of the same small office.  Mr. Gibson's

justification for the extension of Ms. Vosburg's term appointment in 2002 was that, the

"workload of our office will *increase* over the next several years, as a consequence of the

restructuring of the OIG and conditions in the banking industry," PX 11 (emphasis added).  If

this is true, then Ms. Sharpe's workload would also increase as a consequence of the

restructuring of the OIG and conditions in the banking industries, as it was the job of the

paralegal to "provide assistance, as necessary, to members of the legal staff in handling OIG legal

matters." PX 36 (Position Description- Paralegal Specialist).

Furthermore, when Ms. Vosburg was converted to a permanent position in 2004, it was

based on the justification that there was "ample work for a permanent position." PX 4 (Black

Depo.) at 80.  To counter this inconsistency, the Defendant later asserted that, "in general, only

the work in the areas of Advice and Counseling and Litigation increased." Def.'s Motion for

Summary Judgment at 22; *see also* PX 3 (Gibson Depo.) at 59.  However, upon review of

defendant's own exhibits, a reasonable fact-finder could conclude this is simply not true for the

2000-2004 time period at issue during this case.  *See* extracts from OIG reports to Congress from

April 1998 through March of 2004, DX 12(c) at 13; DX 12(d) at 24; DX 12(e) at 26; *Id.* at 28; *Id.*

at 30; DX 12(f) at 32 (listing the number of matters the OC actively litigated or monitored

through the Counsel's Office from 2000-2005).  Indeed, in April 2002 when Mr. Gibson wrote

the memorandum justifying Ms. Vosburg's term extension by claiming that the OC's work was

increasing, the October 2001-March 2002 reporting period just prior to his memorandum shows

that the OC was involved in litigating and monitoring the smallest number of cases in the 2000-

2005 period.  *See* DX 12(d) at 24.  This was confirmed by Ms. Black, who testified during her

deposition that the OIG was in downsizing mode from 2002 through 2005, the same time frame

23

that Ms. Vosburg's term appointment was extended based on representations of an increasing

work load, and then hired permanently for the same reason. PX 4 (Petty Depo.) at 7; PX 11.

Given the conflicting evidence in the record about the workload of the OC at the time in

question, there is a clear dispute between plaintiff and defendant as to whether the true reason

why Ms. Sharpe was forced to take the HR position was that Ms. Sharpe did not have enough

work to keep her busy as a Paralegal Specialist.


**Statement No. 27:**    At the same time, the OIG Human Resources Branch (HRB) had been
seeking an HR specialist to perform the employee benefits duties because
the OIG's former benefits specialist had transferred, and despite
advertisement, the OIG had been unable to find an acceptable candidate to
fill this position

**Response: In dispute.**  While the record reflects that HR was looking for a person to fill the HR

employee benefits position, there is a dispute over whether HR found a suitable candidate prior

to Ms. Sharpe's directed reassignment.  The Plaintiff has presented evidence that by the time she

was transferred out of the OC, HR had already advertised a Human Resources Specialist

(Benefits) position and promoted another individual, Gloria Hill, to this position.  PX 1 (Sharpe

Decl.) at ¶ 26; PX 5 (Petty Depo.) at 23-24.  The record reflects that unlike Ms. Sharpe, Ms. Hill

had the requisite experience for this position, as she had been performing the benefits position for

some time in the HR Branch, had training in benefits, and had been working in the HR

Department for approximately 5 years.  *Id.*; PX 5 (Petty Depo.) at 30.   Therefore, when Ms.

Sharpe was reassigned to the Benefits position, she filled the same position as Ms. Hill. PX 5

(Petty Depo.) at 30 (explaining that she had two people in the benefits position after Ms.

Sharpe's transfer).   The fact that someone else had been promoted to the position raises an issue

of material fact about whether HR still needed a person to fill the employee benefits position at

the time of Ms. Sharpe's transfer. Moreover, Ms. Petty confirmed that, "prior to [Ms. Sharpe's]

directed reassignment [Ms. Petty] raised some concerns that she was not qualified for the

position of Human Resources Specialist," and that the resume that Ms. Sharpe provided her with,

"did not reflect any qualifying work experience." *Id.*; *see also* PX 5 (Petty Depo.) at 51-52.

Since Ms. Sharpe was not even minimally qualified for the HR position to which she was

transferred makes the claim that Ms. Sharpe was transferred to HR because they needed a

"suitable" candidate to fill the position even more unlikely. PX 24 (Aff. of Trina Petty) at 3.


**Statement No. 28:**    Plaintiff had previously expressed an interest in personnel work, had taken
                          government training in personnel law and was soon to be enrolled in a
                          graduate degree program concentrating on human resources management


**Response: In dispute.**    Defendant mis-characterizes Ms. Sharpe's "interest" in personnel work.

Ms. Sharpe testified she did not want to leave the paralegal field. PX 20 at 2; PX 31 at 4. The

record reflects that Ms. Sharpe wanted to gain more skills and knowledge in the legal field and

tried to get her supervisor, Mr. Gibson, to support her career development in the filed. Mr.

Gibson refused Ms. Sharpe's request that she be permitted to take graduate courses in legal

studies at Marymount University. PX 1 at ¶ 11. He also refused her requests to become more

involved in litigation work in the OC. *Id.* at ¶ 10.

In fact, Ms. Sharpe only expressed interest in employee relations work after Mr. Gibson

pressured her to take a job in HR and threatened her by telling her that her job as a paralegal was

surplus, and she might be terminated if she didn't move to the HR department. PX 3 (Gibson

Decl.) at 94; *see also* PX 42. Ms. Sharpe was clear with both Mr. Gibson and Ms. Black that she

had no interest in working in employee benefits and that she had been told by Ms. Petty that she

was not qualified for the position.  PX 42; PX 5 (Petty Depo.) 37 at ¶ 17; *accord* PX 3 (Gibson Depo.) at 89.  Ms. Sharpe only showed interest transferring to a position in employee relations because she feared she would be fired if she did not accept a position in HR and she believed that her skill set more closely matched a position in employee relations.  PX 42; *see generally* PX 20; PX 34.  Furthermore, Ms. Sharpe pursued an education in HR *after* she was involuntarily transferred to a position for which she was unqualified and had no previous experience or skills.  PX 20 at 4; *see also* PX 24 (Aff. of Trina Petty) at 4; PX 5 (Petty Depo.) at 51-52; PX 39.

Not only does the defendant mis-characterize the plaintiff's interests, but it fails to distinguish between different types of "personnel work."  By stating that, "Plaintiff had expressed an interest in working in Human Resources or Personnel, albeit a different sub-specialty" (Def.'s Motion for Summary Judgment at 22), the defendant attempts to create an impression that there is no significant difference between employee benefits and employee relations.  However, employee relations and employee benefits require a completely different set of skills and experience.  Employee benefits is a highly specialized field for which Ms. Sharpe had no qualifications.  *See* PX 42; PX 5 (Petty Depo.) at 71; PX 22 (Aff. of Fred Gibson) at 3; PX 24 (Aff. of Trina Petty); PX 23 (Aff. of Rex Simmons at 2-3.  Ms. Petty confirmed that "prior to [Ms. Sharpe's] directed reassignment [Ms. Petty] raised some concerns that she was not qualified for the position of Human Resources Specialist," and that the resume that Ms. Sharpe provided her with "did not reflect *any* qualifying work experience," PX 24 (Aff. of Trina Petty) at 3; *see also* PX 5 (Petty Depo.) at 51-52.

**Statement No. 30:**    In these conversations, Plaintiff indicated that she would be interested in transferring to HRB if she could be assigned to work on employee

26

relations matters

**Response: In dispute.** *See* response to Statement No. 28.

**Statement No. 31:**    Plaintiff indicated her interest in transferring to HRB if she could be
assigned to work on employee relations matters in en email message to the
Counsel to the Inspector General and OIG HR Director on August 24,
2004

**Response: In dispute.** *See* Response to Statement No. 28.

**Statement No. 33:**    After a review of the United States Office of Personnel Management's
Internal placement provisions, the Deputy IG prepared a letter to the
Plaintiff transferring Plaintiff from her Grade 11 Paralegal position to her
grade 11 HR Specialist position in HRB.

**Response: In dispute.** Plaintiff disputes that defendant reviewed the Personnel Management's

Internal Placement provisions before it transferred Plaintiff to the HR Specialist position because

Defendant did not comply with the In-Service Placement Provisions. Because Ms. Sharpe was

not qualified for the HR position, she could not have been transferred to the position using an

"In-Service Placement." PX 25 (In-Service Placement Provisions). The use of the "In-Service

Placement" for Ms. Sharpe's directed reassignment was contrary to the regulations of the FDIC.

*Id*. The proper method for recruitment for an In-Service Placement is the use of a Solicitation of

Interest (SOI). *Id*. This is a voluntary method of recruitment used when an employee wishes to

transfer to a position for his or her own personal development but does not meet the minimum

qualifications. PX 5 (Petty Depo.) at 79. Ms. Sharpe made it clear that she did not wish to be

transferred to the HR department. PX 42.

Additionally, according to the regulations of the FDIC, and employee can only be

reassigned through an In-Service Placement if the, "applicant's background include[s] related experience that provide[s] the knowledge, skills, and abilities necessary for successful job performance.' PX 25 (In-Service Placement Provisions). However, Ms. Sharpe did not have the skills required for the position of Human Resources Specialist. *See* PX 42; PX 5 (Petty Depo.) at 71; PX 22 (Aff. of Fred Gibson) at 3; PX 24 (Aff. of Trina Petty); PX 23 (Aff. of Rex Simmons) at 2-3 ("I am not aware of any relationship these [HR] duties and responsibilities have to the Complainant's prior education, training, and work experience...Her education would not have qualified her for the CG-11 or anything higher in human resources"); *compare* PX 37 (Position Description for Human Resources Specialist Position) *with* PX 2 (Sharpe Depo.) at 25-26. This is additional evidence that the In-Service Placement was abused to effect Ms. Sharpe's involuntary transfer. Ms. Sharpe's reassignment to a position for which she was not qualified was also contrary to the FDIC's stated use for directed reassignments. Ms. Petty testified that directed reassignments are used when a person's skills are needed in another division and it would be convenient for the FDIC if the person is transferred. PX 5 (Petty Depo.) at 68, 77, 80, 117. Ms. Sharpe's reassignment was abnormal because she did not have any of the required skills for the Benefits position. *Id.* at 71, 78, 80.

**Statement No. 35:**    Plaintiff accepted the involuntary transfer on October 1, 2004

**Response: Non material.** Plaintiff objects to the relevance of her October 1, 2004 acceptance of the HR Specialist Position. By the time Ms. Sharpe received the letter telling her she was being transferred, she had already explained to both Mr. Gibson and Ms. Black that she did not feel she was qualified to work as an HR Specialist and that she had no interest in the position. PX 42.

However, the letter Ms. Sharpe received on directing her reassignment to Ms. Sharpe stated in no

uncertain terms that, "if you decline this directed reassignment, or if you accept the offer and

subsequently fail to report, we will propose your separation under 5 CFR 752 for failure to accept

directed reassignment."   As such, Ms. Sharpe's only options were to take the position, or be

fired.  PX 44; PX 5 (Petty Depo.) at 75.  This was the only reason why plaintiff agreed to take the

position.

**Statement No. 36:**    Between May 2000 and April 2007, the Office of Inspector General paid
for Plaintiff to attend approximately 19 short courses on personnel related
topics.

**Response: Non material.** *See* Response to Statement No. 37

**Statement No. 37:**    Three months after Plaintiff's October, 2004 transfer to the HR specialist
position, beginning in January 2005, and through May 2007, the Office of
Inspector General paid the University of Maryland $12,735.26 for tuition
and textbooks for Plaintiff to pursue and receive a Master of Science of
Management degree, with a concentration in Human Resources.  Plaintiff
transferred to the U.S. Office of Personnel Management on April 28, 2007.

**Response: Non material.** The fact that Defendant paid for Ms. Sharpe to be trained in the field

of Human Resources does not support the claim that Ms. Sharpe was "interested" in personnel

work.  It was because Ms. Sharpe was not qualified for the HR position that the FDIC had to

expend thousands of dollars for her training.  PX 5 (Petty Depo.) at 85; *see also* PX 40 (OIG

Training and Professional Development System); PX 23 (Aff. of Rex Simmons) ("We have spent

a lot of time in training the Complainant to get her up to speed in the position [of Human

Resources Specialist.]").  Ms. Sharpe had to take 32 separate classes at a cost of $11, 943 to the

FDIC just to become minimally qualified for the position of Human Resources Specialist.  PX

40; PX 5 (Petty Depo.) at 85.  Ms. Sharpe had to attend a structured training program in order to

accomplish the most basic of tasks in her new job.  PX 1 (Sharpe Decl.) at 7.  This extensive

training lasted at least a year and was difficult for Ms. Sharpe to complete because she had to put

so much energy into something she had no interest in.  *Id.*  Furthermore, Ms. Sharpe was

pregnant at the time of the training, and the strain of her schedule and the requirements of her

new position took a toll on Ms. Sharpe and her family.  *Id.*  Even after her training, Ms. Sharpe

was not able to do any work on her own because her training classes only taught her about federal

benefits, not FDIC benefits.  *Id.*  Learning the skills necessary for the HR position was extremely

difficult for Ms. Sharpe; she was forced to become an expert in a highly specialized area of

benefits that had no relation to her previous work experience, interest, or education.  *Id.*

    The amount of training given to Ms. Sharpe exceeded the usual training requirements for

an individual joining the HR department as a GS-11.  PX 5 (Petty Depo.) at 87  Typically, for a

benefits job where the applicant needs a significant amount of training, the entry level for the

position is GS-5/7.  *Id.* at 41.  Ms. Petty even needed to rewrite the position description for Ms.

Sharpe's new job because Ms. Sharpe was not able to perform the duties of the position as it was

originally intended.  *Id.* at 40.  Because Ms. Sharpe was unqualified for the HR position, during

her first year with the HR department, she was unable to independently perform her duties.  PX 1

(Sharpe Decl.) at ¶¶27-29.


**Statement No. 38:**    On October 26, 2004, the FDIC announced that it would offer buyouts to a
                         substantial number of employees and conduct a Reduction in Force to
                         eliminate 500 to 600 positions by the end of 2006.

**Response: Non material**: This case centers on the actions taken within the Counsel's Office, not

30

in the OIG as a whole. The defendant does not cite any evidence regarding how any RIF or

buyout that may have taken place at the OIG affected the OC, and therefore any statement

regarding such actions in the OIG are irrelevant. Furthermore, Ms. Sharpe received her directed

reassignment on October 1, 2006. As such, if any such actions had been taken, they would not

have affected Ms. Sharpe.

**Statement No. 40:**     On October 28, 2004, the Deputy IG sent an e-mail message to OIG staff
and informed them of the OIG's initial reaction to the FDIC's announced
buyouts and reduction in force.

**Response: Non material:** *See* Response to Statement No. 38

**Statement No. 41:**     On December 17, 2004, the Deputy IG announced the OIG's buyout plan.
The plan offered employees in surplus or incumbent-only positions, and up
to 10 Office of Audit employees, opportunities to retire or leave OIG
employment with an incentive payment of 50% of the yearly salary of the
departing employee.

**Response: Non material.** *See* Response to Statement No. 38

**Statement No. 44:**     On June 8, 2005, Acting IG, Patricia M. Black, announced that the OIG
was shrinking from its authorized size of 160 employees to 133 employees
and was closing Office of Audit Field Offices in Atlanta and Chicago.

**Response: Non material.** *See* Response to Statement No.12

**Statement No. 46:**     On February 1, 2006, Plaintiff testified in her deposition that the only
evidence that she possessed to show that her involuntary transfer from a
grade 11 Paralegal position to a grade 11 HR Specialist position was
motivated by discriminatory animus was the fact that she was involuntarily

transferred.

**Response: In dispute**.  First, defendant grossly mis-characterizes the statement made by Ms.

Sharpe at her deposition.  When asked why Ms. Sharpe felt she was the subject of race

discrimination, she responded that it was because "no one else got a directed reassignment out of

that office."  PX 2 (Sharpe Depo.) at 49.  From her statement, it is apparent that Ms. Sharpe felt

she was discriminated against because she was treated differently than others in the OC, and not

simply because she was involuntarily transferred.

Furthermore, the statement to which defendant is referring was made in response to a

question that called for a legal conclusion, which Ms. Sharpe was not qualified to give.  Despite

that, Ms. Sharpe gave additional reasons for her belief that she was subject to racial

discrimination throughout the EEO process, in her affidavit and supplemental affidavit, and

through her representatives from the time she filed her original complaint through the present.

For example, Ms. Sharpe has presented evidence that (1) white employees are treated more

favorably than African-American employees in the OIG, (2) her immediate supervisor favored

his white employees over Ms. Sharpe, the only African-American employee in the OC, (3) that a

white employee became a permanent employee of the OC because work was projected to

increase, yet at the same time Ms. Sharpe was transferred out of a predominantly white office and

placed in a predominantly black office based on the justification there was not enough work for

her to perform, (4) that the circumstances of her transfer did not comport with the FDIC's Human

Resources policy, and (5) that the FDIC claims the reason for the involuntary transfer was the

need for a HR specialist in the employee benefits section, but Ms. Sharpe was not even

minimally qualified for that position and someone else was hired for that position before Ms.

Sharpe was transferred. If defendant takes the position that Ms. Sharpe has failed to allege any

other reason for her belief that she was the victim of discrimination, then there is a dispute about

the evidence that has been presented by the plaintiff that must be decided by a jury.


Respectfully submitted,



Richard L. Swick
D.C. Bar # 936930
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email: rlswick@swickandshapiro.com

Attorneys for Plaintiff