# UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## WASHINGTON FIELD OFFICE
#### 1400 L Street, N.W.
#### Washington, D.C. 20005

|  |  |  |
|---|---|---|
| STACEY K. SHARPE, | ) | |
| Complainant, | ) | EEOC No.   100-2005-0097x |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN J. GRUENBERG, | ) | Agency No.  FDICEO-050002 |
| Acting Chairman, | ) | |
| Federal Deposit Insurance Corporation, | ) | |
| Agency. | ) | |

## DECLARATION OF STACEY SHARPE

1.      My name is Stacey Sharpe.  I formerly worked as a Paralegal Specialist at the Federal Deposit Insurance Corporation (FDIC), Office of the Inspector General (OIG), Office of Counsel (OC).  Against my will I was transferred to the FDIC, OIG, Office of Management and Congressional Relations (OMCR), Human Resources Branch (HR) as a Human Resources Specialist (Benefits) in October of 2004.

2.      The OIG asserts that the reason I was forced to transfer from the OC was that there was not enough work for me to perform in the OC. However, this is not a true statement.  I worked in the OC from 1998-2004 and had enough work to perform throughout my time in the office. I worked a full 40 hour work week.  The OIG asserts that because the Freedom of Information Act (FOIA) and Privacy Act (PA) requests in the OC decreased in numbers from when I started working in the OIG and when I was forced to transfer, that this meant my work was decreasing and I did not have enough work to perform.  However, even if it is true that the OC was handling less FOIA and PA requests, I was performing equal or greater amounts of work because my involvement in the complex details of FOIA and PA requests had grown as I became more experienced working with this issue. When I started working on FOIA and PA requests, I worked on these requests under the close supervision of Chris Gieseler and performed mainly redacting work   As I gained more experience and knowledge, my contribution became more and more substantive.  Starting in around 2002, when FOIA and PA requests came in, Mr. Gieseler began to pass them to me so that I would take the first crack at them.  I would determine which offices held potentially responsive records, and I would forward the request to that office.  I also made redactions, conducted research, and drafted responses.  My responses contained an application of FOIA and PA exemptions and a rationale as to why the OIG decided to disclose or not disclose the records. By 2004, I handled the FOIA and PA requests basically on my own. Because I handled these requests on my own, the work took more of my time. I have attached my

2002-2003 performance evaluation from Mr. Gibson which notes my increased responsibility in FOIA and PA requests at Attachment A.

3.       Additionally at the OC, I handled a lot of research projects and drafted memoranda regarding various topics. I researched different issues in order to assist criminal investigators in issuing subpoenas. I researched different issues raised by auditors and criminal investigators in order to assist them in issuing audit and criminal investigative reports. I researched internal issues and corporate directives. I researched external issues (intergovernmental wide) such as telecommuting/teleworking within the federal government. I summarized and briefed EEO and MSPB cases, and any other cases that might have a bearing on OIG programs and operations. I summarized and briefed congressional legislation that might impact OIG programs and operations. I was also tasked with creating a database that included any written OIG written legal opinions.

4.       At the time of my transfer, I still had open FOIA requests, research assignments, and a backlog of written opinions that needed to be indexed and summarized. Indeed, on the day my reassignment was directed, I had two chairs filled with FOIA files I was working on. Chris Geisler, the attorney I worked with on the FOIA and PA requests, expressed concern to me about no one being available to perform the FOIA work after my reassignment. After I had been forced to transfer to HR, he even called me seeking my help on a FOIA request and I had to have my new supervisor, Trina Petty, call him and let him know I could not handle this project.

5.       Fred Gibson, Counsel to the IG, and my first-line supervisor when I worked in the OC, asserts that he discussed with me the fact that I did not have enough work to perform in the OC in 2003 to 2004. This is not correct. I did not learn that my job might be at risk until July or August 2004 when he told me that if the OIG had a Reduction in Force (RIF) my job would be considered surplus. Prior to that discussion with Mr. Gibson, neither he, nor anyone else in OIG, had ever discussed or even mentioned to me that this could be a problem. July or August 2004 was the first time Mr. Gibson told me that my job might be considered surplus, and I was surprised when he told me of this possibility.

6.       Specifically, Mr. Gibson incorrectly asserts that he discussed with me the fact that I did not have enough work to do during my performance evaluation in the early part of 2004. That is impossible because I did not receive my performance evaluation until October 13, 2004, after the decision to direct my transfer to HR had been made.

7.       As the Counsel to the IG, Mr. Gibson is the person who controls the way the work in the OC is distributed. If he believed I did not have enough work to perform, he could have assigned me more projects, but he did not. I know from staff meetings where I listened to other OC employees discuss the work they were performing that there were plenty of projects that I could have been assigned if I were not already fully employed with other work.

8.       The reason Mr. Gibson chose to get rid of my position in the OC was because I am African-American. I personally observed how Mr. Gibson treated me differently from his white employees. Mr. Gibson was supportive of the career development of the white staff in the office who worked under him, but he was not supportive of my career development, the only African-

American in a professional series grade in the OC. Every year during my performance evaluations Mr. Gibson told me I was doing a good job and there was nothing I needed to improve. He gave me the same evaluation every year I worked under him. These were always very short meetings and he never tried to help me with my career development in anyway. Additionally, although he never told me I needed to improve anything in my performance, I was always evaluated at fully successful, never at the highest rating. My highest rating from Mr. Gibson was always in the area of self-improvement because I aggressively sought out opportunities for my own development even though Mr. Gibson never offered me any such opportunities.

9.      When Mr. Gibson became the Deputy Counsel in 2000, and therefore my immediate supervisor, I noticed right away that he never seemed to have time for me. Before Mr. Gibson became my supervisor, Larry Froehlich was my supervisor. Mr. Froehlich was always responsive about my work and would get back to me about the projects I submitted for his review. My experience with Mr. Gibson was very different. Mr. Gibson would not get back to me about the projects I was working on or items I had submitted for his review.  I would always have to go back to him repeatedly to check on the status of work I submitted to him. He would apologize and say he was just too busy, but he simply never made time for me and was never interested in my work or career development.

10.     For example, during my performance evaluation in October or November of 2002, I spoke with Mr. Gibson about more projects I could get involved in, and I specifically mentioned my interest in working with Employee Relations issues. I spoke to him about this not because I felt that I did not have enough work to do in the office, but because as a Paralegal, I wanted to progress in the legal area and the next logical step would be greater involvement in litigation. At that time Mr. Gibson stated that I could work with Mike Cosgrove, a white attorney in the OC who primarily handled Employee Relations cases. Although I told Mr. Cosgrove about my interest in working on these cases, the only work I was ever given regarding EEO litigation matters was photocopying. Although Mr. Cosgrove told me that I could be involved in a case when one came up, I later learned that a new white attorney in the office, Adriana Vosburg, was assigned to work on these cases instead of me.

11.     Based on Mr. Gibson's treatment of me within the OC, I decided I needed to explore other options outside his supervision. I spoke to Mr. Gibson about two positions I was interested in--Employee Relations and Criminal Investigations-- to assist with my career development. He told me to develop a career plan. In December of 2002, I therefore took a class to be able to effectively develop this plan. In around June of 2003, I submitted this development plan to him. He never got back to me about this plan. When I asked him about my plan, he said he had misplaced it. I provided him with another copy of my plan. When we finally met to discuss my career development plan, all he said was that he would have to speak with Rex Simmons, Assistant IG for Management and Congressional Relations, because he was not sure I could target two positions within my plan. Mr. Gibson never got back to me about whether it was possible to target two positions within my plan, however, after a couple of weeks I went to Mr. Gibson again about my career development plan. During this conversation, Mr. Gibson made excuses about why I could not perform the Criminal Investigator position and was not supportive of my interest in trying to become a Criminal Investigator for the OIG. First, Mr. Gibson told me

that the FDIC had corporate investigators, of which I already knew about but was not interested. I did not understand why he spoke to me about the corporate investigator positions because my career development plan showed that I was interested in a Criminal Investigator position within the OIG. Second, he also stated that I would not meet the requirements for a Criminal Investigator position because I had to be under 37 year of age to be hired into this position. I told Mr. Gibson that I had not reached my 37th birthday and that I therefore met the age requirement. Mr. Gibson did not support me in trying to achieve the well-respected, well-paying Criminal Investigator position at the OIG, a position that is currently occupied by an overwhelming majority of whites. I could not pursue my career development plan because Mr. Gibson never approved my plan. I have provided a copy of my career development plan submitted to Mr. Gibson at Attachment B. I have also attached a copy of a vacancy annoucement showing that the OIG was hiring Criminal Investigators after the time I made my request to Mr. Gibson to approve my career development plan to become a Criminal Investigator at Attachment C.

12.      About five months later, in around December of 2003, I approached Mr. Gibson about another developmental opportunity in the legal area. I asked him if the FDIC would pay for classes in a Masters Program in Legal Studies at Marymount University. Mr. Gibson's response to me when I asked about this program was that I "was trying to take his job." That was the end of that conversation, and I never received approval to take graduate classes in legal studies.

13.      In January 2004, I approached Mr. Gibson about the possibility of going on a detail to a policy analyst position in the Division of Consumer Affairs in FDIC. However, after I submitted the paper work to Mr. Gibson for this detail, I was turned down for this position. I have attached the paper work I submitted when I requested this detail from Mr. Gibson at Attachment D.

14.      A couple of months after Mr. Gibson refused my detail, in the spring of 2004, I learned from an e-mail sent to employees that the OIG wanted people to receive training outside of their primary area. I then approached Mr. Gibson about taking 2 Human Resources classes at USDA to better be able to pursue my interest in Employee Relations work. Unlike my other requests, he approved my request to take these classes. The Human Resources Branch is the only division in the FDIC that is predominately African-American. Three out of five employees in this division are African-American, and Trina Petty, the Director of the Human Resources Branch is the only African-American Director in the OIG.

15.      In July or August of 2004, Mr. Gibson approached me to ask if I was interested in looking into a position in the Human Resource Branch in OIG. He told me that Human Resources was going through some kind of reorganization and that I should speak to Trina Petty about an opportunity in that office. When he told me about the possible position in Human Resources, he told me that it was my choice or not if I was interested in the position.

16.      I spoke with Ms. Petty about a possible position in Human Resources either that same day or within a week of my conversation with Mr. Gibson. Ms. Petty told me that I was not qualified for the position they had available. She also told me that because I had no background in Human Resources, it would be difficult for me to do well and advance. I also learned that the

4

position opening was strictly an employee benefits position, an area in which I had no
background, had no relation to my former legal work, and that I was not interested in at all. After
speaking with Ms. Petty there was no reason for me to think that this position was a good
opportunity for me.

17.     After my discussion with Ms. Petty, Mr. Gibson came to speak with me in my office
about the position.  He again told me that accepting the position was my choice, and he wanted
to know how I felt about the position. I told him I was not interested in doing benefits works and
that I did not want the position. All he said in response was okay and left my office.

18.     About a week later, Mr. Gibson called me into his office. He brought up the benefits
position in Human Resources again and told me that I should reconsider accepting this position
because if there was a RIF, my position would be considered surplus, and I would not have any
bump or retreat rights.  I was surprised by what he was saying because this was the first time I
had heard that my position might be considered surplus. I also felt threatened by his statements
because he had first started by telling me it was my choice to accept the benefits job and then he
switched to telling me I would not have a job if I did not take it.  During this conversation it was
clear that Mr. Gibson was not trying to help or protect me but that he was trying to get rid of me
from the OC.  I told him I would reconsider the position because I did not know what else to do.

19.     After telling Mr. Gibson that I would reconsider the position, I thought about it again, but
based on my earlier conversation with Ms. Petty, I decided not to take the position because the
move would not enhance my career development.  On August 24, 2004, I wrote an e-mail to Mr.
Gibson, Ms. Petty and Ms. Black, the Deputy IG, explaining that I was not qualified for the
position, that it did not match my skill set or interests, and declining to take the position.

20.     About four weeks after I sent this e-mail, the Deputy IG, Ms. Black, called me into her
office in September of 2004 and told me that she was ordering my directed reassignment to the
Human Resources Specialist (Benefits) position. Even though I told her that based on my
conversation with Ms. Petty, I would not be welcomed in the branch, she told me that if I did not
take the directed reassignment, I would lose my job.  Although I was told informally by Mr.
Gibson that my job might be considered surplus if the FDIC conducted a RIF, I was never
formally informed that my job was surplus and I was not given the opportunity to take a buyout.
The only option I had was to take the Human Resources position or be fired.  Although it is my
understanding that after my directed reassignment the OIG did offer a buyout opportunity to
employees, I was not given this opportunity.

21.     I never spoke to Mr. Gibson again about my directed assignment. However, it is not an
accurate statement for him to assert that he had nothing to do with my directed reassignment.  Mr.
Gibson was my direct supervisor at the time of my reassignment and prior to my directed
reassignment by Ms. Black, I never had discussions with anyone else about being reassigned to
Human Resources. I was reassigned from the OC so that a white woman, Adriana Vosburg could
be hired into the office permanently. Ms. Vosburg is the only individual that I am aware who had
temporary or term status in OIG.  With the rest of the FDIC downsizing, there was pressure to

reduce the size of the OIG, and Mr. Gibson decided to eliminate my position while at the same time creating a permanent position for Ms. Vosburg.

22.    In around 2003, I became aware Mr. Gibson began assigning work I had performed in the past to Ms. Vosburg. For example, in 2003, I found out that Mr. Cosgrove had been working on employee relations cases with Ms. Vosburg. This surprised me because when I had spoken with Mr. Cosgrove about working on employee relation cases he told me he would ask for my help when a case came up, but he never told me about the cases and instead worked with Ms. Vosburg. Also at staff meetings hosted in the office where everyone was asked to describe the projects they were working on, Ms. Vosburg often described research projects that were similar to the type of projects that I had researched in the past. For example, Ms. Vosburg did research for audit, and I had performed these research projects in the past. I also learned about another project Ms. Vosburg was working on that I would have been assigned, when Ms. Vosburg asked me for assistance researching FIRREA policy.

23.    Additionally, in 2004, there were even two specific times when Mr. Gibson assigned me a research project and then after I started the research he took the project away from me and assigned it to Ms. Vosburg. One project was about weapons distribution. I had conducted the initial research on this project and spoke to the individual in charge of the program, and then Mr. Gibson reassigned this project to Ms. Vosburg. The second project, I had already started to complete the work and was giving Mr. Gibson an update on the status of this project when he called Ms. Vosburg into the office and told me to turn the project over to her. He made me turn this project over to her, shortly before I learned of my directed reassignment.

24.    The OIG has asserted that Ms. Vosburg received her transfer to a permanent assignment in July of 2004, three months prior to my directed reassignment. However, beside a one page form from the Office of Personal Management, there is no other documentary proof of a request for this reassignment. This is very unusual because in my experience in Human Resources, Trina Petty demands documentary proof for every Human Resource action taken. Indeed, for every Human Resources action I have been involved with during my time in Human Resources regarding promotions or hiring, I have had to make sure to include documentation from management in the case files. Therefore, it is very strange that there is no additional documentation for Ms. Vosburg's transfer to a permanent position in July, if this was indeed Ms. Vosburg's permanent placement date, because it is against Human Resources policy to not have written documentation.

25.    In October 2004, I was immediately transferred out of OC to the Human Resources Branch, even though Trina Petty asked that my transfer be delayed because she did not have space in the office for me at that time. This request, although it was only for a couple of weeks was denied. Therefore, although I was formally reassigned to benefits, I had to work from my office in the OC until they had space for me in Human Resources.

26.    The fact that I received the directed reassignment to the Benefits position in Human Resources is particularly strange because when meeting with Ms. Petty after the reassignment had been effected, I learned that Human Resources had advertised a position for a Human Resources Specialist (Benefits), and that Gloria Hill, who already worked in the Human Resources Branch, and who had already been working on benefits would be selected to fill this position. Therefore, when I started in the Benefits position, both Ms. Hill and I were assigned the same position. I was transferred to a position that HR had decided to fill with Ms. Hill, who had worked as a Human Resources assistant in the Branch since 1999 and had already received training for the benefits position.

27.    When I received the directed reassignment out of OC, I was professionally devastated. I was transferred to a position where I had no background and training. The Director of the branch did not want me in the office because I was unqualified for the position. My prior legal background had no relevance to this area of work and I was forced to learn a highly specialized area of benefits that had no relevance to the legal field and was not related to my prior work. As part of my directed reassignment, I was required to have a structured training program because I was not qualified for the position. Therefore, I was required to take many training classes so I could get up to speed in the Benefits area while performing my duties.

28.    Despite the fact that I needed training to even accomplish the easiest of tasks in my new job, after my directed reassignment to the Human Resource Branch, there was a lot of pressure on me to perform immediately. However, I could not do any work on my own and had to ask people questions about everything because I did not know anything about this area. I mainly asked Gloria Hill, and two other Benefits Specialist for FDIC, Priscilla McCutchen and Diane Pediall. It took at least a year of extensive training for me to be competent to answer employee's questions about benefits. Benefits are a highly specialized area and at the FDIC it is an even more specialized area because the FDIC has different benefits than most Federal Agencies. The classes I was taking taught me only about Federal Benefits, not FDIC benefits.

29.    After my directed reassignment, I knew I had been discarded by the OC, because I was an African-American, even though I had always been a good employee. It was extremely difficult having to put so much energy into something I was not interested in and trying to play catch up on something I knew nothing about. I was pregnant at the time this occurred, and the strain of this new position took a toll on me and my family's relationship.

I affirm under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, belief and recollection

___6/7/06___
Date

_Stacey Sharpe_
Stacey Sharpe

Federal Deposit Insurance Corporation

## Performance Management Program
## PERFORMANCE PLAN AND EVALUATION
## Paralegal Specialist

| SECTION A - EMPLOYEE INFORMATION | | |
|---|---|---|

| EMPLOYEE NAME  *(Last, First, MI)*<br>Harkins,Stacey K | SOCIAL SECURITY NUMBER<br>XXX-XX-5418 |
|---|---|
| POSITION TITLE<br>PARALEGAL SPECIALIST | PAY PLAN / SERIES / GRADE<br>CG / 0950 / 11 |
| DIVISION/OFFICE<br>OFFICE OF INSPECTOR GENERAL | LOCATION<br>WASHINGTON, DC |

| PURPOSE OF EVALUATION  *(Check one)* | RATING PERIOD | | | |
|---|---|---|---|---|
| | FROM | | TO | |
| [X] Annual | MONTH | YEAR | MONTH | YEAR |
| [ ] Other  *(Specify)* _____ | 09 | 2002 | 08 | 2003 |

| SECTION B - PERFORMANCE CRITERIA | Meets | Does Not Meet |
|---|---|---|

**01.    Research/Analytical Skills:**    [X]    [ ]

Development and maintenance of technical knowledge to perform the duties of the position and the application of such knowledge.

Demonstrates up-to-date working knowledge of relevant work-related laws, regulations, and Legal policies and procedures.  Applies this knowledge effectively and independently in a complete and manner.  Demonstrates effective research and analytical skills resulting in an accurate and timely work product.  Demonstrates consistent, independent decision-making abilities that reflect sound judgement.  Applies technical knowledge effectively and independently with minimal guidance from the supervisor.

**02.    Organizational Skills:**    [X]    [ ]

Ability to plan, organize, implement, and monitor assignments or projects.   Ability to manage time, achieve deadlines, take initiative in requesting additional assignments and developmental activities. to recognize and respond to changing priorities and circumstances, and adhere to policy and procedure.

Effectively establishes the scope of a project or assignment.  Recognizes and solves problems, prioritizes objectives, considers agency priorities and cost when planning work assignments. Demonstrates efficient use of time and resources to produce a quality product with minimal guidance. Manages assignments effectively by recognizing and promptly reacting to changing priorities and circumstances.  Prepares and submits various assignments in a timely and accurate manner.  Uses and safeguards Corporation equipment, data, and resources prudently.  Shows willingness to accept additional or special assignments, as work permits, and successfully completes them without compromising regular work.

**03.    Oral Comm/Interpersonal Skills:**    [X]    [ ]

Ability to listen to differing opinions and convey technical and complex information in a clear, concise manner.

Acts in a confident, professional, polite, and diplomatic manner in dealing with others to effectively address issues.  Makes appropriate presentations, in proper perspective, and effectively covers the issues and appropriate subject matter.  Cooperates with others to accomplish assignment objectives and keeps them informed as needed to carry out responsibilities.  Responds positively to constructive criticism to modify or correct weaknesses.

| | Meets | Does Not Meet |
|---|---|---|
| **04.    Written Communication Skills:** | [X] | [ ] |

Quality and effectiveness of written products.

Prepares written products that are succinct, thoroughly researched, logical. Major points are clear and easily distinguishable from minor issues, and are conveyed to appropriate parties. The various elements of written products are consistently correct, in proper perspective, and are in concert with overall conclusions. Produces written products that are neat, legible, well organized, properly formatted, and conform to established guidelines. Narratives reflect proper grammar and spelling. Prepares written products that require only minimal editing to change the tone or organization of documents. Once editing is done. Is able to understand the changes made and incorporate those changes into future assignments. Produces written products that cover the subject adequately and are well organized with correct and properly formatted citations. Extent of documentation used to support conclusions is appropriate.

**SECTION C: SUMMARY RATING**    [X] Meets Expectations    [ ] Does Not Meet Expectations*

* A rating of "Does Not Meet" on any performance criterion results in an overall rating of "Does Not Meet Expectations"

| Signature of Employee *Stacey K. Harkins* | Date *11/5/03* |
|---|---|
| Signature of Rating Official | Date *11/5/03* |
| Signature of Reviewing Official *Garton J Jeanni* | Date *11/5/03* |

**SECTION D: RATING OFFICIAL/EMPLOYEE/REVIEWING OFFICIAL COMMENTS**

**Name:**    Gibson, Frederick W Jr

**Comments:**

During this rating period, Ms. Harkins has performed her duties and responsibilities thoroughly, professionally and in a highly competent manner.  Of particular note, she has assumed increasing responsibility in the processing of FOIA/PA requests. Ms. Harkins developed the knowledge necessary to this achievement through an aggressive, self-motivated program of professional education, which she has carried forward during this past year.  She has successfully applied this knowledge to learn the intricacies of the FOIA and the PA, thereby freeing the otherwise limited resources of this office formerly devoted to the area to other important work.  She now routinely processes the request, provides succinct and well-reasoned analyses of documents and FOIA exemptions, interacts effectively with OIG and Legal Division personnel in obtaining and processing requests, and in all other respects handles requests and responses in an outstanding She continues to pursue professional development activities in other areas, and is keenly attuned to finding areas in which she can broaden her contributions to the success of Counsel's Office and the OIG.

Federal Deposit Insurance Corporation
# CAREER DEVELOPMENT PLAN (CDP)

| 1. Name *(Last, First, MI)* | 2. Position Title | 3. Division/Office | 4. Effective Dates of Plan |
|---|---|---|---|
| Harkins, Stacey K | Paralegal Specialist | OIG/Counsel Office | Change date<br>From: 7/1/2003    To:  6/30/2003 |

5. Career Development Goals
To develop skills to contribute to other offices within OIG, such as the Office of Investigations and the Office of Management and Congressional Relations and to target either a criminal investigator or an employee relations specialist position within OIG and/or FDIC.

## SECTION I - TRAINING (TYPE 1) AND DEVELOPMENT FOR CURRENT POSITION

| 6. Developmental Needs | 7. Training and Developmental Activities | 8. Resources Required | 9. Time Frames | 10. Comments |
|---|---|---|---|---|
| Learn to:<br><br>Identify and analyze facts and allegations<br>Select legal and regulatory provisions<br>Develop and prepare explanations of case facts<br>Intrepret and analyze issues of fact and law<br>Locate applicable precedents, legal documentation and legislative history<br>Analyze specific phases, well-precedented and/or recurring cases<br>Express legal recommendations in written and oral form | USDA Basic Employee Relations<br><br>Shadow Jan Welch to become familiar with her duties and responsibilities. | 4 full work days<br><br>Cost is $695. | September 8 - 11 | Registration deadline is<br><br>Point of Contact is |
| Enhance writing skills<br><br>Because, I am tasked with drafting a variety of documents, included FOIA and PA responses, subpoenas and memoranda, this course will enhance my writing skills. | USDA Writing Short Informational Reports | PC<br><br>Cost is $175. | Can enroll at any time | Point of Contact is |
| Membership with fraud professionals<br><br>To gain a more complete understanding and become more familiar with one of the key aspects of the OIG, which is to deter fraud. | Association of Certified Fraud Examiners<br><br>Read newsletters and interact with members of the Association of Certified Fraud Examiners. | Annual Subscription<br><br>Application Fee is $95 and dues are $95 each year thereafter. | Annual Subscription | Point of Contact is |
| Become acquainted with the procedures, techniques, legal concerns, and general problems associated with criminal investigation. | FLETC Introduction to Criminal Investigation Training program (ICITP)<br><br>(This course is designed for noncriminal investigators, including paralegals, who might assist in a criminal investigation, be required to testify in a criminal matter or refer a matter to court for criminal investigators.) | 9 Class Days<br><br>Travel to Glynco, Georgia | | Point of Contact is |

| Become acquainted with: | USDA Investigating Discrimination Complaints | 4 full work days | July 22 - 25 | Registration deadline is |
|---|---|---|---|---|
| Basic principles and techniques of investigating<br>Rules of evidence<br>Functions and jurisdictions of other Federal, State and local agencies<br>Prohibited matters and guides concerning invasion of privacy<br>Scope, application and interpretation of specific laws and regulations regarding investigative jurisdiction of the agency<br>Objectives of various types of investigations, including specialized factor coverage requirements | Learn to gather relevant complaint information, conduct necessary interviews, produce testimony in affidavit form and prepare complete report of investigation.<br><br>Shadow Valerie Toyer to become familiar with her duties and responsibilities. | Cost is $695. | | Point of contact is |

## SECTION II - TRAINING (TYPE 2) AND DEVELOPMENT FOR A NEW POSITION

11.  FDIC Position Targeted *(Title, Series, and Grade)*

Criminal Investigator and/or Employee Relations Specialist

| 12.  Developmental Needs | 13.  Training and Developmental Activities | 14.  Resources Required | 15.  Time Frames | 16.  Comments |
|---|---|---|---|---|
| | | | | s |
| | | | | |
| | | | | |
| | | | | |

## SECTION III - REVIEW AND ACKNOWLEDGEMENT

| 17.  Supervisor's Name and Signature *(Type or print legibly)* | 18.  Date |
|---|---|
| 19.  Employee's Name and Signature *(Ttype or print legibly)* | 20.  Date |

**FDIC** FEDERAL DEPOSIT
INSURANCE CORPORATION
INSURING AMERICA'S FUTURE

QUICK LINKS FOR BANKERS

SEARCH THE SITE

| FDIC INSURANCE | CONSUMER PROTECTION | INDUSTRY ANALYSIS | REGULATION & EXAMINATIONS | ASSET SALES |

| | |
|---|---|
| **VACANCY ANNOUNCEMENT:** | 2004-OIG-2597 |
| **OPENING DATE:** | 6/18/2004 |
| **CLOSING DATE:** | 7/2/2004 |
| **POSITION:** | CRIMINAL INVESTIGATOR |
| **PAY PLAN-SERIES GRADE:** | CG-1811-11/12 |
| **FULL PERFORMANCE LEVEL:** | CG-12 |
| **GRADE AND SALARY RANGE:** | 11  $56,861 - $91,023<br>12  $64,565 - $103,357 |

The salary range reflects total compensation including basic pay and applicable locality adjustment.

| | |
|---|---|
| **LOCATION:** | Office of Inspector General<br>Atlanta, GA; Washington DC Metro Area, DC |
| **POSITION OPEN TO:** | Status Candidates |
| **NUMBER OF VACANCIES:** | Multiple |
| **AREA OF CONSIDERATION:** | Local Commuting Area |
| **TYPE OF APPOINTMENT:** | PERMANENT COMPETITIVE SERVICE |

YOUR APPLICATION MUST BE RECEIVED BY 07/02/2004

Applicants must indicate the grade level(s) for which they wish to receive consideration. Failure to provide this information will result in the applicant receiving consideration only for the highest grade eligible.

This position is located in the Federal Deposit Insurance Corporation, Office of Inspector General, Office of Investigations.

Selections will be made for Washington, DC (Headquarters), and/or Atlanta Field Office.

**SUMMARY OF DUTIES:**
The Office of Investigations' mission is to assist in the reduction of financial risk to our nation through the prevention, detection and prosecution of criminal activity affecting the FDIC's programs and operations. In line with this mission, the incumbent serves as a Special Agent carrying out a range of investigative assignments as a team member, and occasionally at the higher level, handles less complex investigations independently or as a lead agent. Performs investigations which may concern ly sensitive matters involving prominent individuals complicated by few records, conflicting evidence, and/or public scrutiny. Investigations involve alleged violations of criminal statutes concerning fraud, bribery, conflict of interest, false claims, embezzlement, kickbacks, misuse of government property, mismanagement and noncompliance with requirements of legislation and

http://www2.quickhire.com/fdic/fdicjobvacancy.jsp?jobnumber=2419

This is a summary only: see US OPM Qualification Standards

REQUIRED: Applicants must have one year of specialized experience equivalent to ... Specialized experience is experience that equipped the applicant with the ... skills, and abilities to perform successfully the duties of the position, and that is ... to the work of the position to be filled.

REQUIREMENT:
... have served 52 weeks at the next lower grade in the Federal Service. All qualification ... requirements must be met within 60 days of the closing date of this announcement.

RANKING FACTORS (DESIRABLE KNOWLEDGE, SKILLS AND ABILITIES):
... are required to provide a separate narrative statement that demonstrates their ability to ... each KSA listed below.

FAILURE TO PROVIDE A SEPARATE NARRATIVE STATEMENT DEMONSTRATING ABILITY TO PERFORM EACH KSA LISTED BELOW WILL RESULT IN NOT RECEIVING CONSIDERATION FOR THIS POSITION

1. Knowledge of modern criminal investigative principles and theories, practices, and procedures, and rules of evidence, and techniques in order to plan, organize, and conduct complex criminal investigations.

2. Ability to conduct interviews, obtain and summarize information, and present facts in an unbiased and logical manner.

3. Ability to prepare written documents and reports.

4. Ability to work in a team oriented environment.

Core Competencies:

The OIG core competencies are to identify the behaviors and skills needed by all OIG staff members to contribute successfully to the overall mission and goals of the OIG.

Achieve Results: Assumes responsibility and accountability for achieving results in support of the FDIC and OIG mission and goals.

Communicates Effectively: Effectively communicates orally and in writing to promote mutual understanding, effective decision-making, and information gathering.

Demonstrates Teamwork: Builds and maintains inclusive, responsive, and constructive working relationships based on mutual respect and a shared commitment to the OIG's mission, values, and goals.

Exhibits Technical Competence: Demonstrates the technical knowledge, skills, and abilities necessary to effectively carry out the duties and responsibilities of his or her position.

Demonstrates Responsibility and Self-Development: Takes personal initiative to improve individual and organizational performance and promote the OIG's values and goals, while exemplifying high standards of professional and ethical behavior and integrity.

EVALUATION METHODS:
Applicants will be evaluated on the basis of information provided in their application package as to their paid or volunteer experience, training, self-development and awards; knowledge, skills and abilities; and, performance appraisals. Failure to provide specific information regarding the quality ranking factors described in this vacancy announcement could result in your application not being referred to the selecting official for consideration.

Pursuant to the Veterans Employment Opportunities Act of 1998 as amended, veterans who are preference eligibles OR who have been separated from the armed forces under honorable conditions

ers or more of cumulative service may apply under
of your DD 214. Candidates selected under these provisions will be
career appointments. Qualified non-status candidates may be considered
and competitive examining when they submit two applications with one
and one marked for competitive examining.

**OF APPOINTMENT:**
barred from accepting or considering political recommendations regarding appointment or
personnel action by 5 USC 3303; any violation of the bar on recommendations is a
related personnel action. The FDIC is obligated to take appropriate adverse action against
employees who solicit, or Corporation officials who consider prohibited political recommendations.
Candidates who are tentatively identified for appointment must meet suitability requirements for
Federal employment prior to appointment. FDIC may request applicant to provide additional
information prior to making a formal offer of employment, as required by 12 CFR Part 336.

**TRAVEL REQUIREMENT:**
Required overnight travel may be as high as 50%.

**LAUTENBERG AMENDMENT:**
This position authorizes the incumbent to carry a firearm. Any person who has been convicted of a
misdemeanor crime of domestic violence cannot lawfully possess a firearm or ammunition [Title 18,
USC, Section 922 (g) 9]. A "misdemeanor crime of domestic violence" is generally defined under the
statute as any offense involving the use or attempted use of physical force, or the threatened use of a
deadly weapon, committed by the victim's current or former domestic partner, parent, or guardian. The
term "convicted", as defined in the statute excludes any person whose conviction has been expunged,
set-aside, or pardoned, or any person whose civil rights have been restored unless the pardon,
expungement, or restoration of civil rights expressly prohibits the possession of firearms or
ammunition. Candidates who have been convicted of a misdemeanor crime of domestic violence
within the meaning of the referenced statute are not qualified for this position. Candidates under
consideration will be required to certify whether they have ever been convicted of such an offense.
False or fraudulent information provided by candidates is criminally punishable by fine or imprisonment
[ 18, USC, Section 1001].

**MAXIMUM ENTRY AGE:**
Consideration will be restricted to candidates who have not yet reached age 37 at the time of referral
for the position.

**MEDICAL REQUIREMENTS:**
Incumbent will perform moderate to arduous physical exertion involving walking and standing, use of
firearms, and exposure to inclement weather. Manual dexterity with comparatively free motion of
finger, wrist, elbow, shoulder, hip, and knee joints is required. Arms, hands, legs, and feet must be
sufficiently intact and functioning to perform duties successfully. Good vision in each eye, with or
without correction, is required to perform the duties satisfactorily. Near vision, corrective lenses
permitted must be sufficient to read printed material the size of typewritten characters. Hearing loss, as
measured by an audiometer, must not exceed 35 decibels at 1000, 2000, and 3000 Hz levels. Since
the duties of this position are exacting and responsible, and involve activities under trying conditions,
applicants must possess emotional and mental stability. Any physical condition that would cause the
applicant to be a hazard to himself/herself or others is disqualifying.

**DRUG TESTING REQUIREMENTS:**
Appointment to this position is contingent upon a negative drug test result. Any individual tentatively
selected for this position will be required to submit to urinalysis to screen for illegal drug use prior to
appointment unless the selectee is an FDIC/OIG employee currently occupying a testing designated
position (TDP). After appointment the employee will be included in the OIG's random drug test
program.

Position Sensitivity: Critical Sensitive--Background Investigation (BI) Required. See "Personnel
Suitability Program", "http://www.fdic.gov/about/jobs/21201.doc", FDIC Circular 2120.1

AND INTERAGENCY CAREER TRANSITION ASSISTANCE PLAN (CTAP AND ICTAP):
Individuals who have special priority selection rights under the FDIC Career Transition Assistance Plan
(CTAP) or the Interagency Career Transition Assistance Plan (ICTAP) must be well-qualified for the
position to receive consideration for special selection priority. CTAP and ICTAP eligibles will be

http://www2.quickhire.com/fdic/fdic-jobvacancy.jsp?jobnumber=2419                6/22/2004

qualified if they possess the knowledge, skills, and abilities which qualify them for the
requirements of the position. A well-qualified CTAP or ICTAP eligible must be able to
perform the duties of the position upon entry without additional training.

Employees seeking CTAP/ICTAP eligibility must submit proof that they meet the requirements
5 CR 330.605 for CTAP and 5 CFR 330.704 for ICTAP. This includes a copy of the agency notice,
a copy of their most recent Performance Rating and a copy of their most recent SF-50 noting current
position, grade level, and duty location. Please annotate your application to reflect that you are
applying as a CTAP or ICTAP eligible.

Continued employment in the above position is contingent upon: (1) maintaining the criteria outlined in
OIG Manual 400.5, Medical Standards and Physical Requirements for Criminal Investigators; (2)
willingness to travel away from home on a regular basis; (3) working an average of 2 hours extra per
day to meet the requirements for availability pay; and (4) willingness to carry and, when necessary,
use a firearm in the execution of official duties.

HOW TO APPLY:
ALL APPLICATION MATERIALS MUST BE INCLUDED WITH ORIGINAL SUBMISSIONS. FDIC OIG
IS NOT RESPONSIBLE FOR ADDING SUPPLEMENTAL INFORMATION TO ORIGINAL
SUBMISSIONS. FAILURE TO FULLY COMPLY WITH ALL FILING REQUIREMENTS WILL RESULT
IN DISQUALIFICATION. FACSIMILE TRANSMISSIONS WILL NOT BE ACCEPTED!

We recommend that you include with your application, descriptions or examples of experience which
demonstrate your possession of the knowledge, skills and abilities identified in the qualification
requirements and ranking factor sections of this vacancy announcement.

Electronic (e-mail; disk) transmittals cannot be accepted.

Applications submitted in Government franked envelopes will not receive consideration.

1. In order to apply, you need to submit one of the following documents:

   SF612, Optional Application for Federal Employment, (You can get this form at the OPM site in both
Word and PDF Format: "http://www.usajobs.opm.gov/forms.htm");

*SF-171, Application for Federal Employment;

*Your resume.

2. Whichever document you submit must include all of the following information:

*The position title and announcement number on the first page of your application;

*Your name, address, Social Security Number, telephone numbers where you can be reached during
the day, and citizenship.

*For non-bargaining positions, applicants are requested to submit a current appraisal with their
application package.

*Applicants entitled to receive consideration as status candidates who are not currently permanent,
competitive service FDIC employees should submit a copy of their most recent SF-50, Notification of
Personnel Action, which documents eligibility for competitive service reinstatement or transfer

For copies of this Vacancy Announcement, call 202-416-2966

For additional information call, Ms. Towanda Bynum at (202) 416-6943

REMARKS:
All application materials must be sent to the mailing address shown. All material and the envelope
must include the vacancy announcement number. There may be delays in the receipt and processing
of improperly addressed correspondence.

THE OFFICE OF INSPECTOR GENERAL IS AN EQUAL OPPORTUNITY EMPLOYER

http://www2.quickhire.com/fdic/fdicjobvacancy.jsp?jobnumber

ADDRESS FOR
ATIONS:              Office of Inspector General 3501 Fairfax Drive OIG-HRB (801-Room
                     904A) Arlington VA 22226

N ADDRESS:           Office of Inspector General 801 17th Street, NW (Room 904A) Human
                     Resources Branch - Room 904A Washington DC 20434


**YOUR APPLICATION MUST BE RECEIVED BY 7/2/2004**

**CLICK HERE to indicate Geographic Location Preference**


**FDIC is an equal opportunity employer.**

Applications will be considered without regard to race,
color, religion, gender, national origin, age, marital status,
disability, political affiliation, sexual orientation,
or any other non-merit factor.


TB0727A/001872


Return to Careers at FDIC


Careers at FDIC


Home   Contact Us   Search   Help   SiteMap   Forms
Freedom of Information Act   Website Policies   FirstGov.gov


http://www2.quickhire.com/fdic/fdicjobvacancy.jsp?jobnumber=2419                6/22/2004



**Federal Deposit Insurance Corporation**
801 17th Street, NW, Washington, DC 20434

Office of Inspector General
Counsel to the Inspector General

January 30, 2004

MEMORANDUM TO:    Fred W. Gibson, Jr.
                         Counsel to the Inspector General

FROM:              Stacey K. Harkins
                         Paralegal Specialist

SUBJECT:       Request to Apply for Expression of Interest (EOI), Announcement
                         # DSC 4-001 Capital Markets Branch, Policy Section

This is a written request for your approval of my application to the above-referenced EOI. I firmly believe that serving on this detail would be beneficial to both me and the OIG. I do not believe that serving on this detail would pose a conflict of interest as it relates to the mission of the OIG and the DSC since my role as paralegal does not require significant or substantive involvement with the DSC.

According to the EOI, the selected employee would be tasked with monitoring, researching and reporting on financial markets; developing and revising technical policies; advising senior staff and management on appropriate actions; serving as a representative of the Corporation; and coordinating administrative assignments. After having performed those tasks, my skill level would be enhanced. Specifically, my written and communications skills would be improved, my knowledge of internal processes of one of the Corporation's driving divisions would be healthier and I would be more competent as it relates to my ability to develop and draft Corporate policies.

OIG would benefit by employing a more experienced and well-rounded paralegal. Specifically, I would have gained the perspective of a driving division which could facilitate OIG's interaction with that division. Secondly, I would be more suited for different projects. Thirdly, my written and communication skills would be more practiced and accomplished.

If afforded the opportunity to serve on this detail, I would be a more educated and talented OIG employee with multifaceted skills.

Thanks for your consideration regarding this request.