1          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2                    WASHINGTON FIELD OFFICE

3      - - - - - - - - - - - - - x

4      STACEY K. SHARPE,              :

5                Complainant,         :

6          -vs-                       :    EEOC No:  100-2005-00927X

7      MARTIN GRUENBERG,              :    Agency No:  FDICEO-05002

8      Chairman, Federal Deposit :

9      Insurance Corporation,         :

10               Agency.              :

11     - - - - - - - - - - - - - x

12                                   Wednesday, February 1, 2006

13                                   Washington, D.C.

14     Deposition of

15                    STACEY K. SHARPE

16     a witness in the above-entitled cause, was called for

17     examination by counsel for the Agency, at the Office

18     of Inspector General Federal Insurance Corporation, 801

19     17th Street, Northwest, 10th Floor, Washington, D.C.

20     20434, beginning at 10:28 a.m., before Hedy D. Blau, a

21     Notary Public in and for the District of Columbia, and

22     were present on behalf of the respective parties:

| Page 2 | Page 3 |
|---|---|
| 1 APPEARANCES: | 1 C-O-N-T-E-N-T-S |
| 2 FOR THE AGENCY: | 2 Witness:        Examination by Counsel for: |
| 3 BY: MICHAEL S. COSGROVE, ESQUIRE | 3 Stacey K. Sharpe    Agency:    Complainant: |
| 4 Associate Counsel | 4              MR. COSGROVE:  MR. SHAPIRO: |
| 5 Office of Inspector General | 5              4        -- |
| 6 Federal Deposit Insurance Corporation | 6 |
| 7 801 17th Street, Northwest | 7 E-X-H-I-B-I-T-S |
| 8 10th Floor | 8 Exhibit:              Page: |
| 9 Washington, D.C. 20434 | 9 (None) |
| 10 (202) 416-4230 | 10          *** |
| 11 FOR THE COMPLAINANT: | 11 |
| 12 BY: DAVID H. SHAPIRO, ESQUIRE | 12 |
| 13 STEPHANIE K. RICHARD, ESQUIRE | 13 |
| 14 Swick & Shapiro, P.C. | 14 |
| 15 1225 Eye Street, Northwest | 15 |
| 16 Suite 1290 | 16 |
| 17 Washington, D.C. 20005 | 17 |
| 18 (202) 842-0300 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |

| Page 4 | Page 5 |
|---|---|
| 1 P-R-O-C-E-E-D-I-N-G-S | 1 so. We'll go off the record and take a break. |
| 2 Whereupon, | 2 All right, any questions so far? |
| 3        STACEY K. SHARPE | 3 A No. |
| 4 a witness in the above-entitled cause, was called for | 4 Q The first thing I'd like to do is go into |
| 5 oral examination, and after having first been duly | 5 your background a little bit, okay. Why don't you |
| 6 sworn was examined and testified as follows: | 6 start by telling me your date of birth and where you |
| 7 EXAMINATION BY COUNSEL FOR THE AGENCY | 7 were born. |
| 8 BY MR. COSGROVE: | 8 A 5/15/1968. |
| 9 Q Good morning. I'm going to try to remember | 9 Q Okay. |
| 10 the convention of calling you Ms. Sharpe, to be polite. | 10 A I was born in Washington, D.C. |
| 11 But, however, having worked with you for years I'm sure | 11 Q Were you raised here in Washington? |
| 12 I'm going to slip up and call you Stacey. So I | 12 A Yes. |
| 13 apologize. I'm not -- I don't mean any disrespect to | 13 Q And you're married, correct? |
| 14 you or the occasion. | 14 A Yes. |
| 15 The most important thing, I have the ability | 15 Q And your spouse's name? |
| 16 to mangle the English language to uncomprehension. If | 16 A Everett Sharpe. |
| 17 you don't understand the question I'm asking, please | 17 Q And what does Mr. Sharpe do? |
| 18 just make sure we know, okay. And I'll try to work | 18 A He's Support Services Supervisor. |
| 19 with you to make sure that we arrive at a common | 19 Q And I know you have children, correct? |
| 20 understanding of what it is I'm trying to say. | 20 A Yes. |
| 21 This is also not an endurance contest. So if | 21 Q How many? |
| 22 you need a break for any reason whatsoever, just say | 22 A Two. |

Page 6

1    Q   Now I know I've gotten your transcript but I
2  haven't had a chance to go over it.  Where did you go
3  to college?
4    A   I went to the University of Maryland.
5    Q   At Baltimore?
6    A   University College.
7    Q   When did you go to college?
8    A   I think I started Maryland in maybe '93 or
9  '94.
10   Q   Did you go right through the four years?
11   A   No, I didn't go for four years.  I went to
12  UDC prior to Maryland and I got a bachelor's at UDC.
13  Then I started Maryland and Maryland accepted a lot of
14  my classes, the prerequisites.  And so I ended up
15  getting a second bachelor's at Maryland.
16   Q   What was your first B.A. in from UDC?
17   A   Journalism.
18   Q   And your second was legal studies, correct?
19   A   Paralegal studies.
20   Q   Now I saw references in the file to you
21  having completed some law school?
22   A   Yes.

Page 7

1    Q   Where did you go to law school?
2    A   UDC School of Law.
3    Q   How long did you go there?
4    A   I went two semesters.
5    Q   Why did you stop?
6    A   Because I worked full-time and it was too
7  hard.
8    Q   Now you're currently going to graduate
9  school, correct?
10   A   Yes.
11   Q   When did you start that?
12   A   In 2004.
13   Q   Fall semester?
14   A   I think it was summer.
15   Q   And your program is in personnel?
16   A   Yes.
17   Q   Was this personal or was it pursuant to any
18  sort of a development plan?
19   A   Personal.
20   Q   Okay, so it was a personal decision to go to
21  graduate school?
22   A   Yes.

Page 8

1    Q   Is the I.G. helping you pay for graduate
2  school?
3    A   Yes.
4    Q   And who has approved those courses?
5    A   My first and second line supervisors.
6    Q   When you started with -- who was your first
7  supervisor?  Was that Fred Gibson, your first line
8  supervisor?
9    A   No.  When I started he was, but he didn't
10  approve any of those classes.
11   Q   Okay, who did at that point?
12   A   I started by myself.
13   Q   Okay, you started by yourself and later it
14  became part of your --
15   A   When I went down to Personnel they started
16  it.
17   Q   So that would be the January semester or
18  spring semester of 2005, roughly?
19   A   I think so.
20   Q   Starting at the earliest full-time adult
21  position -- don't worry about part-time jobs in high
22  school -- why don't you just go through your work

Page 9

1  history.
2    A   After high school I started working in the
3  Stay In School Program at the Department of Navy as a
4  clerk typist.
5    Q   Okay.
6    A   I was there for a year, transferred to OPM.
7  I had a permanent full-time position.
8    Q   What did you do at OPM?
9    A   I was a clerk typist.
10   Q   What was your grade with OPM?
11   A   I started at a 2, ended up at a 4.
12   Q   All right.  Do you remember approximately
13  when that was?  Do you remember when that was, roughly?
14   A   I think it was in '87 I started there.
15   Q   Okay.
16   A   And I came to FDIC in 1990 as a clerk.
17   Q   And where did you work at that point?
18   A   It was -- it's now DIT.  I forgot the
19  division prior to the name change.
20   Q   Okay.  That was probably a couple of names
21  ago, actually.
22   A   Yes.

Page 10

1      Q    What was it that you were doing -- that would
2  be Information Technology -- at that point?
3      A    I was a clerk.
4      Q    What was your grade at that time?
5      A    Maybe a 5 or a 6.  I'm not sure.
6      Q    Do you remember if that was a GG position or
7  LG position?
8      A    GG.
9      Q    So where did you go from DIT, or the
10  predecessor of DIT?
11      A    Legal Division.
12      Q    Legal Division?
13      A    Yes.
14      Q    What subsection?
15      A    The name changed.
16      Q    Do you remember who you worked for?
17      A    My last supervisor there was Bob Clark.
18      Q    So it would have been in Litigation?
19      A    I don't think so.
20      Q    And what did you do for the Legal Division?
21      A    I was a legal technician.
22      Q    And do you recall about when that was?

Page 11

1      A    Maybe '93 I started there.
2      Q    Now did this overlap the time that you were
3  going to get your degree in paralegal studies?
4           MR. SHAPIRO:  What do you mean by overlap?
5           MR. COSGROVE:  Approximately the same time,
6  not a trick question.
7           BY MR. COSGROVE:
8      Q    Around '93 to '94?
9      A    When I started paralegal studies?
10      Q    Yes.
11      A    It must have been in '94.
12      Q    Okay.  Now from the a legal technician in the
13  Legal Division did you -- well, where did you go at
14  that point, anywhere?
15      A    I went to OICM as -- OICM for a year.
16      Q    Okay.  And what kind of position did you hold
17  there?
18      A    I was an IRIS technician.
19      Q    What's IRIS?
20      A    That's the name of their system, internal
21  controls.
22      Q    So it's a computer system of some type?

Page 12

1      A    Yes.
2      Q    When did you come to the I.G.'s office?
3      A    In 1998.
4      Q    How was it that that came about?
5      A    A position was advertised.  I applied and was
6  selected.
7      Q    Who was the hiring official?
8      A    Either Pat or Larry.
9      Q    And by Pat, you mean Pat Black?
10      A    Yes.
11      Q    And Larry was Larry Frolich?
12      A    Yes.
13      Q    Now, was Ms. Black counsel at the I.G. at
14  that time?
15      A    Yes.
16      Q    And Frolich was one of her deputees?
17      A    He was her deputy.
18      Q    Do you remember who did the interview?
19      A    I interviewed with both.
20      Q    What grade was it that you applied for?
21      A    A Grade 7.
22      Q    And that was a paralegal position?

Page 13

1      A    Yes.
2      Q    What were your duties when you first came
3  onboard?
4      A    Research different laws, processing FOIA and
5  Privacy Act requests and drafting legal summaries and
6  analyses.
7      Q    Now you would you processed FOIA and Privacy
8  Act requests.  What exactly did you do to process a
9  request?
10      A    I had to determine whether or not the
11  information sought was releasable under FOIA and the
12  Privacy Act.
13      Q    Did you have any role in accumulating
14  information?
15      A    I'm sorry?
16      Q    Did you have any role in gathering the
17  information pursuant to the request?
18      A    Okay, when a request came in I had to
19  determine what section in OIG had the records.
20      Q    Was there anything else involved?
21      A    Well, once the records were located I had to
22  go through the documents.

Page 14

1    Q   Did you make redactions?
2    A   Yes.
3    Q   Did you do this alone or were you working
4    with other people?
5    A   I was working with Chris Geisler.
6    Q   When you came onboard the I.G.'s office, who
7    else was employed in the legal office at that time?
8    A   Pat Black, Larry Frolich, Fred Gibson, Andrea
9    Romano, and Theresa Fewell.
10   Q   And Chris, correct?
11   A   Yes.
12   Q   Were there any clerks employed with you?
13   A   Yes.
14   Q   Do you know who they would be -- or, do you
15   remember?
16   A   Mikael Sebastian was one.
17   Q   Now thinking back to about 1998, do you have
18   any sense today about how many FOIA requests were
19   coming into the office?
20       MR. SHAPIRO:  Back when she started?
21       MR. COSGROVE:  Yes.
22       THE WITNESS:  I don't, but I know there was

Page 15

1    one big one.
2        BY MR. COSGROVE:
3        Q   Do you recall the one big one?
4        A   No.
5        Q   Now comparing your recollection from '98 to
6    2004, had it stayed the same, increased or decreased?
7        MR. SHAPIRO:  You mean in terms of number of
8    FOIA or Privacy Act requests?
9        MR. COSGROVE:  Yes.
10       THE WITNESS:  That's hard to say.
11       BY MR. COSGROVE:
12       Q   Do you have a sense of whether -- now you
13   talked about one big one.  What do you mean by big?
14       A   It was a huge FOIA request.  I know I was
15   involved, so was Chris Geisler, and maybe one of the
16   other attorneys.  I can't -- I don't remember exactly.
17       Q   That's fine.  But by big, you mean lots of
18   documents?
19       A   Yes.
20       Q   Now in terms of using that as a yardstick, as
21   time went by, did they get smaller, stay the same?
22       A   It depended on the request.  And as time went

Page 16

1    by, I got more involved with the actual processing.
2        Q   Now during the course of time of your
3    employment as a paralegal, did you have any involvement
4    in litigation?
5        A   No.
6        Q   Now what kind of research did you do?
7        A   I researched laws, proposed legislation.
8        Q   Is that on Thomas?
9        A   Thomas, yes, that was one.
10       Q   Did you use other sources?
11       A   Yes.
12       Q   Do you recall now what they were?
13       A   For legislation -- I used Thomas for the
14   legislation, congressional bills.
15       Q   Who were you principally doing research for?
16       A   Initially I think all of my assignments came
17   through Larry Frolich.
18       Q   So he was your direct day-to-day supervisor
19   after your first employ?
20       A   Yes.
21       Q   Now Larry eventually left, correct?
22       A   Yes.

Page 17

1        Q   Do you have any idea about when?
2        A   I don't know the year.
3        Q   But after Mr. Frolich left, Mr. Gibson became
4    your direct supervisor?
5        A   Yes.
6        Q   Did the practice of your assignments coming
7    through your supervisor continue?
8        A   Anything outside of FOIA, for the most part.
9        Q   And with FOIA did you work just directly with
10   Chris Geisler?
11       A   For the most part.
12       Q   Outside of your work directly for Chris, do
13   you have any sense at all how often you worked with the
14   other attorneys?
15       A   They would just come to me.
16       Q   Do you have any -- did some tend to come to
17   you more than others?
18       A   Larry and Andrea left, so there was only Fred
19   and Chris.  So it was between the two of them.
20       Q   All right, now we'll move away from that for
21   the moment.  Now you came onboard the I.G. as a 7,
22   correct?

Page 18

1   A   Yes.
2   Q   And you left as an 11?
3   A   Yes.
4   Q   So obviously you were promoted in between
5   times. When were you promoted?
6   A   A year after serving in each grade.
7   Q   So you went from 7 to 9, then 9 to 11?
8   A   Yes.
9   Q   Do you remember who it was promoted you?
10   A   I think Larry promoted me to Grade 9 and Fred
11   promoted me to the Grade 11.
12   Q   During the course of your performance of your
13   duties as a paralegal, did you ever receive any awards?
14   A   Yes.
15   Q   Would you tell me when they were.
16   A   I think I did receive an award for that first
17   FOIA I worked on when I came, and I can't tell you the
18   years but I did receive maybe four.
19   Q   And that would be over the course of
20   approximately six years?
21   A   During my time in the counsel's office.
22   Q   Do you have any recollection of who it was

Page 19

1   that signed off on the awards, who gave you the awards?
2   A   Fred Gibson.
3   Q   And do you have any recollection of what they
4   were for?
5   A   I think a couple of them were related to
6   FOIAs.
7   Q   Let me try and rephrase that a little more
8   meaningfully. Were they for special -- a specific
9   project or were they a general you're doing a good job
10   awards over the course of a year?
11   A   For specific projects.
12   Q   For specific projects, okay. Now while you
13   were employed here at the I.G.'s office, from '98 to --
14   in counsel's office in the I.G.'s office, from '98 to
15   2004, did you have the occasion to apply for any jobs?
16   A   Yes.
17   Q   Do you recall which jobs it was you applied
18   for?
19   A   I applied for a couple of human resources
20   positions.
21   Q   Would that be internally in the I.G.'s office
22   or would that be outside the agency?

Page 20

1   A   Outside of OIG.
2   Q   Do you know what kind of jobs you applied
3   for? Do you remember?
4   A   Human resources specialist.
5   Q   Did you only apply within the FDIC or did you
6   go to other agencies?
7   A   I applied for some outside of the agency. I
8   applied for some positions outside the FDIC.
9   Q   Now I know that you stayed at the I.G.'s
10   office, but what was the result of the applications?
11   Did you receive any offers?
12   A   No.
13   Q   And what were the specialty areas that you
14   were applying for?
15   A   I don't understand.
16   Q   Okay. Within Personnel, all right, there are
17   subspecialties, correct?
18   A   Right.
19   Q   And employee relations is one. Staffing
20   would be one. Benefits would be one. Training would
21   be one. Classification would be one. There may be
22   others, but I don't know the offhand. Are you aware if

Page 21

1   there are others?
2   A   I don't know.
3   Q   So in terms of those specialty areas, were
4   these in particular specialty areas?
5   A   I think one was training.
6   Q   Any others that you're familiar with or
7   remember?
8   A   I don't know. I don't think so.
9   Q   Now during the course of time -- during the
10   last year or so of your employment as a paralegal at
11   the I.G.'s office, so approximately 2003 and 2004, did
12   you ever make any inquiries about doing personnel work
13   internally in the I.G.'s office?
14   A   Yes.
15   Q   And with whom did you make those inquiries?
16   A   Fred Gibson.
17   Q   Did you ever talk to anybody in HOUR?
18   A   I don't think so. I can't remember.
19   Q   Do you recall when you had those
20   conversations?
21   A   During my last year.
22   Q   In your affidavit, in the Report of

Page 22

1 Investigation, you indicated you spoke to Fred three or
2 four times about the benefits job.  Were these in
3 addition to those conversations or are you including
4 those conversations?
5    A   Those were in addition.
6    Q   What were you talking about?
7    A   Which job?
8    Q   We're not talking about the -- you had three
9 or four conversations, according to your affidavit,
10 about going down to Personnel and working in benefits.
11    A   Okay.
12    Q   Now to make sure we understand each other,
13 when I asked you did you have conversations during the
14 last -- 2003 and 2004 about going to work for
15 Personnel, were they exclusive of those conversations?
16    MR. SHAPIRO:  I don't think she understands
17 the question.  Were they those -- the conversations
18 that you were talking about, is that the conversations
19 you were talking about when you answered his question?
20    THE WITNESS:  Wait a minute.
21    BY MR. COSGROVE:
22    Q   Okay, we're confused.  What I'm trying to

Page 23

1 figure out is, we know that you've had three or four
2 conversations from your affidavit, with Fred about
3 going down and working for Trina in benefits, replacing
4 Debbie Gonza, correct?
5    A   Right.
6    Q   All right, now other than those conversations
7 that you had with Fred about going downstairs to work
8 with Trina to replace Debbie Gonza in benefits, did you
9 have any other conversations with anybody about going
10 to work in Personnel?
11    A   I don't think so.  I don't remember.
12    MR. SHAPIRO:  So they were the same
13 conversations.
14    BY MR. COSGROVE:
15    Q   Now I'd like you to turn your attention and
16 think about the last six months you worked for -- as a
17 paralegal, okay?
18    A   Yes.
19    Q   What were you doing in the counsel's office
20 during those last six months?
21    A   Processing FOIA and PA requests.
22    Q   PA being Privacy Act?

Page 24

1    A   Privacy Act -- and I think, I'm not sure,
2 some research projects.
3    Q   Now do you remember who you did any research
4 for?
5    A   No.
6    Q   Was it in addition to your FOIA and Privacy
7 Act work?
8    A   Yes.
9    Q   Did you do any work for anyone outside the
10 counsel's office at that time?
11    A   I don't remember.
12    Q   Again, in your affidavit -- you remember
13 doing your affidavit -- you talk about preparing briefs
14 of EEO cases.  Let me just find the phrase exactly,
15 okay -- yes, the phrase exactly used is "prepared
16 briefs on EEO related cases."
17    A   Yes.
18    Q   What exactly did you mean when you said you
19 prepared briefs on EEO cases?
20    A   Summarized an EEO case.
21    Q   Okay, so it's taking the case and briefing
22 the case?

Page 25

1    A   Yes.
2    Q   It's not preparing a legal brief 20 pages
3 long with argument and lots of other cases involved?
4    A   No.
5    Q   Additionally, in your affidavit you used the
6 phrase "skill set," okay.  What exactly do you mean by
7 skill set?
8    MR. SHAPIRO:  Why don't you show her where it
9 is.
10    MR. COSGROVE:  Sure.
11    BY MR. COSGROVE:
12    Q   In that first sentence you used the phrase,
13 "it did not match my skill set."  You're talking about
14 the benefits job?
15    A   Yes.
16    Q   Skill set is one of those wonderful human
17 resources words that can mean many things to many
18 different people.  So what exactly does it mean to you?
19    A   My background, my experience.
20    Q   Would you identify for us what do you think
21 exactly is your skill set ?
22    A   Researching cases, laws, conducting legal

Page 26

1  research, preparing analysis of legislation,
2  interpreting the law, different cases, case holdings,
3  applying those holdings to cases, issues, writing legal
4  memos.
5     Q   Interpersonal skills?
6     A   Yes.
7     Q   Okay.  Let me rephrase that more as a
8  question.  Do you think you have good -- strong
9  interpersonal skills?
10    A   Yes.
11    Q   Now before we get -- let me direct your
12 attention, again, back to the last few months that you
13 worked.  Do you recall offhand -- outside of FOIA and
14 Privacy Act processing, do you recall anything
15 specifically you were doing in the last, say, three to
16 six months?
17    A   No, I can't remember.
18    Q   How would you describe the amount of effort
19 that you had to put forth in your job?
20    A   I put forth great effort.
21    Q   Do you feel you were overworked?
22    A   At times.

Page 27

1     Q   Was that a regular condition or depending on
2  events?
3     A   It would depend on the workload.
4     Q   Were there days when you were underemployed?
5     A   No.
6     Q   Was it all just FOIA processing at that time?
7     A   No.  There were other things in the office.
8     Q   Okay, but you don't recall anything you can
9  put your finger on and say,  This is what kept me busy?
10    A   Within that last -- I was working on a
11 library of the counsel's office's legal opinions.
12    Q   Okay.
13    A   I had to read the legal opinions and
14 summarize them and enter them in a library.
15    Q   So you were reading and summarizing.  Where
16 were you summarizing?
17    A   What do you mean?  I don't understand the
18 question.
19    Q   Well, you said entering them in a library.
20 I'm confused, so I'm trying to explore that, exactly
21 what we mean.  So you were reading the opinions and you
22 were summarizing them.  So you were summarizing them in

Page 28

1  some place.  I mean, were you just writing up a little
2  summary of each one and turning it in to Fred, or what
3  were you doing?
4     A   No.  The summary is included in that
5  database, that library.
6     Q   Oh, so you were making a database.
7        MR. SHAPIRO:  A library, like she said.
8        BY MR. COSGROVE:
9     Q   Okay, and do you remember what kind of a
10 program you were using to do that?
11    A   Maybe Excel.
12    Q   It was part of the Office Suite.  Do you know
13 how much time that involved?
14    A   We had a backlog, so --
15    Q   Now I'd like you to turn your attention to
16 the actual transfer itself, that general time period.
17 You began studying for a management degree with
18 concentration in personnel, correct, in about the
19 summer of 2004?
20    A   Yes.
21    Q   And this was your personal interest?
22    A   Yes.

Page 29

1     Q   Now was it pure curiosity, or did you hope to
2  have something mature out of this?
3     A   Yes, I did.
4     Q   What was it that you were looking for?
5     A   A position in Human Resources.
6     Q   During the summer and fall of 2004 -- now we
7  know you had those conversations you talked about in
8  your affidavit with Fred about going to Human Resources
9  here at the I.G.  Did you talk to anyone else about a
10 transfer to this human resources office or any other
11 office?
12    A   No.
13    Q   Did you have the occasion during the last six
14 months or so of your employment to ever work with
15 anybody from --
16       MR. SHAPIRO:  Last six months of employment
17 at OIG Counsel?
18       MR. COSGROVE:  At OIG Counsel, correct.
19       THE WITNESS:  I'm sorry.
20       BY MR. COSGROVE:
21    Q   All right, during the last six months or so
22 that you worked as a paralegal, did you have occasion

**Page 30**

1  to work with anybody in Human Resources on any projects
2  or anything?
3      A   I don't think so.
4      Q   Now turn your attention to the conversations
5  you had with Fred, that you've already talked about in
6  your affidavit.  Do you recall about when these
7  started?
8      A   Maybe early 2004.
9      Q   Early in 2004.  All right, can you recall --
10  tell us about the conversations.
11      A   I think maybe it was following a performance
12  appraisal.  And I spoke to him about some career
13  changes.  And I did a -- I had to do a career
14  development plan at his direction.  And in that plan --
15  the plan covered employee relations and criminal
16  investigator training.
17      Q   Now after you did the career development plan
18  did you have any conversations with him about -- you
19  started to have conversations with him about going to
20  Personnel?
21      A   No.
22      Q   When was the first time you had a

**Page 31**

1  conversation with him about going to Personnel?
2      A   When he asked me, when he told me about a
3  benefits position there.
4      Q   Do you recall approximately when that was?
5      A   Maybe July or August 2004.
6      Q   Now you didn't want to go to benefits,
7  correct?
8      A   Correct.
9      Q   But you were interested in changing jobs to
10  Personnel?
11      A   Human resources, employee relations.
12      Q   Employee relations only?
13      A   Yes.
14      Q   To your knowledge, how many people are
15  employed in Employee Relations here at the I.G.'s
16  office, in our human resources branch?
17      A   One.
18      Q   And she's been here since it was set up,
19  correct?
20      A   I guess.
21      Q   Well, she's been here as long as you've known
22  her?

**Page 32**

1      A   Right.
2      Q   And that was prior to you actually
3  transferring to Human Resources, correct?
4      A   Right.
5      Q   When you identified your skill set earlier,
6  why do you think that's more appropriately related to
7  employee relations as opposed to benefits?
8      A   Because a lot of the EEO type cases that I've
9  briefed, Fred would sometimes forward them to Jan, who
10  was the employee relations specialist.
11      Q   Any other reason to have reached that
12  conclusion?
13      A   In the counsel's office you work on employee
14  -- complaints filed by employees.
15      Q   So if there had been -- so we're talking
16  about 2004 when your transfer was accomplished.  You
17  objected to being transferred to benefits.  Would you
18  have objected to being transferred to Employee
19  Relations?
20      A   No.
21      Q   Now upon your departure from the counsel's
22  office to go to Human Resources, what -- to your

**Page 33**

1  knowledge, what part of your work was transferred to
2  Theresa Fewell?
3      A   I don't know exactly.
4      Q   Do you know if anything was?
5      A   I can't recall, but I remember speaking to
6  maybe Chris or Fred about that, but I can't remember.
7      Q   You don't remember the content of the
8  conversation?
9      A   It was about the work.
10      Q   So you remember having a conversation with
11  either Fred or Chris about your work, correct?  Do you
12  remember anything else about the content of that work
13  with either Fred or Chris about your work?
14      A   No.
15      Q   And you don't remember them telling you what
16  of your work was to be transferred to Theresa?
17      A   No.
18      Q   Do you remember them telling you anything was
19  to be transferred to Theresa?
20      A   I think I do.
21      Q   Okay, now how about anybody else in the
22  office.  Do you recall them talking about transferring

Page 34

1  any of your work to anyone else?
2  A  No, I didn't talk to anyone else about that.
3  Q  Okay, but in your conversation with Fred or
4  Chris -- you're not sure which -- do you recall talking
5  about the transfer of any other part of your work to
6  anyone else in the office other than Theresa?
7  A  Theresa and Adriana.
8  Q  What do you remember them saying about
9  transferring your work to Adriana?
10  A  I'm not sure.  It was either Chris or Fred.
11  And a statement was made -- I don't think it was a
12  conversation.
13  Q  Okay, so a statement was made by either Chris
14  or Fred.  Do you recall the content of the statement?
15  A  I know -- I think maybe Chris, when I told
16  him that I was leaving he asked me who was going to
17  help with FOIAs.
18  Q  So Chris asked you if you knew who was going
19  to help with FOIA.  And did you have any information to
20  convey to him?
21  A  No, I didn't.
22  Q  Do you recall any other conversations with

Page 35

1  anybody about how your work was divided up after you
2  left the I.G. counsel's office?
3  A  No.  No, I don't think so.
4  Q  Now for the record, Adriana is Adriana
5  Fossberg, correct?
6  A  Yes.
7  Q  And how long have you known Ms. Fossberg?
8  A  Since she came here.
9  Q  And that would be approximately?
10  A  Maybe 2001.
11  Q  And you had known Ms. Fossberg when she was
12  employed as a law clerk?
13  A  Yes.
14  Q  Had you worked with her when she was a law
15  clerk?
16  A  Yes.
17  Q  Did you work with her after she was employed
18  as a lawyer?
19  A  I guess so.
20  Q  Do you have any specific recollection?
21  A  I don't know when she became a lawyer.  I
22  don't know.

Page 36

1  Q  You have no idea -- all right, you worked
2  with her when she was a law clerk?
3  A  Yes.
4  Q  And you remember her being hired about 2001.
5  Now do you recall her being hired as a law clerk or do
6  you recall her being hired as a lawyer in 2001?
7  A  Law clerk.
8  Q  Do you have any sense of when it was she
9  became a lawyer?
10  A  After graduating -- whenever she graduated.
11  Q  Well, as I said, do you have any sense of if
12  that was last year, three years ago?
13  A  She graduated from law school before I left.
14  I don't know the year.
15  Q  Okay, just some time before you left?
16  A  Right.
17  Q  Did you any particular tension or
18  disagreement with Ms. Fossberg over anything?
19  A  No.
20  Q  Did you get along with the other people in
21  the office fine?
22  A  Yes.

Page 37

1  Q  Did you ever have any disputes or
2  disagreements that you recall with anybody in the
3  office?
4  A  No.
5  Q  Are you at all familiar with Ms. Fossberg's
6  background on a personal level?
7  MR. SHAPIRO:  What do you mean, background on
8  a personal level?
9  BY MR. COSGROVE:
10  Q  Do you know anything about her parents, for
11  example?
12  A  Yes.
13  Q  Did you know that they were from Costa Rico?
14  A  I know that.  I found that out, I don't know,
15  maybe 2004.
16  Q  In -- I believe it's your rebuttal affidavit.
17  Let me dig it up.  Right here, you talk about the OIG
18  had recently hired additional auditors and criminal
19  investigators, okay.  And I think you originally talked
20  about new investigators.  So I'm trying -- I just want
21  to talk to you about what your understanding of that
22  was.  When you said additional, did you mean that they

Page 38

1  had expanded the number of investigators?
2    A  I guess.
3      MR. SHAPIRO: Let her read it.
4      MR. COSGROVE: Sure.
5    BY MR. COSGROVE:
6    Q  To your knowledge, when you say that they had
7  additional criminal investigators, did you think that
8  they had hired more?
9    A  Yes.
10   Q  Larger amounts, larger numbers?
11   A  Yes.
12   Q  And what is it that you base that belief on?
13   A  The e-mail traffic.
14   Q  Now what about the e-mail traffic that led
15  you to believe that they were hiring additional, as in
16  more, criminal investigators, than they had in the
17  past?
18   A  As always, Trina would send Patty an e-mail
19  when there was a position posted.
20   Q  So it was just from the postings?
21   A  Yes.
22   Q  Do you have any knowledge if those postings

Page 39

1  were actually intended to replace people who had left?
2    A  No.
3    Q  Did you have any knowledge -- when you're
4  talking about additional criminal investigators and
5  basing that on postings, do you have any knowledge that
6  anybody left the workplace?
7    A  Then?
8    Q  Yes.
9    A  E-mails would be sent out when people left.
10   Q  Now the same thing about auditors --
11     MR. SHAPIRO: What same thing about auditors?
12     MR. COSGROVE: I'm thinking about how to
13  actually state the question.
14     BY MR. COSGROVE:
15   Q  Was it your belief when you signed this
16  affidavit, which would be May of 2005, that at or about
17  the time that you left as a paralegal -- so that would
18  be in the fall, October 2004 -- the FDIC was hiring
19  additional auditors?
20   A  Yes.
21   Q  And upon what do you -- why do you believe
22  that?

Page 40

1    A  The e-mail traffic.
2    Q  Now what about the e-mail traffic led you to
3  believe that?
4    A  An e-mail would be sent out when positions
5  were posted. E-mails were sent out when people were
6  leaving.
7    Q  Prior to your departure from the I.G.
8  counsel's office, had you seen e-mail traffic about
9  downsizing?
10   A  Yes.
11   Q  And had you seen e-mail traffic about
12  downsizing specifically in the Office of Audit?
13   A  I don't know.
14   Q  Had you seen e-mails about buyouts being
15  offered?
16   A  Maybe one.
17   Q  Did you see anything of reductions in the
18  size of the I.G.'s office?
19   A  Yes.
20   Q  And what was your understanding of the
21  reduction in the size of the I.G.'s office generally?
22   A  Then, at that time, I know some people took a

Page 41

1  buyout.
2    Q  Do you have any clue as to the number of
3  people who did that?
4    A  No.
5    Q  Was it your sense that the I.G.'s office was
6  growing or getting smaller?
7    A  That's hard to say.
8    Q  I know it's hard to say today, but trying to
9  think best you can, to go back in your mind --
10   A  That's what I'm saying, back then it was hard
11  to say.
12   Q  Okay, never mind. Now how did you feel about
13  being transferred from the counsel's office to the HOUR
14  office?
15   A  I didn't like it.
16   Q  Now what about it didn't you like?
17   A  I was transferred to do benefits.
18   Q  Was it just the fact that you were doing
19  benefits that you didn't care for?
20   A  It was the way I was transferred.
21   Q  Well, what about it? What was the way that
22  you were transferred that bothered you?

Page 42

1    A    I was told it was my choice.
2    Q    You were told it was your choice?
3    A    I was asked if I was interested, and I said
4    no.
5    Q    Correct.
6    A    And I was told that was the end of it.
7    Q    Okay. And then ultimately you were
8    involuntarily transferred, correct?
9    A    Right.
10    Q    Now how did you feel after that happened?
11    A    I was upset.
12    Q    Now what about it that upset you, just
13    because it was involuntary?
14    A    The way things happened, going into a
15    position I knew nothing about.
16    Q    Okay.
17    A    Going to work with people who didn't feel
18    that I should have been there.
19    Q    Now did people make you comfortable when you
20    got there?
21    A    I don't know what you're asking.
22    Q    Okay, did anybody go out of their way to

Page 43

1    insult you after you were transferred?
2    A    No.
3    Q    Did they treat you like you were a boob who
4    knew nothing?
5    A    That's how I felt.
6    Q    Now why did you feel that way?
7    A    Well, it was told to me that I didn't have
8    the background for HOUR.
9    Q    Now who told you that?
10    A    Trina and Patty.
11    Q    And when was that?
12    A    Before I was actually transferred.
13    Q    Was that a calculated insult or an
14    observation?
15    A    I don't know.
16    Q    Now you had skills to conduct research,
17    correct?
18    A    Yes.
19    Q    And you knew how to apply the results of that
20    research to the facts of the situation?
21    A    Yes.
22    Q    And you have strong interpersonal skills?

Page 44

1    A    Yes.
2    Q    How would that have better qualified you for
3    an HR position than a benefits position?
4    A    Because I had been researching and
5    summarizing EEO cases. I had been conducting research
6    for some of those cases being litigated in the
7    counsel's office.
8    Q    Did you have any familiarity beyond that
9    research that you had done for lawyers?
10    A    What do you mean?
11    Q    Had you taken any courses in either employee
12    relations or benefits?
13    A    Employee relations, yes.
14    Q    So you were more familiar generally with the
15    outlining of the subject area?
16    A    In employee relations and EEO I had training.
17    Q    Now, what is it that leads you to believe that
18    Ms. Black involuntarily transferred you because you're
19    black, or an African-American?
20    A    Because I said -- I was told that it would be
21    my choice.
22    Q    Now who told you that?

Page 45

1    A    Fred Gibson.
2    Q    That was Mr. Gibson, correct. And it's
3    obvious that Ms. Black made it not your choice,
4    correct?
5    A    Correct.
6    Q    Now outside of the fact that she did it
7    involuntarily, she gave you no choice, do you have
8    anything that leads you to believe she did that because
9    you're an African-American?
10    A    Yes.
11    Q    And what's that?
12    A    For hiring Ms. Fossberg.
13    Q    Now Ms. Fossberg is a lawyer, correct?
14    A    Correct.
15    Q    And you're a paralegal?
16    A    Correct.
17    Q    Now I'll go at it a different way. I was
18    hired in July of 2001, correct? You were here then?
19    A    Yes.
20    Q    Ms. Fossberg was hired shortly after I was.
21    A    Okay.
22    Q    Okay, we're both lawyers?

Page 46

1    A    Okay.
2    Q    So why is it that the fact that hiring Ms.
3   Fossberg is proof that your transfer was discriminatory
4   when the fact of hiring me is not the same proof?
5        MR. SHAPIRO:  Objection, argumentative.
6   If you understand the question, you can answer, but
7   it's argumentative.  Objection.
8        THE WITNESS:  Well, from my understanding we
9   were at our core numbers in the counsel's office before
10  Adriana was hired.
11       BY MR. COSGROVE:
12   Q    And that would be approximately 2001?
13   A    I don't know what capacity you're talking
14  about as far as hiring her.  I don't know.
15   Q    Well, where did you get the idea we were at
16  our core numbers?
17       MR. SHAPIRO:  She's talking about when she
18  was moved and Adriana was brought on.
19       MR. COSGROVE:  Okay, we will accept that, in
20  2004 when you were moved.
21       BY MR. COSGROVE:
22   Q    Where did you get the idea that there was a

Page 47

1   core number?
2    A    Because I've heard it at our staff meetings.
3    Q    And you heard it described as core numbers?
4    A    Yes.
5    Q    What specifically do you recall hearing in
6   terms of core numbers of the counsel's office?
7    A    That we were at our core numbers, no empty
8   slots.
9    Q    I'm confused now.  What significance does
10  that have?
11   A    There were no slots to hire anybody in the
12  counsel's office.
13   Q    Okay, so from that you conclude that to hire
14  Ms. Fossberg -- it wasn't to be concluded.  Don't let
15  me put words in your mouth.
16   A    Say that again.
17   Q    I don't want to put words in your mouth.  So
18  what did you conclude from the fact that you understood
19  everything to be at core numbers?
20   A    That's why I was transferred out.
21   Q    What makes you think that the transfer of a
22  paralegal would create a vacancy for a lawyer?

Page 48

1    A    It creates a slot.
2    Q    Do you see them all as fungible, lawyers,
3   paralegals, legal technicians?
4    A    I don't know.
5    Q    Well, do you believe that to be the case?
6    A    I don't understand your question.
7    Q    All right, I'll go back to it again.  Because
8   I don't understand the analysis.  What in your mind
9   says to you that to hire Ms. Fossberg they had to get
10  rid of me and that is inherently because I'm an
11  African-American?
12       MR. SHAPIRO:  She's just said -- I think
13  she's answered that question.  You're asking for a
14  sophisticated explanation personnel-wise, but she's
15  talking about FTEs.  There's only so many FTEs.  They
16  needed one.  Because they were full up, they moved her
17  out of counsel.  FTE appears.  Fossberg gets hired.
18       BY MR. COSGROVE:
19   Q    Okay, assuming that that is all true, what
20  makes you believe that that was because you're African-
21  American?  That's what I'm trying to understand.
22   A    No one else got a direct reassignment out of

Page 49

1   that office.
2    Q    Was there any other paralegals?
3    A    No.
4    Q    Is there anything else other than the fact of
5   the reassignment that leads you to conclude that you
6   were discriminated against because of your race?
7    A    I guess that's it.
8    Q    Now if you had stayed as a paralegal in the
9   counsel's office, what would you have expected to
10  happen with your career thereafter?
11   A    Well, being a paralegal, I think, opened up a
12  lot of doors for other positions.
13   Q    They would not be in the counsel's office,
14  correct?
15   A    Maybe not.
16   Q    Well, let me rephrase that.  Can you think of
17  any position that it would have opened a door into in
18  the counsel's office?
19   A    Positions get upgraded and they have been in
20  OIG.
21   Q    Did you have any expectation that your
22  position as a paralegal would be upgraded?

Page 50

1  A  I didn't know.  I don't know.

2  Q  Well, I understand you didn't know for sure.

3  But did you have an expectation that it would happen?

4  A  No.

5  MR. COSGROVE:  Bear with me for two minutes.

6  MR. SHAPIRO:  I think you're closing in;

7  aren't you?

8  MR. COSGROVE:  I think we're pretty much

9  done, but bear with me for a couple of minutes.

10  BY MR. COSGROVE:

11  Q  I'd like to turn your attention to this part

12  of your affidavit which says you were aware that there

13  was an employee relations position open at the time --

14  now this is at the time that you were having the

15  discussions with Fred Gibson about transferring to HOUR

16  in benefits, correct?

17  A  Okay, yes.

18  Q  I'm trying to place it in time, when it says

19  you were aware.  I'm trying to figure out what time

20  you're aware.

21  A  An employee relations position had been

22  posted maybe shortly before my conversation with Fred.

Page 51

1  I don't remember exactly.

2  Q  Was that the Grade 14 position that talked

3  about people experienced in employee relations, staff,

4  classification and all the subspecialties?

5  A  I know that it was in employee relations.

6  Q  All right, do you have any clue as to what

7  grade level it was?

8  A  It was a 14.

9  Q  It was a 14.  So you were grade 11 at the

10  time?

11  A  Yes.

12  Q  Was there ever a position to which you could

13  transfer to Employee Relations advertised at the OIG?

14  A  No.

15  Q  Now here you talk about -- this paragraph.

16  I'll read it.  Particularly it says, "The I.G.

17  counsel's office seemed to have enough work to keep

18  this white woman busy and promoted but not enough to

19  keep me, a black woman, on.  Once surplus, I requested

20  permission to apply for detail as to other positions."

21  Now was your position ever identified as surplus in

22  like the C-TAP or IC-TAP matrix?

Page 52

1  A  No.

2  Q  So when you talk about being declared

3  surplus, are you talking about an official action or

4  just your understanding of the position you found

5  yourself in?

6  A  I based that on what Fred Gibson said to me.

7  Q  Now you said you asked for permission to

8  apply for other details.  What other details was it

9  that you were interested in applying for?

10  A  At HOUR -- I guess maybe it was an HOUR

11  position.

12  Q  And that would be where?

13  A  In the corporation.

14  Q  In the corporation, not in the I.G.'s office?

15  A  Right.

16  Q  Was that an announced detail opportunity?

17  A  Yes.

18  Q  And to your knowledge were they allowing

19  detail transfers back and forth between the FDIC and

20  the I.G.?

21  A  It was on a case by case basis.

22  Q  Had you ever applied for a position as an

Page 53

1  investigator?

2  A  In the FDIC?

3  Q  Yes, as an 1811?

4  A  I don't think so.

5  MR. COSGROVE:  Now I think I am finished.

6  MR. SHAPIRO:  Can we take five minutes?

7  MR. COSGROVE:  Sure.

8  (There was a recess in the deposition.)

9  (The deposition of Stacey K. Sharpe was

10  concluded at 11:47 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

Page 54

1          ACKNOWLEDGMENT OF DEPONENT
2    - - - - - - - - - - - - x
3    STACEY K. SHARPE,        :
4        Complainant,   :
5    -vs-            : EEOC No: 100-2005-00927X
6    MARTIN GRUENBERG,       : Agency No: FDICEO-05002
7    Chairman, Federal Deposit :
8    Insurance Corporation,   :
9        Agency.       :
10   - - - - - - - - - - - - x
11       I, Stacey K. Sharpe, hereby acknowledge that I
12   have read and examined pages 4 through 53, inclusive,
13   of the transcript of my deposition, and that except for
14   the changes noted in the attached Errata Sheet, the
15   same is an accurate and complete transcription of the
16   answers given by me to the questions herein recorded.
17   _____   _____
18   Date            Signature
19   Subscribed and sworn to before me this ___day of _____
20   _____
21          Notary Public
22   My commission expires:

Page 55

1          E R R A T A   S H E E T
2    In re: Stacey K. Sharpe v. Martin Gurenberg
3    Deposition of: Stacey K. Sharpe
4    Taken on:    Wednesday, February 1, 2006
5          At the time the above-named deponent read and
6    signed the deposition, the deponent desired to make the
7    following corrections:
8    PAGE: LINE: AS TRANSCRIBED:        CHANGE TO:
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   DATED:_____  SIGNED:_____

Page 56

1          CERTIFICATE OF NOTARY PUBLIC
2        I, Hedy D. Blau, the officer before whom the
3    foregoing deposition was taken, do hereby certify that
4    the witness whose testimony appears in the foregoing
5    deposition was duly sworn by me; that the testimony of
6    said witness was taken by me in shorthand and
7    thereafter reduced to typewriting under my direction;
8    that said deposition is a true record of the testimony
9    given by said witness; that I am neither counsel for,
10   nor related to any of the parties to the action in
11   which  this deposition was taken; and further that I am
12   not a relative or employee of any attorney or counsel
13   employed by the parties thereto, nor financially or
14   otherwise interested in the outcome of the action.
15
16
17   _____
18       Notary Public in and for the
19       District of Columbia
20
21   My commission expires:
22

**A**

ability 4:15
above-entitled 1:16
    4:4
above-named 55:5
accept 46:19
accepted 6:13
accomplished
    32:16
accumulating
    13:13
accurate 54:15
acknowledge 54:11
ACKNOWLED...
    54:1
Act 13:5,8,12 15:8
    23:22 24:1,7
    26:14
action 52:3 56:10
    56:14
actual 16:1 28:16
addition 22:3,5
    24:6
additional 37:18,22
    38:7,15 39:4,19
Additionally 25:5
Adriana 34:7,9
    35:4,4 46:10,18
adult 8:20
advertised 12:5
    51:13
affidavit 21:22
    22:9 23:2 24:12
    24:13 25:5 29:8
    30:6 37:16 39:16
    50:12
African 48:20
African-American
    44:19 45:9 48:11
agencies 20:6
agency 1:7,10,17
    2:2 3:3 4:7 19:22
    20:7 54:6,9
ago 9:21 36:12
allowing 52:18
American 48:21
amount 26:18

amounts 38:10
analyses 13:6
analysis 26:1 48:8
Andrea 14:8 17:18
announced 52:16
answer 46:6
answered 22:19
    48:13
answers 54:16
anybody 21:17
    23:9 29:15 30:1
    33:21 35:1 37:2
    39:6 42:22 47:11
apologize 4:13
APPEARANCES
    2:1
appears 48:17 56:4
applications 20:10
applied 12:5,20
    19:17,19 20:2,7,8
    52:22
apply 19:15 20:5
    43:19 51:20 52:8
applying 20:14
    26:3 52:9
appraisal 30:12
appropriately 32:6
approve 8:10
approved 8:4
approximately
    9:12 11:5 18:20
    21:11 31:4 35:9
    46:12
area 44:15
areas 20:13 21:3,4
argument 25:3
argumentative
    46:5,7
arrive 4:19
asked 22:13 31:2
    34:16,18 42:3
    52:7
asking 4:17 42:21
    48:13
assignments 16:16
    17:6
Associate 2:4

assuming 48:19
attached 13:6
attention 23:15
    26:12 28:15 30:4
    50:11
attorney 56:12
attorneys 15:16
    17:14
Audit 40:12
auditors 37:18
    39:10,11,19
August 31:5
award 18:16
awards 18:13 19:1
    19:1,10
aware 20:22 50:12
    50:19,20
a.m 1:20 53:10

**B**

bachelor's 6:12,15
back 14:17,20
    26:12 41:9,10
    48:7 52:19
background 5:5
    25:19 37:6,7 43:8
backlog 28:14
Baltimore 6:5
base 38:12
based 52:6
basing 39:5
basis 52:21
bear 50:5,9
began 28:17
beginning 1:20
behalf 1:22
belief 38:12 39:15
believe 37:16 38:15
    39:21 40:3 44:17
    45:8 48:5,20
benefits 20:20 22:2
    22:10 23:3,8
    25:14 31:3,6 32:7
    32:17 41:17,19
    44:3,12 50:16
best 41:9
better 44:2

beyond 44:8
big 15:1,3,13,13,17
bills 16:14
birth 5:6
bit 5:5
black 12:9,13 14:8
    44:18,19 45:3
    51:19
Blau 1:20 56:2
Bob 10:17
boob 43:3
born 5:7,10
bothered 41:22
branch 31:16
break 4:22 5:1
brief 25:2
briefed 32:9
briefing 24:21
briefs 24:13,16,19
brought 46:18
busy 27:9 51:18
buyout 41:1
buyouts 40:14
B.A 6:16

**C**

calculated 43:13
call 4:12
called 1:16 4:4
calling 4:10
capacity 46:13
care 41:19
career 30:12,13,17
    49:10
case 24:20,21,22
    26:2 48:5 52:21
    52:21
cases 24:14,16,19
    25:3,22 26:2,3
    32:8 44:5,6
cause 1:16 4:4
CERTIFICATE
    56:1
certify 56:3
Chairman 1:8 54:7
chance 6:2
change 9:19 55:8

changed 10:15
changes 30:13
    54:14
changing 31:9
children 5:19
choice 42:1,2 44:21
    45:3,7
Chris 14:5,10
    15:15 17:10,12,19
    33:6,11,13 34:4
    34:10,13,15,18
Clark 10:17
classes 6:14 8:10
classification 20:21
    51:4
clerk 9:4,9,16 10:3
    35:12,15 36:2,5,7
clerks 14:12
closing 50:6
clue 41:2 51:6
college 6:3,6,7
Columbia 1:21
    56:19
come 12:2 17:15,16
comfortable 42:19
coming 14:19 17:6
commission 1:1
    54:22 56:21
common 4:19
comparing 15:5
Complainant 1:5
    2:11 3:3 54:4
complaints 32:14
complete 54:15
completed 6:21
computer 11:22
concentration
    28:18
conclude 47:13,18
    49:5
concluded 47:14
    53:10
conclusion 32:12
condition 27:1
conduct 43:16
conducting 25:22
    44:5

confused 22:22
  27:20 47:9
congressional
  16:14
content 33:7,12
  34:14
contest 4:21
continue 17:7
controls 11:21
convention 4:10
conversation 31:1
  33:8,10 34:3,12
  50:22
conversations
  21:20 22:3,4,9,13
  22:15,17,18 23:2
  23:6,9,13 29:7
  30:4,10,18,19
  34:22
convey 34:20
core 46:9,16 47:1,3
  47:6,7,19
corporation 1:9,18
  2:6 52:13,14 54:8
correct 5:13,19
  6:18 7:9 14:10
  16:21 17:22 20:17
  23:4 28:18 29:18
  31:7,8,19 32:3
  33:11 35:5 42:5,8
  43:17 45:2,4,5,13
  45:14,16,18 49:14
  50:16
corrections 55:7
COSGROVE 2:3
  3:4 4:8 11:5,7
  14:21 15:2,9,11
  22:21 23:14 25:10
  25:11 28:8 29:18
  29:20 37:9 38:4,5
  39:12,14 46:11,19
  46:21 48:18 50:5
  50:8,10 53:5,7
Costa 37:13
counsel 1:17 2:4
  3:2 4:7 12:13
  29:17,18 48:17

56:9,12
counsel's 18:21
  19:14 23:19 24:10
  27:11 32:13,21
  35:2 40:8 41:13
  44:7 46:9 47:6,12
  49:9,13,18 51:17
couple 9:20 19:5,19
  50:9
course 16:2 18:12
  18:19 19:10 21:9
courses 8:4 44:11
covered 30:15
create 47:22
creates 48:1
criminal 30:15
  37:18 38:7,16
  39:4
curiosity 29:1
currently 7:8
C-O-N-T-E-N-T-S
  3:1
C-TAP 51:22

**D**

D 1:20 56:2
database 28:5,6
date 5:6 54:18
DATED 55:22
DAVID 2:12
day 54:19
days 27:4
day-to-day 16:18
Debbie 23:4,8
decision 7:20
declared 52:2
decreased 15:6
degree 11:3 28:17
Department 9:3
departure 32:21
  40:7
depend 27:3
depended 15:22
depending 27:1
deponent 54:1 55:5
  55:6
Deposit 1:8 2:6

54:7
deposition 1:14
  53:8,9 54:13 55:3
  55:6 56:3,5,8,11
deputees 12:16
deputy 12:17
describe 26:18
described 47:3
desired 55:6
detail 51:20 52:16
  52:19
details 52:8,8
determine 13:10,19
development 7:18
  30:14,17
different 13:4
  25:18 26:2 45:17
dig 37:17
direct 16:18 17:4
  26:11 48:22
direction 30:14
  56:7
directly 17:9,12
disagreement
  36:18
disagreements 37:2
discriminated 49:6
discriminatory
  46:3
discussions 50:15
disputes 37:1
disrespect 4:13
District 1:21 56:19
DIT 9:18 10:9,10
divided 35:1
division 9:19 10:11
  10:12,20 11:13
documents 13:22
  15:18
doing 10:1 16:15
  19:9 21:12 23:19
  24:13 26:15 28:3
  41:18
door 49:17
doors 49:12
downsizing 40:9,12
downstairs 23:7

drafting 13:5
duly 4:5 56:5
duties 13:2 18:13
D.C 1:13,19 2:9,17
  5:10

**E**

E 55:1,1,1
earlier 32:5
earliest 8:20
early 30:8,9
EEO 24:14,16,19
  24:20 32:8 44:5
  44:16
EEOC 1:6 54:5
effort 26:18,20
either 12:8 33:11
  33:13 34:10,13
  44:11
employ 16:19
employed 14:7,12
  19:13 31:15 35:12
  35:17 56:13
employee 20:19
  30:15 31:11,12,15
  32:7,10,13,18
  44:11,13,16 50:13
  50:21 51:3,5,13
  56:12
employees 32:14
employment 1:1
  16:3 21:10 29:14
  29:16
empty 47:7
ended 6:14 9:11
endurance 4:21
English 4:16
enter 27:14
entering 27:19
EQUAL 1:1
Errata 54:14
ESQUIRE 2:3,12
  2:13
events 27:2
eventually 16:21
Everett 5:16
exactly 13:8 15:16

24:14,15,18 25:6
  25:18,21 27:20
  33:3 51:1
examination 1:17
  3:2 4:5,7
examined 4:6 54:12
example 37:11
Excel 28:11
exclusive 22:15
Exhibit 3:8
expanded 38:1
expectation 49:21
  50:3
expected 49:9
experience 25:19
experienced 51:3
expires 54:22 56:21
explanation 48:14
explore 27:20
Eye 2:15
e-mail 38:13,14,18
  40:1,2,4,8,11
e-mails 39:9 40:5
  40:14
E-X-H-I-B-I-T-S
  3:7

**F**

fact 41:18 45:6
  46:2,4 47:18 49:4
facts 43:20
fall 7:13 29:6 39:18
familiar 21:6 37:5
  44:14
familiarity 44:8
far 5:2 46:14
FDIC 9:16 20:5,8
  39:18 52:19 53:2
FDICEO-05002
  1:7 54:6
February 1:12 55:4
Federal 1:8,18 2:6
  54:7
feel 26:21 41:12
  42:10,17 43:6
felt 43:5
Fewell 14:9 33:2

**FIELD** 1:2
**figure** 23:1 50:19
**file** 6:20
**filed** 32:14
**financially** 56:13
**find** 24:14
**fine** 15:17 36:21
**finger** 27:9
**finished** 53:5
**first** 4:5 5:4 6:16
  8:5,6,7 13:2 16:19
  18:16 25:12 30:22
**five** 53:6
**Floor** 1:19 2:8
**FOIA** 13:4,7,11
  14:18 15:8,14
  17:8,9 18:17
  23:21 24:6 26:13
  27:6 34:19
**FOIAs** 19:6 34:17
**following** 30:11
  55:7
**follows** 4:6
**foregoing** 56:3,4
**forgot** 9:18
**forth** 26:19,20
  52:19
**forward** 32:9
**Fossberg** 35:5,7,11
  36:18 45:12,13,20
  46:3 47:14 48:9
  48:17
**Fossberg's** 37:5
**found** 37:14 52:4
**four** 6:10,11 18:18
  22:2,9 23:1
**Fred** 8:7 14:8 17:18
  18:10 19:2 21:16
  22:1 23:2,7 28:2
  29:8 30:5 32:9
  33:6,11,13 34:3
  34:10,14 45:1
  50:15,22 52:6
**Frolich** 12:11,16
  14:8 16:17 17:3
**FTE** 48:17
**FTEs** 48:15,15

**full** 48:16
**full-time** 7:6 8:20
  9:7
**fungible** 48:2
**further** 56:11

**G**

**gathering** 13:16
**Geisler** 14:5 15:15
  17:10
**general** 1:18 2:5
  19:9 28:16
**generally** 40:21
  44:14
**getting** 6:15 41:6
**GG** 10:6,8
**Gibson** 8:7 14:8
  17:3 19:2 21:16
  45:1,2 50:15 52:6
**given** 54:16 56:9
**go** 5:1,4 6:2,2,7,10
  6:11 7:1,3,20 8:22
  10:9 11:13 13:22
  20:6 31:6 32:22
  41:9 42:22 45:17
  48:7
**going** 4:9,12 7:8
  11:3 22:10,14
  23:3,7,9 29:8
  30:19 31:1 34:16
  34:18 42:14,17
**Gonza** 23:4,8
**good** 4:9 19:9 26:8
**gotten** 6:1
**grade** 9:10 10:4
  12:20,21 18:6,10
  18:11 51:2,7,9
**graduate** 7:8,21 8:1
**graduated** 36:10,13
**graduating** 36:10
**great** 26:20
**growing** 41:6
**GRUENBERG** 1:7
  54:6
**guess** 31:20 35:19
  38:2 49:7 52:10
**Gurenberg** 55:2

**H**

**H** 2:12 55:1
**happen** 49:10 50:3
**happened** 42:10,14
**hard** 7:7 15:10 41:7
  41:8,10
**heard** 47:2,3
**hearing** 47:5
**Hedy** 1:20 56:2
**help** 34:17,19
**helping** 8:1
**high** 8:21 9:2
**hire** 47:11,13 48:9
**hired** 36:4,5,6
  37:18 38:8 45:18
  45:20 46:10 48:17
**hiring** 12:7 38:15
  39:18 45:12 46:2
  46:4,14
**history** 9:1
**hold** 11:16
**holdings** 26:2,3
**hope** 29:1
**HOUR** 21:17 41:13
  43:8 50:15 52:10
  52:10
**HR** 44:3
**huge** 15:14
**human** 19:19 20:4
  25:16 29:5,8,10
  30:1 31:11,16
  32:3,22

**I**

**IC-TAP** 51:22
**idea** 17:1 36:1
  46:15,22
**identified** 32:5
  51:21
**identify** 25:20
**important** 4:15
**included** 28:4
**including** 22:3
**inclusive** 54:12
**increased** 15:6
**indicated** 22:1
**information** 10:2

13:11,14,17 34:19
**inherently** 48:10
**Initially** 16:16
**inquiries** 21:12,15
**Inspector** 1:18 2:5
**insult** 43:1,13
**Insurance** 1:9,18
  2:6 54:8
**intended** 39:1
**interest** 28:21
**interested** 31:9
  42:3 52:9 56:14
**internal** 11:20
**internally** 19:21
  21:13
**interpersonal** 26:5
  26:9 43:22
**interpreting** 26:2
**interview** 12:18
**interviewed** 12:19
**Investigation** 22:1
**investigator** 30:16
  53:1
**investigators** 37:19
  37:20 38:1,7,16
  39:4
**involuntarily** 42:8
  44:18 45:7
**involuntary** 42:13
**involved** 13:20
  15:15 16:1 25:3
  28:13
**involvement** 16:3
**IRIS** 11:18,19
**issues** 26:3
**I.G** 8:1 12:2,13
  14:6 17:21 19:13
  19:14,21 20:9
  21:11,13 29:9
  31:15 35:2 40:7
  40:18,21 41:5
  51:16 52:14,20

**J**

**Jan** 32:9
**January** 8:17
**job** 19:9 22:2,7

25:14 26:19
**jobs** 8:21 19:15,17
  20:2 31:9
**Journalism** 6:17
**July** 31:5 45:18

**K**

**K** 1:4,15 2:13 3:3
  4:3 53:9 54:3,11
  55:2,3
**keep** 51:17,19
**kept** 27:9
**kind** 11:16 16:6
  20:2 28:9
**knew** 34:18 42:15
  43:4,19
**know** 4:18 5:19 6:1
  14:14,22 15:14
  17:2 20:2,9,22
  21:2,8 23:1 28:12
  29:7 33:3,4 34:15
  35:21,22 36:14
  37:10,13,14,14
  40:13,22 41:8
  42:21 43:15 46:13
  46:14 48:4 50:1,1
  50:2 51:5
**knowledge** 31:14
  33:1 38:6,22 39:3
  39:5 52:18
**known** 31:21 35:7
  35:11

**L**

**language** 4:16
**larger** 38:10,10
**Larry** 12:8,11,11
  14:8 16:17,21
  17:18 18:10
**law** 6:21 7:1,2 26:2
  35:12,14 36:2,5,7
  36:13
**laws** 13:4 16:7
  25:22
**lawyer** 35:18,21
  36:6,9 45:13
  47:22

**lawyers** 44:9 45:22
   48:2
**leads** 44:17 45:8
   49:5
**leaving** 34:16 40:6
**led** 38:14 40:2
**left** 16:21 17:3,18
   18:2 35:2 36:13
   36:15 39:1,6,9,17
**legal** 6:18 10:11,12
   10:20,21 11:12,13
   13:5 14:7 25:2,22
   26:3 27:11,13
   48:3
**legislation** 16:7,13
   16:14 26:1
**level** 37:6,8 51:7
**LG** 10:7
**library** 27:11,14,19
   28:5,7
**line** 8:5,7 55:8
**litigated** 44:6
**litigation** 10:18
   16:4
**little** 5:5 19:7 28:1
**located** 13:21
**long** 7:3 25:3 31:21
   35:7
**looking** 29:4
**lot** 6:13 32:8 49:12
**lots** 15:17 25:3

**M**
**making** 28:6
**management** 28:17
**mangle** 4:16
**married** 5:13
**Martin** 1:7 54:6
   55:2
**Maryland** 6:4,8,12
   6:13,13,15
**match** 25:13
**matrix** 51:22
**mature** 29:2
**mean** 4:13 11:4
   12:9 15:7,13,17
   24:18 25:6,17,18

27:17,21 28:1
   37:7,22 44:10
**meaningfully** 19:8
**meetings** 47:2
**memos** 26:4
**MICHAEL** 2:3
**Mikael** 14:16
**mind** 41:9,12 48:8
**minute** 22:20
**minutes** 50:5,9
   53:6
**moment** 17:21
**months** 23:16,20
   26:12,16 29:14,16
   29:21
**morning** 4:9
**mouth** 47:15,17
**move** 17:20
**moved** 46:18,20
   48:16

**N**
**name** 5:15 9:19
   10:15 11:20
**names** 9:20
**Navy** 9:3
**need** 4:22
**needed** 48:16
**neither** 56:9
**never** 41:12
**new** 37:20
**Northwest** 1:19 2:7
   2:15
**Notary** 1:21 54:21
   56:1,18
**noted** 54:14
**number** 15:7 38:1
   41:2 47:1
**numbers** 38:10
   46:9,16 47:3,6,7
   47:19

**O**
**objected** 32:17,18
**Objection** 46:5,7
**observation** 43:14
**obvious** 45:3

**obviously** 18:4
**occasion** 4:14 19:15
   29:13,22
**October** 39:18
**offered** 40:15
**offers** 20:11
**offhand** 20:22
   26:13
**office** 1:2,17 2:5
   12:2 14:6,7,19
   18:21 19:13,14,14
   19:21 20:10 21:11
   21:13 23:19 24:10
   27:7 28:12 29:10
   29:11 31:16 32:13
   32:22 33:22 34:6
   35:2 36:21 37:3
   40:8,12,18,21
   41:5,13,14 44:7
   46:9 47:6,12 49:1
   49:9,13,18 51:17
   52:14
**officer** 56:2
**office's** 27:11
**official** 12:7 52:3
**Oh** 28:6
**OICM** 11:15,15
**OIG** 13:19 20:1
   29:17,18 37:17
   49:20 51:13
**okay** 4:18 5:5,9
   7:20 8:11,13 9:5
   9:15,20 11:12,16
   13:18 19:12 20:16
   22:11,22 23:17
   24:15,21 25:6
   26:7 27:8,12 28:9
   33:21 34:3,13
   36:15 37:19 41:12
   42:7,16,22 45:21
   45:22 46:1,19
   47:13 48:19 50:17
**onboard** 13:3 14:6
   17:21
**once** 13:21 51:19
**open** 50:13
**opened** 49:11,17

**opinions** 27:11,13
   27:21
**OPM** 9:6,8,10
**opportunity** 1:1
   52:16
**opposed** 32:7
**oral** 4:5
**originally** 37:19
**outcome** 56:14
**outlining** 44:15
**outside** 17:8,12
   19:22 20:1,7,8
   24:9 26:13 45:6
**overlap** 11:2,4
**overworked** 26:21

**P**
**PA** 23:21,22
**Page** 3:8 55:8
**pages** 25:2 54:12
**paragraph** 51:15
**paralegal** 6:19 11:3
   11:9 12:22 16:3
   18:13 21:10 23:17
   29:22 39:17 45:15
   47:22 49:8,11,22
**paralegals** 48:3
   49:2
**parents** 37:10
**part** 8:14 17:8,11
   28:12 33:1 34:5
   50:11
**particular** 21:4
   36:17
**Particularly** 51:16
**parties** 1:22 56:10
   56:13
**part-time** 8:21
**Pat** 12:8,9,9 14:8
**Patty** 38:18 43:10
**pay** 8:1
**people** 14:4 25:18
   31:14 36:20 39:1
   39:9 40:5,22 41:3
   42:17,19 51:3
**performance** 18:12
   30:11

**period** 28:16
**permanent** 9:7
**permission** 51:20
   52:7
**personal** 7:17,19
   7:20 28:21 37:6,8
**personnel** 7:15
   8:15 20:16 21:12
   22:10,15 23:10
   28:18 30:20 31:1
   31:10
**personnel-wise**
   48:14
**phrase** 24:14,15
   25:6,12
**place** 28:1 50:18
**plan** 7:18 30:14,14
   30:15,17
**please** 4:17
**point** 8:11 9:17
   10:2 11:14
**polite** 4:10
**position** 8:21 9:7
   10:6,7 11:16 12:5
   12:22 29:5 31:3
   38:19 42:15 44:3
   44:3 49:17,22
   50:13,21 51:2,12
   51:21 52:4,11,22
**positions** 19:20
   20:8 40:4 49:12
   49:19 51:20
**posted** 38:19 40:5
   50:22
**postings** 38:20,22
   39:5
**practice** 17:6
**predecessor** 10:10
**prepared** 24:15,19
**preparing** 24:13
   25:2 26:1
**prerequisites** 6:14
**present** 1:22
**pretty** 50:8
**principally** 16:15
**prior** 6:12 9:19
   32:2 40:7

Privacy 13:5,7,12
   15:8 23:22 24:1,6
   26:14
probably 9:20
process 13:8
processed 13:7
processing 13:4
   16:1 23:21 26:14
   27:6
program 7:15 9:3
   28:10
project 19:9
projects 19:11,12
   24:2 30:1
promoted 18:4,5,9
   18:10,11 51:18
proof 46:3,4
proposed 16:7
Public 1:21 54:21
   56:1,18
pure 29:1
pursuant 7:17
   13:17
put 26:19,20 27:9
   47:15,17
P-R-O-C-E-E-D-...
   4:1
P.C 2:14

**Q**
qualified 44:2
question 4:17 11:6
   22:17,19 26:8
   27:18 39:13 46:6
   48:6,13
questions 5:2 54:16

**R**
R 55:1,1
race 49:6
raised 5:11
reached 32:11
read 27:13 38:3
   51:16 54:12 55:5
reading 27:15,21
reason 4:22 32:11
reassignment 48:22

49:5
rebuttal 37:16
recall 10:22 15:3
   16:12 19:17 21:19
   26:13,14 27:8
   30:6,9 31:4 33:5
   33:22 34:4,14,22
   36:5,6 37:2 47:5
receive 18:13,16,18
   20:11
recess 53:8
recollection 15:5
   18:22 19:3 35:20
record 5:1 35:4
   56:8
recorded 54:16
records 13:19,21
redactions 14:1
reduced 56:7
reduction 40:21
reductions 40:17
references 6:20
regular 27:1
related 19:5 24:16
   32:6 56:10
relations 20:19
   30:15 31:11,12,15
   32:7,10,19 44:12
   44:13,16 50:13,21
   51:3,5,13
relative 56:12
releasable 13:11
remember 4:9 9:12
   9:13 10:6,16
   12:18 14:15 15:16
   18:9 20:3 21:7,18
   23:11 24:3,11,12
   26:17 28:9 33:5,6
   33:7,10,12,15,18
   34:8 36:4 51:1
rephrase 19:7 26:7
   49:16
replace 23:8 39:1
replacing 23:3
Report 21:22
request 13:9,17,18
   15:14,22

requested 51:19
requests 13:5,8
   14:18 15:8 23:21
research 13:4 16:6
   16:15 24:2,3 26:1
   43:16,20 44:5,9
researched 16:7
researching 25:22
   44:4
resources 19:19
   20:4 25:17 29:5,8
   29:10 30:1 31:11
   31:16 32:3,22
respective 1:22
result 20:10
results 43:19
RICHARD 2:13
Rico 37:13
rid 48:10
right 5:2 6:10 9:12
   17:20 20:16,18
   23:5,6 29:21 30:9
   32:1,4 36:1,16
   37:17 42:9 48:7
   51:6 52:15
role 13:13,16
Romano 14:9
roughly 8:18 9:13

**S**
s 2:3 12:2 14:6
   19:13,14,21 20:9
   21:11,13 31:15
   40:18,21 41:5
   52:14 55:1
saw 6:20
saying 34:8 41:10
says 48:9 50:12,18
   51:16
school 6:21 7:1,2,9
   7:21 8:2,22 9:2,3
   36:13
Sebastian 14:16
second 6:15,18 8:5
section 13:19
see 40:17 48:2
seen 40:8,11,14

selected 12:6
semester 7:13 8:17
   8:18
semesters 7:4
send 38:18
sense 14:18 15:12
   17:13 36:8,11
   41:5
sent 39:9 40:4,5
sentence 25:12
Services 5:18
serving 18:6
set 25:6,7,13,16,21
   31:18 32:5
Shapiro 2:12,14
   3:4 11:4 14:20
   15:7 22:16 23:12
   25:8 28:7 29:16
   37:7 38:3 39:11
   46:5,17 48:12
   50:6 53:6
Sharpe 1:4,15 3:3
   4:3,10 5:16,17
   53:9 54:3,11 55:2
   55:3
Sheet 54:14
shorthand 56:6
shortly 45:20 50:22
show 25:8
Signature 54:18
signed 19:1 39:15
   55:6,22
significance 47:9
situation 43:20
six 18:20 23:16,20
   26:16 29:13,16,21
size 40:18,21
skill 25:6,7,13,16
   25:21 32:5
skills 26:5,9 43:16
   43:22
slip 4:12
slot 48:1
slots 47:8,11
smaller 15:21 41:6
sophisticated 48:14
sorry 13:15 29:19

sort 7:18
sought 13:11
sources 16:10
speaking 33:5
special 19:8
specialist 20:4
   32:10
specialty 20:13
   21:3,4
specific 19:8,11,12
   35:20
specifically 26:15
   40:12 47:5
spoke 22:1 30:12
spouse's 5:15
spring 8:18
Stacey 1:4,15 3:3
   4:3,12 53:9 54:3
   54:11 55:2,3
staff 47:2 51:3
Staffing 20:19
start 5:6 7:11
started 6:8,13 8:6,9
   8:12,13,15 9:2,11
   9:14 11:1,9 14:20
   30:7,19
Starting 8:20
state 39:13
statement 34:11,13
   34:14
stay 9:3 15:21
stayed 15:6 20:9
   49:8
STEPHANIE 2:13
stop 7:5
Street 1:19 2:7,15
strong 26:8 43:22
studies 6:18,19
   11:3,9
studying 28:17
subject 44:15
Subscribed 54:19
subsection 10:14
subspecialties
   20:17 51:4
Suite 2:16 28:12
summaries 13:5

summarize 27:14
Summarized 24:20
summarizing 27:15
27:16,22,22 44:5
summary 28:2,4
summer 7:14 28:19
29:6
supervisor 5:18 8:7
8:8 10:17 16:18
17:4,7
supervisors 8:5
Support 5:18
sure 4:11,18,19
10:5 22:12 24:1
25:10 34:4,10
38:4 50:2 53:7
surplus 51:19,21
52:3
Swick 2:14
sworn 4:6 54:19
56:5
system 11:20,22

**T**

T 55:1,1
take 5:1 53:6
taken 44:11 55:4
56:3,6,11
talk 21:17 24:13
29:9 34:2 37:17
37:21 51:15 52:2
talked 15:13 29:7
30:5 37:19 51:2
talking 22:6,8,18
22:19 25:13 32:15
33:22 34:4 39:4
46:13,17 48:15
52:3
technician 10:21
11:12,18
technicians 48:3
Technology 10:2
tell 18:15,17 30:10
telling 5:6 33:15,18
tend 17:16
tension 36:17
terms 15:7,20 21:3

47:6
testified 4:6
testimony 56:4,5,8
Theresa 14:9 33:2
33:16,19 34:6,7
thereto 56:13
thing 4:15 5:4
39:10,11
things 25:17 27:7
42:14
think 6:8 7:14 8:19
9:14 10:19 16:16
18:10,16 19:5
21:5,8,18 22:16
23:11,16 24:1
25:20 26:8 30:3
30:11 32:6 33:20
34:11,15 35:3
37:19 38:7 41:9
47:21 48:12 49:11
49:16 50:6,8 53:4
53:5
thinking 14:17
39:12
Thomas 16:8,9,13
three 22:1,8 23:1
26:15 36:12
time 10:4 11:2,5
12:14 14:7 15:21
15:22 16:2 18:21
21:9 24:10 27:6
28:13,16 30:22
36:15 39:17 40:22
50:13,14,18,19
51:10 55:5
times 18:5 22:2
26:22
today 14:18 41:8
told 31:2 34:15
42:1,2,6 43:7,9
44:20,22
traffic 38:13,14
40:1,2,8,11
training 20:20 21:5
30:16 44:16
TRANSCRIBED
55:8

transcript 6:1
54:13
transcription 54:15
transfer 28:16
29:10 32:16 34:5
46:3 47:21 51:13
transferred 9:6
32:17,18 33:1,16
33:19 41:13,17,20
41:22 42:8 43:1
43:12 44:18 47:20
transferring 32:3
33:22 34:9 50:15
transfers 52:19
treat 43:3
trick 11:6
Trina 23:3,8 38:18
43:10
true 48:19 56:8
try 4:9,18 19:7
trying 4:20 22:22
27:20 37:20 41:8
48:21 50:18,19
turn 23:15 28:15
30:4 50:11
turning 28:2
two 5:2 7:4 17:19
50:5
type 11:22 32:8
typewriting 56:7
typist 9:4,9

**U**

UDC 6:12,12,16
7:2
ultimately 42:7
uncomprehension
4:16
underemployed
27:4
understand 4:17
20:15 22:12 27:17
46:6 48:6,8,21
50:2
understanding
4:20 37:21 40:20
46:8 52:4

understands 22:16
understood 47:18
University 6:4,6
upgraded 49:19,22
upset 42:11,12
use 16:10
U.S 1:1

**V**

v 55:2
vacancy 47:22
vs 1:6 54:5

**W**

Wait 22:20
want 31:6 37:20
47:17
Washington 1:2,13
1:19 2:9,17 5:10
5:11
wasn't 47:14
way 41:20,21 42:14
42:22 43:6 45:17
Wednesday 1:12
55:4
went 6:4,11 7:4
8:15 11:15 15:21
15:22 18:7
we'll 5:1 17:20
we're 22:8,22 32:15
45:22 50:8
whatsoever 4:22
white 51:18
witness 11:3:2
4:4 14:22 15:10
22:20 29:19 46:8
56:4,6,9
woman 51:18,19
wonderful 25:16
words 25:17 47:15
47:17
work 4:18 8:22
9:17 17:9,12
21:12 22:14 23:7
23:10 24:7,9
29:14 30:1 32:13
33:1,9,11,12,13

33:16 34:1,5,9
35:1,17 42:17
51:17
worked 4:11 7:6
10:16 17:13 18:17
23:16 26:13 29:22
35:14 36:1
working 9:2 14:3,5
22:10 23:3 27:10
workload 27:3
workplace 39:6
worry 8:21
writing 26:3 28:1

**X**

x 1:3,11 54:2,10

**Y**

yardstick 15:20
year 9:6 11:15 17:2
18:6 19:10 21:10
21:21 36:12,14
years 4:11 6:10,11
18:18,20 36:12

**1**

1 1:12 55:4
10th 1:19 2:8
10:28 1:20
100-2005-00927X
1:6 54:5
11 18:2,7,11 51:9
11:47 53:10
1225 2:15
1290 2:16
14 51:2,8,9
17th 1:19 2:7
1811 53:3
1990 9:16
1998 12:3 14:17

**2**

2 9:11
20 25:2
20005 2:17
2001 35:10 36:4,6
45:18 46:12
2003 21:11 22:14

**2004** 7:12 15:6
   19:15 21:11 22:14
   28:19 29:6 30:8,9
   31:5 32:16 37:15
   39:18 46:20
**2005** 8:18 39:16
**2006** 1:12 55:4
**202** 2:10,18
**20434** 1:20 2:9

---
**4**
---
**4** 3:5 9:11 54:12
**416-4230** 2:10

---
**5**
---
**5** 10:5
**5/15/1968** 5:8
**53** 54:12

---
**6**
---
**6** 10:5

---
**7**
---
**7** 12:21 17:21 18:7

---
**8**
---
**801** 1:18 2:7
**842-0300** 2:18
**87** 9:14

---
**9**
---
**9** 18:7,7,10
**93** 6:8 11:1,8
**94** 6:9 11:8,11
**98** 15:5 19:13,14