UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - x
                                    :
STACEY K. SHARPE,            :
                                    :
      Complainant,          :
                                    :
      v.                    : EEOC#100-2005-00927X
                            : Agency No.
                            : FDICEO-050002
MARTIN GRUENBERG, CHAIRMAN,  :
FEDERAL DEPOSIT INSURANCE CORP.,:
                                    :
      Agency.               :
- - - - - - - - - - - - - - x

Washington, D.C.

Tuesday, February 7, 2006

Deposition of

FREDERICK W. GIBSON, JR.,

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Ed

Greenberg, Notary Public in and for the District of

Columbia, in the offices of Swick & Shapiro, 1225 I

Street, N.W., Suite 1290, Washington, D.C., commencing

at 10:09 a.m.

## CONTENTS

EXAMINATION BY:                              PAGE

   Counsel for Complainant                      4

GIBSON DEPOSITION EXHIBITS:

1 - 11/1/04 memo to Trina Petty              137

---

APPEARANCES:

   On Behalf of the Complainant:

      DAVID SHAPIRO, ESQ.
      STEPHANIE K. RICHARD, ESQ.
      Swick & Shapiro, P.C.
      1225 Eye Street, N.W.
      Washington, D.C. 20005
      (202) 842-0300

   On Behalf of the Agency:

      MICHAEL S. COSGROVE, ESQ.
      Federal Deposit Insurance Corporation
      801 17th Street, N.W., 10th Floor
      Washington, D.C. 20434
      (202) 416-4230

1         PROCEEDINGS
2   Whereupon,
3         FREDERICK W. GIBSON, JR.,
4   was called as a witness and, having been first duly
5   sworn, was examined and testified as follows:
6              EXAMINATION
7      BY MR. SHAPIRO:
8      Q  Can you state your name, please, sir?
9      A  Frederick W. Gibson, Jr.
10     Q  And can you tell us where you live?
11     A  I live at 10805 Windermere Lane, Fairfax
12  Station, Virginia.
13     Q  No plans to move.
14     A  Not at the moment.
15     Q  Good.
16        Where are you employed?
17     A  The FDIC Office of Inspector General.
18     Q  How long have you been there?
19     A  I've been with the FDIC Office of Inspector
20  General since January 1, 1996.
21     Q  And what is your current job?
22     A  Counsel to the Inspector General.

Page 5

1    Q    How long have you held that job?

2    A    Since, I believe, 2003 or -- late 2003 or

3    early 2004.

4        I don't know the specific date.

5    Q    Prior to that, what was your position?

6    A    Deputy counsel to the Inspector General.

7    Q    And how long did you hold that job?

8    A    I think from about 2002 -- 2001 to --

9    somewhere -- 2000 to 2001. I'm sorry.

10        Again, I don't remember the specific date I

11    entered the position.

12    Q    What was your position before that?

13    A    I was a senior attorney, and that was at all

14    times from January 1, '96, through the time I became

15    the deputy counsel.

16    Q    What's your current grade?

17    A    I'm an EM, executive manager.

18        There's no specific level, I don't believe,

19    within that.

20    Q    And as deputy counsel?

21    A    I was a CG-15.

22    Q    And when you first came as a senior attorney?

Page 6

1    A    I was a CG-14.

2    Q    Prior to serving in the IG's office at -- at

3    FDIC, where were you?

4    A    I was in the IG's office at the Resolution

5    Trust Corporation, and that was from August 1992

6    through December 31, 1995.

7    Q    So, for about three-and-a-half years?

8    A    Roughly.

9    Q    And what was your position there?

10    A    Senior attorney.

11    Q    Grade?

12    A    14.

13    Q    GS?

14    A    No, it was -- I don't remember. It wasn't a

15    GS scale.

16        They were on the same scale as the FDIC. I

17    don't remember the designation. It became CG, whatever

18    the predecessor to CG was.

19    Q    Okay.

20        Prior to -- prior to the RTC OIG?

21    A    I was in private practice.

22    Q    Where?

Page 7

1    A    Kennedy & Baris here in Washington, D.C.

2    That's K-e-n-n-e-d-y and Baris, B-a-r-i-s.

3    Q    What kind of work did you do?

4    A    Banking law and securities law.

5    Q    And how long were you with Kennedy & Baris?

6    A    About five years.

7    Q    You were a partner there?

8    A    Four or five years. Yes, I was.

9    Q    Always?

10    A    Yes.

11    Q    Okay.

12        So, sometime between '90 and '95? Oh, sorry.

13    A    I think it was 1987.

14    Q    What did you do before that?

15    A    I worked at Winstead, W-i-n-s-t-e-a-d,

16    McGuire, M-c-G-u-i-r-e, also a law firm in Dallas,

17    Texas.

18    Q    And how long were you there?

19    A    About three years.

20    Q    So, something like '84 to '87?

21    A    Roughly.

22    Q    What did you do there?

Page 8

1    A    I was an associate, and I practiced in

2    securities and banking.

3    Q    Before that?

4    A    I was with Jones Day in Dallas.

5    Q    And for how long were you with them?

6    A    Two years.

7    Q    So, '82 to '84?

8    A    Roughly, yeah.

9    Q    What did you do for them?

10    A    Same thing. Corporate and securities work and

11    banking work.

12    Q    And before that?

13    A    I was with Cox & Smith, C-o-x, ampersand,

14    Smith, in San Antonio, Texas.

15    Q    And how long were you with them?

16    A    Two to three years, from 1980 until I went

17    to -- to Dallas.

18    Q    And what did you do for them?

19    A    Same thing.

20    Q    Securities work?

21    A    Associate corporate securities work.

22    Q    Okay. And before that?

Page 9

1  A  I was in law school.
2  Q  Where did you go?
3  A  University of Texas at Austin.
4  Q  And you graduated in '80?
5  A  December of 1980.
6  Q  Full-time student?
7  A  Uh-huh.  Yes.
8  Q  Okay.
9      So, you went three years or two-and-a-half
10 years?
11 A  Two-and-a-half years, actually.  I started in
12 May of 1978.
13 Q  And prior to that, were you in college?
14 A  I was in graduate school.
15 Q  Grad school.
16     Where did you go your grad school?
17 A  Georgetown University here in Washington.
18 Q  And what field?
19 A  Russian Area Studies.
20 Q  Do you have a Master's degree in that?
21 A  Yes, I do.
22 Q  When did you get it?

Page 10

1  A  May of 1978.
2  Q  And before that?
3  A  I was at the University of Texas at Austin.
4  Q  For undergraduate?
5  A  Yes.
6  Q  Full-time?
7  A  Yes.
8  Q  When did you graduate?
9  A  December 1975.
10 Q  And when did you start?
11 A  January 1974.
12 Q  Okay.
13     So, you did your last year --
14 A  I did my last year-and-a-half, three
15 semesters, at Texas.
16 Q  At UT.
17 A  Right.
18 Q  And where did you go before that?
19 A  The Air Force Academy.
20 Q  Colorado Springs.
21 A  Colorado Springs.
22 Q  And how long were you there?

Page 11

1  A  From July 1972 until January 1974.
2  Q  Why did you leave?
3  A  Pardon me?
4  Q  Why did you leave?
5  A  I left because I wanted to pursue a civilian
6  career as a lawyer, and frankly, my eyes had
7  deteriorated, and I couldn't be a pilot.
8  Q  And before you went to the Air Force Academy,
9  you were in high school?
10 A  Yes, sir.
11 Q  Where did you go to high school?
12 A  Keystone, K-e-y-s-t-o-n-e, High School, San
13 Antonio, Texas.
14 Q  Okay.
15     How large -- when you -- when you came to the
16 counsel's office of the IG in FDIC, how large was the
17 office?
18 A  There were, at the time of the merger, two
19 offices that provided legal services within the IG.
20 The first was the counsel's office.  I was not assigned
21 to that office.  I was assigned to an office that was
22 called the Office of Evaluations and Legal Support.

Page 12

1      In that group, which basically was devoted to
2  handling carryover matters from the RTC IG, there were
3  two lawyers, and the head of the office was Pat Black,
4  who essentially was dividing her time between the legal
5  services side and the evaluation side.
6      The counsel's office --
7  Q  Who headed the office?
8  A  Which office?
9  Q  The Office of Evaluation and Legal Support.
10 Pat Black?
11 A  Pat Black did.
12     The Office of Counsel to the Inspector General
13 of the FDIC, I believe, had four attorneys and one
14 assistant.  The head of the office, the counsel to the
15 Inspector General, was Larry Froehlich, F-r-o-e-h-l-i-
16 c-h.
17 Q  One of the four lawyers?
18 A  Yes, he was one of the four lawyers.
19 Q  Larry --
20 A  Larry Froehlich, F-r-o-e-h-l-i-c-h.
21 Q  Now, those two offices were merged, I believe,
22 in late '96 or early '97.

Page 13

1    Pat Black became the counsel to the Inspector
2 General.
3    Larry Froehlich was the deputy counsel to the
4 Inspector General, and then there were three
5 attorneys -- I believe, at the time, there were three
6 attorneys and one secretary. There could have been
7 four attorneys at the time of that merger, but we were
8 in a process of downsizing at the time, and I can't
9 remember specifically when one of the guys left.
10    Q  Who were the other attorneys?
11    A  In which office?
12    Q  Well, in the merger.
13    A  At the time that they were merged, to the best
14 of my recollection, I -- it was -- it was me.
15 Christian Gieseler, G-i-e-s-e-l-e-r.  Larry Froehlich,
16 whom we've mentioned before.
17    Q  Yes.
18    A  Andrea Bernardo, B-e-r-n-a-r-d-o.
19    Q  So --
20    A  And the Pat Black.
21    Q  So, it was Pat Black, Froehlich, counsel and
22 deputy counsel, and then three staff lawyers.

Page 14

1    A  Yes.
2    Q  Yourself and --
3    A  -- Chris and Andrea.
4    Q  Right.  And you were the senior.
5    A  Of the three, yes.
6    Q  And you had the title senior counsel.
7    A  Yes.  I think everybody may have. Titles have
8 been kind of malleable, but I was a senior attorney or
9 senior counsel.
10    Q  Who was the -- who was the -- who was the
11 fourth lawyer?
12    A  The fourth lawyer -- I'm not sure whether he
13 left -- exactly what the timing of his departure was,
14 but it was Tom Coogan, C-o-o-g-a-n, and Tom left either
15 before or right after those two offices were combined.
16    Q  In terms of the merger, you were from the old
17 RTC.
18    A  Yes, I was.
19    Q  So was Ms. Black.
20    A  So was Ms. Black.
21    Q  And who was the other lawyer?
22    A  David Kuhnsman, K-u-h-n-s-m-a-n.

Page 15

1    Q  And the four lawyers on the other side of the
2 house.
3    A  Right.  Were Chris, Larry, Tom, and Andrea.
4    Q  Okay.
5    So, Ms. Black is what race?
6    A  She is, I believe, caucasian.
7    Q  And Mr. Froehlich?
8    A  The same, to my knowledge.
9    Q  You're caucasian.
10    A  Yes.
11    Q  Mr. Gieseler?
12    A  The same, to my knowledge.
13    Q  Andrea Bernardo?
14    A  The same, to my knowledge.
15    Q  And Tom Coogan?
16    A  The same, to my knowledge.
17    Q  And Mr. Kuhnsman.
18    A  Mr. Kuhnsman, I believe, is caucasian, also.
19    Q  Now, you said there was an assistant in the
20 IG's office.
21    A  Yes.
22    Q  Who is that?  Not a secretary.

Page 16

1    A  Yes, it was a secretary.
2    Q  Oh, a secretary.  Okay.
3    A  And that's Teresa Fewell, F-e-w-e-l-l.
4    Q  And what race was she?
5    A  She is black.
6    Q  All right.
7    Now, bringing this up to -- what is the next
8 change in the office, personnel-wise, after the merger?
9    A  After the merger -- and I don't remember the
10 precise sequence, but two lawyers left. That was Ms.
11 Bernardo and Mr. Froehlich.
12    Ms. Bernardo took a position with the Postal
13 Service IG, Mr. Froehlich with the IG for the Board of
14 Governors of the Federal Reserve System, as their
15 counsel to the IG.
16    Q  Okay.
17    A  The office also brought Stacy, at the time,
18 Harkins, H-a-r-k-i-n-s, now Stacy Sharpe, on board. I
19 am fairly sure that she came on board before both
20 Andrea and Larry left, but to be honest, I don't
21 remember the exact sequence.
22    Q  Okay.

Page 17

1  So, if we could -- if I came to -- to the year
2  2000, would that get us both Stacy Sharpe on board and
3  Bernardo -- Ms. Bernardo and Mr. -- Mr. Froehlich gone?
4  A  I think that's correct.
5  Q  So, let's do circa 2000, January 2000.
6  A  Okay.
7  Q  Okay?
8  At that point, is there any other -- were
9  there any other changes besides Ms. Sharpe coming on
10 board and Ms. Bernardo and Mr. Froehlich leaving?
11 A  I do not recall when we hired a new attorney
12 in our office, Adriana Vosburg.
13 Q  Okay.
14 A  I don't think that was early 2000, but I could
15 be wrong about that.  But I don't think it was.  I
16 think it was subsequent to that.
17 Q  Okay.
18 A  So, I would say the next iteration -- and I
19 can't -- I'm sorry, I can't be specific about the date,
20 but you know, the iteration that we had was an office
21 after Larry and Andrea both departed.  The office was
22 Pat Black, was the counsel.

Page 18

1  I was the deputy counsel.  Chris Geiseler was
2  in the office.
3  Kuhnsman was gone.
4  Andrea was gone.
5  Tom was gone.
6  I think the next person we brought on board
7  was actually Mike Cosgrove, if I'm not mistaken, but I
8  don't remember the sequence of hiring, whether Mike was
9  before Stacy -- no, Mike was here -- Mike would have
10 been after Stacy, I think.
11 So, the sequence was, then -- you know, during
12 the course of this down-sizing, Stacy was brought on
13 board, followed by Mike.
14 Q  Any other changes besides Bernardo and
15 Froehlich leaving and Stacy Sharpe and Mike Cosgrove
16 coming?
17 A  Not that I recall.
18 Q  So, up until today, it's the -- it's the same
19 office, except --
20 A  Well -- and -- and Adriana Vosburg.
21 Q  And Ms. Vosburg.
22 A  And Ms. Vosburg, yeah, including Ms. Vosburg.

Page 19

1  Q  Was Mr. Cosgrove on board by the time Ms.
2  Vosburg comes on board?
3  A  Yes, he was.
4  Q  Okay.
5  So, if we take it just before Ms. Vosburg
6  comes on board --
7  A  Yes.
8  Q  Okay.
9  We have an office made up of Pat Black, the
10 counsel --
11 A  Yes.  Myself as the deputy counsel.
12 Q  And you had three lawyers.  Geiseler --
13 A  Geiseler, Cosgrove -- and this was right
14 before we hired Adriana, so that was it in terms of
15 lawyers.
16 Q  And you had a paralegal.
17 A  A paralegal, Stacy Harkins Sharpe.
18 Q  And secretary?
19 A  Yes, Teresa Fewell.
20 Q  Cosgrove is a white male?
21 A  Yes, he is.
22 Q  And Ms. Sharpe is a black female.

Page 20

1  A  Is a black female.
2  Q  As is Ms. Fewell.
3  A  That is correct.
4  Q  And all the other people were white --
5  Geiseler, yourself, and Black.
6  A  Yes.  Insofar as I know.
7  Q  And the only other change until the events of
8  this law suit -- that is, the departure of Stacy Sharpe
9  -- was the addition of --
10 A  -- Adriana Vosburg.  And I do want to point
11 out that, through this period, we had non-full time law
12 clerks who were also in the office.  I can't even
13 remember exactly how many we had.
14 Q  Law clerks are law students?
15 A  Law students from local law schools --
16 Q  Working part-time.
17 A  -- who would work part-time.  Sometimes full-
18 time for a month or two during the summer, but other
19 than that, part-time during the school year.
20 Q  Okay.  And how many would you have at any
21 given time?
22 A  No more than two at any given time, sometimes

Page 21

1 one. I'd say -- yeah, one or two. It would just
2 depend on the circumstances.
3    Q Okay. And these would be paid employees?
4    A Uh-huh. Yes.
5    Q Okay.
6       Good.
7       Did you hire any of them?
8    A Did I hire any of them?
9    Q As full-time lawyers, when they graduated?
10   A Yes, I did.
11   Q Who?
12   A Adriana Vosburg.
13   Q So, which school was she at?
14   A G.W. George Washington University School of
15 Law.
16   Q And when did she graduate?
17   A 2003, I would guess. That's just a guess.
18   Q So, she was a law clerk for how long before --
19 her last year?
20   A She was a law clerk for the summer of her
21 second year and her third year in law school. So, I
22 guess she clerked for -- before she graduated, for

Page 22

1 three semesters before she graduated, and then she
2 continued while she was studying for her bar.
3    Q So, she was a part-time law clerk for her last
4 year in law school?
5    A Yes, she was.
6       (Pause.)
7       BY MR. SHAPIRO:
8    Q Now, there's a -- there's a job that we
9 identified as student intern law and then law clerk,
10 two separate job designations. Do you know the
11 difference?
12   A No, I do not.
13   Q Okay.
14       Did you have non-paid interns? That is to
15 say, people taking things for credit?
16   A Not that I recall.
17   Q Okay.
18   A No, I don't believe we ever had --
19   Q Was the part-time job called by a different
20 title than a full-time summer job?
21   A I don't remember. I don't think so, but I
22 don't remember.

Page 23

1    Q Okay.
2       So, you don't know the difference between a
3 intern, law, and a law clerk.
4    A I have no idea what the specific differences
5 between those are.
6       I assume there are different PDs. What the
7 differences are, I have no idea.
8    Q What grades were the law clerks?
9       (Pause.)
10       THE WITNESS: I don't recall.
11       I would assume it's either a 7 or a 9, but I
12 don't know.
13       MR. SHAPIRO: Okay.
14       BY MR. SHAPIRO:
15   Q And all the lawyers, by the time -- we're
16 talking about when Ms. Vosburg came on -- the other
17 lawyers were what grades?
18   A 15.
19   Q They were all 15s.
20   A I believe so, yes.
21   Q So, Geiseler was a --
22   A He was a 15. Mr. Cosgrove was a 15.

Page 24

1    Q That's a CG-15?
2    A Yes.
3    Q And you, as a deputy, were --
4    A I was a 15, also.
5    Q And Ms. Black, as the counsel?
6    A She was an executive -- I think she was an E-
7 2. We had a different executive system at the time,
8 and I think it was graded E-2.
9    Q And Ms. Vosburg, when she came on as a
10 lawyer --
11   A Yes. She came on as a 9.
12   Q As a lawyer.
13   A As a lawyer. And she was promoted to 11 when
14 she passed the bar. I believe it was 9 to 11 when she
15 passed the bar.
16   Q So, she was a law clerk as a 9.
17   A She may have been a 7 as a law clerk. A 9 is
18 a first-year lawyer without passing the bar, in
19 anticipation of passing the bar, and then an 11. I
20 think that's the right sequence.
21   Q And what is she now?
22   A She's now a 14.

Page 21 - Page 24

Page 25

1    Q  So, she got out of school in '03 --

2    A  Uh-huh.

3    Q  -- and she became a 9.

4    A  And then an 11.  The promotion to 11 on

5  passage of the bar is automatic, and it's pretty quick.

6    Q  Okay.

7       So, by the end of '03, she was an 11.

8    A  Assuming '03 is right, yeah.  I mean, again, I

9  don't remember the exact year.

10    Q  Could it have been '04?

11    A  It could have been '02.

12    Q  Could it have been '04?

13    A  That she was -- no, no.

14    Q  A year-and-a-half ago.  How long has she been

15  with you as a barred lawyer?

16    A  I'd have to think about that for a moment.  I

17  don't remember.

18    Q  Why don't you think about that for a moment

19  and just see if you can come up with the time that she

20  became a member of the bar and, therefore, a full-

21  fledged attorney in the office?

22       (Pause.)

Page 26

1       THE WITNESS:  It must have been '02.  She was

2  promoted to 14 in '05, end of '05.

3       BY MR. SHAPIRO:

4    Q  So, just a couple months ago.

5    A  Couple months ago.

6       She was promoted to 13 at the end of '04.

7       So, she would have been promoted as a 12 in

8  '03.

9    Q  End of '03.

10    A  End of '03.

11    Q  So, you have a year between grades.

12    A  I think so, and if she came on as an 11, that

13  would mean she must have come on in '02, so her bar

14  date would have been November of -- roughly November of

15  '02.

16       She passed the bar on her first try in

17  Maryland, so it -- and she graduated in May and took

18  the bar right away.

19       So, I would guess that she was sworn in in

20  late October or November of '02.

21    Q  So, she graduated in '02.

22    A  That's -- I guess that's right, yeah.

Page 27

1    Q  Something like May '02.

2    A  Yeah, it was May or June, whatever.

3    Q  So, she was a law clerk in '01, in the summer,

4  and a law clerk in '02 for the summer --

5    A  Yes, that's right.

6    Q  -- and the school year '01 to '02, her last

7  year --

8    A  That's right.  She was a part-time law clerk.

9    Q  So, she was a part-time law clerk in school

10  year '01-'02.

11    A  I believe that's correct.

12    Q  Okay.

13       (Pause.)

14       BY MR. SHAPIRO:

15    Q  And when did you become -- you became the IG

16  in early '04.

17    A  No, sir.  I've never been the IG.

18    Q  I'm sorry.  The counsel to the IG.

19    A  I became the IG -- it would have been earlier

20  than that, I guess.

21       It must have been -- it must have been in '03.

22  I was -- I was acting as the counsel to the IG for some

Page 28

1  period of time.  Pat Black had been acting as the

2  deputy Inspector General, and that would be roughly

3  2000-2001, until she became the deputy Inspector

4  General.

5       She was selected for the position by the

6  Inspector General.

7       I don't remember exactly that was, but about

8  six months after she became the deputy Inspector

9  General, I was selected to be the counsel.

10    Q  So, you --

11    A  But I was essentially acting in the position

12  for a while before that.

13    Q  Since 2000 or 2001.

14    A  2001 or so.

15    Q  So, the permanent was sometime in 2002?

16    A  I think so, or early 2003.  Again, I don't

17  remember the date.

18    Q  So, it was either late 2002 or early 2003.

19       (Pause.)

20       BY MR. SHAPIRO:

21    Q  Who hired Stacy Sharpe?

22    A  I believe Pat Black did.

Page 29

1  Q  By the way, Ms. Vosburg is white?

2  A  No.  She is Hispanic.

3  Q  Hispanic is -- the opposite of Hispanic, so

4  far as America, is Anglo?

5  A  I'm sorry, I don't know --

6  Q  Is Ms. Vosburg white or black?

7  A  Are you asking about her color --

8  Q  Race.

9  A  -- or her race?

10  Q  Race.

11  A  I believe that she is Hispanic.

12  Q  That's not a race.  That's an ethnic

13  background.

14       Racial discrimination is not against

15  Hispanics.

16       That would be national origin discrimination.

17  You understand the difference.

18  A  I see.  Okay.

19  Q  Yes.

20       She's -- she's -- she's caucasian.

21  A  Accepting your definition, then I would

22  believe she's caucasian.

Page 30

1  Q  Right.

2       She's not --

3  A  I don't know that --

4  Q  She's not --

5  A  She's not African-American.  That I know.

6  Q  Okay.

7       Does she speak with an accent, Spanish accent?

8  A  No.

9  Q  Speaks English without accent?

10  A  I believe so.  I've never noticed an accent.

11  (Pause.)

12  BY MR. SHAPIRO:

13  Q  And who hired Ms. Vosburg?

14  A  As a law clerk?

15  Q  As a lawyer.

16  A  It was either Ms. Black or me.  I reviewed her

17  applications.  I remember that.  And I don't remember

18  whether I actually executed the -- we had a system

19  called PARS that was the system that authorizes -- an

20  automated system that was the actual personnel action

21  system, and so, I don't recall whether I initiated or

22  signed the PARS action or whether Pat Black did.  I

Page 31

1  think Pat Black did based on my review of her papers,

2  but I could be wrong about that.

3  Q  Now, when Ms. -- Ms. Vosburg came in, she came

4  on as a "not to exceed," correct?

5  A  Yes, she did.

6  Q  She was hired initially not as a permanent

7  employee but on a temporary appointment.

8  A  That's correct.

9  Q  Why?

10  A  Because there was no certainty that we were

11  going to need another person in the office for a period

12  beyond the term.

13       A term was four years, and that's the hiring

14  basis that Gaston authorized, Gaston Gianni, the

15  Inspector General.

16  Q  Just for her or for others?

17  A  I can't speak to any other hiring that was

18  done at the time.

19       I don't know.

20  Q  So, it wasn't a general rule, this hiring in

21  NTE status, but it was for Ms. Vosburg.

22  A  We were not doing a lot of hiring at the time.

Page 32

1       So, I -- I -- I couldn't even address that,

2  honestly.

3       I'm not aware of whether there were other

4  positions that were hired on a term basis or not.  I

5  simply don't know.

6  Q  When Ms. Sharpe was hired into the IG's

7  office, was it NTE?

8  A  My understanding is no, but I wasn't involved

9  in her hiring process, so I can't answer that.

10  (Pause.)

11  MR. SHAPIRO:  Okay.

12  THE WITNESS:  "NTE" meaning "not to exceed"?

13  BY MR. SHAPIRO:

14  Q  "Not to exceed," yes, a limited -- a limited

15  term appointment, as opposed to a general appointment.

16  A  Right.  Yeah.  No, I don't believe so, but I

17  don't know.

18  Q  Okay.

19       When Mike Cosgrove was hired, was he hired NTE

20  or on a --

21  A  No, he was not.  He was not.

22  Q  When was Mr. Cosgrove hired?

Page 33

1  A  2000 to 2001. Again, I don't remember the
2  specific date.
3      Probably 2001 would be my guess, but it was in
4  that time-frame.
5  Q  And Vosburg would have been hired in 2002.
6  A  Uh-huh. Yes. As -- if we work back through
7  that date sequence, I believe that to be correct.
8  Q  About a year after Cosgrove.
9  A  Again, assuming that date sequence that we
10 worked out is about right, yeah, that's about right.
11 Q  Mr. Gianni was the IG for how long?
12 A  Mr. Gianni was the IG from March 1996 until
13 his retirement on December 31, 2004.
14 Q  And when did he -- when did he -- was there
15 any other hiring that Mr. Gianni -- in the -- in the
16 counsel's office -- that Mr. Gianni insisted that there
17 be -- gave only NTE authority?
18 A  No.
19 Q  So, only Vosburg.
20 A  Not to my knowledge.
21 Q  So, only Vosburg.
22 A  Yes.

Page 34

1  Q  And to this day, is it the same office that we
2  talked about, with the exception that Ms. Sharpe is no
3  longer in the counsel's office?
4      In other words, the last count we had was --
5  let's just go through it.
6      It would be -- it would be --
7      (Pause.)
8  BY MR. SHAPIRO:
9  Q  Yourself --
10 A  Yes.
11 Q  -- as the counsel.
12 A  That is correct.
13 Q  There's no deputy now?
14 A  There's no deputy.
15 Q  All right.
16     So, now there would be Geiseler?
17 A  Yes.
18     Mr. Cosgrove.
19 Q  Cosgrove.
20     Vosburg?
21 A  Ms. Vosburg. And Ms. Fewell.
22 Q  The secretary.

Page 35

1  A  Yes.
2  Q  Is she still a secretary?
3  A  I don't know what her title is now. Legal
4  technician, office technician.
5  Q  Well, is it a legal technician? Is she a
6  paralegal?
7  A  No, she's not.
8  Q  Does she now have a different title than she
9  did?
10     Has there been a title change?
11 A  At some point, her title changed, but I don't
12 know --
13 Q  Is she a legal tech?
14 A  -- from what to what.
15 Q  Do you know what her current title is?
16 A  No, she's not a legal tech.
17 Q  All right.
18     There's no "legal" in her title?
19 A  I think legal office assistant or something
20 like that.
21     I really don't know what --
22 Q  What's her grade?

Page 36

1  A  Her grade? She's an 8.
2  Q  So, she got promoted.
3  A  She did.
4  Q  When?
5  A  Three or four years ago, now, maybe a little
6  longer ago than that.
7  Q  So, she was promoted to an 8 three or four
8  years ago?
9  A  Yes.
10 Q  And did that come with the title change?
11 A  Yes, it did.
12     There was a desk audit that was performed of a
13 number of administrative positions in the IG's office,
14 and I believe, at that time, there were several people
15 who were promoted to aid and whose position titles were
16 changed.
17 Q  So, Ms. Sharpe was in the office as a
18 paralegal when Ms. -- Ms. Fewell got a title change to
19 legal office assistant --
20 A  Yes, I believe --
21 Q  -- or legal administrative assistant or
22 something like that.

Page 37

1    A  I believe she was.

2    Q  Has there been anybody else that has been in
3  the office as a lawyer or a paralegal, other than the
4  people we've mentioned, from the time you got there?

5    A  Not that I recall.

6    Q  Okay.

7       So, you've mentioned everybody.

8    A  I believe so.

9    Q  Okay.  And you've had law clerks throughout
10  that period?

11    A  Not throughout.  We haven't had a law clerk in
12  a number of years now.

13       We've had law -- Adriana was actually the last
14  law clerk that we had.  We had other law clerks before
15  her.

16    Q  How many?

17    A  In addition to her, four others that I recall.
18  There were some before that that I -- I had no
19  relationship with.

20    Q  Who were the others that you recall?

21    A  I recall Mekel, M-e-k-e-l,  Sebestyen, S-e-b-e-
22  s-t-y-e-n.

Page 38

1    Q  How long ago was he there?

2    A  It's a she.

3       She was there a couple of years before -- a
4  year or two before Adriana.

5    Q  So, it would have been '99-2000?

6    A  '99 to 2000.  And then there were three
7  others.  I don't recall their names.

8    Q  What race was Mekel?

9    A  I don't know.  I mean I believe she was
10  caucasian, but I don't know.  I never inquired.

11    Q  Okay.

12       Any of the other law clerks -- you can't
13  recall their names?

14    A  I can't recall their names.

15    Q  Males or females?

16    A  One, two, three -- all males, one of whom was
17  African-American.

18    Q  And the others?  White males?

19    A  Two of whom I believe were white males.

20    Q  How long ago was the African-American?  Was he
21  immediately before or during the time that Mekel
22  Sebestyan --

Page 39

1    A  It was before her, so it would have been '97,
2  '98, somewhere around there.

3    Q  Do you recall the race of any of the other law
4  clerks, or is that all the law clerks you --

5    A  That's all that I recall.

6    Q  So, from '96 on, that's the ones you recall.

7    A  Those were the ones I recall.

8    Q  Okay.  And did any of the others get offers of
9  employment besides Ms. Vosburg?

10    A  Not that I know of.

11    Q  Okay.

12       Did you favor offering anybody a job?

13    A  With respect to most of these people, I wasn't
14  in a position to offer or not offer a position, and I
15  don't recall being asked if I had a recommendation.

16    Q  Do you recall wanting to bring anybody on and
17  urging bringing them on, whether you were asked or not

18    A  I don't recall urging bringing anybody on, no.

19    Q  Okay.

20       (Pause.)

21    BY MR. SHAPIRO:

22    Q  Now, when we talked about hiring Vosburg, were

Page 40

1  you referring to the initial hiring of her after she
2  finished law school or in contemplation  of her
3  finishing law school?

4    A  Yes, I believe so.  If you are referring to my
5  comment about reviewing applications,  the application I
6  was referring to was the application  for the position
7  that was the NTE position that she occupied after law
8  school, yes.

9    Q  Okay.  So, when you said that it was either
10  you or Pat Black who signed that --

11    A  Right.

12    Q  -- that's the one you were talking --

13    A  That's the one I was talking about, yes.

14    Q  Which would have been, by our -- by our
15  calculation --

16    A  -- 2001, 2002.

17    Q  I think we calculated that she graduated in
18  May of 2002.

19       So, this would have been --

20    A  This would have been around that time.

21    Q  So, this would have been to bring her on in
22  September or --

Page 41

1  A  Right.

2  Q  -- or August, after the bar, after she took

3  the bar.

4  A  That's correct.

5  Q  She would be -- still be a part-time law clerk

6  or --

7  A  A part-time law clerk --

8  Q  -- a temporary --

9  A  As I recall, she was a part-time law clerk

10  until she took the bar, and then, after the bar, she

11  came on board full-time.

12  Q  NTE.

13  A  NTE, yes.

14  Q  And that's the hiring we're talking about.

15  A  Yes.

16  Q  Okay.

17  A  Uh-huh.

18  Q  And that would have been for like August 2002.

19  A  Yeah, September, August, September.    Again, I

20  don't remember the date.

21  Q  And then she would have gotten her promotion

22  to an 11 when she passed the bar and --

Page 42

1  A  Correct.

2  Q  -- sworn in as the bar.

3  A  That's right. I believe that's automatic --

4  Q  Automatic.

5  A  -- when you pass.

6  Q  Okay.  Well, sworn in.

7  A  And sworn in, yes.

8  Q  Were there other applicants for that job, that

9  NTE job?

10  A  Yes, there were.

11  Q  How many?

12  A  I don't recall.  There was a large number.

13  Q  Anybody interviewed?

14  A  No, we didn't conduct any interviews.

15  (Pause.)

16  BY MR. SHAPIRO:

17  Q  So, when was it -- you said she got a "not to

18  exceed four years." That was the original appointment?

19  A  Yes.

20  Q  So, if she came on in September of 2002, it

21  would be September 2006 that the four-year appointment

22  would have gone to.

Page 43

1  A  Yes, that's right.

2  Q  She has subsequently become not on a temporary

3  appointment but on a permanent appointment.

4  A  That's correct.

5  Q  Okay.  And when did she get that appointment?

6  A  I don't know that that's an appointment.  She

7  was converted to a permanent appointment, and the

8  conversion took place in -- I don't remember

9  specifically.  I don't remember specifically.

10  Q  Did it have to be re-advertised?

11  A  No, it did not.

12  Q  Was Gianni the -- the IG at the time of that

13  conversion?

14  A  Yes, he was.

15  Q  Did he have to approve that?

16  A  I'm sure it was discussed with him whether his

17  approval was required.

18  I don't recall -- I don't think he had to

19  approve it.

20  Q  How are you sure that it was discussed -- did

21  you discuss it with him?

22  A  I -- I discussed it with him.

Page 44

1  Q  Now, at the time she became permanent, by

2  conversion --

3  A  Uh-huh.

4  Q  -- "she" being Vosburg -- were you the acting

5  counsel to the IG?

6  A  I think so.

7  Q  Or were you permanently the counsel to the IG?

8  A  That's a good question, and I'm not sure.  I -

9  - I don't know.

10  Q  You were at least acting.

11  A  I was at least acting, yes, absolutely.

12  Regardless of whether I had been selected -- permanent

13  counsel position -- I was at least acting counsel at

14  the time.

15  Q  Now, acting -- when you're in an acting

16  position, you have all the powers of the position,

17  correct?

18  A  That's correct.

19  Q  You just don't have tenure in it.

20  A  That's correct.

21  Q  Now, when you were acting IG, counsel to the

22  IG, you were in that role for more than 120 days,

Page 45

1 correct?

2    A  I believe so, yes.

3    Q  Did you receive an emolument, an increase in -

4 - in pay?

5    A  No.

6    Q  Why not?

7    A  I don't know.

8    Q  Weren't you entitled to it?

9    A  I don't know. I never inquired.

10    Q  Okay.

11        So, your pay stayed the same, but your -- you

12 exercised the -- the full powers of counsel for the IG.

13    A  Yes, I did.

14    Q  Now, at the time that you were IG, counsel to

15 the IG -- and I don't care whether it's -- we've

16 already established you had the same powers as acting

17 as when you got it permanently, so I don't care -- to

18 me, this question transcends the acting period. In

19 other words, it includes the acting period.

20    A  Okay.

21    Q  Okay? During that time, did you have a

22 ceiling in the counsel's office, a personnel ceiling?

Page 46

1    A  No.

2    Q  You know what I'm talking about? An FTE

3 ceiling? You could only have so many people permanent

4 on board.

5    A  We have no formal ceiling.

6    Q  No formal ceiling. Did the IG's office have a

7 ceiling?

8    A  I believe so, at several points in time.

9    Q  Well, doesn't the IG's office have a ceiling

10 now?

11    A  The IG -- yeah. Let me explain. We have --

12 let me explain what I mean by that. We have a budget

13 that is appropriated by the Congress on an annual

14 basis.

15    Q  "We" being the Office of the Inspector

16 General.

17    A  The Office of Inspector General.

18    Q  Okay.

19    A  The Office of Inspector General's budget is

20 appropriated for operations of the Office of Inspector

21 General, period. There is no specific earmarking or

22 designation of the way in which those funds are spent.

Page 47

1 It's just a general appropriation for the operations of

2 the office.

3        The OIG has a corporate budget which is a

4 budget within the FDIC that is essentially used for

5 general planning purposes and to keep track of

6 expenditures during the course of the year.

7    Q  The budget is for the purpose of keeping track

8 of the expenditures or the budget is the -- is those

9 expenditures?

10    A  No. The -- the budget is not necessarily

11 those expenditures.

12        It's not subject to the appropriations

13 process, and it's not subject to reprogramming or other

14 issues that you have with appropriations law. It's an

15 FDIC internal process that derives from the fact that

16 FDIC's -- FDIC is not an appropriated agency. The

17 costs and activities of the FDIC are paid out of the

18 insurance funds that the FDIC oversees.

19        The budget that we have internally --

20    Q  "We" being?

21    A  The IG's office. Would contemplate a certain

22 number of full-time positions overall. It would be

Page 48

1 mathematically computed on the basis of a certain

2 number of positions. That's how we get to the dollar

3 amount that we have in both the appropriation and the

4 FDIC's budget, but that's a computation. It's not, as

5 I understand things, something that says you've got

6 however many FTEs and that's it.

7        Basically, it's a method of allocating the

8 costs of the operation of the office among its various

9 components.

10        Salaries and benefits, not surprisingly, is

11 the largest single component of that budget.

12    Q  So, there's no FTEs in the IG's office.

13    A  I think, in the context we're using that

14 term -- I'm not sure that I even understand the context

15 precisely.

16    Q  FTE -- do you know what it stands for?

17    A  Full-time -- actually, you know, I don't.

18    Q  Full-time equivalent.

19    A  Full-time -- okay.

20        Fine.

21        No, I have never worked in the regular

22 government outside of the FDIC or the RTC. So, in the

Page 49

1 context that you may be using that term, my
2 experience -- I'm unfamiliar with it.
3 Q Okay. Who does the personnel management for
4 the IG? Are you dependent upon the FDIC's Office of
5 Human Resources?
6 A No. We have an office internally that handles
7 our human resources functions.
8 Q What's it called?
9 A Human Resources Branch. And that is the
10 Office of Management and Congressional Relations.
11 Q And who heads that now?
12 A The branch?
13 Q Yes.
14 A Trina Petty, P-e-t-t-y.
15 Q And Ms. Petty is -- was she the head of the
16 branch in 2004?
17 A I believe so.
18 Q And what grade is she?
19 A I believe she's a 15.
20 Q And who does she report to?
21 A She reports to the head of the Office of
22 Management and Congressional Relations.

Page 50

1 Q Is that an assistant IG?
2 A Yes. He's the assistant IG for OMCR. His
3 name is Rex Simmons, S-i-m-m-o-n-s.
4 Q I know Mr. Simmons.
5 A And Rex's responsibility, overall, is, among
6 other things, budget.
7 (Pause.)
8 BY MR. SHAPIRO:
9 Q Now, did -- let me ask you this.
10 Who decided that there was no paralegal -- it
11 wasn't necessary to have a paralegal in counsel's
12 office any longer?
13 MR. SHAPIRO: Why don't we take five?
14 (A brief recess was taken.)
15 BY MR. SHAPIRO:
16 Q Who decided that it was no longer necessary to
17 have a paralegal in counsel's office?
18 A Pat Black.
19 Q And Ms. Black was not acting as counsel at the
20 time.
21 A That's correct.
22 Q She was acting as deputy IG?

Page 51

1 A Yes, she was.
2 Q Did she share the reason for that decision
3 with you?
4 A Yes, she did.
5 Q What did she say?
6 A She said that she did not believe -- or she --
7 she did not believe that the paralegal position in
8 counsel's office was sustained by enough work and that
9 the -- there were other positions in the office. There
10 was, frankly, more work available for.
11 Q I don't know what you mean. There were other
12 positions in the office that there was more work
13 available for.
14 A In other words, there was -- there was not
15 enough work in counsel's office to justify the
16 paralegal position, and the person occupying that
17 position was not fully occupied, and that that time
18 could be more profitable used elsewhere, or more
19 effectively used elsewhere.
20 Q What do you mean "that time" could be more --
21 A That person's time, that person incumbent in
22 the position.

Page 52

1 Q I see. But I thought you said there was more
2 work elsewhere in the office. In other words, you
3 could use another lawyer.
4 A No. That's -- well, we're talking about two
5 different things here.
6 What we're talking about is -- when I say
7 "work in the office," I'm talking about other work in
8 the Office of Inspector General, not in counsel's
9 office.
10 Q I see.
11 A Specifically, in counsel's office, there was
12 not enough work for the person who was -- for a person
13 to occupy that position.
14 Q Okay.
15 Was Ms. -- that was Ms. Sharpe.
16 A Yes, it was.
17 Q Was she not putting in a full day?
18 A She was in the office on a full-time basis.
19 Q Was there -- was she occupied with work from
20 the Office of Inspector General counsel's office for a
21 full day?
22 A I don't believe so.

Page 53

1   Q   How long had that been going on?

2   A   She had had a steady decline in the volume of
3 work that she was doing for some period of time.
4 When --

5   Q   In volume of work?

6   A   In the volume of work that she was -- was
7 doing.

8     When she first came on board, I believe the
9 original concept for the position was to provide
10 assistance largely in connection with some document-
11 intensive discovery cases in which we were involved,
12 and I say discovery cases because these were typically
13 lawsuits to which the FDIC was a party with respect to
14 which the Office of Inspector General was in possession
15 of large volumes of relevant records.

16     Over time, the volume of lawsuits dwindled
17 significantly.

18     As that volume dwindled, she became -- Ms.
19 Sharpe -- by "she," I mean Ms. Sharpe -- became
20 involved in processing FOIA requests. At one point in
21 time, we had in the office a significant backlog of
22 FOIA matters.

Page 54

1     I don't remember the precise number, but it
2 was a very large number of FOIA requests that were late
3 in terms of being out-processed and materials being
4 produced.

5     So, she transitioned into doing work in that
6 area.

7     The backlog was resolved, and again, as the
8 agency decreased in size and the number of institutions
9 that were in receivership declined and the number of
10 problem banks declined, the size of the agency
11 correspondingly decreased, and the number of requests
12 that we had for material or information or other things
13 began to decline, also.

14   Q   But you added a lawyer about the same time-
15 frame.

16   A   Yes, we did.

17   Q   In this declining period of declining
18 receiverships, declining failed banks, declining
19 Freedom of Information Act requests or backlog,
20 declining major discovery -- correct?

21     I'm describing all the decline over a course
22 of several years, right?

Page 55

1   A   That's correct.

2   Q   It's still continuing.

3   A   The decline is --

4   Q   Yes.

5   A   I'd say our work has probably leveled off at
6 this point in time?

7   Q   When did it level off?

8   A   I can't give you a specific date.

9     This was just a qualitative observation that I
10 had as --

11   Q   Okay.

12   A   -- the counsel to the IG.

13   Q   Okay.

14     So, during this time-frame that -- for several
15 years there had been a declining work load --

16   A   Declining work load for Stacy.

17   Q   Not declining work --

18   A   Declining work load for paralegals.

19   Q   I see. But you said there was a declining
20 work load in the FDIC generally.

21   A   Uh-huh.

22   Q   Correct? Is that a yes?

Page 56

1   A   Yes.

2   Q   And fewer receiverships, fewer failed banks.

3   A   Right.

4   Q   The large volume litigation, large volume of
5 material that the OIG would have --

6   A   Yes.

7   Q   -- right? -- declined.

8   A   Yes.

9   Q   FOIA was caught up.

10   A   Yes.

11   Q   And as the agency shrinks, there's a decline
12 in FOIA, as well.

13   A   The number of requests goes down.

14   Q   Right.

15     As the agency shrinks in terms of size, the
16 number of everything goes down.

17   A   As a general proposition.

18   Q   Okay. And that was -- has been going on
19 since, say, 2002?

20   A   In truth, it's been going on since 1995, with
21 the merger of the RTC into the FDIC.

22   Q   I see. But you added a paralegal after '95.

Page 57

1 A Yes.

2 Q Right?

3 So, at some point, in terms of paralegal work,
4 it was going up.

5 Even as legal work was going down generally,
6 paralegal work was going up.

7 A I guess it was perceived that way. I didn't
8 add the paralegal, so I can't speak to the reasons why
9 that decision was made.

10 Q I understand. But in addition, you added Ms.
11 Vosburg.

12 A That's correct.

13 Q In the midst of a real decline in work.

14 A It was a decline in work for certain types of
15 positions.

16 Now, I have never said, in this discussion,
17 that the work for lawyers decreased.

18 It didn't.

19 Q I see. But the number of failed banks
20 decreased.

21 A That has nothing to do with the work of
22 lawyers in my office.

Page 58

1 Q I see. Only the work of paralegals.

2 A No. Failed banks has nothing to do with the
3 work of paralegals.

4 Q I see.

5 Okay.

6 How about receiverships?

7 A That is a general observation about the down-
8 sizing of the agency that caused the decline in certain
9 types of work generally through the agency.

10 Q Okay.

11 A Within the Office of Inspector General, the
12 impact of some of those declines is that the type of
13 cases on which it would be appropriate for a paralegal
14 to provide services declined.

15 The type of cases in which the independent
16 judgement of a lawyer is necessary is a different issue
17 altogether.

18 Q Has that gone up?

19 A I believe it did.

20 Q Oh, it did.

21 Well, what exact work went up to require the
22 adding of a lawyer during the early -- the early part

Page 59

1 of this century so far? That is to say 2002, 2003,
2 2004.

3 MR. COSGROVE: For the purposes of the record,
4 I'll object. I don't think the work went up for a
5 lawyer or not for a lawyer is totally relevant to the
6 case, because I don't think there's any comparison
7 whatsoever, legitimate comparison -- excuse me -- that
8 can be made between the position of paralegal and the
9 position of a lawyer.

10 MR. SHAPIRO: For those with a mechanistic
11 approach to this, I'm sure that's true. I don't share
12 that approach.

13 BY MR. SHAPIRO:

14 Q Please answer the question.

15 A Well, as I understand the question, the work
16 that went up in which a lawyer could be involved -- we
17 have a larger volume of lawsuits involving the Office
18 of Inspector General today than we did at that point in
19 time.

20 Q How many -- how many lawsuits?

21 A I'd have to sit down and count, and it has
22 varied somewhat over time.

Page 60

1 Q How many -- how many lawsuits do you have now
2 against the IG's office?

3 A Well, involving the IG's office, there's this
4 one.

5 We have one, two -- at various stages -- at
6 various stages, I would say that we probably have five
7 or six active cases.

8 Q Is that true since 2000?

9 A I'd say, on average, it's been at least that
10 many, and sometimes more.

11 Q Has it been true since 1996?

12 A No, it has not.

13 Q It's been more now?

14 A I believe so.

15 Q So, it's been more since 2000 than between '96
16 and 2000.

17 A I believe that to be the case.

18 Q And on average, you'd say, since 2000, to be
19 five to six lawsuits active involving the IG's office?

20 A Yeah, probably. And that's just a rough
21 guess, but yeah, I'd say that that's about right.

22 Q Okay.

Page 61

1    So, which are the suits that are going on now
2 besides this one?

3    A  Besides this one, we have litigation -- I'm
4 sorry.

5    (The witness conferred with counsel.)

6    MR. SHAPIRO:  I don't think there's
7 confidentiality requirements in EEO complaints.

8    MR. COSGROVE:  I do.

9    MR. SHAPIRO:  Why are there confidentiality --
10 I'm not entitled to know other people who are suing --

11    MR. COSGROVE:  Correct.

12    MR. SHAPIRO:  I certainly am.  That's part of
13 the discovery necessary in --

14    MR. COSGROVE:  I don't think --

15    MR. SHAPIRO:  Are you instructing him not to
16 answer?

17    MR. COSGROVE:  I'm instructing him not to
18 answer that question.

19    MR. SHAPIRO:  Okay.  I urge you to reconsider
20 that, since this is discovery and I'm entitled to know
21 these things.

22    MR. COSGROVE:  I don't think you are.

Page 62

1    I think the EEOC's regulations prohibit it.
2 So --

3    MR. SHAPIRO:  I don't think so.

4    BY MR. SHAPIRO:

5    Q  First of all, this is not a lawsuit, is it?
6 When you say lawsuits --

7    A  I'm using the term generically to include
8 complaints of various sorts.

9    Q  I see.

10    So, how many -- let's deal with lawsuits.
11 That is, actions filed in courts of law or equity.

12    A  Right.  We have two personnel-related cases at
13 the moment.

14    The first -- yes.  The first is a case that
15 was brought by Cynthia Vickers, which is currently on
16 appeal to the Court of Appeals here in the District of
17 Columbia.

18    Q  You said there's two.

19    A  Yes.  The second is an action in United States
20 District Court here in the District of Columbia.

21    Q  What case is that?

22    A  That is Nettie Chandler's case.

Page 63

1    Q  And that's in D.C.?

2    A  D.C.

3    Q  Nettie, N-e-t-t --

4    A  I don't know if she spells it "y" or "i-e",
5 frankly.

6    Q  Chandler?

7    A  Chandler.

8    Q  Okay.

9    Those are two court actions.

10    The other three or four are administrative
11 matters?

12    A  Yes.

13    Q  Including this one?

14    A  Yes.

15    Q  Any others?

16    A  I don't think we have anything active at the
17 moment.

18    Q  So, right now, there are three.

19    A  Don't pin me to the number.  I'd need to sit
20 down and take a look at my records.

21    Q  Well, you said you don't think.  I understand
22 that this is what you think.

Page 64

1    A  Uh-huh.

2    Q  There may be another one that you're not
3 thinking of.

4    All right.

5    A  Okay.

6    Q  Why don't we take a couple of moments and
7 think if there are any others right.

8    A  I'd say there are three.

9    Q  Those three.

10    A  I'd have to check the status on a couple of
11 things.

12    I think it's three.

13    Q  Okay.

14    Ms. Vickers -- who is the lawyer assigned to
15 that case from your office?

16    A  Mr. Cosgrove.  And he's working with the
17 United States Attorney's Office.

18    Q  And Ms. Chandler?

19    A  The Chandler case -- that's also Mr. Cosgrove,
20 also with the United States Attorney's Office.

21    Q  Okay.  And taking back the last case aside
22 from those three matters -- and I'm using the word

Page 65

1  "case" broadly, like you used it, both lawsuits in
2  courts of law and equity and administrative complaints
3  and claims -- what was the last one that is no longer
4  on your active list, the last one to be active?
5      A  I believe the last case that we would have had
6  that is no longer active was a subpoena enforcement
7  case in which we received a customer objection to our
8  subpoena under the Right to Financial Privacy Act.
9      Q  So, a customer objected to you responding to a
10  subpoena.
11      A  He objected to our obtaining information
12  pursuant to a subpoena.
13          We subpoenaed a bank for his financial
14  records, and he objected.
15      Q  You being the IG.
16      A  The Office of Inspector General, yes.  It's an
17  administrative subpoena.
18      Q  Okay.  And when did that end?
19      A  Two, three months ago.
20      Q  So, 2005.
21      A  Uh-huh.
22      Q  Okay.  And how long was that ongoing?

Page 66

1      A  Probably two to three months.
2      Q  And before that?  How many subpoena
3  enforcements have they had since 2000, objections to
4  subpoena enforcement, that sort of thing, by OIG?
5      A  Three or four, I would guess.  I would have to
6  go check our records.
7          They happen.
8      Q  And they're usually a month to three months'
9  duration?
10      A  No, it depends.  I wouldn't say that they're a
11  month to three months' durations.  It depends on the
12  case.  Some have hung around for a year or two.  Some
13  are resolved in less time than that.
14      Q  And which lawyer does those?
15      A  Ms. Vosburg did the most recently one.
16      Q  She do the one before that?
17      A  I don't believe that she did one independently
18  before that, but this one she handled on her own.
19      Q  Who did the one before that?
20      A  Chris Geiseler has done them.  I've done them.
21  It depends on who's been available and what the
22  circumstances of the case were.

Page 67

1      Q  Any other litigation?  You consider these
2  matters of litigation cases.
3      A  Yes.  They're in a Federal District Court and
4  they're contested proceedings.
5      Q  Sure.  And you represent the OIG directly or
6  through the Department of Justice?
7      A  No, in those cases we typically do the work
8  ourselves.
9      Q  I see.  And so, there's been three or four of
10  those since 2000, as best you can recall, the last one
11  ending a few months ago.
12      A  Yeah, I think that's right.
13      Q  Okay.
14          What other matters are included in litigation
15  since 2000, cases, in addition to the three current
16  matters and the three to four objections to enforcement
17  of OIG subpoenas?
18      A  Well, first, I don't know if I would
19  characterize those just as -- as objections to the
20  enforcement of the subpoena.  I mean those sometimes
21  involve some fairly sophisticated issues dealing with
22  our jurisdiction.

Page 68

1          So, I -- I think, frankly, that the term
2  you're using is --
3      Q  The term I'm using.  What term?
4      A  Objection.
5      Q  Okay.  Subpoena enforcement matters.
6      A  It's not one that I would use.  I would use
7  "an enforcement matter" to describe it.
8      Q  Okay.
9          So, in addition to the enforcement matters and
10  these personnel-related matters, the three cases that
11  are current --
12      A  We've had more -- certainly we've had
13  personnel cases, using that term broadly, that have
14  come and gone during that period --
15      Q  Okay.
16          When was the last --
17      A  -- a variety of matters.
18      Q  What was the last --
19      A  A variety of issues.
20      Q  What was the last one that is no longer
21  active?
22      A  No longer active.

Page 69

1   Q In other words, not one of the three that you
2 cited.
3   A I think, actually, the last one that's no
4 longer active was a case that we had had involving a
5 former employee claiming retaliation on a whistle-
6 blower theory.
7     That was Koszola, K-o-s-z-o-l-a, originally a
8 case brought in the United States District Court for
9 the District of Columbia.
10     That was decided on appeal, probably a year-
11 and-a-half or so ago.
12   Q So, how long was it active at the District
13 Court level?
14   A That case was active at the District Court for
15 about six or seven years.
16   Q And it was decided a year-and-a-half ago by
17 the Court of Appeals?
18   A By the Court of Appeals.
19   Q D.C. Circuit?
20   A Yes.
21   Q So, it would have been in 2005, 2004 decision
22 in the Court of Appeals?

Page 70

1   A I think so.
2   Q C-a-s --
3   A K-o-s-z-o-l-a.
4   Q Versus Powell?
5   A No, it would have been before Powell. I think
6 the case was styled Koszola versus FDIC, but I'm not
7 sure.
8   Q All right.
9     So, that was over in 2004.
10   A Yeah, that was over in 2004.
11   Q Who was the lawyer on that case?
12   A Me.
13   Q Starting when you were senior counsel.
14   A I was on that case for a very long time.
15   Q Okay.
16     Another case. Other -- other than that, what
17 was the last one before that that was resolved, that is
18 no longer on the active list?
19   A I really don't know.
20   Q We're talking about cases that were active
21 sometime after 2000.
22   A Well, do you want like a list of every case

Page 71

1 that we've ever had in litigation in this office?
2 Because I can't give you an answer to that question.
3   Q No. I'm asking you the last -- I'm asking you
4 what I'm asking you. You said Koszola was the last one
5 that you recall of this personnel-type matters that was
6 actually in court or administrative matters that is no
7 longer active but was active within the period after
8 2000.
9   A Uh-huh.
10   Q Do you recall any of the others?
11   A I would have to go back and check our records.
12 There were others. I don't recall them.
13   Q And any other class of cases besides these
14 personnel-related litigations, somehow loosely HR-
15 related litigation, and what you call the enforcement.
16   A And the enforcement cases.
17   Q Yes.
18     I'm using the term that you wanted to use.
19   A Uh-huh.
20   Q Enforcement. Could be subpoena enforcement,
21 could be other things. Any other categories of things
22 that fall into this lawyer work litigation area?

Page 72

1   A It really depends on how broadly you want to
2 define that term.
3     If you want to include criminal matters that
4 we have some involvement in at various levels, then
5 there's an ongoing number of cases in that area.
6   Q What kind of criminal matters do you have some
7 involvement -- you're not the -- you're not the -- the
8 prosecuting authority.
9   A Not the prosecuting authority, but we very
10 often find ourselves working with United States
11 Attorneys' offices.
12   Q Do you have any active matters now?
13   A I'm sorry?
14   Q Do you have active matters now --
15   A Yes.
16   Q And what lawyers do those?
17     Is that lawyers who do that, or is that OIG
18 investigators?
19   A Well, investigators work on the matters, but
20 we work with them in those cases, depending upon the
21 nature of the case and whatever service we can provide.
22   Q You give counsel.

Page 73

1    A  We do some -- sometimes we give counsel.
2  Sometimes we will do other things.
3        We'll, you know, work with the United States
4  Attorney's Office to develop the criminal theories that
5  they're going to use.
6        I mean, frankly, we have a lot more exposure
7  to some areas of criminal law than the typical
8  prosecutor does.
9        Bank fraud would be a good example of that.
10  We do bank fraud cases all over the country.
11    Q  Yeah, but that's your investigators, not your
12  lawyers.
13    A  The investigation is done that way, but the
14  lawyers find themselves working with the United States
15  Attorney's Office. They very often will talk to us
16  about those.
17        I will handle that. I have one case at the
18  moment where Adriana has done a fair amount of work on
19  it.
20    Q  Other areas of litigation besides these
21  criminal matters, these personnel-connected lawsuits
22  and administrative claims, and the enforcement matters.

Page 74

1    A  I can't think of any off the top of my head.
2    Q  And how many criminal matters would you have
3  where you're dealing with prosecutors? I don't mean as
4  just coordinating, scheduling, getting your
5  investigators over there. I mean dealing as a matter.
6  How many do you have at any given time?
7    A  It varies.
8        I would say, you know, two to three at any
9  given time.
10    Q  And these are during the investigative stage,
11  generally.
12    A  Typically during the grand jury phase of the
13  case.
14        (Pause.)
15    BY MR. SHAPIRO:
16    Q  And that -- I take it these are -- these --
17  this area has increased in the second half of your time
18  in the office, as opposed to first half, or is it about
19  the same?
20    A  I think it probably has increased.
21    Q  Some.
22    A  Yeah, some. Uh-huh.

Page 75

1    Q  What percentage?
2    A  I can't give you a percentage.
3    Q  Well, has it doubled?
4    A  Well, I think that, if you go back far enough,
5  the answer is, starting from zero, anything is an
6  increase.
7    Q  Yes, of course.
8        I'm talking about --
9    A  There was nothing that we did in this area
10  before, you know, 2000 or so.
11    Q  So, you did nothing in this area.
12    A  Not typically, no. This is something that is
13  an evolutionary stage still. We continue to work on
14  these cases, and have been since -- you know, probably
15  since that point in time.
16    Q  All right.
17        So, at the time that Ms. Sharpe's position was
18  eliminated, was Ms. Vosburg -- Ms. Vosburg was
19  employed.
20    A  Yes, she was.
21    Q  Was she already a full-time employee, the NTE?
22    A  My recollection is yes, she was.

Page 76

1    Q  She had been converted.
2    A  Yes.
3    Q  How close in time?
4    A  I don't know. Probably pretty close, but I
5  don't know.
6    Q  Probably pretty close. But Vosburg got her
7  permanent before Sharpe was moved to Benefits.
8    A  I think that's the case.
9    Q  I see. And you say you think that's the case.
10    A  I think that's the case.
11    Q  You did not participate in those two things?
12    A  I did not participate in the decision to move
13  Ms. Sharpe to the benefits office.
14    Q  You did not participate at all in that?
15    A  No, I did not.
16    Q  I see.
17        So, do you recall calling her in and offering
18  her to send her to benefits, transfer her to benefits,
19  asking her if she wanted to go to benefits?
20    A  I recall having a conversation -- I recall
21  having several conversations with her concerning going
22  to that office.

Page 77

1    Q  "That office" being Benefits?
2    A  Yes. Well, "that office" being the HR branch.
3    Q  For a benefits job, a job in benefits.
4    A  Ultimately, that's what the job was, yes.
5    Q  Okay.
6        How many conversations did you have with her
7  about going to the HR office, I mean moving from the
8  counsel's office to the HR office?
9    A  I don't recall the specific number of
10  conversations.
11       I'd say that there were probably two or three
12  principle conversations.
13   Q  Tell me about the first one, the first one
14  that you can recall.
15       Where did it take place?
16   A  I think it took place in my office.
17   Q  Who was present?
18   A  Stacy and me.
19   Q  How did it come about?  Did you call her in?
20   A  I think so.
21       I think I asked her to come down to my office
22  so we could have that conversation.

Page 78

1    Q  What prompted you to do that?
2    A  We had had a -- let me back up.
3        Pat Black had asked me whether there were any
4  positions in counsel's office that I would consider
5  surplus, where -- under-utilized -- in other words, a
6  position where there wasn't enough work to keep a
7  person busy -- and my answer was yes, I thought that
8  there was, and that was the paralegal position. That
9  conversation probably took place -- I don't know -- a
10  month, six weeks before the conversation that I
11  subsequently had with Stacy.
12   Q  Okay.
13       This one that you're talking about --
14   A  The one I'm talking about with Ms. Black.
15   Q  So, when was that?  No, when was the
16  conversation with Stacy in your office, that first one?
17  Give me a time or year and a year.
18   A  Oh, God, I can't even give you a time of year.
19   Q  It was in 2004?
20   A  It would have been when Stacy -- if you want
21  to back up from the date Stacy was reassigned -- and
22  you know that better than I do. I don't know what date

Page 79

1  that was. If you want to back that up several months -
2  -
3    Q  "Several" being three?
4    A  Three to four. That would have been the time
5  of that conversation.
6    Q  Summer 2004?
7    A  If you say that that was a move that took
8  place in the fall, yes.
9    Q  If she was moved in October --
10   A  Okay.
11       If she was moved in October, then I would say
12  that conversation probably took place -- May-June 2004
13  would be my guess.
14   Q  Okay. So, Ms. Black asked you to identify
15  positions in the counsel's office that could be
16  surplus, that were surplus.
17   A  She asked me the following question:  If I
18  were to ask you to identify a position, would yo do so?
19  And the answer that I said, after thinking about it,
20  was yes, I would identify this position. She never
21  asked me to specifically identify it. She said if you
22  were to be asked, would you, and I said sure.

Page 80

1    Q  Would you or could you?
2        In other words, is there a position that you
3  could lose?
4    A  Well, it's not a position that you could lose.
5  She was asking whether I could identify a position that
6  I believe there wasn't enough work to support.
7    Q  Okay.
8    A  And the answer was, yes, ultimately.
9    Q  Okay.
10       All right.
11       So --
12   A  And that position would have been Stacy's
13  position.
14   Q  Okay.
15       So, Black asked you this question, and that
16  prompted you to have this conversation with Stacy?
17   A  Not immediately.
18       What prompted me to have the conversation
19  later was another discussion --
20   Q  Between who?
21   A  -- in which --
22   Q  Between who?

Page 81

1    A  I believe it was between Pat and me, in which
2  the position in the HR office was identified, and I --
3  I don't recall -- I don't recall knowing about the HR
4  position before our conversation.  I think it was a
5  conversation with Pat Black.
6          Anyway, Pat did point out that this position
7  was open and asked whether Stacy would have -- whether
8  I thought Stacy would have an interest in going down
9  there, and I told her that I would go have a
10  conversation with Stacy.
11    Q  But why would Pat focus on Stacy if she hadn't
12  yet -- you hadn't yet told her that that was the
13  position that you would -- you would identify?
14    A  Because I had already -- I had already told
15  her that there wasn't enough work to keep a paralegal
16  busy in our law office.
17    Q  Okay.
18    A  She was aware of that, and then she initiated
19  a conversation, well, do you think she would be
20  interested in another position in the OIG? I said I
21  would talk to her about it, so I did.
22    Q  So, the conversation that you talked to her --

Page 82

1  Stacy about was May-June 2004.
2    A  Roughly, yeah.
3    Q  Okay.  So, the other conversation that you had
4  with Ms. Black, these two or three conversations --
5    A  That was before that.
6    Q  You're talking about three conversations.  One
7  is she asked you, if she was to ask --
8    A  Uh-huh.
9    Q  -- would there be -- you said yes.
10    A  Yeah.
11    Q  Then she had a conversation, what position are
12  you talking about, when you told her, and then you had
13  a third conversation where she said, you know, there's
14  a position available in Benefits, would Stacy be
15  interested?
16    A  I don't know if I'd characterize as three
17  specific conversations, but yeah, that's the general
18  sequence of the discussion that was had.
19    Q  And that sequence led you to call Stacy to
20  your office sometime perhaps in May-June 2004 to ask
21  her, to inquire whether she'd be interested in going to
22  this job in Benefits that was vacant.

Page 83

1    A  Yeah.  And essentially it was to tell her that
2  there was a position that was down there and to urge
3  her to look into it and allow her to pursue it if she
4  wanted to pursue it.
5    Q  Did you have any -- did you have conversations
6  with Stacy earlier than that, or in that conversation,
7  telling her that her job was disappearing?
8    A  Telling her that he job was disappearing?
9    Q  That -- that, in other words, the work was too
10  light to support a paralegal?
11    A  We had talked, actually, during the year
12  before that, about some concern that I had.
13    Q  The year 2003-2004.
14    A  Yeah.  In the context of her performance
15  appraisals, which you know, would have been performed
16  in the first quarter of 2004.
17    Q  You had problems with her performance  or just
18  telling her that we don't have enough work?
19    A  No, I did not have a problem with her
20  performance.
21        When she had work, I thought that she did a
22  good job, and she worked diligently and -- and was very

Page 84

1  thorough in the work that she did. I did tell her at
2  the time that I was really concerned that there wasn't
3  enough work to support that position.
4        We were in a continuing down-sizing
5  environment where we were receiving a significant
6  amount of pressure from the FDIC to reduce overall
7  staff size, that in the event that we were to, you
8  know, agree to reduce that staff size, that I didn't
9  know, frankly, what was going to happen, but there were
10  no guarantees, and it was something that we should all
11  be concerned about.
12        So, that was a conversation that I had before,
13  and again, I want to emphasize, no, there was never an
14  issue with Stacy's work in any of that, in the sense of
15  her performance when she had work to do, but I did
16  raise it with her, you know, before that -- that
17  particular series of events that we're -- we're --
18  we're tagging May-June -- that we're tying to May-June,
19  you know, where we're having these discussions  about a
20  position down in the HR office.
21    Q  When was the first quarter, when you said "the
22  first quarter"?

Page 85

1   A  Calendar quarter, January to March of 2004.

2   Q  So, that's when you would have this -- a
3   conversation with her, during the performance
4   appraisal.

5   A  Sometime -- sometime in there, yeah.  We did
6   our performance appraisals  -- I want to say that we --
7   we did them in January, but I'm not real sure.  We've
8   gone through a couple of changes in the timing of those
9   systems lately, and you know, that time sequence is not
10  one that I really recall.

11     (Pause.)

12     MR. SHAPIRO:  All right.

13     BY MR. SHAPIRO:

14  Q  So, you had this conversation with her, and
15  you said, listen, there's a vacancy down in Benefits
16  and you might be interested in pursuing that, or did
17  you offer -- make an offer to her that she could have
18  that job?

19  A  I told her that she would have to discuss that
20  position with Trina.

21     I was not in a position to make an offer of
22  any position.

Page 86

1   Q  You were just pointing out to her that it was
2   available.

3   A  I was telling her that it was available.

4   Q  Because Ms. Black told you it was available.

5   A  Yes.  And --

6   Q  And asked you to see if she was interested.

7   A  Yes.  And I, you know, suggested that she
8   might want to go down and talk to Trina about the
9   details of the position and whether it was a fit, and -
10  -

11  Q  That's Trina --

12  A  Trina Petty.

13  Q  Uh-huh.

14     Okay.

15     So, what did Ms. -- what did -- what, if
16  anything, did -- did Ms. Sharpe say about that?

17  A  She said she would go down and talk to Trina
18  about it, and I believed, based on our conversation,
19  she was interested in looking into it.

20  Q  Was it a benefits job or just an HR job that
21  you told her about?  I mean I'm not asking you what the
22  job was; I'm asking you what you told her about it.

Page 87

1     Did you say, you know, there's a job down in
2   HR that's available?

3   A  I believe I told her that there is a position
4   in HR, that I did not know exactly what the nature of
5   the position was.

6     I do know -- I do recall, at the time, part of
7   the discussion -- Stacy had indicated an interest
8   previously in HR work, as an alternative field of
9   activity for herself.

10    In fact, she'd been to some training in some
11  HR-related matters, I think principally an EEO
12  litigation seminar or course.

13    There are probably a couple of other things
14  that she took, but she was interested in HR as a
15  potential area for development, and in any case, she --
16  I remember her being interested in the area, and part
17  of the conversation that I had with her was that this
18  is a small shop --

19  Q  This first conversation.

20  A  The HR offer in the first conversation.

21    It's a small shop.  There aren't many people
22  down there.  Some of the people in that office do

Page 88

1   benefits, some do ER, some do classification, some do -
2   - I mean it's a full-service shop, but with four
3   people, that I knew that you had to cross-train for
4   those various positions.

5     I said I didn't know what the mix of work in
6   that particular position would be, but that it was
7   something that was at least broadly in the HR area and
8   something that would encompass areas of HR that would
9   include benefits and other things, as well.

10  Q  So, you knew it was a benefits job.

11  A  I knew part of it was benefits, but I --
12  that's all I really knew, you know.  So, in any case, I
13  told her that, and she expressed an interest in going
14  down and talking to Trina, and she subsequently,  to my
15  knowledge, did.

16  Q  To your knowledge.

17  A  Yes.  I was not party to those conversations.

18  Q  How did you know that she went down?

19  A  She told me.

20  Q  So, you had a --

21  A  She said I talked to Trina.

22  Q  So, you had a second conversation.

Page 89

1    How soon after the first?

2    A  She may have -- we may have had a hallway

3  conversation where she told me that she had been down

4  to talk to Trina.

5        That was a very brief conversation.

6        I think the next substantive conversation that

7  we had was probably a couple of weeks after the first

8  one.

9    Q  So, sometime in June-July.

10    A  That would be my guess.

11    Q  Okay.  And what was that conversation?

12    A  In that conversation, Stacy came in and asked

13  me -- or not came in and asked me -- she came in to

14  tell me that she had talked to Trina, she had

15  considered the position, and she had concluded that she

16  didn't want to take it.

17    Q  Did she say why?

18    A  She -- I don't think she did.  She said that

19  she really didn't want to take it, it wasn't -- if she

20  said anything, what she said was -- she may have made a

21  reference to the benefits aspect of the job and said

22  that she just didn't want to do it.

Page 90

1    Q  Uh-huh.

2    A  Wasn't interested.

3    Q  Did you say anything, or was it just

4  information gathering from your point of view?

5    A  No.  I told her that I thought that she should

6  reconsider this as an opportunity.  The concern that I

7  had, again, was that there was an insufficient volume

8  of work to justify a paralegal position in our office,

9  and she was in a position where -- we have one

10  paralegal.  We have no other paralegal positions in the

11  Office of Inspector General.

12        We have no rights to bump back into the FDIC

13  or go back into the FDIC, because we're a separate

14  appointing authority in the event that somebody

15  eventually runs a RIF.  That did not strike me as a

16  good position for her to be in, if we got to that

17  point, and I wasn't saying and I couldn't say that we

18  were going to get to that point, but there was

19  certainly a suggestion, kind of in -- there was a

20  suggestion that down-sizing was going to be necessary

21  and we did not know how we could achieve the down-

22  sizing that would be necessary.

Page 91

1    Q  Has the IG run a RIF?

2    A  Yes.  Uh-huh.

3    Q  When?

4    A  I don't know.  The most recent RIF that we

5  ran, you know, I believe, was just a couple of months

6  ago, when we closed some field offices.

7    Q  Okay.

8    A  We have closed a field office in -- an audit

9  field office in Atlanta, an audit field office in

10  Chicago.

11        In the round of down-sizing before that, we

12  closed an office in San Francisco, and in each one of

13  those cases, we did run a RIF.

14    Q  Is that because the work is getting less?

15    A  Well, we had pressure to down-size, and I

16  think that the organization  -- we had -- going back --

17  and you have to go back to the merger of the FDIC and

18  the RTC.

19        We had about a 400-person organization at the

20  time of that merger.

21    Q  "We" being the OIG.

22    A  "We" being the OIG.

Page 92

1        The OIG --

2    Q  Nationally.

3    A  Nationally.

4        The OIG, at this point, is down to roughly 130

5  employees, and it's been a constant process through

6  that period of time of down-sizing, so --

7    Q  And the work has shrunk.

8    A  The work has has, overall, shrunk.  It's

9  changed.

10        We do different types of work now than we did

11  before.

12    Q  But overall, it's shrunk.

13    A  Overall, sure.

14    Q  Has headquarters increased in size?

15    A  I don't believe so.  I believe headquarters

16  was well over 200 people at the time of the merger.

17    Q  You had RIFs in the field.

18    A  Uh-huh.

19    Q  All right.  For these field offices.  Did you

20  have a RIF at headquarters?

21    A  I don't think that we've run a RIF in

22  headquarters.

Page 93

1   Q Since you've been there, has there been a RIF
2 at headquarters?
3   A Not to my recollection.
4   Q Okay.
5     All the lawyers are at headquarters?
6   A Yes.
7   Q So, the counsel's office is in headquarters.
8   A Yes, it is.
9   Q Is there a personnel office in the field?
10   A No.
11   Q None.
12   A Not that I know of.
13   Q Had there been the past?
14   A No.
15   Q Did field offices have personnellists?
16   A Not for the OIG, no.
17   Q That's what I'm talking -- I'm only talking
18 about OIG.
19   A No.
20   Q Not talking about FDIC.
21   A No.
22   Q Because you are separate, right?

Page 94

1   A Yes, we are. And the HR office has always
2 been in headquarters.
3   Q Uh-huh. Okay. And there's been no RIFs in
4 headquarters.
5   A That is -- to my knowledge --
6   Q I mean since you were there.
7   A That's correct.
8   Q A planned RIF in headquarters now?
9   A Not that I know of.
10   Q Okay.
11     All right.
12     So, she told you she wasn't interested, that
13 the benefits aspects was -- you said you should
14 reconsider.
15   A I think she said -- I said you should
16 reconsider, because I don't know where we're going as -
17 - the OIG, as a whole, is going, and if memory serves,
18 we were to about a hundred and -- we were somewhere, at
19 that time, around 170 people, having just gone through
20 a down-sizing that got us from about 200 and --
21 actually about 220 or 230, down to 170 or so.
22   Q Nationally.

Page 95

1   A Nationally.
2   Q Uh-huh. Including the field offices.
3   A Including field offices.
4   Q Right.
5   A And we have since gone through a further
6 reduction down to our current level, which I think is
7 around 130 employees.
8     So, at the time that we were discussing this
9 round of down-sizing, from about the 170 -- and again,
10 I think it was about 170, it may have been 175 or so --
11 down to 130, this is the period of time when -- when
12 that down-sizing is being contemplated that Stacy and I
13 were having this conversation.
14   Q All right.
15     So, you left it with her that she should --
16 you urged her to reconsider.
17   A Yes.
18   Q What did she say?
19   A She said she would.
20   Q Uh-huh.
21   A And she came back a day or two later and said
22 I really don't want to.

Page 96

1   Q Because of the benefits, because she wasn't
2 interested in benefits.
3   A She didn't say. At that point in time, she
4 said -- what she said, as I -- as I recall, what she
5 said was that she appreciated our conversation and
6 understood what I was telling her, but she had just
7 decided, I've made a decision, and I'm just not
8 interested, and that's all she said, without being
9 specific as to why.
10   Q But at that point, you understood it that she
11 was -- she was not interested because of the benefits.
12   A I understood that may be a component of her
13 decision.
14     Whether that was the reason or -- I have no
15 idea.
16   Q Did she indicate to you that she'd be happy to
17 consider a job in HR in employee relations, that that
18 was more her interest, EEO, employee relations?
19   A I think, at some point during our
20 conversations -- and I don't remember exactly when -- I
21 have -- again, I don't remember exactly when. I'm sure
22 that, at some point, she said something to the effect

Page 97

1  that she thought she would like doing ER work, employee
2  relations work, but I don't remember where in the
3  sequence of discussions that statement was made. But
4  yeah, sure, she said that she would -- she would like
5  to do ER work. That I know.
6     Q  Okay.
7        What was the next thing that happened? She
8  told you that she had thought about it again, but she
9  really didn't want that benefits job, that job.
10    A  That was the end of the discussions --
11    Q  So, when was that?
12    A  -- that I had with Stacy.
13    Q  So, when was that third conversation?
14    A  Very shortly after the second conversation.
15    Q  So, July-August?
16    A  Yeah. I would say they followed within days.
17  If we're saying the first was May-June, the second was
18  June, this would have been about the same time --
19    Q  Okay.
20    A  -- frankly.
21    Q  So, you didn't have another discussion with
22  her at all.

Page 98

1     A  No, I did not.
2     Q  Okay.  And what was the next thing that
3  happened?
4     A  The next thing that happened was I remember
5  telling Pat that Stacy wasn't interested in the
6  position.
7     Q  When did you tell her that?
8     A  Very shortly after the last conversation I had
9  with Stacy.
10    Q  So, it's June.
11    A  Probably the same day. I don't remember, but
12  probably pretty -- I said Stacy has decided she's not
13  interested in the position.
14    Q  Okay.
15       So, you told Pat that.
16    A  Yes.
17    Q  And was the position advertised?
18    A  I don't believe it was advertised.
19    Q  I see.  But it was vacant.  At the time you --
20  Pat talked to you and you talked to Stacy and had this
21  running conversation with Stacy, the position was
22  vacant.

Page 99

1     A  I think so, but I don't know for sure.
2     Q  Okay.
3     A  If it wasn't vacant, it was a position that --
4  that they were in the process of establishing. I don't
5  know, in the sequence of the personnelists' creation of
6  positions, where they were.
7     Q  Well, think about it. Think back to what Pat
8  Black said to you when she first broached this. Did
9  she say there's a vacancy down in --
10    A  I don't recall if she said there's a vacancy
11  or we're going to be establishing some positions --
12    Q  Positions?
13    A  You know -- or position or whatever. I don't
14  recall.
15    Q  Okay.
16       So, once you told Pat Black that Stacy was not
17  interested, what was the next thing that happened,
18  sequentially, chronologically?
19    A  Sequentially, the next thing that happened is
20  Pat advised me that she had decided to reassign Stacy
21  to the position.
22    Q  Okay.  And can you tell us when that was, in

Page 100

1  relation to either your last conversation with Pat,
2  where you told her Stacy wasn't interested, or when
3  Stacy was actually moved?
4     A  Well, I believe Stacy was actually moved --
5  Stacy stayed in counsel's office for about six weeks or
6  so after Pat had indicated she was going to direct her
7  reassignment.
8     Q  Indicated to Stacy or indicated to you?
9     A  I think both. I think that -- there was a
10  period that I recall during which Stacy stayed up in
11  counsel's office -- there was a point in time -- they
12  didn't have an office -- or some issue about actually
13  physically moving her down to the other floor in which
14  the HR office was located. So, they didn't move her
15  down right away.
16       So, that may have been the October point in
17  time.
18       As far as, you know, the last -- when did I
19  hear from Pat?
20       I don't recall. It was -- it was sometime --
21  not an extended period of time after the conversation
22  that I had with Pat. I don't remember --

Page 101

1    Q  What would be an extended period of time?
2  When you say "extended," I'm not sure --
3    A  I want to say it was a week.
4    Q  A week.
5      So, sometime in the summer?
6    A  Yeah.
7    Q  June-July.
8    A  Pat said I'm going to reassign Stacy.
9    Q  When was Stacy told about this?
10    A  I don't know.
11    Q  Did you tell her about this?
12    A  No, I did not.
13    Q  So, you were her boss, though, and you didn't
14  tell her, Stacy, you're being reassigned.
15    A  Pat --
16    Q  Pat did.
17      Did she do it by e-mail?
18    A  I don't know whether she sent her an e-mail or
19  not.  I believe she told her verbally, but I -- I don't
20  know.
21    Q  Did she send you an e-mail indicating that
22  that's what she was going to do?

Page 102

1    A  No, I don't recall an e-mail.
2    Q  When she made the decision, did she tell you
3  by e-mail?
4      Did she give you a writing saying I'm
5  reassigning her?
6    A  No, she didn't.
7    Q  Okay.
8    A  She told me verbally that that's what she'd
9  decided to do.
10    Q  Okay.
11      Did you agree with the decision?
12    A  It was her decision.
13      I didn't think that there was enough work to
14  support the paralegal position in counsel's office.  I
15  was not in a position to judge whether there was work
16  in the HR office that could be performed by Stacy or
17  not.
18      Assuming that there was, you know, I would
19  have to speculate about whether I would agree with it
20  or not.
21      I wasn't asked whether I agreed, and my advice
22  wasn't solicited in connection with that decision.

Page 103

1    Q  Okay.  Fine.
2      So, just to get the sequence right -- so, by
3  July 2004, Pat had told you she was going to do this.
4    A  Accepting your -- you know, our -- our
5  reconstruction of these dates --
6    Q  Right.
7    A  -- you know --
8    Q  But she didn't tell you in writing.  She
9  just --
10    A  No, she told me verbally.
11    Q  Okay.  And then, if we know that Stacy was
12  moved in October --
13    A  Uh-huh.
14    Q  -- we're talking about a two-, three-month --
15    A  There was a period of time, before Stacy went
16  down -- physically went down, where she was still up in
17  our office.
18    Q  Do you know when Pat told Stacy she was moving
19  her?
20    A  No.  I assume she told her -- my recollection
21  is that Pat told me at virtually the same time.  In
22  other words, she either said I have just told Stacy or

Page 104

1  I am going to be meeting with Stacy in five minutes to
2  tell her that.
3      I don't remember which it was, but she --
4    Q  So, you weren't at --
5    A  -- just informed --
6    Q  So, you weren't at the meeting.
7    A  No, I was not.
8    Q  I see.  And then there was a hiatus of months
9  before Stacy was actually moved, not just a couple of
10  weeks.
11    A  Physically moved, yeah.  Well, I don't know if
12  it was months or not.
13      Again, I don't know the -- that time --
14  that's, you know, our reconstruction of that.  It was a
15  period of time.
16      I don't know how long it was.
17    Q  Did you have any other connection with this
18  after Pat told you that she was going to tell Stacy?
19  Did you have any other meetings, any other decisions to
20  make, any other -- even as a secretariat -- that is,
21  somebody facilitating the move -- did you participate
22  at all after that?

Page 105

1   A  Not that I recall.

2   Q  Okay.

3   A  No.

4   Q  Do you recall Stacy asking -- do you recall

5   Ms. Petty asking them to wait?

6   A  No, I don't recall that. That could have

7   happened, but I don't recall that.

8   Q  Do you recall Stacy opposing being moved and

9   coming to you or talking to you or you -- you hearing

10  about her being upset by being moved?

11  A  Well, I believe that I heard that she was

12  upset.

13     I do not recall Stacy subsequently coming to

14  discuss it with me at all.

15  Q  It would have done her no good. It wasn't

16  your decision.

17  A  Wasn't my decision. But I don't recall her

18  coming to talk to me --

19  Q  Okay.

20  A  -- about it at all.

21  Q  Do you recall telling Stacy that she

22  wouldn't -- when you talked to her about the job, that

Page 106

1   she wouldn't be moved without her -- that you gave her

2   the opportunity to take this job, but she -- she asked

3   you, was she going to be forced into this job, and you

4   indicated no?

5      Do you recall that?

6   A  I do not remember being asked that question or

7   having that discussion with Stacy. I don't believe

8   that she did ask me that question.

9   Q  But you don't recall.

10  A  I don't believe she asked me that question.

11  Q  Okay.

12     Do me --

13  A  We did not -- our discussion was -- was

14  strictly in terms of this is an opportunity that you

15  may want to look into and I think that you should

16  consider.

17     We did not discuss anything in terms of being

18  reassigned to it, regardless. She did not raise that

19  with me.

20     I would have recalled that.

21  Q  Okay.

22  A  We didn't talk about that.

Page 107

1   Q  So, if she says -- if she says that you told

2   her -- that she asked if I'm going to be forced to take

3   this job and you said no, this is voluntary, if you

4   want to look into this, this is -- if you want to take

5   this job, you can have this job --

6   A  I do not remember saying any such thing or

7   remember any such conversation.

8   Q  And you would remember that sort of thing.

9   A  I would remember that.

10  Q  So, if she says that, she's not telling the

11  truth.

12  A  I'm not going to say she's not telling the

13  truth.

14     I'm saying we have different memories or may

15  be mistaken.

16     She may have had that conversation with

17  somebody else and attributed it to me, but I -- I do

18  not remember that conversation.

19  Q  Well, are you're saying you don't remember and

20  it -- it could have happened, or are you saying it

21  didn't happen?

22  A  I don't think it happened.

Page 108

1   Q  Okay.

2      So, either she's not telling the truth or

3   she's mis-remembering.

4      Is that what your testimony is?

5   A  I will leave it to somebody else to reach a

6   conclusion about what is. I -- I -- you know, I mean I

7   remember the facts differently.

8   Q  Okay.

9      So, you had nothing further to do with this.

10  A  Not that I recall.

11  Q  Okay. And at some point, Stacy was gone.

12     Let me ask you this. When did you inform Mr.

13  Gianni that you were converting Ms. Vosburg to

14  permanent, not NTE?

15  A  I don't recall a specific time. We'd had

16  discussions leading up to that decision in which I had

17  discussed my view that Ms. Vosburg is a very talented

18  lawyer and that, as a lawyer, she was contributing to

19  the office substantially and that it would nice if we

20  were able to keep her.

21  Q  But you could keep her through 2006, to -- to

22  sometime in September 2006.

Page 109

1    A  I could.

2       She was, at the time, married, and she has two

3  kids.

4       I don't know how willing she would be to

5  remain in an NTE position indefinitely.

6    Q  Did she ever come to you to say -- indicate

7  that she wasn't willing to remain in an NTE position?

8    A  Not in so many words, but I mean she certainly

9  expressed some anxiety over that when -- not anxiety --

10  probably overstates it.

11       I -- I -- I think that there was certainly a

12  tacit understanding on both of our parts that, you

13  know, if this is a term position, that eventually she

14  was going to have to look somewhere else for a

15  permanent position.

16    Q  Uh-huh.  But not in 2004.

17    A  We'd had that discussion before then.  I'm

18  pretty sure we'd had that discussion.

19    Q  Do you have any documents?

20    A  Really -- no.

21    Q  Any e-mails back and forth?

22    A  No.

Page 110

1    Q  Any memos from her expressing her anxiety or

2  her -- her intention to look elsewhere?

3    A  Not that I recall.

4    MR. SHAPIRO:  Let's take five.

5       (Whereupon, at 12:17 p.m., a luncheon recess

6  was taken.)

Page 111

1       A F T E R N O O N   S E S S I O N

2    MR. SHAPIRO:  Back on the record.

3    BY MR. SHAPIRO:

4    Q  I wonder if you can tell me precisely what Ms.

5  Sharpe's duties were at the point where you identified

6  her job as -- as something that you could do without?

7    A  Okay.

8       She was, at that point in time --

9    Q  This would have been circa first of -- first

10  of the year 2004?

11    A  Right.  That's fine.  I think that's

12  consistent with what we were saying before.

13       At the point in time, her duties were --

14    Q  Duties and responsibilities, okay?

15    A  Okay.  To assist or work on FOIA requests as

16  they came in, and she did.  She was maintaining an

17  opinions log within counsel's office that basically was

18  an effort and is an effort to catalog the legal

19  opinions that we either issue or receive so that we can

20  identify them as we provide advice on those or related

21  subjects in the future.

22    MR. SHAPIRO:  We'll have to go off the record.

Page 112

1       (A discussion was held off the record.)

2    BY MR. SHAPIRO:

3    Q  Her duties -- you said FOIA as -- as it came

4  in.

5    A  FOIA as it came in and opinions log.

6    Q  Right.

7    A  Stacy was -- I believe she was an alternate in

8  our subpoena system, and let me explain.  We have

9  essentially an automated subpoena request system for

10  the issuance of IG subpoenas.  When one comes in, it

11  basically notifies the attorneys and Teresa, and I

12  think, at the time, it notified Stacy, too, that a

13  subpoena had come into the office.

14       The attorneys would review the request and

15  determine whether we had the jurisdiction and the

16  authority to issue the subpoena.  They would work with

17  the language on the subpoena, and then the subpoena

18  language, the request, the formal document itself would

19  have to be processed.

20       Ordinarily, Teresa did that.  Stacy, I

21  believe, backed her up, while Stacy was in the office.

22  So, if Teresa wasn't there, one of her duties would

Page 109 - Page 112

Page 113

1 have been to -- to help back up in the preparation of
2 subpoenas, administrative subpoenas.
3    She was, at some point in time -- and I think
4 that, at this particular point in time, she was still
5 performing this function. She was doing kind of a
6 weekly summary of information for Gaston Gianni, the
7 Inspector General, and he'd asked her basically to
8 review some number of periodicals. I don't even know
9 what they are now, maybe the American Banker or other
10 professional journals, something in that nature, to
11 pull out some materials that were of interest to him.
12 I don't even know what specific guidelines he had for
13 her, but this was a -- you know, would you please do
14 this for the IG request, and -- and -- and she was
15 doing that.
16    She would do research, as assigned.
17    Q  What about discovery documents?
18    A  The discovery had pretty much gone away by
19 that point in time.
20    We haven't had a case where we had a large
21 volume of materials produced in connection -- in
22 discovery for sometime at that point. I don't know

Page 114

1 what the last one we had done was, but it had been
2 quite a while.
3    We didn't have any --
4    Q  Anything else?
5    A  Off the top of my head, nothing that I recall.
6    Q  There was no FOIA/Privacy Act backlog?
7    A  At that time, no, there was not.
8    Q  But when you said FOIA, you also meant the
9 Privacy Act, I take it.
10    A  Of course. Yeah, we treat them within the
11 same system.
12    Q  And when the -- this opinion log was actually
13 writing up opinions, summarizing an opinion.
14    A  Yeah. The opinion log essentially involved
15 identifying what provisions of law or general subjects
16 were involved in the opinion so that a lawyer who
17 wondered whether there was an opinion on a particular
18 subject would be able to identify whether we had passed
19 on it in the past or not.
20    Q  Like the West Key number system, so that
21 somebody could look something up.
22    A  Yeah. It's not that sophisticated.

Page 115

1    I mean it's -- it's -- I think it's -- I don't
2 know if they did it in Excel or they did it in
3 Microsoft Access, but it's essentially a searchable
4 database with some -- some terms. That's basically
5 what it was about.
6    Q  The year before, say January '03 --
7    A  Uh-huh.
8    Q  I take it she was doing the same duties.
9    A  Yes, she was.
10    Q  What else was she doing?
11    A  I specifically don't recall.
12    Q  So, you don't know what reduced.
13    A  I would say that there may have been something
14 of a greater volume of the same sort of work, but that
15 was about it.
16    Q  When was the backlog cleaned up for
17 FOIA/Privacy Act?
18    A  That was cleaned up, you know, a year or two
19 before that. I don't -- I don't know the specific
20 date, but that was cleaned up -- that was cleaned up a
21 year or two before that, and frankly, I think that was
22 before I even became the counsel to the IG.

Page 116

1    FOIA was not an area of my responsibility
2 before I became the counsel.
3    Q  Who does the opinion log now?
4    A  Teresa Fewell.
5    Q  So, she can categorize these opinions -- she
6 knows enough law to categorize the opinions and do the
7 summary statements?
8    A  Yeah, I think that's probably fair. I don't
9 think it's --
10    Q  Who reviews her work?
11    A  -- too difficult.
12    Q  Who reviews her work?
13    A  To the extent there is any, I do.
14    Q  Okay.
15    A  We haven't added anything to it in some time.
16    Q  Who does FOIA processing?
17    A  Chris Geiseler.
18    Q  Well, wasn't he the lawyer on that before, as
19 well?
20    A  He was the lawyer on that before.
21    Q  So, who does the processing?
22    A  I think that Chris does it himself.

Page 117

1    If I understand "processing" to mean the
2 mechanical process of responding to a FOIA request, I
3 think that Chris does that.
4    Q What Teresa used to do. What -- what Stacy
5 used to do.
6    A I -- I think that's -- yeah, I think that
7 Stacy's -- I think Chris has absorbed those
8 responsibilities.
9    I think that's a fair statement.
10    Q How about the alternate subpoena system?
11 Who's the alternate now, the alternate on the subpoena
12 system?
13    A I don't know that we have an alternate at this
14 point in time.
15    Teresa does the work on that.
16    Q And if she's out?
17    A If she's out, I think that Adriana knows how
18 to do it, but I don't think we've faced that situation.
19    Q Are weekly summaries being done for the IG
20 still?
21    A The IG has retired. That was a project for
22 him personally.

Page 118

1    I do not believe any such thing is still being
2 done.
3    Q Who does the legal research?
4    A The lawyers.
5    Q Not Teresa.
6    A No.
7    Q How many other duties did she have besides
8 those areas back in January '04?
9    A There aren't any that I recall.
10    Q Now, who gave her -- this is Stacy -- who gave
11 Stacy her assignments day to day?
12    A Ordinarily, it would be me. Ordinarily, it
13 would be me, yes.
14    Q On everything?
15    A Well, with the exception of the matter that
16 the IG asked her to do for her. I think that he
17 discussed that with her directly. The only question
18 was whether she was available time-wise, and she was.
19 But I think, other than that, her assignments came
20 through me. I'm not aware of anybody else doing it.
21    Q How about the FOIA work?
22    A Chris -- Chris would work with her on that.

Page 119

1    When I would give her assignments -- a FOIA
2 would come in, and the assignment I would give her is,
3 Stacy, go work with Chris on this. In terms of the
4 specific nature of the work she was performing, Chris
5 oversaw that.
6    Q Anybody else involved in overseeing Stacy's
7 work or giving her assignments?
8    A Certainly not on a regular basis, no.
9    Any attorney that would ask her to do any
10 research, I would expect that attorney to oversee that
11 research and assure themselves that they were satisfied
12 with it, but --
13    Q Well, could they give her research
14 assignments, or did they have to go through you?
15    A There were so few of them, frankly, that it
16 never was much of an issue. If somebody had asked if
17 Stacy was available, I would have said sure, and it,
18 you know, frankly, would have been fine with me for
19 them to go ahead and assign it to her and -- and
20 oversee it. I don't think I need to know everything
21 that they're doing. But I don't recall that happening
22 very much.

Page 120

1    Q Was there any change in this from the time you
2 became the acting IG?
3    A The acting counsel to the IG.
4    Q Acting counsel to the IG. Is this the way it
5 was --
6    A I would say that the volume of FOIA work that
7 we had when I became the acting counsel to the IG was a
8 little higher than it was later on, just the number of
9 FOIAs that we received.
10    You know, probably, it was in the 13 to 16 a
11 year range.
12    I think it dropped down below that since that
13 point in time.
14    The opinions log was something that didn't
15 exist previously. So, that was a new project that --
16 that -- that she had.
17    Once the work had been done to locate,
18 collate, identify the existing opinions and -- and get
19 the information about them into the database, there was
20 a limited level of ongoing work with respect to that.
21    So, that was probably around that point in
22 time that she became involved with that particular

Page 121

1 project, that point in time being the -- the point in
2 time that I became the -- the counsel, as opposed to
3 the acting counsel.
4     Q Did you tell her, during 2002, to -- to speak
5 with Cosgrove about getting more involved in
6 employment-related matters?
7     A I may have. I don't recall specifically
8 telling her to do that.
9        Mike is our office's personnel lawyer, and if
10 she expressed an interest -- and she did express an
11 interest in doing personnel-related work -- I would
12 have probably suggested that she talk to Mike or talk
13 to Jan Welch. Jan Welch is the ER specialist, employee
14 relations specialist --
15     Q Well, no, I'm talking about --
16     A -- for HRB.
17     Q Right.
18       I'm talking about assigned to work in
19 employment-related matters for the IG counsel's office.
20 Did you tell her to speak with Mike about getting more
21 involved in working on employment-related litigation
22 that he was doing?

Page 122

1     A I don't remember. I may have. I don't
2 recall.
3     Q Okay.
4     A I certainly asked the lawyers to keep me
5 posted on any work that they had that they thought was
6 suitable to be assigned to a paralegal. So, I know
7 that I had those conversations with the lawyers in the
8 office, but I don't really recall whether I had that
9 conversation --
10     Q Mr. Gibson --
11     A I don't recall having that conversation with
12 Stacy.
13     Q What was the -- what kind of work do law
14 clerks do at the OIG counsel's office?
15     A Predominantly, they did research, maybe some
16 drafting, depending upon what sort of documents had to
17 come out of the office at a particular time. The
18 research that they would do -- maybe the support for an
19 opinion or research on a point that was related to a
20 matter that was in litigation. I'd say it's fairly
21 routine legal research.
22     Q Did Stacy do that, as well, same kind of

Page 123

1 research?
2     A She did some of that, yeah.
3     Q Right. And also drafting, as well.
4     A I don't recall Stacy ever doing much drafting.
5     Q Wouldn't she draft interrogatories,
6 interrogatory answers?
7     A I did not recall Stacy drafting
8 interrogatories.
9       She may have been involved in drafting some
10 answers to interrogatories, I don't know, but I don't
11 recall her ever independently doing -- or, for that
12 matter, doing first drafts of interrogatories or
13 requests for production or materials --
14     Q How about -- how about responses to employee
15 privacy act requests, where you cite -- where you cite
16 exceptions?
17     A She did write a couple of responses. I don't
18 remember -- that would have been -- yeah, she did a
19 couple of those.
20       I don't know how many, offhand, but she did
21 some.
22     Q Law clerks would do that, as well?

Page 124

1     A I don't know that I ever had law clerks work
2 on FOIA matters, but that would have been an
3 appropriate for them to work on, sure.
4     (Pause.)
5     BY MR. SHAPIRO:
6     Q When was the first time that Stacy told you
7 she was interested in HR as an alternative field?
8     A We were talking about that -- I remember, you
9 know, having that discussion at the time -- we talked
10 about the performance review cycle for -- it would have
11 been, I guess, '03 and '04, and I think that, during
12 the course of '03, we had some discussions on an
13 ongoing -- occasional but ongoing basis on that
14 subject.
15     Q So, that would be the first time that you can
16 recall.
17     A That I can recall, yeah.
18     Q Uh-huh.
19       Okay.
20       With respect to Ms. Vosburg, she became a --
21 she went off the -- the NTE by competing for a job,
22 correct?

Page 121 - Page 124

Page 125

1   A   No, she -- she was converted from an NTE
2 position to a permanent position.
3   Q   Lawyer position.
4   A   Yes.
5   Q   All right.
6     Now, lawyer positions in the FDIC OIG,
7 counsel's office --
8   A   Uh-huh.
9   Q   They are 905 positions, correct?
10   A   Yes, they are.
11   Q   That's the series.
12   A   Uh-huh.
13   Q   And in the 905 series and in the legal
14 division of the -- the counsel's office of the OIG's
15 office, your 905 positions have a career ladder, don't
16 they?
17   A   Actually, they did not --
18   Q   They had no career ladder.
19   A   -- at that point in time. Adriana is
20 currently in a position with a career ladder, but at
21 the time, there was no career ladder for her position -
22 -

Page 126

1   Q   I see.
2   A   -- no PD -- as I understand it, there was no
3 PD that was established as a career ladder PD in our
4 office.
5   Q   Okay.
6     When Mike Cosgrove was hired, was he hired as
7 a GS-15?
8   A   He was hired laterally as a 15.
9   Q   And you were hired as a 14.
10   A   I was hired as a 14, and I competed for a 15.
11   Q   You competed for a 15.
12   A   Yes, I did.
13   Q   Okay.
14     What about the others in the office?
15   A   Chris Geiseler -- I don't remember. That was
16 before I became the counsel to the IG, and I don't know
17 under what mechanism or even at what time Chris became
18 a 15.
19   Q   Was there anybody promoted from a 12 to a 13
20 in that office?
21   A   Adriana was promoted from a 12 to a 13.
22   Q   Did she have to compete for that?

Page 127

1   A   She competed for that.
2   Q   She competed for that.
3     I see.
4     So, how -- she competed even though it was in
5 the same -- it was in the same series.
6   A   She competed so that she could be on a career
7 ladder PD.
8     Her PD currently is a career ladder PD,
9 13/14/15.
10   Q   Well, wait a minute. When she converted from
11 NTE, she was not on a career ladder?
12   A   No, she was not. She converted from a 12 to a
13 12.
14   Q   Did she compete to get from an 11 to a 12?
15   A   She had a desk audit.
16   Q   She had a desk audit.
17   A   Yes.
18   Q   So, there was no competition.
19   A   That's correct.
20   Q   All right.
21     Was she doing 13-level work as a 12?
22   A   In my opinion, yes, she was.

Page 128

1   Q   Why not desk audit?
2   A   The reason that there wasn't a desk audit was
3 because there was an opportunity, by competing the
4 position, to put her on a career ladder position, so
5 you wouldn't have to do a desk audit every time you
6 wanted to consider a promotion.
7   Q   I see.
8     How many people have you -- is there a plan
9 for the office?
10   A   I'm sorry. What do you mean by a plan?
11   Q   A plan for expansion, a plan -- manning plan,
12 a personnel management plan for the OIG counsel's
13 office.
14   A   No, I don't think that there is.
15   Q   Do you expect to hire more people?
16   A   No, I don't.
17   Q   Do you expect to shrink?
18   A   It's a possibility, yes.
19   Q   All right.
20     When has it been a possibility? From what
21 point has it been a possibility?
22   A   It has been a possibility constantly. It has

Page 129

1 never not been a possibility, and it remains a
2 possibility today.
3 Q Uh-huh.
4 The vacancy announcement that Ms. Vosburg
5 applied for, under which she applied for a 509 GS-
6 CG-13 job --
7 A Okay.
8 Q That still exists?
9 A I'm sorry. Does the announcement itself still
10 exist?
11 Q Yes, indeed.
12 A I don't know.
13 Q Were the duties and responsibilities announced
14 for that vacancy the ones that Vosburg was performing?
15 A I believe that they were consistent with her
16 duties at the time, yes.
17 Q Uh-huh.
18 Had there been no career ladder established in
19 the counsel's office before this?
20 A To my knowledge, that's correct.
21 Q I see. The FDIC legal office has a career
22 ladder, doesn't it?

Page 130

1 A I don't know. I've never worked in the legal
2 office or used their PDS.
3 Q I see.
4 They're 905 positions, as well, aren't they?
5 A As far as I know.
6 Q Uh-huh.
7 A I assume that they are. I think all
8 government positions are 905s.
9 Q Who wrote the vacancy announcement -- that is,
10 the duties and responsibilities in the vacancy
11 announcement?
12 A I believe that that was written by -- the
13 vacancy announcement would have been written by
14 somebody in our personnel shop. I don't know whether
15 Trina wrote it or not.
16 Q Yeah, but who filled in the summary of duties?
17 That would be somebody in your shop.
18 A A draft of that came up and a draft of that
19 would come up from the HR office.
20 I'm sure I reviewed it to ensure that it was
21 correct from my standpoint, but I'm pretty sure that,
22 you know, the -- the document itself, in the first

Page 131

1 instance, was written down in the HR office. I assume
2 it's based on other similar vacancy announcements of
3 the past taken from sources that I -- I don't know what
4 they would have been.
5 (Pause.)
6 BY MR. SHAPIRO:
7 Q Ms. Petty -- she has a signature stamp?
8 A I believe so.
9 Q Who is authorized to use her signature stamp?
10 A I do not know.
11 Q Uh-huh.
12 (Pause.)
13 BY MR. SHAPIRO:
14 Q Who is Janet Welch?
15 A Jan Welch is the ER specialist in the Human
16 Resources Branch.
17 She reports to Trina Petty.
18 Q The vacancy for Ms. Vosburg for the 13 that
19 she got was only open for one week.
20 A I don't remember.
21 Q Why was it open only one week?
22 A I don't remember how long it was open.

Page 132

1 Q Ms. Vosburg was the only applicant?
2 A I don't know the answer to that question.
3 Q Was the vacancy advertised government-wide or
4 just FDIC-wide?
5 A I believe it was advertised FDIC-wide.
6 Q Uh-huh.
7 A But I don't know.
8 That's something the personnelists would have
9 to tell you.
10 Q Right.
11 You didn't ask that it be advertised only to
12 the FDIC.
13 A No. I asked that the position be advertised.
14 The personnel office decides, I believe, where and how
15 it's necessary to advertise a position to ensure
16 competition. That's something that they do, not
17 management.
18 Q How many lawyers on the staff right now have
19 been in the FDIC's counsel's office?
20 In other words, lawyers for the FDIC, not the
21 FDIC OIG.
22 A One.

Page 133

1  Q  Who?

2  A  Mr. Cosgrove.

3  Q  Mr. Cosgrove.

4  A  Uh-huh.

5  Q  And he came over from the --

6  A  He came over from the FDIC counsel's office.

7  Q  Under what circumstances?

8  A  He was --

9  MR. COSGROVE:  Excuse me.  I'm going to object

10  to relevance.

11  What possibly --

12  MR. SHAPIRO:  Because we're dealing with

13  people coming on board in the counsel's office,

14  completely relevant.

15  MR. COSGROVE:  He can answer the question.

16  MR. SHAPIRO:  Sure.

17  MR. COSGROVE:  I register my objection, but

18  David, really.

19  MR. SHAPIRO:  Your objection is registered.

20  BY MR. SHAPIRO:

21  Q  Sir.

22  A  He was brought on board at a time when we had

Page 134

1  a fairly significant volume -- fairly -- a very

2  significant volume of personnel-related litigation.  No

3  one in our office had a specific legal background in

4  personnel law, and Mike had been a specialist in that

5  area for a very long time.

6  He was with the FDIC's -- I don't remember

7  what the name of the group was, but it was part of the

8  corporate affairs section that handles FDIC's personnel

9  cases, and he was an experienced FDIC personnel lawyer,

10  and he came over to work with us in that specific area,

11  along with whatever other areas we would be able to

12  utilize his time.

13  Q  And what year was that?

14  A  2000 or 2001.

15  Q  And that was an expansion -- in other words,

16  that was a new job, an addition -- it wasn't because

17  somebody left; it was a new job.

18  A  We had, certainly, a need for an experienced

19  personnel lawyer.

20  I don't remember the sequence of people coming

21  and going at that point in time to say it's a new job

22  or not a new job, and that kind of gets back to the FTE

Page 135

1  discussion earlier.  I don't think that we had X number

2  of jobs in counsel's office.

3  Q  Did he replace somebody?

4  A  He was different in the sense that he had

5  experience that nobody else had.

6  Q  Right.

7  Did he replace somebody who left?  Somebody

8  left, and therefore, there was a vacancy, and then you

9  announced it, but you needed some other specialty, so

10  you changed the --

11  A  We had a need for the services of a lawyer

12  with that experience.

13  I don't really remember whether we had a

14  vacancy in the sense you're using the term or we didn't

15  have a vacancy.

16  We had a need, and we filled it.

17  Q  Was it a promotion for him when he took the

18  job?

19  A  I don't believe so.  I believe he was

20  lateraled.

21  Q  Lateraled at the 15 level.

22  A  I believe he was a 15 --

Page 136

1  Q  Okay.

2  A  -- in the legal division.

3  Q  Why was the position competed on November 1st?

4  A  Why was what position competed on November

5  1st?

6  Q  The 13, 905-13 that Ms. -- that Ms. -- that

7  Ms. Vosburg --

8  A  My understanding from our personnel people was

9  that she could not be put on a career ladder PD unless

10  the position was competed.

11  That's what I was told, and I have no reason

12  to disbelieve that.

13  Q  Right.

14  Why was it November 1st, though?  I understand

15  the reason why you're saying that she had to -- you had

16  to advertise this job, but I'm asking the timing, not -

17  -

18  A  I don't know why it was November 1st.

19  Q  Well, when did you ask for it to be done?

20  A  I don't recall.

21  Q  You made the request for this job to be

22  advertised on November 1st.

Page 137

1    A  I don't  know when  I made  the  request  for that
2  job  to  be  advertised.
3        I don't  remember  the  day.
4        But if  you're -- if  you've got  some document
5  that you're going  to tell  me it  was November  1st, I'm
6  willing  to accept  that.
7        It could  have  been.
8        I don't  know.
9    Q  We'll look  at  a  document.
10              (Gibson  Exhibit 1  was marked
11              for identification.)
12  BY MR.  SHAPIRO:
13    Q  I'm showing  you what  has  been  marked  Gibson 1.
14  It's a  November 1, 2004, memorandum  to Trina  Petty,
15  Deputy Assistant  Inspector  General, from  you re
16  position  announcement.
17    A  Okay.
18    Q  And it  starts off,  "Please advertise  a
19  position  for a  CG-905-13 in  counsel's office  with
20  promotion  potential  to grades  14" --  I take  that  to be
21  "and" --  there a  typo --
22    A  I would  assume so.  It looks  like a  typo.

Page 138

1    Q  -- "15.  I understand  this advertisement  can
2  be made  FDIC-wide."
3    A  Okay.
4    Q  Okay.  And then  it says,  "I have reviewed  the
5  position announcement  for vacancy  2001-OIG-1254  which
6  advertised  a 905-15  position."
7    A  Okay.
8    Q  That's the  position  that Mr.  Cosgrove got,
9  correct?
10    A  I don't  know.
11    Q  It sounds  like  it.  He was  the last  one in,
12  wasn't  he?
13    A  I think  so.
14    Q  And --
15    A  It could  be, but  I don't  know.
16    Q  And he  came in  about  2001-2002,  correct?
17    A  He did,  but again,  I don't  have that  vacancy
18  announcement  in front  of me,  so I  don't know  what
19  specific  position  that was  for.  For all  I know,  it was
20  a position  that wasn't  filled.  I don't  know whether
21  that's  his position  or not.
22    Q  Do you  recall  a position  that wasn't  filled,

Page 139

1  that was -- that -- an announcement  for a position  that
2  was not  filled --
3    A  No.
4    Q  -- in the  counsel's  office.
5        Okay.
6    A  No, I don't.
7    Q  When was -- I am -- it is clear  that Mr.
8  Cosgrove  was the  last person  in before  Ms. Vosburg,
9  correct?
10    A  I believe  that's true.
11    Q  Okay.  And the person  before  Mr. Cosgrove  who
12  got a job -- in other  words, as a lawyer --
13    A  Uh-huh.
14    Q  -- in OIG counsel's  office was whom?
15    A  I don't believe  that  there  was a lawyer  who
16  came into  OIG counsel's  office  before  Mike short  of the
17  merger.
18    Q  Okay.
19        So, that  would have  been --
20    A  1996.
21    Q  -- 1996.
22    A  January 1, '96.

Page 140

1    Q  Okay.  Fine.
2        So, the  question  is, why is  it that you
3  decided,  at this  time, to request  an announcement  be
4  made for  a position  vacancy?
5    A  I don't  think that November  1st had  any
6  significance  to me at  all.  It was just  a point in  time
7  when this  memo was  written.
8        Why did  I decide  at that time  as opposed  to
9  later?
10    Q  Or earlier.
11    A  Or earlier?  I --
12    Q  Why didn't  you do  it in the  summer?  Why
13  didn't  you do it  in the spring  when you  could have
14  gotten  the new  crop of  lawyers?
15    A  Well, I  wouldn't  have  hired  somebody as  a 13
16  who was  just coming  out of  law school.
17    Q  Maybe  a law clerk,  somebody who  came out of  a
18  clerkship,  somebody who  came out of the  justice
19  department.
20    A  Well, sir,  if  you want  to argue  about it, I'm
21  just telling  you, I -- I don't  have any -- I don't  know
22  why it  was advertised  at this  particular  point in time.

Page 141

1   Q We're not asking about the advertisement.
2 We're asking about your asking that the vacancy
3 announcement be posted.
4   A I don't have any specific memory that ties me
5 to why, on this day, at this time, I made that request.
6 I don't really remember.
7   Q This is two weeks after Ms. -- Ms. Sharpe was
8 reassigned.
9   A I don't know that. If --
10   Q Did Ms. Sharpe's departure have anything to do
11 with the timing of this?
12   A No.
13   Q You're sure.
14   A I'm positive.
15   Q Well, then what did? What compelled to, at
16 this point, say not only I want this job posted, I want
17 it posted FDIC-wide only, and that you even gave her
18 the vacancy announcement that you wanted used and told
19 her where to supplement it.
20   MR. COSGROVE: Objection.
21   First of all, it's asked and answered a number
22 of times, and then not only did you ask the same

Page 142

1 question again, you decided to add two or three more in
2 there.
3   MR. SHAPIRO: Well --
4   MR. COSGROVE: Let's take it one at a time.
5   BY MR. SHAPIRO:
6   Q Why is it that -- why is it that -- where did
7 you get -- you got the CG-509-13 − 15 job announcement
8 from the vacancy 2001-OIG-1254. You had that in your
9 file, correct?
10   A I doubt it.
11   I don't have those in my file.
12   I would guess that somebody in personnel may
13 have given me the PAD or the position announcement to
14 take a look at.
15   Q Is there any memo to that -- any -- any
16 written documentation where you requested it?
17   A I doubt it.
18   I would probably just, you know, say, in
19 discussion with our human resources office, that I was
20 thinking about doing something like this and what do I
21 need to do it?
22   I'd ask them how to go about doing it.

Page 143

1   Q From whom did you request the vacancy
2 announcement 2001-OIG-1254?
3   A I have no idea.
4   I would have probably discussed it with Trina
5 Petty --
6   Q Uh-huh.
7   A -- because she's the head of that office, but
8 I don't remember making a specific request for vacancy
9 2001-OIG-1254.
10   I don't recall that.
11   I don't recall even asking for a vacancy
12 announcement.
13   Q Is there written documentation of your
14 requesting such vacancy announcements?
15   A Not to my knowledge.
16   Q Uh-huh. And you don't recall who you
17 requested it of.
18   A I don't recall even making a request.
19   Q It may be that you had them in your records.
20   A I don't think I would keep those. I'm pretty
21 certain I don't have in my records copies of prior
22 position announcements or other documents like that.

Page 144

1   That's something our personnel office keeps,
2 and I wouldn't have any reason to keep that in my
3 files.
4   Q How come you didn't just call Petty on the
5 phone and say let's advertise --
6   A Well, I might have. That's what I'm saying,
7 sir.
8   Q But this is a memo that you sent.
9   You tell her here please advertise the
10 position.
11   A Well, now we're talking about something else.
12   Now what we're saying is let's do the
13 advertisement.
14   She would want a document in her file from
15 somebody in management that says we want you to
16 advertise a position.
17   So, that's what this would be. Here is a
18 document that tells you management wants to advertise
19 this position.
20   I'd give her a memo for that, but I mean I --
21 I wouldn't, in a preliminary discussion with anybody,
22 sit there and write a chain of memoranda back and forth

Page 145

1 saying I'm thinking about doing this or whatever else.
2 We just discuss it.
3    I'm sure we discussed it.
4    Q Who made the decision to advertise this only
5 FDIC-wide?
6    A I don't know.
7    The decision to advertise it FDIC-wide could
8 only have been made by the personnelists. It wouldn't
9 have been made from me.
10    I mean what this memo says is I understand
11 that this advertisement can be made FDIC-wide. What
12 that suggests to me is that I had had a conversation
13 with Trina and been so advised and I put that in the
14 memo, and that's all there was to that.
15    I didn't decide to advertise it one way or the
16 other.
17    Q What was the lowest -- the most narrow area of
18 advertising that you could do in this vacancy?
19    A I don't know.
20    Q Well, FDIC would be the smallest, wouldn't it?
21    A Actually, OIG-wide would be the smallest, but
22 I don't know whether that would assure adequate

Page 146

1 competition. I assume it wouldn't and that Trina made
2 that call.
3    All I know is --
4    Q Trina made the call.
5    A She would have made the call about what
6 constituted an adequate universe for competitive
7 purposes.
8    Q You weren't asking that this be FDIC-wide by
9 this memo.
10    A No.
11    Q So, the words, "I understand that this
12 advertisement can be made FDIC-wide" is not --
13    A To me, that designates something that she said
14 to me.
15    Q But you weren't asking that that be so.
16    A No.
17    Q I see.
18    A It didn't matter to me.
19    Q Uh-huh.
20    MR. SHAPIRO: We'll take five. We're almost
21 done.
22    (A brief recess was taken.)

Page 147

1    MR. SHAPIRO: Just a few more questions.
2    BY MR. SHAPIRO:
3    Q Mr. Gibson, you know, this memo that we were
4 looking at a moment ago, the November 1st memo where
5 you're asking that a vacant position be announced -- do
6 you remember the memorandum?
7    A Uh-huh.
8    MR. SHAPIRO: Show it to him again.
9    Okay.
10    BY MR. SHAPIRO:
11    Q I don't have a similar written memorandum
12 requesting that Ms. Vosburg be converted from NTE to
13 permanent.
14    Do you recall making such a request in
15 writing?
16    A No, I don't.
17    Q Was there original competition for the NTE
18 position?
19    A Yes, there was.
20    Q There was. But the permanent position --
21    A The conversion to the permanent position was
22 done by the personnel office.

Page 148

1    Q I understand, but it was not at the end of the
2 NTE period.
3    A No, it was not.
4    Q Right?
5    Is there a written request for it to be done?
6    A I don't recall one.
7    Q Uh-huh.
8    So, just to be certain on this document that
9 we were looking at, the November 1 memorandum, there's
10 no reason why you can tell me why this happened on
11 November 1.
12    A No, there isn't.
13    Q As opposed to August 1.
14    A No. I don't know why it happened on November
15 1, as opposed to August 1.
16    Q Or October 1.
17    A No.
18    Q Or October 14.
19    A You can pick any day that you want, and it's
20 the same answer, sir.
21    I don't know. I don't have any specific
22 reason why this took place on November 1st.

Page 149

1    Q Just happened to be thinking of doing it
2 around that time.
3    A Well, it wasn't something that you thought
4 about doing today.
5      It's something that you'd been thinking about
6 for a while --
7    Q Uh-huh.
8    A -- and I don't know -- I mean this memo
9 suggests to me that I may have had -- not that I may
10 have had, that I probably did have some previous
11 conversations with Trina.
12      I don't know when that would have been. Those
13 could have been in August; they could have been a year
14 before.
15      I don't know.
16    Q Uh-huh.
17      Okay.
18      From the time she first became a lawyer in --
19 in the -- in the OIG counsel's office, who supervised
20 Ms. Vosburg?
21    A I do.
22    Q And you give her assignments?

Page 150

1    A Typically.
2    Q And that continues to this day?
3    A I think that's typically the case. She gets
4 work from some of our -- our offices directly, and
5 generally brings to my attention the fact that they've
6 asked her to do something, and then I will say yes or
7 no.
8    Q Can you tell me, during the period since
9 beginning of 2005 -- that would be, now, the last
10 year -- up until today, so a little bit more than a
11 year, and you can even stretch it back till December of
12 2004, you know, or even a little bit earlier than that,
13 to make it a year-and-a-half -- can you tell us, in
14 addition to the three personnel-related cases that
15 you're talking about, did you have any other personnel-
16 related litigation? And I'm using the term
17 "litigation" now the way you used it -- administrative
18 litigation, court litigation, MSPB, EEOC, EEO matters
19 that are in contention, that your office got involved
20 in.
21      Can you tell us anymore than the three that
22 you've told us about?

Page 151

1      I think it was three, and you also said that
2 there was some sort of -- of whistle-blower --
3    A That was -- yeah, the whistle-blower case was
4 prior to that period --
5    Q Okay.
6    A -- in time. So, that wouldn't be there.
7      Were there any others?
8      We have had a number, during that period of
9 time, of personnel matters that I think it would be
10 fair to say we dealt with in anticipation of
11 litigation.
12      Several of them were potential proposed
13 removals of employees for misconduct --
14    Q Not in counsel's office.
15    A Not in counsel's office, no. This is where
16 counsel's office performed and with respect to which we
17 would have given advice.
18    Q But it wasn't MSPB or EEOC litigation.
19    A I don't believe that these cases, at that
20 time, had gotten to a formal forum. This was a pre-
21 filing type advice.
22    Q And they never did get to that forum, at least

Page 152

1 not yet, because the only three that you have currently
2 going --
3    A Well, again, you're tying me down to a number
4 three here that --
5    Q Well, it's what you mentioned.
6    A It's what I recall, sir.
7    Q Well, I'm only going by what your recollection
8 is.
9    A Okay. As long as we understand this is a
10 recollection, and you know, that's not a specific
11 representation, about three.
12      The point is, is that there were other matters
13 somewhere on the continuum between the beginning of a
14 problem and the resolution of a problem.
15      I don't know how many of them there were
16 during that period of time.
17      We've had a number of contentious personnel
18 matters.
19    Q Uh-huh.
20      Ms. Vosburg work on any?
21    A Yes, she has.
22    Q Which?

Page 153

1    A  I'm not going to identify a number of these.
2        I don't know how to identify them for you
3 specifically.
4        She has worked in this area, yes.
5    Q  Well, were they EEO matters?
6    A  Potential EEO matters, maybe.  I mean,
7 certainly, one that I can think of was a potential MSPB
8 case.
9        Whether it would have been a mixed case or
10 not, who knows?
11    Q  I'm still entitled to know what she worked on.
12 So, why don't you just identify them?
13        If they're not EEO matters, then there's no
14 privacy question.
15    A  Well, there are privacy -- with respect to the
16 conduct of an employee, you know, prior to getting
17 ourselves into a fair report, where we've got some
18 public disclosure of an issue with an employee.
19        (The witness conferred with counsel.)
20    THE WITNESS: I recall two personnel-related
21 cases during the period of time that we're talking
22 about that she worked on.

Page 154

1    MR. SHAPIRO: Okay.
2    BY MR. SHAPIRO:
3    Q  What period of time are we talking about?
4    A  That would have been from the beginning of
5 2004 to the present.
6    Q  No, beginning of 2005 --
7    A  No, beginning of 2005 to the present, I'm
8 sorry, the beginning of 2005 to the present.
9    Q  So, do you still recall two?
10    A  Well, I recall two that were MSPB-type
11 situations.
12    Q  Did they go to the MSPB?
13    A  One was resolved -- yes, one did, as a matter
14 of fact.
15    Q  What was the name of that case?
16    A  I'm sorry.  Both did.
17    Q  So, what were the names of those cases?
18    A  The first involved a gentleman named Bart
19 Henkle, H-e-n-k-l-e, and the second involved an agent
20 named Lisa Arnold, A-r-n-o-l-d.
21        Mr. Henkle's case was resolved.  Ms. Arnold's
22 case currently is pending.

Page 155

1    Q  Has there been a hearing in Ms. Arnold's case?
2    A  No, there has not.
3    Q  So, there's a hearing scheduled?
4    A  At the moment, there is not a hearing
5 scheduled.
6        She filed a complaint that has been
7 essentially stayed by the administrative judge pending
8 an additional personnel action that is presently being
9 considered.  The AJ will roll them together if the
10 agency takes an action that's appealable in the second
11 case.
12    Q  When was the case first appealed?
13    A  Three months ago.
14    Q  So, something like November?
15    A  November.
16    Q  And Mr. Henkle's case -- when was that --
17    A  Mr. Henkle's case was resolved --
18    Q  Resolved by decision or by --
19    A  No, it was resolved by settlement, and that
20 was -- I don't remember the specific date, but it would
21 have been probably the beginning of the summer
22 sometime.

Page 156

1    Q  Beginning of this past summer.
2    A  This past -- summer of 2005.
3    Q  So, June.
4    A  May-June, somewhere in that time-frame.  I
5 don't remember the specific day.
6    Q  Who worked on those cases?
7    A  Ms. Vosburg worked on those cases.
8    Q  Any other cases that she worked on?
9    A  I'm sure that there are other cases that she's
10 worked on.
11        Those are the two personnel cases --
12    Q  That's what I'm --
13    A  -- MSPB-type cases that come to mind.
14    Q  Was there a hearing in Mr. Henkle's case?
15    A  No.  I don't believe that case went to
16 hearing.  They were preparing to go to hearing and
17 ultimately did not.
18    Q  Any other cases of a personnel nature that Ms.
19 Vosburg worked on?
20    A  She worked on at least two EEO matters that
21 are -- there's been no judicial filing with respect to
22 those matters.

Page 157

1      They are -- one is at a formal investigation
2 stage where our ODEO office -- ODEO -- the office that
3 handles these matters for the FDIC has retained an
4 investigator, and the investigation is moving forward.
5      The other case is also at a formal stage.
6   **Q Formal investigation stage?**
7   A I believe so.
8      I don't think the investigation -- I don't --
9 I don't know that the investigation has been completed
10 or that we've been notified of the filing of the
11 complaint once that's -- the investigation is
12 completed.
13      I --
14   **Q You mean counseling or investigation?**
15   A Pardon me?
16   **Q Counseling or investigation?**
17   A No, this is -- this is beyond the counseling -
18 - this is beyond the informal counseling.
19   **Q So --**
20   A This is a formal EEO -- a formal
21 investigation.
22   **Q So, has the investigator been appointed?**

Page 158

1   A Yes, as far as I know.
2   **Q Has --**
3   A I believe so.
4   **Q Has an ROI been issued?**
5   A Not to my knowledge.
6   **Q So, it's in investigation.**
7   A I believe so. The reason I say I believe so
8 is because the ROI's go to -- again, they go to ODEO.
9 ODEO reviews them. We may not hear about it for some
10 time after that.
11      There could be an ROI that's been issued in
12 these cases and we just haven't seen it or heard what
13 the decision of the -- of the employee was with respect
14 to -- to that report.
15   **Q When were these cases -- when did these cases**
16 **become investigations?**
17   A It would have been within the course of this
18 year that we're talking about. I don't recall
19 specifically when.
20      (Pause.)
21   BY MR. SHAPIRO:
22   **Q What is an executive appointment?**

Page 159

1   A I'm not familiar with the term specifically.
2   **Q Did you sign the interrogatory answers in this**
3 **matter?**
4   A No, I don't believe so.
5   **Q Did you provide information for interrogatory**
6 **answers?**
7   A I'm sure I did provide some information.
8   **Q I'm asking you what information you provided.**
9   A I don't recall what information I may have
10 provided.
11      MR. SHAPIRO: Here's the problem, Mike. If a
12 lawyer signs the interrogatory answers at this level, I
13 don't have anybody to examine about the interrogatory
14 answers.
15      See, somebody else besides the lawyer has to
16 sign them for me to be able to inquire. I don't want
17 to inquire of you, because you're the lawyer, unless
18 you want to replace yourself with somebody else. Then
19 I'll have you as a witness.
20      MR. COSGROVE: What, specifically, are you
21 talking about?
22      MR. SHAPIRO: There's a bunch of answers here

Page 160

1 that I want to talk about with a person who can tell me
2 -- I mean you're just the lawyer.
3      MR. COSGROVE: Yes.
4      MR. SHAPIRO: Presumably, you were told things
5 and you wrote them up.
6      Now, I understand you write the answers. I
7 write answers all the time.
8      MR. COSGROVE: Yeah.
9      MR. SHAPIRO: But somebody has to sign them.
10      MR. COSGROVE: Well, we don't normally have
11 people swearing to them, particularly at the
12 administrative level.
13      MR. SHAPIRO: But that's --
14      MR. COSGROVE: I sign the darn things --
15      MR. SHAPIRO: Okay. But that's --
16      MR. COSGROVE: -- and those are the statements
17 of the agency and we stand by them.
18      MR. SHAPIRO: Okay. But you understand the
19 problem.
20      The problem is I can't inquire further --
21      MR. COSGROVE: Yeah.
22      MR. SHAPIRO: There are some that I want to

Diversified Reporting Services, Inc. (202) 467-9200

Page 161

1 inquire about here, but there are -- there are others
2 that I may want to inquire about, but I need to know
3 who is responsible for these things.
4     MR. COSGROVE: Again, tell me which one we're
5 talking about, and I'll tell you who you need to talk
6 to.
7     MR. SHAPIRO: Well, I'll tell you -- why don't
8 I do this?
9     Why don't I go through them, and I will tell
10 you that -- what I'm interested in. I'll ask you an
11 interrogatory about it.
12     MR. COSGROVE: Okay.
13     MR. SHAPIRO: And then you'll be able to tell
14 me, you know, who -- who is responsible.
15     MR. COSGROVE: David, if you want to do it
16 that way, that's fine. We can just sit down and go
17 over them, too.
18     It's up to you, whatever -- David, if you want
19 to do it that way, that's fine with me. If you want to
20 sit down and talk about them after the deposition,
21 that's fine, too.
22     It's whatever is good for you.

Page 162

1     MR. SHAPIRO: Okay.
2     Well, I'm specifically interested in number 8.
3 The question was, "Describe in detail any and all
4 personnel actions associated with placing Adriana
5 Vosburg in a permanent position in the Office of
6 Counsel to the Inspector General at the FDIC in 2004.
7 Identify each FDIC official who either recommended or
8 approved such personnel action," and what I got from
9 this was, "Effective July 25, 2004, Ms. Vosburg was
10 appointed to the executive service. The action was
11 recommended by Fred Gibson, counsel to the Inspector
12 General, and approved by Trina Petty, OIG personnel
13 office."
14     MR. COSGROVE: Correct.
15     MR. SHAPIRO: So, I want to know who told you
16 that.
17     MR. COSGROVE: That's on the face of the
18 documents.
19     MR. SHAPIRO: So, there's nobody -- so, he's
20 one of the people that I can ask about it.
21     MR. COSGROVE: You can ask him about that,
22 because that's on the face of the documents. That's

Page 163

1 from whence the answer was drawn, right from the
2 official documents.
3     MR. SHAPIRO: Okay.
4     MR. COSGROVE: And I gave you the record.
5     MR. SHAPIRO: Okay.
6     BY MR. SHAPIRO:
7 Q You proposed doing that.
8 A Evidently so.
9 Q Document, exhibit, memorandum. Please convert
10 her to -- appoint her to the executive service.
11 A I don't recall a document.
12     I have no recollection of writing a document
13 on that subject.
14 Q Okay.
15     It is true Ms. Vosburg was the only candidate
16 referred.
17 A I think that is correct.
18 Q That means you never saw another candidate.
19 A I believe that is correct.
20 Q In fact, she may have been the only candidate.
21 A She may have been. I think that that is
22 correct.

Page 164

1 Q That is the only applicant.
2 A I don't know whether she was the only
3 applicant for the position. I don't know who may have
4 applied.
5 Q You had her in mind for that job when you
6 advertised it.
7     Is that right?
8     The whole idea of advertising that job was to
9 get her on a career ladder, correct?
10 A The whole point in advertising the position
11 was to hire an attorney at the 13 level. If she's
12 qualified for the position, she applies for the
13 position, she makes it through the process, you know,
14 then she is eligible to be selected for the position.
15 Q Before, you told me that the reason was,
16 instead of just doing it by accretion of duties or a --
17 or a -- a desk audit, was to not have to do a desk
18 audit each time you wanted to promote her.
19 A That's true, but I had no assurance that she
20 was going to either apply for or she would be the
21 person who would be forwarded by Personnel for that
22 position.

Page 161 - Page 164

Page 165

1    Q You would agree that keeping the area of -- of
2 -- that the announcement could be made to for the
3 vacancy, the area of consideration, as small as
4 possible would have increased the chances that she
5 would be competitive for the job.
6    A The issue, as far as our office was concerned,
7 was the adequacy of competition, and that's not a
8 decision that I made. I wouldn't agree or disagree
9 with your point.
10    Q Okay. But you did advertise this job in order
11 to get Ms. Vosburg onto a career ladder. That's what
12 you said before.
13    A The position was offered as a career ladder
14 position.
15    Q For the purpose of --
16    A She was experienced in the position.
17    Q Uh-huh.
18    A She was already doing the work at a 13 level.
19 If she applied and if her application was -- was -- met
20 the requirements of the -- the process, you know, then
21 the bottom line is, is that I would say yeah, she had a
22 pretty good chance of being selected for it.

Page 166

1    Q And you were the selecting official.
2    A Yes, I was.
3    Q Uh-huh.
4       Did you ever tell her before it was posted
5 that you were posting the job?
6    A I don't know. I don't think so.
7    Q Okay.
8    A I don't really recall.
9       (Pause.)
10       MR. SHAPIRO: I don't have anything further.
11       Questions?
12       MR. COSGROVE: No.
13       MR. SHAPIRO: Good.
14       Thank you, sir.
15       (Whereupon, at 2:15 p.m., the deposition was
16 concluded.)
17                *****

**-'-**

'01 [3] 27:3,6,10
'02 [10] '25:11 26:1,13,15
  26:20,21 27:1,4,6,10
'03 [10] 25:1,7,8 26:8,9
  26:10 27:21 115:6 124:11
  124:12
'04 [6] 25:10,12 26:6
  27:16 118:8 124:11
'05 [2] 26:2,2
'80 [1] 9:4
'82 [1] 8:7
'84 [2] 7:20 8:7
'87 [1] 7:20
'90 [1] 7:12
'95 [2] 7:12 56:22
'96 [5] 5:14 12:22 39:6
  60:15 139:22
'97 [3] 12:22 39:1
'98 [1] 39:2
'99 [1] 38:6
'99-2000 [1] 38:5

**-1-**

1 [13] 3:5 4:20 5:14 137:10
  137:13,14 139:22 148:9
  148:11,13,15,15,16
10805 [1] 4:11
10:09 [1] 1:27
10th [1] 2:12
11 [9] 24:13,14,19 25:4,4
  25:7 26:12 41:22 127:14
11/1/04 [1] 3:5
12 [7] 26:7 126:19,21
  127:12,13,14,21
120 [1] 44:22
1225 [2] 1:25 2:6
1290 [1] 1:26
12:17 [1] 110:5
13 [9] 26:6 120:10 126:19
  126:21 131:18 136:6
  140:15 164:11 165:18
13-level [1] 127:21
13/14/15 [1] 127:9
130 [3] 92:4 95:7,11
137 [1] 3:5
14 [7] 6:12 24:22 26:2
  126:9,10 137:20 148:18
15 [13] 23:18,22,22 24:4
  49:19 126:8,10,11,18
  135:21,22 138:1 142:7
15s [1] 23:19
16 [1] 120:10
170 [4] 94:19,21 95:9,10
175 [1] 95:10
17th [1] 2:12
1972 [1] 11:1
1974 [2] 10:11 11:1
1975 [1] 10:9
1978 [2] 9:12 10:1

1980 [2] 8:16 9:5
1987 [1] 7:13
1992 [1] 6:5
1995 [2] 6:6 56:20
1996 [5] 4:20 33:12 60:11
  139:20,21
1st [9] 136:3,5,14,18,22
  137:5 140:5 147:4 148:22

**-2-**

2 [1] 24:7
200 [2] 92:16 94:20
2000 [19] 5:9 17:2,5,5,14
  28:13 33:1 38:6 60:8,15
  60:16,18 66:3 67:10,15
  70:21 71:8 75:10 134:14
2000-2001 [1] 28:3
20005 [1] 2:7
2001 [8] 5:8,9 28:13,14
  33:1,3 40:16 134:14
2001-2002 [1] 138:16
2001-OIG-1254 [1]
  138:5 142:8 143:2,9
2002 [11] 5:8 28:15,18
  33:5 40:16,18 41:18 42:20
  56:19 59:1 121:4
2003 [6] 5:2,2 21:17
  28:16,18 59:1
2003-2004 [1] 83:13
2004 [22] 5:3 33:13 49:16
  59:2 69:21 70:9,10 78:19
  79:6,12 82:1,20 83:16
  85:1 103:3 109:16 111:10
  137:14 150:12 154:5
  162:6,9
2005 [7] 65:20 69:21
  150:9 154:6,7,8 156:2
2006 [4] 1:19 42:21
  108:21,22
202 [2] 2:8,14
20434 [1] 2:13
220 [1] 94:21
230 [1] 94:21
25 [1] 162:9
2:15 [1] 166:15

**-3-**

31 [2] 6:6 33:13

**-4-**

4 [1] 3:3
400-person [1] 91:19
416-4230 [1] 2:14

**-5-**

509 [1] 129:5

**-7-**

7 [3] 1:19 23:11 24:17

**-8-**

8 [3] 36:1,7 162:2
801 [1] 2:12
842-0300 [1] 2:8

**-9-**

9 [6] 23:11 24:11,14,16,17
  25:3
905 [4] 125:9,13,15 130:4
905-13 [1] 136:6
905-15 [1] 138:6
905s [1] 130:8

**-A-**

A-r-n-o-l-d [1] 154:20
a.m [1] 1:27
able [5] 108:20 114:18
  134:11 159:16 161:13
above-entitled [1] 1:23
absolutely [1] 44:11
absorbed [1] 117:7
Academy [2] 10:19 11:8
accent [1] 30:7,7,9,10
accept [1] 137:6
Accepting [3] 29:21
  103:4
Access [1] 115:3
accretion [1] 164:16
achieve [1] 90:21
act [6] 54:19 65:8 114:6,9
  115:17 123:15
acting [20] 27:22 28:1,11
  44:4,10,11,13,15,15,21
  45:16,18,19 50:19,22
  120:2,3,4,7 121:3
action [8] 1:23 30:20,22
  62:19 155:8,10 162:8,10
actions [2] 62:11 63:9
  162:4
active [17] 60:7,19 63:16
  65:4,4,6 68:21,22 69:4,12
  69:14 70:18,20 71:7,17
  72:12,14
activities [1] 47:17
activity [1] 87:9
actual [1] 30:20
add [2] 57:8 142:1
added [4] 54:14 56:22
  57:10 116:15
adding [1] 58:22
addition [7] 20:9 37:17
  57:10 67:15 68:9 134:16
  150:14
additional [1] 155:8
address [1] 32:1
adequacy [1] 165:7
adequate [2] 145:22
  146:6
administrative [11]
  36:13,21 63:10 65:2,17
  71:6 73:22 113:2 150:17
  155:7 160:12
Adriana [12] 17:12 18:20

advertise [11] 132:15
  136:16 137:18 144:5,9,16
  144:18 145:4,7,15 165:10
advertised [11] 98:17,18
  132:3,5,11,13 136:22
  137:2 138:6 140:22 164:6
advertisement [5] 138:1
  141:1 144:13 145:11
  146:12
advertising [3] 145:18
  164:8,10
advice [4] 102:21 111:20
  151:17,21
advised [2] 99:20 145:13
affairs [1] 134:8
African-American [3]
  30:5 38:17,20
again [19] 5:10 25:8 28:16
  33:1,9 41:19 54:7 84:13
  90:7 95:9 96:21 97:8
  104:13 138:17 142:1
  147:8 152:3 158:8 161:4
against [2] 29:14 60:2
age [1] 1:22
agency [2] 1:10,15 2:9
  47:16 54:8,10 56:11,15
  58:8,9 155:10 160:17
agent [1] 154:19
ago [15] 25:14 26:4,5 36:5
  36:6,8 38:1,20 65:19
  67:11 69:11,16 91:6 147:4
  155:13
agree [5] 84:8 102:11,19
  165:1,8
agreed [1] 102:21
ahead [1] 119:19
aid [1] 36:15
Air [2] 10:19 11:8
AJ [1] 155:9
allocating [1] 48:7
allow [1] 83:3
almost [1] 146:20
along [1] 134:11
alternate [5] 112:7
  117:10,11,11,13
alternative [2] 87:8
  124:7
altogether [1] 58:17
always [1] 7:9 94:1
America [1] 29:4
American [1] 113:9
among [2] 48:8 50:5
amount [2] 48:3 73:18
  84:6
ampersand [1] 8:13
and-a-half [1] 69:11
Andrea [7] 13:18 14:3
  15:3,13 16:20 17:21 18:4
Anglo [1] 29:4
announced [1] 129:13
  135:9 147:5

announcement [17]
  129:4,9 130:9,11,13
  137:16 138:5,18 139:1
  140:3 141:3,18 142:7,13
  143:2,12 165:2
announcements [3]
  131:2 143:14,22
annual [1] 46:13
answer [3] 32:9 59:14
  61:16,18 71:2 75:5 78:7
  79:19 80:8 132:2 133:15
  148:20 163:1
answered [1] 141:21
answers [9] 123:6,10
  159:2,6,12,14,22 160:6,7
anticipation [2] 24:19
  151:10
Antonio [2] 8:14 11:13
anxiety [3] 109:9,9 110:1
Anyway [1] 81:6
appeal [2] 62:16 69:10
appealable [1] 155:10
appealed [1] 155:12
Appeals [4] 62:16 69:17
  69:18,22
APPEARANCES [1]
  2:1
applicant [3] 132:1
  164:1,3
applicants [1] 42:8
application [3] 40:5,6
  165:19
applications [2] 30:17
  40:5
applied [4] 129:5,5 164:4
  165:19
applies [1] 164:12
apply [1] 164:20
appoint [1] 163:10
appointed [2] 157:22
  162:10
appointing [1] 90:14
appointment [1] 31:7
  32:15,15 42:18,21 43:3,3
  43:5,6,7 158:22
appraisal [1] 85:4
appraisals [2] 83:15
  85:6
appreciated [1] 96:5.
approach [2] 59:11,12
appropriate [2] 58:13
  124:3
appropriated [3] 46:13
  46:20 47:16
appropriation [2] 47:1
  48:3
appropriations [2]
  47:12,14
approval [1] 43:17
approve [2] 43:15,19
approved [2] 162:8,12
area [17] 9:19 54:6 71:22
  72:5 74:17 75:9,11 87:15
  87:16 88:7 116:1 134:5

areas [5] 73:7,20 88:8 118:8 134:11

argue [1] 140:20

Arnold [1] 154:20

Arnold's [2] 154:21 155:1

aside [1] 64:21

aspect [1] 89:21

aspects [1] 94:13

assign [1] 119:19

assigned [6] 11:20,21 64:14 113:16 121:18 122:6

assignment [1] 119:2

assignments [6] 118:11 118:19 119:1,7,14 149:22

assist [1] 111:15

assistance [1] 53:10

assistant [8] 12:14 15:19 35:19 36:19,21 50:1,2 137:15

associate [2] 8:1,21

associated [1] 162:4

assume [7] 23:6,11 103:20 130:7 131:1 137:22 146:1

assuming [3] 25:8 33:9 102:18

assurance [1] 164:19

assure [2] 119:11 145:22

Atlanta [1] 91:9

attention [1] 150:5

attorney [9] 5:13,22 6:10 14:8 17:11 25:21 119:9 119:10 164:11

Attorney's [4] 64:17,20 73:4,15

attorneys [7] 12:13 13:5 13:6,7,10 112:11,14

Attorneys' [1] 72:11

attributed [1] 107:17

audit [10] 36:12 91:8,9 127:15,16 128:1,2,5 164:17,18

August [7] 6:5 41:2,18 41:19 148:13,15 149:13

Austin [1] 9:3 10:3

authority [5] 33:17 72:8 72:9 90:14 112:16

authorized [1] 31:14 131:9

authorizes [1] 30:19

automated [2] 30:20 112:9

automatic [3] 25:5 42:3 42:4

available [10] 51:10,13 66:21 82:14 86:2,3,4 87:2 118:18 119:17

average [1] 60:9,18

aware [3] 32:3 81:18

away [3] 26:18 100:15 113:18

-B-

B-a-r-i-s [1] 7:2

B-e-r-n-a-r-d-o [1] 13:18

backed [1] 112:21

background [2] 29:13 134:3

backlog [5] 53:21 54:7 54:19 114:6 115:16

bank [3] 65:13 73:9,10

Banker [1] 113:9

banking [1] 7:4 8:2,11

banks [5] 54:10,18 56:2 57:19 58:2

bar [16] 22:2 24:14,15,18 24:19 25:5,20 26:13,16 26:18 41:2,3,10,10,22 42:2

Baris [1] 7:1,2,5

barred [1] 25:15

Bart [1] 154:18

based [3] 31:1 86:18 131:2

basis [7] 31:14 32:4 46:14 48:1 52:18 119:8 124:13

became [22] 5:14 6:17 13:1 25:3,20 27:15,19 28:3,8 44:1 53:18,19 115:22 116:2 120:2,7,22 121:2 124:20 126:16,17 149:18

become [3] 27:15 43:2 158:16

began [1] 54:13

beginning [8] 150:9 152:13 154:4,6,7,8 155:21 156:1

behalf [1] 1:22 2:2,9

below [1] 120:12

benefits [23] 48:10 76:7 76:13,18,18,19 77:1,3,3 82:14,22 85:15 86:20 88:1 88:9,10,11 89:21 94:13 96:1,2,11 97:9

Bernardo [8] 13:18 15:13 16:11,12 17:3,3,10 18:14

best [2] 13:13 67:10

better [1] 78:22

between [11] 7:12 12:4 23:2,5 26:11 59:8 60:15 80:20,22 81:1 152:13

beyond [3] 31:12 157:17 157:18

bit [2] 150:10,12

black [4] 12:3,10,11 13:1 13:20,21 14:19,20 15:5 16:5 17:22 19:2,22 20:1,5 24:5 28:1,22 29:6 30:16 30:22 31:1 40:10 50:18 50:19 78:3,14 79:14 80:15

81:5 82:4 86:4 99:8,16

blower [1] 69:6

board [15] 16:13,18,19 17:2,10 18:6,13 19:1,2,6 41:11 46:4 53:8 133:13 133:22

boss [1] 101:13

bottom [1] 165:21

branch [5] 49:9,12,16 77:2 131:16

brief [3] 50:14 89:5 146:22

bring [2] 39:16 40:21

bringing [3] 16:7 39:17 39:18

brings [1] 150:5

broached [1] 99:8

broadly [4] 65:1 68:13 72:1 88:7

brought [6] 16:17 18:6 18:12 62:15 69:8 133:22

budget [11] 46:12,19 47:3 47:4,7,8,10,19 48:4,11 50:6

bump [1] 90:12

bunch [1] 159:22

busy [2] 78:7 81:16

-C-

C [2] 3:1 4:1

C-a-s [1] 70:2

c-h [1] 12:16

C-o-o-g-a-n [1] 14:14

C-o-x [1] 8:13

calculated [1] 40:17

calculation [1] 40:15

Calendar [1] 85:1

candidate [3] 163:15,18 163:20

care [2] 45:15,17

career [16] 11:6 125:15 125:18,20,21 126:3 127:6 127:8,11 128:4 129:18,21 136:9 164:9 165:11,13

carryover [1] 12:2

case [45] 59:6 60:17 62:14 62:21,22 64:15,19,21 65:1 65:5,7 66:12,22 69:4,8,14 70:6,11,14,16,22 72:21 73:17 74:13 76:8,9,10 87:15 88:12 113:20 150:3 151:3 153:8,9 154:15,21 154:22 155:1,11,12,16,17 156:14,15 157:5

cases [34] 53:11,12 58:13 58:15 60:7 62:12 67:2,7 67:15 68:10,13 70:20 71:13,16 72:5,20 73:10 75:14 91:13 134:9 150:14 151:19 153:21 154:17 156:6,7,8,9,11,13,18 158:12,15,15

catalog [1] 111:18

categories [1] 71:21

categorize [1] 116:5,6

caucasian [3] 15:6,9,18 29:20,22 38:10

caught [1] 56:9

caused [1] 58:8

ceiling [7] 45:22,22 46:3 46:5,6,7,9

century [1] 59:1

certain [6] 47:21 48:1 57:14 58:8 143:21 148:8

certainly [9] 61:12 68:12 90:19 109:8,11 119:8 122:4 134:18 153:7

certainty [1] 31:10

CG [2] 6:17,18

CG-13 [1] 129:6

CG-14 [1] 6:1

CG-15 [2] 5:21 24:1

CG-509-13 [1] 142:7

CG-905-13 [1] 137:19

chain [1] 144:22

CHAIRMAN [1] 1:12

chance [1] 165:22

chances [1] 165:4

Chandler [4] 63:6,7 64:18,19

Chandler's [1] 62:22

change [6] 16:8 20:7 35:10 36:10,18 120:1

changed [4] 35:11 36:16 92:9 135:10

changes [3] 17:9 18:14 85:8

characterize [2] 67:19 82:16

check [5] 64:10 66:6 71:11

Chicago [1] 91:10

Chris [14] 14:3 15:3 18:1 66:20 116:17,22 117:3,7 118:22,22 119:3,4 126:15 126:17

Christian [1] 13:15

chronologically [1] 99:18

circa [2] 17:5 111:9

Circuit [1] 69:19

circumstances [3] 21:2 66:22 133:7

cite [2] 123:15,15

cited [1] 69:2

civilian [1] 11:5

claiming [1] 69:5

claims [2] 65:3 73:22

class [1] 71:13

classification [1] 88:1

cleaned [4] 115:16,18,20 115:20

clear [1] 139:7

clerk [18] 21:18,20 22:3,9 23:3 24:16,17 27:3,4,8,9 30:14 37:11,14 41:5,7,9

categorize [1] 116:5,6

clerked [1] 21:22

clerks [11] 20:12,14 23:8 37:9,14 38:12 39:4,4 122:14 123:22 124:1

clerkship [1] 140:18

close [3] 76:3,4,6

closed [1] 91:6,8,12

collate [1] 120:18

college [1] 9:13

color [1] 29:7

Colorado [2] 10:20,21

Columbia [4] 1:25 62:17 62:20 69:9

combined [1] 14:15

coming [2] 17:9 18:16 105:9,13,18 133:13 134:20 140:16

commencing [1] 1:26

comment [1] 40:5

COMMISSION [1] 1:1

comparison [2] 59:6,7

compelled [1] 141:15

compete [2] 126:22 127:14

competed [9] 126:10,11 127:1,2,4,6 136:3,4,10

competing [1] 124:21 128:3

competition [5] 127:18 132:16 146:1 147:17 165:7

competitive [2] 146:6 165:5

Complainant [1] 1:7 2:2 3:3

complaint [1] 155:6 157:11

complaints [3] 61:7 62:8 65:2

completed [2] 157:9,12

completely [1] 133:14

component [2] 48:11 96:12

components [1] 48:9

computation [1] 48:4

computed [1] 48:1

concept [1] 53:9

concern [2] 83:12 90:6

concerned [3] 84:2,11 165:6

concerning [1] 76:21

concluded [2] 89:15 166:16

conclusion [1] 108:6

conduct [2] 42:14 153:16

conferred [2] 61:5 153:19

confidentiality [2] 61:7 61:9

Congress [1] 46:13

Congressional [2]

**connection** [4] 53:10
102:22 104:17 113:21

**consider** [5] 67:1 78:4
96:17 106:16 128:6

**consideration** [1] 165:3

**considered** [2] 89:15
155:9

**consistent** [2] 111:12
129:15

**constant** [1] 92:5

**constantly** [1] 128:22

**constituted** [1] 146:6

**contemplate** [1] 47:21

**contemplated** [1] 95:12

**contemplation** [1] 40:2

**contention** [1] 150:19

**contentious** [1] 152:17

**contested** [1] 97:4

**context** [4] 48:13,14 49:1
83:14

**continue** [1] 75:13

**continued** [1] 22:2

**continues** [1] 150:2

**continuing** [2] 55:2 84:4

**continuum** [1] 152:13

**contributing** [1] 108:18

**conversation** [45] 76:20
77:22 78:9,10,16 79:5,12
80:16,18 81:4,5,10,19,22
82:3,11,13 83:6 84:12
85:3,14 86:18 87:17,19
87:20 88:22 89:3,5,6,11
89:12 95:13 96:5 97:13
97:14 98:8,21 100:1,21
107:7,16,18 122:9,11
145:12

**conversations** [12]
76:21 77:6,10,12 82:4,6
82:17 83:5 88:17 96:20
122:7 149:11

**conversion** [4] 43:8,13
44:2 147:21

**convert** [1] 163:9

**converted** [6] 43:7 76:1
125:1 127:10,12 147:12

**converting** [1] 108:13

**Coogan** [2] 14:14 15:15

**coordinating** [1] 74:4

**copies** [1] 143:21

**CORP** [1] 1:13

**corporate** [4] 8:10,21
47:3 134:8

**Corporation** [2] 2:11
6:5

**correct** [35] 17:20 21:3
27:11 31:4,8 33:7 34:12
41:4 42:1 43:4 44:17,18
44:20 45:1 50:21 54:20
55:1,22 57:12 61:11 94:7
124:22 125:9 127:19
129:20 130:21 138:9,16
139:9 142:9 162:14
163:17,19,22 164:9

**correspondingly** [1]
54:11

**Cosgrove** [47] 2:10 18:7
18:15 19:1,13,20 23:22
32:19,22 33:8 34:18,19
59:3 61:8,11,14,17,22
64:16,19 121:5 126:6
133:2,3,9,15,17 138:8
139:8,11 141:20 142:4
159:20 160:3,8,10,14,16
160:21 161:4,12,15
162:14,17,21 163:4
166:12

**costs** [2] 47:17 48:8

**counsel** [47] 3:3 4:22 5:6
5:15,20 12:2,14 13:1,3
13:21,22 14:6,9 16:15
17:22 18:1 19:10,11 24:5
27:18,22 28:9 34:11 44:5
44:7,13,13,21 45:12,14
50:19 55:12 61:5 70:13
72:22 73:1 115:22 116:2
120:3,4,7 121:2,3 126:16
153:19 162:6,11

**counsel's** [39] 11:16,20
12:6 33:16 34:3 45:22
50:11,17 51:8,15 52:8,11
52:20 77:8 78:4 79:15
93:7 100:5,11 102:14
111:17 121:19 122:14
125:7,14 128:12 129:19
132:19 133:6,13 135:2
137:19 139:4,14,16
149:19 151:14,15,16

**counseling** [4] 157:14
157:16,17,18

**count** [2] 34:4 59:21

**country** [1] 73:10

**couple** [12] 26:4,5 38:3
64:6,10 85:8 87:13 89:7
91:5 104:9 123:17,19

**course** [8] 18:12 47:6
54:21 75:7 87:12 114:10
124:12 158:17

**court** [12] 62:16,20 63:9
67:3 69:8,13,14,17,18,22
71:6 150:18

**courts** [2] 62:11 65:2

**Cox** [1] 8:13

**creation** [1] 99:5

**credit** [1] 22:15

**criminal** [6] 72:3,6 73:4
73:7,21 74:2

**crop** [1] 140:14

**cross-train** [1] 88:3

**current** [6] 4:21 5:16
35:15 67:15 68:11 95:6

**customer** [2] 65:7,9

**cycle** [1] 124:10

**Cynthia** [1] 62:15

**-D-**

**D** [1] 4:1

**D.C** [7] 1:18,26 2:7,13 7:1
63:2 69:19

**D.C.** [1] 63:1

**Dallas** [3] 7:16 8:4,17

**darn** [1] 160:14

**database** [2] 115:4
120:19

**date** [14] 5:4,10 17:19
26:14 28:17 33:2,7,9
41:20 55:8 78:21,22
115:20 155:20

**dates** [1] 103:5

**David** [5] 2:3 14:22
133:18 161:15,18

**days** [4] 44:22 97:16

**deal** [1] 62:10

**dealing** [4] 67:21 74:3,5
133:12

**dealt** [1] 151:10

**December** [5] 6:6 9:5
10:9 33:13 150:11

**decide** [2] 140:8 145:15

**decided** [10] 50:10,16
69:10,16 96:7 98:12 99:20
102:9 140:3 142:1

**decides** [1] 132:14

**decision** [18] 51:2 57:9
69:21 76:12 96:7,13 102:2
102:11,12,22 105:16,17
108:16 145:4,7 155:18
158:13 165:8

**decisions** [1] 104:19

**decline** [5] 53:2 54:13
54:21 55:3 56:11 57:13
57:14 58:8

**declined** [4] 54:9,10 56:7
58:14

**declines** [1] 58:12

**declining** [10] 54:17,17
54:18,18,20 55:15,16,17
55:18,19

**decreased** [4] 54:8,11
57:17,20

**define** [1] 72:2

**definition** [1] 29:21

**degree** [1] 9:20

**departed** [1] 17:21

**department** [2] 67:6
140:19

**departure** [3] 14:13 20:8
141:10

**depend** [1] 21:2

**dependent** [1] 49:4

**depending** [2] 72:20
122:16

**Deposit** [1] 13:2 11

**deposition** [4] 1:20 3:4
161:20 166:15

**deputy** [5] 5:6,15,20
13:3,22 18:1 19:11 24:3
28:2,3,8 34:13,14 50:22
137:15

**derives** [1] 47:15

**describe** [2] 68:7 162:3

**describing** [1] 54:21

**designates** [1] 146:13

**designation** [2] 6:17

**46:22

**designations** [1] 22:10

**desk** [8] 36:12 127:15,16
128:1,2,5 164:17,21

**detail** [1] 162:3

**details** [1] 86:9

**deteriorated** [1] 11:7

**determine** [1] 112:15

**develop** [1] 73:4

**development** [2] 87:15

**devoted** [1] 115:6

**difference** [2] 22:11
23:2 29:17

**differences** [2] 23:4,7

**different** [9] 22:19 23:6
24:7 35:8 52:5 58:16
92:10 107:14 135:4

**differently** [1] 108:7

**difficult** [1] 116:11

**diligently** [1] 83:22

**direct** [1] 100:6

**directly** [2] 67:5 118:17
150:4

**disagree** [1] 165:8

**disappearing** [2] 83:7,8

**disbelieve** [1] 136:12

**disclosure** [1] 153:18

**discovery** [8] 53:11,12
54:20 61:13,20 113:17,18
113:22

**discrimination** [2]
29:14,16

**discuss** [5] 43:21 85:19
105:14 106:17 145:2

**discussed** [7] 43:16,20
43:22 108:17 118:17
143:4 145:3

**discussing** [1] 95:8

**discussion** [25] 57:16
80:19 82:18 87:7 97:21
106:7,13 109:17,18 112:1
124:9 135:1 142:19
144:21

**discussions** [5] 84:19
97:3,10 108:16 124:12

**District** [9] 1:24 62:16
62:20,20 67:3 69:8,9,12
69:14

**dividing** [1] 12:4

**division** [2] 125:14
136:2

**document** [11] 53:10
112:18 130:22 137:4,9
144:14,18 148:8 163:9,11
163:12

**documentation** [2]
142:16 143:13

**documents** [7] 109:19
113:17 122:16 143:22
162:18,22 163:2

**doesn't** [2] 46:9 129:22

**dollar** [1] 48:2

**done** [14] 31:18 66:20,20
73:13,18 105:15 114:1

**117:19 118:2 120:17
136:19 146:21 147:22
148:5

**doubled** [1] 75:3

**doubt** [2] 142:10,17

**down** [33] 56:13,16 57:5
58:7 59:21 63:20 77:21
81:8 83:2 84:20 85:15
86:8,17 87:1,22 88:14,18
89:3 90:21 92:4 94:21
95:6,11 99:9 100:13,15
103:16,16 120:12 131:1
152:3 161:16,20

**down-size** [1] 91:15

**down-sizing** [8] 18:12
84:4 90:20 91:11 92:6
94:20 95:9,12

**downsizing** [2] 13:5 130:18,18

**draft** [3] 125:3 130:18,18

**drafting** [5] 122:16 123:3
123:4,7,9

**drafts** [1] 123:12

**drawn** [1] 163:1

**dropped** [1] 120:12

**duly** [1] 4:4

**duration** [1] 66:9

**durations** [1] 66:11

**during** [21] 18:11 20:18
20:19 38:21 45:21 47:6
55:14 58:22 68:14 74:10
74:12 83:11 85:3 96:19
100:10 121:4 124:11
150:8 151:8 152:16
153:21

**duties** [12] 111:5,13,14
112:3,22 115:8 118:7
129:13,16 130:10,16
164:16

**dwindled** [2] 53:16,18

**-E-**

**E** [6] 3:1 4:1,1 24:6 111:1
111:1

**E-2** [1] 24:8

**e-mail** [5] 101:17,18,21
102:1,3

**e-mails** [1] 109:21

**early** [5] 5:3 12:22 17:14
27:16 28:16,18 58:22,22

**earmarking** [1] 46:21

**Ed** [1] 1:23

**EEO** [9] 61:7 87:11 96:18
150:18 153:5,6,13 156:20
157:20

**EEOC** [2] 150:18 151:18
EEOC#100-2005-00927X
[1] 1:9

**EEOC's** [1] 62:1

**effect** [1] 96:22

**Effective** [1] 162:9

**effectively** [1] 51:19

**effort** [2] 111:18,18

**either** [11] 14:14 23:11
28:18 30:16 40:19 100:1

103:22 108:2 111:19
162:7 164:20
**eligible** [1] 164:14
**eliminated** [1] 75:18
**elsewhere** [4] 51:18,19
52:2 110:2
**EM** [1] 5:17
**emolument** [1] 45:3
**emphasize** [1] 84:13
**employed** [2] 4:16 75:19
**employee** [1] 31:7 69:5
75:21 96:17,18 97:1
121:13 123:14 153:16,18
158:13
**employees** [4] 21:3 92:5
95:7 151:13
**employment** [2] 1:1
39:9
**employment-related**
[3] 121:6,19,21
**encompass** [1] 88:8
**end** [8] 25:7 26:2,6,9,10
65:18 97:10 148:1
**ending** [1] 67:11
**enforcement** [12] 65:6
66:4 67:16,20 68:5,7,9
71:15,16,20,20 73:22
**enforcements** [1] 66:3
**English** [1] 30:9
**ensure** [2] 130:20 132:15
**entered** [1] 5:11
**entitled** [4] 45:8 61:10
61:20 153:11
**environment** [1] 84:5
**EQUAL** [1] 1:1
**equity** [2] 62:11 65:2
**equivalent** [1] 48:18
**ER** [5] 88:1 97:1,5 121:13
131:15
**ESQ** [3] 2:3,4,10
**essentially** [8] 12:4
28:11 47:4 83:1 112:9
114:14 115:3 155:7
**established** [3] 45:16
126:3 129:18
**establishing** [1] 99:4,11
**ethnic** [1] 29:12
**evaluation** [2] 12:5,9
**Evaluations** [1] 11:22
**event** [1] 84:7 90:14
**events** [2] 20:7 84:17
**eventually** [2] 90:15
109:13
**everybody** [2] 14:7 37:7
**Evidently** [1] 163:8
**evolutionary** [1] 75:13
**exact** [3] 16:21 25:9
58:21
**exactly** [6] 14:13 20:13
28:7 87:4 96:20,21
**EXAMINATION** [2]
3:2 4:6

**examine** [1] 159:13
**examined** [1] 4:5
**example** [1] 73:9
**exceed** [4] 31:4 32:12,14
42:18
**Excel** [1] 115:2
**except** [1] 18:19
**exception** [1] 34:2
118:15
**exceptions** [1] 123:16
**excuse** [1] 59:7 133:9
**executed** [1] 30:18
**executive** [1] 5:17 24:6
24:7 158:22 162:10
163:10
**exercised** [1] 45:12
**exhibit** [2] 137:10 163:9
**EXHIBITS** [1] 3:4
**exist** [2] 120:15 129:10
**existing** [1] 120:18
**exists** [1] 129:8
**expansion** [1] 128:11
134:15
**expect** [3] 119:10 128:15
128:17
**expenditures** [4] 47:6,8
47:9,11
**experience** [3] 49:2
135:5,12
**experienced** [3] 134:9
134:18 165:16
**explain** [3] 46:11,12
112:8
**exposure** [1] 73:6
**express** [1] 121:10
**expressed** [2] 88:13
109:9 121:10
**expressing** [1] 110:1
**extended** [1] 100:21
101:1,2
**extent** [1] 116:13
**Eye** [1] 2:6
**eyes** [1] 11:6

---

**-F-**

**F** [1] 111:1
**F-e-w-e** [1] 16:3
**F-r-o-e-h-l-i** [1] 12:15
**F-r-o-e-h-l-i-c-h** [1]
12:20
**face** [2] 162:17,22
**faced** [1] 117:18
**facilitating** [1] 104:21
**fact** [5] 41:15 87:10 150:5
154:14 163:20
**facts** [1] 108:7
**failed** [2] 54:18 56:2
57:19 58:2
**fair** [5] 73:18 116:8 117:9
151:10 153:17
**Fairfax** [1] 4:11

**fairly** [5] 16:19 67:21
122:20 134:1,1
**fall** [1] 71:22 79:8
**familiar** [1] 159:1
**far** [7] 29:4 59:1 75:4
100:18 130:5 158:1 165:6
**favor** [1] 39:12
**FDIC** [32] 4:17,19 6:3,16
11:16 12:13 47:4,15,16
47:17,18 48:22 53:13
55:20 56:21 70:6 84:6
90:12,13 91:17 93:20
125:6 129:21 132:12,20
132:21 133:6 134:9
145:20 157:3 162:6,7
**FDIC's** [6] 43:16 48:4
49:4 132:19 134:6,8
**FDIC-wide** [9] 132:4,5
138:2 141:17 145:5,7,11
146:8,12
**FDICEO-050002** [1]
1:11
**February** [1] 1:19
**Federal** [4] 1:13 2:11
16:14 67:3
**female** [1] 19:22 20:1
**females** [1] 38:15
**few** [3] 67:11 119:15
147:1
**Fewell** [6] 16:3 19:19
20:2 34:21 36:18 116:4
**fewer** [1] 56:2,2
**field** [14] 1:2 9:18 87:8
91:6,8,9,9 92:17,19 93:9
93:15 95:2,3 124:7
**file** [3] 142:9,11 144:14
**filed** [2] 62:11 155:6
**files** [1] 144:3
**filing** [3] 151:21 156:21
157:10
**filled** [5] 130:16 135:16
138:20,22 139:2
**financial** [2] 65:8,13
**fine** [4] 48:20 103:1
111:11 119:18 140:1
161:16,19,21
**finished** [1] 40:2
**finishing** [1] 40:3
**firm** [1] 7:16
**first** [32] 4:4 5:22 11:20
26:16 53:8 62:5,14,14
67:18 74:18 77:13,13
78:16 83:16 84:21,22
87:19,20 89:1,7 97:17
99:8 111:9,9 123:12 124:6
124:15 130:22 141:21
149:18 154:18 155:12
**first-year** [1] 24:18
**fit** [1] 86:9
**five** [7] 7:6,8 50:13 60:6
60:19 104:1 110:4 146:20
**fledged** [1] 25:21
**floor** [2] 2:12 100:13
**focus** [1] 81:11

**FOIA** [16] 53:20,22 54:2
56:9,12 111:15 112:3,5
114:8 116:1,16 117:2
118:21 119:11 120:6 124:2
**FOIA/Privacy** [2]
114:6 115:17
**FOIAs** [1] 120:9
**followed** [2] 18:13 97:16
**following** [1] 79:17
**follows** [1] 4:5
**Force** [1] 10:19 11:8
**forced** [2] 106:3 107:2
**formal** [1] 46:5,6 112:18
151:20 157:1,5,6,20,20
**former** [1] 69:5
**forth** [2] 109:21 144:22
**forum** [2] 151:20,22
**forward** [1] 157:4
**forwarded** [1] 164:21
**four** [17] 7:8 12:13,17,18
13:7 15:1 31:13 36:5,7
37:17 42:18 63:10 66:5
67:9,16 79:4 88:2
**four-year** [1] 42:21
**fourth** [2] 14:11,12
**frame** [1] 54:15
**Francisco** [1] 91:12
**frankly** [10] 11:6 51:10
63:5 68:1 73:6 84:9 97:20
115:21 119:15,18
**fraud** [2] 73:9,10
**Fred** [1] 162:11
**Frederick** [3] 1:21 4:3,9
**Freedom** [1] 54:19
**Froehlich** [2] 12:15,20
13:3,15,21 15:7 16:11,13
17:3,10 18:15
**front** [1] 138:18
**FTE** [4] 46:2 48:16
134:22
**FTEs** [1] 48:6,12
**full** [5] 20:17 25:20 45:12
52:17,21
**full-service** [1] 88:2
**full-time** [1] 9:6 10:6
21:9 22:20 41:11 47:22
48:17,18,19 52:18 75:21
**fully** [1] 51:17
**function** [1] 115:11
**functions** [1] 49:7
**funds** [2] 46:22 47:18
**future** [1] 111:21

---

**-G-**

**G** [1] 4:1
**G-i-e-s-e-l-e-r** [1]
13:15
**G.W** [1] 21:14
**Gaston** [3] 31:14,14
113:6
**gathering** [1] 90:4
**Geiseler** [9] 18:1 19:12

19:13 20:5 23:21 34:16
66:20 116:17 126:15
**general** [35] 4:17,20,22
5:6 12:12,15 13:2,4 28:2
28:4,6,9 31:15,20 32:15
46:16,17,21 47:1,5 52:8
52:20 53:14 56:17 58:7
58:11 59:18 65:16 82:17
90:11 113:7 114:15
137:15 162:6,12
**General's** [1] 46:19
**generally** [4] 55:20 57:5
58:9 74:11 150:5
**generically** [1] 62:7
**gentleman** [1] 154:18
**George** [1] 21:14
**Georgetown** [1] 9:17
**Gianni** [8] 31:14 33:11
33:12,15,16 43:12 108:13
113:6
**Gibson** [9] 1:21 3:4 4:3
4:9 122:10 137:10,13
147:3 162:11
**Gieseler** [2] 13:15 15:11
**given** [6] 20:21,22 74:6,9
142:13 151:17
**giving** [1] 119:7
**God** [1] 78:18
**goes** [2] 56:13,16
**gone** [12] 17:3 18:3,4,5
42:22 58:18 68:14 85:8
94:19 95:5 108:11 113:18
**good** [10] 4:15 21:6 44:8
73:9 83:22 90:16 105:15
161:22 165:22 166:13
**government** [2] 48:22
130:8
**government-wide** [1]
132:3
**Governors** [1] 16:14
**grad** [2] 9:15,16
**grade** [5] 5:16 6:11 35:22
36:1 49:18
**graded** [1] 24:8
**grades** [4] 23:8,17 26:11
137:20
**graduate** [3] 9:14 10:8
21:16
**graduated** [7] 9:4 21:9
21:22 22:1 26:17,21 40:17
**grand** [1] 74:12
**greater** [1] 115:14
**Greenberg** [1] 1:24
**group** [2] 12:1 134:7
**GRUENBERG** [1] 1:12
**GS** [6] 6:13,15 129:5
**GS-15** [1] 126:7
**guarantees** [1] 84:10
**guess** [14] 21:17,17,22
26:19,22 27:20 33:3 57:7
60:21 66:5 79:13 89:10
124:11 142:12
**guidelines** [1] 113:12
**guys** [1] 13:9

**-H-**

H-a-r-k-i-n-s [1] 16:18
H-e-n-k-l-e [1] 154:19
half [2] 74:17,18
hallway [1] 89:2
handle [1] 73:17
handled [1] 66:18
handles [3] 49:6 134:8
157:3
handling [1] 12:2
happening [1] 119:21
happy [1] 96:16
Harkins [3] 16:18 19:17
he'd [1] 113:7
head [7] 12:3,14 49:15,21
74:1 114:5 143:7
headed [1] 12:7
headquarters [10] 92:14
92:15,20,22 93:2,5,7 94:2
94:4,8
heads [1] 49:11
hear [2] 100:19 158:9
heard [2] 105:11 158:12
hearing [7] 105:9 155:1
155:3,4 156:14,16,16
held [2] 5:1 112:1
help [1] 113:1
Henkle [1] 154:19
Henkle's [4] 154:21
155:16,17 156:14
herself [1] 87:9
hiatus [1] 104:8
high [3] 11:9,11,12
higher [1] 120:8
himself [1] 116:22
hire [4] 21:7,8 128:15
164:11
hired [17] 17:11 19:14
28:21 30:13 31:6 32:4,6
32:19,19,22 33:5 126:6,6
126:8,9,10 140:15
hiring [10] 18:8 31:13,17
31:20,22 32:9 33:15 39:22
40:1 41:14
Hispanic [4] 29:2,3,11
Hispanics [1] 29:15
hold [1] 5:7
honest [1] 16:20
honestly [1] 32:2
house [1] 15:2
HR [22] 71:14 77:2,7,8
81:2,3 84:20 86:20 87:2,4
87:8,14,20 88:7,8 94:1
96:17 100:14 102:16
124:7 130:19 131:1
HR-related [1] 87:11
HRB [1] 121:16
human [5] 49:5,7,9
131:15 142:19
hundred [1] 94:18
hung [1] 66:12

**-I-**

i-c [1] 63:4
idea [5] 23:4,7 96:15
143:3 164:8
identification [1]
137:11
identified [3] 22:9 81:2
111:5
identify [13] 79:14,18,20
79:21 80:5 81:3 111:20
114:18 120:18 153:1,2,12
162:7
identifying [1] 114:15
IG [41] 11:16,19 12:2
16:13,13,15 27:15,17,18
27:19,22 33:11,12 43:12
44:5,7,21,22 45:12,14,15
46:11 49:4 50:1,2,22
55:12 65:15 91:1 112:10
113:14 115:22 117:19,21
118:16 120:2,3,4,7 121:19
126:16
IG's [12] 6:2,4 15:20 32:6
36:13 46:6,9 47:21 48:12
60:2,3,19
immediately [2] 38:21
80:17
impact [1] 58:12
include [3] 62:7 72:3
88:9
included [1] 67:14
includes [1] 45:19
including [4] 18:22
63:13 95:2,3
increase [2] 45:3 75:6
increased [4] 74:17,20
92:14 165:4
incumbent [1] 51:21
indeed [1] 129:11
indefinitely [1] 109:5
independent [1] 58:15
independently [2]
66:17 123:11
indicate [2] 96:16 109:6
indicated [5] 87:7 100:6
100:8,8 106:4
indicating [1] 101:21
inform [1] 108:12
informal [1] 157:18
information [10] 54:12
54:19 65:11 90:4 113:6
120:19 159:5,7,8,9
informed [1] 104:5
initial [1] 40:1
initiated [2] 30:21 81:18
inquire [6] 82:21 159:16
159:17 160:20 161:1,2
inquired [2] 38:10 45:9
insisted [1] 33:16
Insofar [1] 20:6
Inspector [28] 4:17,19
4:22 5:6 12:12,15 13:1,4
28:2,3,6,8 31:15 46:15,17

46:19,20 52:8,20 53:14
58:11 59:18 65:16 90:11
113:7 137:15 162:6,11
instance [1] 131:1
instead [1] 164:16
institutions [1] 54:8
instructing [2] 61:15,17
insufficient [1] 90:7
insurance [3] 1:13 2:11
47:18
intensive [1] 53:11
intention [1] 110:2
interest [7] 81:8 87:7
88:13 96:18 113:11
121:10,11
interested [20] 81:20
82:15,21 85:16 86:6,19
87:14,16 90:2 94:12 96:2
96:8,11 98:5,13 99:17
100:2 124:7 161:10 162:2
intern [2] 22:9 23:3
internal [1] 47:15
internally [4] 47:19 49:6
interns [1] 22:14
interrogatories [4]
123:5,8,10,12
interrogatory [6] 123:6
159:2,5,12,13 161:11
interviewed [1] 42:13
interviews [1] 42:14
investigation [11] 73:13
157:1,4,6,8,9,11,14,16,21
158:6
investigations [1]
158:16
investigative [1] 74:10
investigator [2] 157:4
157:22
investigators [4] 72:18
72:19 73:11 74:5
involve [1] 67:21
involved [14] 32:8 53:11
59:22 66:12 114:14,16
119:6 120:22 121:5,21
123:9 150:19 154:18,19
involvement [2] 72:4,7
involving [4] 59:17 60:3
60:19 69:4
issuance [1] 112:10
issue [8] 58:16 84:14
100:12 111:19 112:16
119:16 153:18 165:6
issued [2] 158:4,11
issues [3] 47:14 67:21
68:19
iteration [2] 17:18,20
itself [3] 112:18 129:9
130:22

**-J-**

Jan [3] 121:13,13 131:15
Janet [1] 31:14
January [10] 4:20 5:14

job [52] 4:21 5:1,7 22:8
22:10,19,20 39:12 42:8,9
77:3,3,4 82:22 83:7,8,22
85:18 86:20,20,22 87:1
88:10 89:21 96:17 97:9,9
105:22 106:2,3 107:3,5,5
111:6 124:21 129:6
134:16,17,21,22 135:18
136:16,21 137:2 139:12
141:16 142:7 164:5,8
165:5,10 166:5,15
jobs [1] 135:2
Jones [1] 8:4
journals [1] 113:10
Jr [3] 1:21 4:3,9
judge [2] 102:15 155:7
judgement [1] 58:16
judicial [1] 156:21
July [3] 1:1 103:3 162:9
July-August [1] 97:15
June [4] 27:2 97:18 98:10
156:3
June-July [2] 89:9 101:7
jurisdiction [2] 67:22
112:15
jury [1] 74:12
justice [1] 67:6 140:18
justify [2] 51:15 90:8

**-K-**

K [2] 1:5 2:4
K-e-n-n-e-d-y [1] 7:2
K-e-y-s-t-o-n-e [1]
11:12
K-o-s-z-o-l-a [2] 69:7
70:3
K-u-h-n-s-m-a-n [1]
14:22
keep [8] 47:5 78:6 81:15
108:20,21 122:4 143:20
144:2
keeping [2] 47:7 165:1
keeps [1] 144:1
Kennedy [2] 7:1,5
Key [1] 114:20
Keystone [1] 11:12
kids [1] 109:3
kind [8] 7:3 14:8 72:6
90:19 113:5 122:13,22
134:22
knew [4] 88:3,10,11,12
knowing [1] 81:3
knowledge [11] 15:8,12
15:14,16 33:20 88:15,16
94:5 129:20 143:15 158:5
knows [1] 116:6 117:17
153:10
Koszola [3] 69:7 70:6
71:4
Kuhnsman [4] 14:22
15:17,18 18:3

**-L-**

l-l [1] 16:3
ladder [15] 125:15,18,20
125:21 126:3 127:7,8,11
128:4 129:18,22 136:9
164:9 165:11,13
Lane [1] 4:11
language [2] 112:17,18
large [8] 11:15,16 42:12
53:15 54:2 56:4,4 113:20
largely [1] 53:10
larger [1] 59:17
largest [1] 48:11
Larry [8] 12:15,19,20
13:3,15 15:3 16:20 17:21
last [26] 10:13,14 21:19
22:3 27:6 34:4 37:13
64:21 65:3,4,5 67:10
68:16,18,20 69:3 70:17
71:3,4 98:8 100:1,18
114:1 138:11 139:8 150:9
late [5] 5:2 12:22 26:20
28:18 54:2
lately [1] 85:9
lateraled [1] 135:20,21
laterally [1] 126:8
law [55] 7:4,4,16 9:1 20:8
20:11,14,14,15,15 21:15
21:18,20,21 22:3,4,9,9
23:3,3,8 24:16,17 27:3,4
27:8,9 30:14 37:9,11,13
37:14,14 38:12 39:3,4
40:2,3,7 41:5,7,9 47:14
62:11 65:2 73:7 81:16
114:15 116:6 122:13
123:22 124:1 134:4
140:16,17
lawful [1] 1:22
lawsuit [1] 62:5
lawsuits [10] 53:13,16
59:17,20 60:11,19 62:6,10
65:1 73:21
lawyer [24] 11:6 14:11
14:12,21 24:10,12,13,18
25:15 30:15 37:3 52:3
54:14 58:16,22 59:5,5,9
59:16 64:14 66:14 70:11
71:22 108:18,18 114:16
116:18,20 121:9 125:3,6
134:9,19 135:11 139:12
139:15 149:18 159:12,15
159:17 160:2
lawyers [24] 12:3,17,18
13:22 15:11 16:10 19:12
19:15 21:9 23:15,17 57:17
57:22 72:16,17 73:12,14
93:5 118:4 122:4,7 132:18
132:20 140:14
leading [1] 108:16
least [7] 44:10,11,13 60:9
88:7 151:22 156:20
leave [1] 11:2,4 108:5
leaving [2] 17:10 18:15
led [1] 82:19
left [10] 11:5 13:9 14:13

14:14 16:10,20 95:15 134:17 135:7,8

**legal** [21] 11:19,22 12:4,9 35:3,5,13,16,18,9 36:19 36:21 57:5 111:18 118:3 122:21 125:13 129:21 130:1 134:3 136:2

**legitimate** [1] 59:7

**less** [2] 66:13 91:14

**level** [10] 5:18 55:7 69:13 95:6 120:20 135:21 159:12 160:12 164:11 165:18

**leveled** [1] 55:5

**levels** [1] 72:4

**light** [1] 83:10

**limited** [3] 32:14,14 120:20

**line** [1] 165:21

**Lisa** [1] 154:20

**list** [3] 65:4 70:18,22

**listen** [1] 85:15

**litigation** [19] 56:4 61:3 67:1,2,14 71:1,15,22 73:20 87:12 121:21 122:20 134:2 150:16,17 150:18,18 151:11,18

**litigations** [1] 71:14

**live** [2] 4:10,11

**load** [4] 55:15,16,18,20

**local** [1] 20:15

**locate** [1] 120:17

**located** [1] 100:14

**log** [6] 111:17 112:5 114:12,14 116:3 120:14

**longer** [11] 34:3 36:6 50:12,16 65:3,6 68:20,22 69:4 70:18 71:7

**look** [9] 63:20 83:3 106:15 107:4 109:14 110:2 114:21 137:9 142:14

**looking** [3] 86:19 147:4 148:9

**looks** [1] 137:22

**loosely** [1] 71:14

**lose** [2] 80:3,4

**lowest** [1] 145:17

**luncheon** [1] 110:5

**-M-**

**M-c-G-u-i-r-e** [1] 7:16

**M-c-k-e-l** [1] 37:21

**maintaining** [1] 111:16

**major** [1] 54:20

**makes** [1] 164:13

**male** [1] 19:20

**males** [4] 38:15,16,18,19

**malleable** [1] 14:8

**management** [7] 49:3 49:10,22 128:12 132:17 144:15,18

**manager** [1] 5:17

---

**manning** [1] 128:11

**March** [2] 33:12 85:1

**marked** [2] 137:10,13

**married** [1] 109:2

**MARTIN** [1] 1:12

**Maryland** [1] 26:17

**Master's** [1] 9:20

**material** [2] 54:12 56:5

**materials** [4] 54:3 113:11,21 123:13

**mathematically** [1] 48:1

**matter** [8] 68:7 74:5 118:15 122:20 123:12 146:18 154:13 159:3

**matters** [35] 12:2 53:22 63:11 64:22 67:2,14,16 68:5,9,10,17 71:5,6 72:3 72:6,12,14,19 73:21,22 74:2 87:11 121:6,19 124:2 150:18 151:9 152:12,18 153:5,6,13 156:20,22 157:3

**may** [33] 9:12 10:1 14:7 24:17 26:17 27:1,2 40:18 49:1 64:2 89:2,2,20 95:10 96:12 100:16 106:15 107:14,16 115:13 121:7 122:1 123:9 142:12 143:19 149:9,9 158:9 159:9 161:2 163:20,21 164:3

**May-June** [7] 79:12 82:1 82:20 84:18,18 97:17 156:4

**McGuire** [1] 7:16

**mean** [26] 25:8 26:13 38:9 46:12 51:11,20 53:19 67:20 73:6 74:3,5 77:7 86:21 88:2 94:6 108:6 109:8 115:1 117:1 128:10 144:20 145:10 149:8 153:6 157:14 160:2

**meaning** [1] 32:12

**means** [1] 163:18

**meant** [1] 114:8

**mechanical** [1] 117:2

**mechanism** [1] 126:17

**mechanistic** [1] 59:10

**meeting** [2] 104:1,6

**meetings** [1] 104:1

**Mekel** [3] 37:21 38:8,21

**member** [1] 25:20

**memo** [7] 3:5 140:7 142:15 144:8,20 145:10 145:14 146:9 147:3,4 149:8

**memoranda** [1] 144:22

**memorandum** [5] 137:14 147:6,11 148:9 163:9

**memories** [1] 107:14

**memory** [2] 94:17 141:4

**memos** [1] 110:1

**mentioned** [4] 13:16

---

37:4,7 152:5

**merged** [2] 12:21 13:13

**merger** [11] 11:18 13:7 13:12 14:16 16:8,9 56:21 91:17,20 92:16 139:17

**met** [1] 165:19

**method** [1] 48:7

**MICHAEL** [1] 2:10

**Microsoft** [1] 115:3

**midst** [1] 57:13

**might** [3] 85:16 86:8 144:6

**Mike** [14] 18:7,8,9,9,13 18:15 32:19 121:9,12,20 126:6 134:4 139:16 159:11

**mind** [2] 156:13 164:5

**minute** [1] 127:10

**minutes** [1] 104:1

**mis-remembering** [1] 108:3

**misconduct** [1] 151:13

**mistaken** [2] 18:7 107:15

**mix** [1] 88:5

**mixed** [1] 153:9

**moment** [8] 4:14 25:16 25:18 62:13 63:17 73:18 147:4 155:4

**moments** [1] 64:6

**month** [4] 20:18 66:8,11 78:10

**months** [11] 26:4,5 28:8 65:19 66:1 67:11 79:1 91:5 104:8,12 155:13

**months'** [2] 66:8,11

**most** [4] 39:13 66:15 91:4 145:17

**move** [5] 4:13 76:12 79:7 100:14 104:21

**moved** [11] 76:7 79:9,11 100:3,4 103:12 104:9,11 105:8,10 106:1

**moving** [4] 77:7 100:13 103:18 157:4

**Ms** [79] 14:19,20 15:5 16:10,12 17:3,9,10 18:21 18:22,22 19:1,5,22 20:2 23:16 24:5,9 29:1,6 30:13 30:16 31:3,3,21 32:6 34:2 34:21,21 36:17,18,18 39:9 49:15 50:19 52:15,15 53:18,19 57:10 64:14,18 66:15 75:17,18,18 76:13 78:14 79:14 82:4 86:4,15 86:16 105:5 108:13,17 111:4 124:20 129:4 131:7 131:18 132:1 136:6,6,7 139:8 141:7,7,10 147:12 149:20 152:20 154:21 155:1 156:7,18 162:9 163:15 165:11

**MSPB** [4] 150:18 151:18 153:7 154:12

**MSPB-type** [2] 154:10 156:13

---

**must** [4] 26:1,13 27:21 27:21

**-N-**

**N** [6] 3:1,1 4:1 111:1,1,1

**N-c-t-t** [1] 63:3

**N.W** [3] 1:26 2:6,12

**name** [4] 4:8 50:3 134:7 154:15

**named** [2] 154:18,20

**names** [4] 38:7,13,14 154:17

**narrow** [1] 145:17

**national** [1] 29:16

**Nationally** [4] 92:2,3 94:22 95:1

**nature** [5] 72:21 87:4 113:10 119:4 156:18

**necessarily** [1] 47:10

**necessary** [7] 50:11,16 58:16 61:13 90:20,22 132:15

**need** [9] 31:11 63:19 119:20 134:18 135:11,16 142:21 161:2,5

**needed** [1] 135:9

**Nettie** [2] 62:22 63:3

**never** [13] 27:17 30:10 38:10 45:9 48:21 57:16 79:20 84:13 119:16 129:1 130:1 151:22 163:18

**new** [7] 17:11 120:15 134:16,17,21,22 140:14

**next** [9] 16:7 17:18 18:6 89:6 97:7 98:2,4 99:17,19

**nice** [1] 108:19

**nobody** [2] 135:5 162:19

**non-full** [1] 20:11

**non-paid** [1] 22:14

**None** [1] 93:11

**normally** [1] 160:10

**Notary** [1] 1:24

**nothing** [6] 57:21 58:2 75:9,11 108:9 114:5

**noticed** [1] 30:10

**notified** [2] 112:12 157:10

**notifies** [1] 112:11

**November** [18] 26:14,14 26:20 136:3,4,14,18,22 137:5,14 140:15 147:4 148:9,11,14,22 155:14,15

**now** [42] 12:21 15:19 16:7 16:18 22:8 24:21,22 31:3 34:13,16 35:3,8 36:5 37:12 39:22 44:1,15,21 45:14 46:10 49:11 50:9 57:16 60:1,13 61:1 63:18 72:12,14 92:10 94:8 113:9 116:3 117:11 118:10 125:6 132:18 144:11,12 150:9,17 160:6

**NTE** [19] 31:21 32:7,12 32:19 33:17 40:7 41:12

---

41:13 42:9 75:21 108:14 109:5,7 124:21 125:1 127:11 147:12,17 148:2

**number** [26] 36:13 37:12 42:12 47:22 48:2 54:1,2,8 54:9,11 56:13,16 57:19 63:19 72:5 77:9 113:8 114:20 120:8 135:1 141:21 151:8 152:3,17 153:1 162:2

**-O-**

**O** [5] 3:1 4:1 111:1,1,1

**object** [2] 59:4 133:9

**objected** [3] 65:9,11,14

**objection** [5] 65:7 68:4 133:17,19 141:20

**objections** [2] 66:3 67:16,19

**observation** [2] 55:9 58:7

**obtaining** [1] 65:11

**occasional** [1] 124:13

**occupied** [3] 40:7 51:17 52:19

**occupy** [1] 52:13

**occupying** [1] 51:16

**October** [7] 26:20 79:9 79:11 100:16 103:12 148:16,18

**ODEO** [4] 157:2,2 158:8 158:9

**off** [8] 55:5,7 74:1 111:22 112:1 114:5 124:21 137:18

**offer** [6] 39:14,14 85:17 85:17,21 87:20

**offered** [1] 165:13

**offering** [2] 39:12 76:17

**offers** [1] 39:8

**offhand** [1] 123:20

**office** [164] 2:14 4:17,19 6:2,4 11:16,17,20,21,21 11:22 12:3,6,7,8,9,12,14 13:11 15:20 16:8,17 17:12 17:20,21 18:2,19 19:9 20:12 25:21 31:11 32:7 33:16 34:1,3 35:4,19 36:13,17,19 37:3 45:22 46:6,9,15,17,19,20 47:2 47:21 48:8,12 49:4,6,10 49:21 50:12,17 51:8,9,12 51:15 52:2,7,8,9,11,18,20 52:20 53:14,21 57:22 58:11 59:17 60:2,3,19 64:15,17,20 65:16 71:1 73:4,15 74:18 76:13,22 77:1,2,7,8,8,16,21 78:4 78:16 79:15 81:2,16 82:20 84:20 87:22 90:8,11 91:8 91:9,9,12 93:7,9 94:1 100:5,11,12,14 102:14,16 103:17 108:19 111:17 112:13,21 121:19 122:8 122:14,17 125:7,14,15 126:4,14,20 128:9,13 129:19,21 130:2,19 131:1

132:14,19 133:6,13 134:3
135:2 137:19 139:4,14,16
142:19 143:7 144:1
147:22 149:19 150:19
151:14,15,16 157:2,2
162:5,13 165:6
**office's** [1] 121:9
**offices** [11] 1:25 11:19
12:21 14:15 72:11 91:6
92:19 93:15 95:2,3 150:4
**official** [3] 162:7 163:2
166:1
**often** [2] 72:10 73:15
**OIG** [23] 6:20 47:3 56:5
66:4 67:5,17 72:17 81:20
91:21,22 92:1,4 93:16,18
94:17 122:14 125:6
128:12 132:21 139:14,16
149:19 162:12
**OIG's** [1] 125:14
**OIG-wide** [1] 145:21
**old** [1] 14:16
**OMCR** [1] 50:2
**once** [3] 99:16 120:17
157:11
**one** [60] 12:13,17,18 13:6
13:9 21:1,1 38:16,16
40:12,13 53:20 60:4,5
61:2,3 63:13 64:2 65:3,4
66:15,16,17,18,19 67:10
68:6,20 69:1,3 70:17 71:4
73:17 77:13,13 78:13,14
78:16 82:6 85:10 89:8
90:9 91:12 112:10,22
114:1 131:19,21 132:22
134:3 138:11 142:4
145:15 148:6 153:7
154:13,13 157:1 161:4
162:20
**ones** [3] 39:6,7 129:14
**ongoing** [5] 65:22 72:5
120:20 124:13,13
**onto** [1] 165:11
**open** [4] 81:7 131:19,21
131:22
**operation** [1] 48:8
**operations** [2] 46:20
47:1
**opinion** [8] 114:12,13,14
114:16,17 116:3 122:19
127:22
**opinions** [8] 111:17,19
112:5 114:13 116:5,6
120:14,18
**opportunity** [5] 1:1 90:6
106:2,14 128:3
**opposed** [6] 32:15 74:18
121:2 140:8 148:13,15
**opposing** [1] 105:8
**opposite** [1] 29:3
**order** [1] 165:10
**Ordinarily** [3] 112:20
118:12,12
**organization** [2] 91:16
91:19
**origin** [1] 29:16

**original** [3] 42:18 53:9
147:17
**originally** [1] 69:7
**ourselves** [3] 67:8 72:10
153:17
**out-processed** [1] 54:3
**outside** [1] 48:22
**overall** [6] 47:22 50:5
84:6 92:8,12,13
**oversaw** [1] 119:5
**oversee** [2] 119:10,20
**overseeing** [1] 119:6
**oversees** [1] 47:18
**overstates** [1] 109:10
**own** [1] 66:18

**–P–**

**P** [1] 4:1
**P-e-t-t-y** [1] 49:14
**P.C** [1] 2:5
**p.m** [2] 110:5 166:15
**PAD** [1] 142:13
**PAGE** [1] 3:2
**paid** [2] 21:3 47:17
**papers** [1] 31:1
**paralegal** [24] 19:16,17
30:14,18 37:3 50:10,11
50:17 51:7,16 56:22 57:3
57:6,8 58:13 59:8 78:8
81:15 83:10 90:8,10,10
102:14 122:6
**paralegals** [3] 55:18
58:1,3
**Pardon** [2] 11:3 157:15
**PARS** [2] 30:19,22
**part** [6] 58:22 61:12 87:6
87:16 88:11 134:7
**part-time** [10] 20:16,17
20:19 22:3,19 27:8,9 41:5
41:7,9
**participate** [4] 76:11,12
76:14 104:21
**particular** [7] 84:17 88:6
113:4 114:17 120:22
122:17 140:22
**particularly** [1] 160:11
**partner** [1] 7:7
**parts** [1] 109:12
**party** [2] 53:13 88:17
**pass** [1] 42:5
**passage** [1] 25:5
**passed** [5] 24:14,15 26:16
41:22 114:18
**passing** [2] 24:18,19
**past** [5] 93:13 114:19
131:3 156:1,2
**Pat** [36] 12:3,10,11 13:1
13:20,21 17:22 19:9 28:1
28:22 30:22 31:1 40:10
50:18 78:3 81:1,5,6,11
98:5,15,20 99:7,16,20
100:1,6,19,22 101:8,15
101:16 103:3,18,21

104:18
**Pause** [18] 22:6 23:9
25:22 27:13 28:19 30:11
32:10 34:7 39:20 42:15
50:7 74:14 85:11 124:4
131:5,12 158:20 166:9
**pay** [2] 45:4,11
**PD** [7] 126:2,3,3 127:7,8
127:8 136:9
**PDs** [2] 23:6 130:2
**pending** [2] 154:22 155:7
**people** [19] 20:4 22:15
36:14 37:4 39:13 46:3
61:10 87:21,22 88:3 92:16
94:19 128:8,15 133:13
134:20 136:8 160:11
162:20
**perceived** [1] 57:7
**percentage** [2] 75:1,2
**performance** [7] 83:14
83:17,20 84:15 85:3,6
124:10
**performed** [4] 36:12
83:15 102:16 151:16
**performing** [1] 113:5
119:4 129:14
**perhaps** [1] 82:20
**period** [25] 20:11 28:1
31:11 37:10 45:18,19
46:21 53:3 54:17 68:14
71:7 92:6 95:11 100:10
100:21 101:1 103:15
104:15 148:2 150:8 151:4
151:8 152:16 153:21
154:3
**periodicals** [1] 113:8
**permanent** [15] 28:15
31:6 43:3,7 44:1,12 46:3
76:7 108:14 109:15 125:2
147:13,20,21 162:5
**permanently** [2] 44:7
45:17
**person** [11] 18:6 31:11
51:16,21 52:12,12 78:7
139:8,11 160:1 164:21
**person's** [1] 51:21
**personally** [1] 117:22
**personnel** [27] 30:20
45:22 49:3 68:13 93:9
121:9 128:12 130:14
132:14 134:4,8,9,19 136:8
142:12 144:1 147:22
150:15 151:9 152:17
155:8 156:11,18 162:4,8
162:12 164:21
**personnel-connected**
[1] 73:21
**personnel-related** [7]
62:12 68:10 71:14 121:11
134:2 150:14 153:20
**personnel-type** [1] 71:5
**personnel-wise** [1]
16:8
**personnelists** [3] 93:15
132:8 145:8
**personnelists'** [1] 99:5

**Petty** [11] 3:5 49:14,15
86:12 105:5 131:7,17
137:14 143:5 144:4
162:12
**phase** [1] 74:12
**phone** [1] 14:20
**physically** [3] 100:13
103:16 104:11
**pick** [1] 148:19
**pilot** [1] 11:7
**pin** [1] 63:19
**place** [7] 43:8 77:15,16
78:9 79:8,12 148:22
**placing** [1] 162:4
**Plaintiff** [1] 1:23
**plan** [6] 128:8,10,11,11
128:11,12
**planned** [1] 94:8
**planning** [1] 47:5
**plans** [1] 4:13
**point** [42] 17:8 20:10
35:11 53:20 55:6 57:3
59:18 75:15 81:6 90:4,17
90:18 92:4 96:3,10,19,22
100:11,16 108:11 111:5,8
111:13 113:3,4,19,22
117:14 120:13,21 121:1,1
122:19 125:19 128:21
134:21 140:6,22 141:16
152:12 164:10 165:9
**pointing** [1] 86:1
**points** [1] 46:8
**position** [109] 5:5,11,12
6:9 16:12 28:5,11 36:15
39:14,14 40:6,7 44:13,16
44:16 51:7,16,17,22 52:13
53:9 59:8,9 75:17 78:6,8
79:18,20 80:2,4,5,12,13
81:2,4,6,13,20 82:11,14
83:2 84:3,20 85:20,21,22
86:9 87:3,5 88:6 89:15
90:8,9,16 98:6,13,17,21
99:3,13,21 102:14,15
109:5,7,13,15 125:2,2,3
125:20,21 128:4,4 132:13
132:15 136:3,4,10 137:16
137:19 138:5,6,8,19,20
138:21,22 139:1 140:4
142:13 143:22 144:10,16
144:19 147:5,18,20,21
162:5 164:3,10,12,13,14
164:22 165:13,14,16
**positions** [19] 32:4 36:13
47:22 48:2 51:9,12 57:15
78:4 79:15 88:4 90:10
99:6,11,12 125:6,9,15
130:4,8
**positive** [1] 141:14
**possession** [1] 53:14
**possibility** [6] 128:18
128:20,21,22 129:1,2
**possible** [1] 165:4
**possibly** [1] 133:11
**Postal** [1] 16:12
**posted** [5] 122:5 141:3
141:16,17 166:4

**posting** [1] 166:5
**potential** [5] 87:15
137:20 151:12 153:6,7
**Powell** [2] 70:4,5
**powers** [3] 44:16 45:12
45:16
**practice** [1] 6:21
**practiced** [1] 8:1
**pre** [1] 151:20
**precise** [2] 16:10 54:1
**precisely** [2] 48:15 111:4
**predecessor** [1] 6:18
**Predominantly** [1]
122:15
**preliminary** [1] 144:21
**preparation** [1] 113:1
**preparing** [1] 156:16
**present** [4] 77:17 154:5
154:7,8
**presently** [1] 155:8
**pressure** [2] 84:6 91:15
**Presumably** [1] 160:4
**pretty** [9] 25:5 76:4,6
98:12 109:18 113:18
130:21 143:20 165:22
**previous** [1] 149:10
**previously** [2] 87:8
120:15
**principally** [1] 87:11
**principle** [1] 77:12
**privacy** [2] 65:8 114:9
123:15 153:14,15
**private** [1] 6:21
**problem** [7] 54:10 83:19
152:14,14 159:11 160:19
160:20
**problems** [1] 83:17
**proceedings** [1] 67:4
**process** [3] 13:8 32:9
47:13,15 92:5 99:4 117:2
164:13 165:20
**processed** [1] 112:19
**processing** [4] 53:20
116:16,21 117:1
**produced** [2] 54:4
113:21
**production** [1] 123:13
**professional** [1] 113:10
**profitable** [1] 51:18
**prohibit** [1] 62:1
**project** [3] 117:21 120:15
121:1
**promote** [1] 164:18
**promoted** [9] 24:13 26:2
26:6,7 36:2,7,15 126:19
126:21
**promotion** [5] 25:4
41:21 128:6 135:17
137:20
**prompted** [3] 78:1 80:16
80:18
**proposed** [2] 151:12
163:7

proposition [1] 56:17
prosecuting [2] 72:8,9
prosecutor [1] 73:8
prosecutors [1] 74:3
provide [6] 53:9 58:14
72:21 111:20 159:5,7
provided [3] 11:19 159:8
159:10
provisions [1] 114:15
public [1] 1:24 153:18
pull [1] 113:11
purpose [2] 47:7 165:15
purposes [3] 47:5 59:3
146:7
pursuant [1] 65:12
pursue [3] 11:5 83:3,4
pursuing [1] 85:16
put [3] 128:4 136:9 145:13
putting [1] 52:17

-Q-

qualified [1] 164:12
qualitative [1] 55:9
quarter [4] 83:16 84:21
84:22 85:1
questions [2] 147:1
166:11
quick [1] 25:5
quite [1] 114:2

-R-

R [2] 4:1 111:1
race [8] 15:5 16:4 29:8,9
29:10,12 38:8 39:3
Racial [1] 29:14
raise [2] 84:16 106:18
ran [1] 91:5
range [1] 120:11
re [1] 137:15
re-advertised [1] 43:10
reach [1] 108:5
real [2] 57:13 85:7
really [15] 35:21 70:19
72:1 84:2 85:10 88:12
89:19 95:22 97:9 109:20
122:8 133:18 135:13
141:6 166:8
reason [10] 51:2 96:14
128:2 136:11,15 144:2
148:10,22 158:7 164:15
reasons [1] 57:8
reassign [2] 99:20 101:8
reassigned [4] 78:21
101:14 106:18 141:8
reassigning [1] 102:5
reassignment [1] 100:7
recalled [1] 16:20
receive [2] 45:3 111:19
received [2] 65:7 120:9
receivership [1] 54:9
receiverships [1] 54:18

56:2 58:6
receiving [1] 84:5
recent [1] 91:4
recently [1] 66:15
recess [3] 50:14 110:5
146:22
recollection [1] 13:14
75:22 93:3 103:20 152:7
152:10 163:12
recommendation [1]
39:15
recommended [2] 162:7
162:11
reconsider [5] 61:19
90:6 94:14,16 95:16
reconstruction [2]
103:5 104:14
record [5] 59:3 111:2,22
112:1 163:4
records [7] 53:15 63:20
65:14 66:6 71:11 143:19
143:21
reduce [2] 84:6,8
reduced [1] 115:12
reduction [1] 95:6
reference [1] 89:21
referred [1] 163:16
referring [3] 40:1,4,6
regardless [2] 44:12
106:18
register [1] 133:17
registered [1] 133:19
regular [3] 48:21 119:8
regulations [1] 62:1
related [4] 71:15 111:20
122:19 150:16
relation [1] 100:1
relations [6] 49:10,22
96:17,18 97:2 121:14
relationship [1] 37:19
relevance [1] 133:10
relevant [3] 53:15 59:5
133:14
remain [2] 109:5,7
remains [1] 129:1
remember [52] 5:10 6:14
6:17 13:9 16:9,21 18:8
20:13 22:21,22 25:9,17
28:7,17 30:17,17 33:1
41:20 43:8,9 54:1 87:16
96:20,21 97:2 98:4,11
100:22 104:3 106:6 107:6
107:7,8,9,18,19 108:7
122:1 123:18 124:8
126:15 131:20,22 134:6
134:20 135:13 137:3
141:6 143:8 147:6 155:20
156:5
removals [1] 151:13
replace [3] 135:3,7
159:18
report [3] 49:20 153:17
158:14
reports [2] 49:21 131:17

represent [1] 67:5
representation [1]
152:11
reprogramming [1]
47:13
request [14] 112:9,14,18
113:14 117:2 136:21
137:1 140:3 141:5 143:1
143:8,18 147:14 148:5
requested [2] 142:16
143:17
requesting [2] 143:14
147:12
requests [8] 53:20 54:2
54:11,19 56:13 111:15
123:13,15
require [1] 58:21
required [1] 43:17
requirements [2] 61:7
165:20
research [1] 113:16
118:3 119:10,11,13
122:15,18,19,21 123:1
Reserve [1] 16:14
resolution [2] 6:4 152:14
resolved [8] 54:7 66:13
70:17 154:13,21 155:17
155:18,19
resources [5] 49:5,7,9
131:16 142:19
respect [8] 39:13 53:13
120:20 124:20 151:16
153:15 156:21 158:13
responding [2] 65:9
117:2
responses [2] 123:14,17
responsibilities [4]
111:14 117:8 129:13
130:10
responsibility [2] 50:5
116:1
responsible [2] 161:3
161:14
retained [1] 157:3
retaliation [1] 69:5
retired [1] 117:21
retirement [1] 33:13
review [4] 31:1 112:14
113:8 124:10
reviewed [1] 30:16
130:20 138:4
reviewing [1] 40:5
reviews [3] 116:10,12
158:9
Rex [1] 50:3
Rex's [1] 50:5
RICHARD [1] 2:4
RIF [8] 90:15 91:1,4,13
92:20,21 93:1 94:8
RIFs [2] 92:17 94:3
right [60] 10:17 14:4,15
15:3 16:6 19:13 24:20
25:8 26:18,22 27:5,8 30:1
32:16 33:10,10 34:15

35:17 40:11 41:1 42:3
43:1 54:22 56:3,7,14 57:2
60:21 62:12 63:18 64:4,7
65:8 67:12 70:8 75:16
80:10 85:12 92:19 93:22
94:11 95:4,14 100:15
103:2,6 111:11 112:6
121:17 123:3 125:5
127:20 128:19 132:10,18
135:6 136:13 148:4 163:1
164:7
rights [1] 90:12
ROI [2] 158:4,11
ROI's [1] 158:8
role [1] 44:22
roll [1] 155:9
rough [1] 60:20
roughly [7] 6:8 7:21 8:8
26:14 28:2 82:2 92:4
round [2] 91:11 95:9
routine [1] 122:21
RTC [6] 6:20 12:2 14:17
48:22 56:21 91:18
rule [1] 31:20
run [3] 91:1,13 92:21
running [1] 98:21
runs [1] 90:15
Russian [1] 9:19

-S-

S [6] 2:10 3:1 4:1 111:1,1
111:1
S-e-b-e [1] 37:21
S-i-m-m-o-n-s [1] 50:3
s-t-y-e-n [1] 37:22
Salaries [1] 48:10
San [3] 8:14 11:12 91:12
satisfied [1] 119:11
saw [1] 163:18
says [7] 48:5 107:1,1,10
138:4 144:15 145:10
scale [2] 6:15,16
scheduled [2] 155:3,5
scheduling [1] 74:4
school [19] 9:1,14,15,16
11:9,11,12 20:19 21:13
21:14,21 22:4 25:1 27:6,9
40:2,3,8 140:16
schools [1] 20:15
searchable [1] 115:3
Sebestyan [1] 38:22
Sebestyen [1] 37:21
second [8] 21:21 62:19
74:17 88:22 97:14,17
154:19 155:10
secretariat [1] 104:20
secretary [7] 13:6 15:22
16:1,2 19:18 34:22 35:2
section [1] 134:8
securities [5] 7:4 8:2,10
8:20,21
see [23] 25:19 29:18 52:1
52:10 55:19 56:22 57:19

58:1,4 62:9 67:9 76:9,16
86:6 98:19 104:8 126:1
127:3 128:7 129:21 130:3
146:17 159:15
selected [5] 28:5,9 44:12
164:14 165:22
selecting [1] 166:1
semesters [2] 10:15 22:1
seminar [1] 87:12
send [2] 76:18 101:21
senior [8] 5:13,22 6:10
14:4,6,8,9 70:13
sense [3] 84:14 135:4,14
sent [2] 101:18 144:8
separate [3] 22:10 90:13
93:22
September [6] 40:22
41:19,19 42:20,21 108:22
sequence [14] 16:10,21
18:8,11 24:20 33:7,9
82:18,19 85:9 97:3 99:5
103:2 134:20
sequentially [1] 99:18
99:19
series [4] 84:17 125:11
125:13 127:5
serves [1] 94:17
service [6] 16:13 72:21
162:10 163:10
services [4] 11:19 12:5
58:14 135:11
serving [1] 6:2
settlement [1] 155:19
seven [1] 69:15
several [8] 36:14 46:8
54:22 55:14 76:21 79:1,3
151:12
Shapiro [72] 1:25 2:3,5
4:7 22:7 23:13,14 26:3
27:14 28:20 30:12 32:11
32:13 34:8 39:21 42:16
50:8,13,15 59:10,13 61:6
61:9,12,15,19 62:3,4
74:15 85:12,13 110:4
111:2,3,22 112:2 124:5
131:6,13 133:12,16,19,20
137:12 142:3,5 146:20
147:1,2,8,10 154:1,2
158:21 159:11,22 160:4,9
160:13,15,18,22 161:7,13
162:1,15,19 163:3,5,6
166:10,13
share [2] 51:2 59:11
Sharpe [19] 1:5 16:18
17:2,9 18:15 19:17,22
20:8 28:21 32:6 34:2
36:17 52:15 53:19,19 76:7
76:13 86:16 141:7
Sharpe's [3] 75:17 111:5
141:10
shop [5] 87:18,21 88:2
130:14,17
short [1] 139:16
shortly [2] 97:14 98:8
Show [1] 147:8
showing [1] 137:13

**shrink** [1] 128:17
**shrinks** [2] 56:11,15
**shrunk** [3] 92:7,8,12
**side** [3] 12:5,5 15:1
**sign** [2] 159:2,16 160:9 160:14
**signature** [2] 131:7,9
**signed** [2] 30:22 40:10
**significance** [1] 140:6
**significant** [4] 53:21 84:5 134:1,2
**significantly** [1] 53:17
**signs** [1] 159:12
**similar** [2] 131:2 147:11
**Simmons** [2] 50:3,4
**simply** [1] 32:5
**single** [1] 48:11
**sit** [5] 59:21 63:19 144:22 161:16,20
**situation** [1] 117:18
**situations** [1] 154:11
**six** [6] 28:8 60:7,19 69:15 78:10 100:5
**size** [6] 54:8,10 56:15 84:7,8 92:14
**sizing** [2] 58:8 90:22
**small** [3] 87:18,21 161:5
**smallest** [2] 145:20,21
**Smith** [2] 8:13,14
**solicited** [1] 102:22
**sometime** [12] 7:12 28:15 70:21 82:20 85:5,5 89:9 100:21 101:5 108:22 113:22 155:22
**sometimes** [6] 20:17,22 60:10 67:20 73:1,2
**somewhat** [1] 59:22
**somewhere** [6] 5:9 39:2 94:18 109:14 152:13 156:4
**soon** [1] 89:1
**sophisticated** [2] 67:21 114:22
**sorry** [11] 5:9 7:12 17:19 27:18 29:5 61:4 72:13 128:10 129:9 154:8,16
**sort** [5] 66:4 107:8 115:14 122:16 151:2
**sorts** [1] 62:8
**sounds** [1] 138:11
**sources** [1] 131:3
**Spanish** [1] 30:7
**speak** [5] 30:7 31:17 57:8 121:4,20
**Speaks** [1] 30:9
**specialist** [4] 121:13,14 131:15 134:4
**specialty** [1] 135:9
**specific** [24] 5:4,10,18 17:19 23:4 33:4 46:21 55:8 77:9 82:17 96:9 108:15 113:12 115:19 119:4 134:3,10 138:19

**specifically** [12] 13:9 43:9,9 52:11 79:21 115:11 121:7 153:3 158:19 159:1 159:20 162:2
**speculate** [1] 102:19
**spells** [1] 63:4
**spent** [1] 46:22
**spring** [1] 140:13
**Springs** [2] 10:20,21
**STACEY** [1] 1:5
**Stacy** [73] 16:17,18 17:2 18:9,10,12,15 19:17 20:8 28:21 55:16 77:18 78:11 78:16,20,21 80:16 81:7,8 81:10,11 82:1,14,19 83:6 87:7 89:12 95:12 97:12 98:5,9,12,20,21 99:16,20 100:2,3,4,5,8,10 101:8,9 101:14 102:16 103:11,15 103:18,22 104:1,9,18 105:4,8,13,21 106:7 108:11 112:7,12,20,21 117:4 118:10,11 119:3,17 122:12,22 123:4,7 124:6
**Stacy's** [4] 80:12 84:14 117:7 119:6
**staff** [4] 13:22 84:7,8 132:18
**stage** [5] 74:10 75:13 157:2,5,6
**stages** [2] 60:5,6
**stamp** [2] 131:7,9
**stand** [1] 160:17
**standpoint** [1] 130:21
**stands** [1] 48:16
**start** [1] 10:10
**started** [1] 9:11
**starting** [2] 70:13 75:5
**starts** [1] 137:18
**state** [1] 4:8
**statement** [2] 97:3 117:9
**statements** [2] 116:7 160:16
**States** [8] 1:1 62:19 64:17 64:20 69:8 72:10 73:3,14
**Station** [1] 4:12
**status** [2] 31:21 64:10
**stayed** [4] 45:11 100:5 100:10 155:7
**steady** [1] 53:2
**STEPHANIE** [1] 2:4
**still** [12] 35:2 41:5 55:2 75:13 103:16 113:4 117:20 118:1 129:8,9 153:11 154:9
**Street** [3] 1:26 2:6,12
**stretch** [1] 150:11
**strictly** [1] 106:14
**strike** [1] 90:15
**student** [2] 9:6 22:9
**students** [2] 20:14,15
**Studies** [1] 9:19

**studying** [1] 22:2
**styled** [1] 70:6
**subject** [5] 47:12,13 114:18 124:14 163:13
**subjects** [2] 111:21 114:15
**subpoena** [18] 65:6,8,10 65:12,17 66:2,4 67:20 68:5 71:20 112:8,9,13,16 112:17,17 117:10,11
**subpoenaed** [1] 65:13
**subpoenas** [2] 67:17 112:10 113:2,2
**subsequent** [1] 17:16
**subsequently** [4] 43:2 78:11 88:14 105:13
**substantially** [1] 108:19
**substantive** [1] 89:6
**such** [6] 107:6,7 118:1 143:14 147:14 162:8
**suggested** [2] 86:7 121:12
**suggestion** [2] 90:19,20
**suggests** [2] 145:12 149:9
**suing** [1] 61:10
**suit** [1] 20:8
**suitable** [1] 122:6
**Suite** [1] 1:26
**suits** [1] 61:1
**summaries** [1] 117:19
**summarizing** [1] 114:13
**summary** [3] 113:6 116:7 130:16
**summer** [11] 20:18 21:20 22:20 27:3,4 79:6 101:5 140:12 155:21 156:1,2
**supervised** [1] 149:19
**supplement** [1] 141:19
**support** [7] 11:22 12:9 80:6 83:10 84:3 102:14 122:18
**surplus** [3] 78:5 79:16 79:16
**surprisingly** [1] 48:10
**sustained** [1] 51:8
**swearing** [1] 160:11
**Swick** [2] 1:25 2:5
**sworn** [5] 4:5 26:19 42:2 42:6,7
**system** [12] 16:14 24:7 30:18,19,20,21 112:8,9 114:11,20 117:10,12
**systems** [1] 85:9

**-T-**

**T** [3] 3:1,1 111:1
**tacit** [1] 109:12
**tagging** [1] 84:18
**takes** [1] 155:10
**taking** [2] 22:15 64:21
**talented** [1] 108:17

**tech** [2] 35:13,16
**technician** [3] 35:4,4,5
**telling** [12] 83:7,8,18 86:3 96:6 98:5 105:21 107:10 107:12 108:2 121:8 140:21
**tells** [1] 144:18
**temporary** [3] 31:7 41:8 43:2
**tenure** [1] 44:19
**Teresa** [9] 16:3 19:19 112:11,20,22 116:4 117:4 117:15 118:5
**term** [17] 31:12,13 32:4 32:15 48:14 49:1 62:7 68:1,3,3,13 71:18 72:2 109:13 135:14 150:16 159:1
**terms** [9] 14:16 19:14 54:3 56:15 57:3 106:14 106:17 115:14 119:3
**testified** [1] 4:5
**testimony** [1] 108:4
**Texas** [6] 7:17 8:14 9:3 10:3,15 11:13
**Thank** [1] 166:14
**themselves** [2] 73:14 119:11
**theories** [1] 73:4
**theory** [1] 69:6
**therefore** [2] 25:20 135:8
**they've** [1] 150:5
**thinking** [6] 64:3 79:19 142:20 145:1 149:1,5
**third** [3] 21:21 82:13 97:13
**thorough** [1] 84:1
**thought** [9] 52:1 78:7 81:8 83:21 90:5 97:1,8 122:5 149:3
**three** [45] 7:19 8:16 9:9 10:14 13:4,5,22 14:5 19:12 22:1 36:5,7 38:6,16 63:10,18 64:8,9,12,22 65:19 66:1,5,8,11 67:9,15 67:16 68:10 69:1 74:8 77:11 79:3,4 82:4,6,16 142:1 150:14,21 151:1 152:1,4,11 155:13
**three-and-a-half** [1] 6:7
**three-month** [1] 103:14
**through** [16] 5:14 6:16 20:11 33:6 34:5 58:9 67:6 85:8 92:5 94:19 95:5 108:21 118:20 119:14 161:9 164:13
**throughout** [2] 37:9,11
**ties** [1] 141:4
**time-frame** [3] 33:4 55:14 156:4
**time-wise** [1] 118:18
**times** [2] 5:14 141:22
**timing** [4] 14:13 85:8 136:16 141:11

**title** [11] 14:6 22:20 35:3 35:8,10,11,15,18 36:10 36:18
**titles** [2] 14:7 36:15
**today** [5] 18:18 59:18 129:2 149:4 150:10
**together** [1] 155:9
**Tom** [5] 14:14,14 15:3,15 18:5
**too** [5] 83:9 112:12 116:11 161:17,21
**took** [6] 16:12 26:17 41:2 41:10 43:8 77:16 78:9 79:7,12 87:14 135:17 148:22
**top** [2] 74:1 114:5
**totally** [1] 59:5
**track** [2] 47:5,7
**training** [1] 87:10
**transcends** [1] 45:18
**transfer** [1] 76:18
**transitioned** [1] 54:5
**treat** [1] 114:10
**Trina** [20] 3:5 49:14 85:20 86:8,11,12,17 88:14 88:21 89:4,14 130:15 131:17 137:14 143:4 145:13 146:1,4 149:11 162:12
**true** [6] 59:11 60:8,11 139:10 163:15 164:19
**Trust** [1] 6:5
**truth** [4] 56:20 107:11,13 108:2
**try** [1] 26:16
**Tuesday** [1] 1:19
**two** [38] 8:6,16 11:18 12:3 12:21 14:15 16:10 20:18 20:22 21:1 22:10 38:4,16 38:19 52:4 60:5 62:12,18 63:9 65:19 66:1,12 74:8 76:11 77:11 82:4 95:21 103:14 109:2 115:18,21 141:7 142:1 153:20 154:9 154:10 156:11,20
**two-and-a-half** [2] 9:9 9:11
**tying** [2] 84:18 152:3
**type** [3] 58:12,15 151:21
**types** [2] 54:18 58:9 92:10
**typical** [1] 73:7
**typically** [6] 53:12 67:7 74:12 75:12 150:1,3
**typo** [2] 137:21,22

**-U-**

**ultimately** [3] 77:4 80:8 156:17
**under** [4] 65:8 126:17 129:5 133:7
**under-utilized** [1] 78:5
**undergraduate** [1] 10:4
**understand** [16] 29:17

48:5,14 57:10 59:15 63:21
117:1 126:2 136:14 138:1
145:10 146:11 148:1
152:9 160:6,18
**understood** [3] 96:6,10
96:12
**unfamiliar** [1] 49:2
**United** [8] 1:1 62:19
64:17,20 69:8 72:10 73:3
73:14
**universe** [1] 146:6
**University** [4] 9:3,17
10:3 21:14
**unless** [2] 136:9 159:17
**up** [30] 16:7 18:18 19:9
25:19 56:9 57:4,6 58:18
58:21 59:4,16 78:2,21
79:1 100:10 103:16
108:16 112:21 113:1
114:13,21 115:16,18,20
115:20 130:18,19 150:10
160:5 161:18
**upset** [2] 105:10,12
**urge** [2] 61:19 83:2
**urged** [1] 95:16
**urging** [2] 39:17,18
**used** [9] 47:4 51:18,19
65:1 117:4,5 130:2 141:18
150:17
**using** [10] 48:13 49:1 62:7
64:22 68:2,3,13 71:18
135:14 150:16
**usually** [1] 66:8
**UT** [1] 10:16
**utilize** [1] 134:12

**-V-**

**v** [1] 1:9
**vacancy** [26] 85:15 99:9
99:10 129:4,14 130:9,10
130:13 131:2,18 132:3
135:8,14,15 138:5,17
140:4 141:2,18 142:8
143:1,8,11,14 145:18
165:3
**vacant** [5] 82:22 98:19
98:22 99:3 147:5
**varied** [1] 59:22
**varies** [1] 74:7
**variety** [2] 68:17,19
**various** [6] 48:8 60:5,6
62:8 72:4 88:4
**verbally** [3] 101:19
102:8 103:10
**versus** [2] 70:4,6
**Vickers** [2] 62:15 64:14
**view** [2] 90:4 108:17
**Virginia** [1] 4:12
**virtually** [1] 103:21
**volume** [14] 53:2,5,6,16
53:18 56:4,4 59:17 90:7
113:21 115:14 120:6
134:1,2
**volumes** [1] 53:15

**-W-**

**W** [3] 1:21 4:3,9
**W-i-n-s-t-e-a-d** [1]
7:15
**wait** [2] 105:5 127:10
**wanting** [1] 39:16
**wants** [1] 144:18
**Washington** [8] 1:2,18
1:26 2:7,13 7:1 9:17 21:14
**week** [4] 101:3,4 131:19
131:21
**weekly** [2] 113:6 117:19
**weeks** [7] 78:10 89:7
100:5 104:10 141:7
**Welch** [4] 121:13,13
131:14,15
**West** [1] 114:20
**whatsoever** [1] 59:7
**whence** [1] 163:1
**whistle** [1] 69:5
**whistle-blower** [2]
151:2,3
**white** [6] 19:20 20:4 29:1
29:6 38:18,19
**whole** [3] 94:17 164:8,10
**willing** [3] 109:4,7 137:6
**Windermere** [1] 4:11
**within** [9] 5:19 11:19
47:4 58:11 71:7 97:16
111:17 114:10 158:17
**without** [5] 24:18 30:9
96:8 106:1 111:6
**witness** [9] 1:22 4:4
23:10 26:1 32:12 61:5
153:19,20 159:19
**wonder** [1] 111:4
**wondered** [1] 114:17
**word** [1] 64:22
**words** [14] 34:4 45:19
51:14 52:2 69:1 78:5 80:2
83:9 103:22 109:8 132:20
134:15 139:12 146:11
**worked** [14] 7:15 33:10
48:21 83:22 130:1 153:4
153:11,22 156:6,7,8,10
156:19,20
**write** [4] 123:17 144:22
160:6,7
**writing** [5] 102:4 103:8
114:13 147:15 163:12

**written** [8] 130:12,13
131:1 140:7 142:16
143:13 147:11 148:5
**wrong** [2] 17:15 31:2
**wrote** [4] 130:9,15 160:5

**-X-**

**x** [3] 1:3,17 135:1

**-Y-**

**y** [1] 63:4
**year** [32] 10:13 17:1 20:19
21:19,21,21 22:4 25:9
26:11 27:6,7,10 33:8 38:4
47:6 66:12 69:10 78:17
78:17,18 83:11,13 111:10
115:6,18,21 120:11
134:13 149:13 150:10,11
158:18
**year-and-a-half** [4]
10:14 25:14 69:16 150:13
**years** [18] 6:7 7:6,8,19 8:6
8:16 9:9,10,11 31:13 36:5
36:8 37:12 38:3 42:18
54:22 55:15 69:15
**yet** [3] 81:12,12 152:1
**yo** [1] 79:18
**yourself** [4] 14:2 20:5
34:9 159:18

**-Z-**

**zero** [1] 75:5

Diversified Reporting Services, Inc. (202) 467-9200