UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

```
- - - - - - - - - - - - - - - -x
                                :
STACEY K. SHARPE,               :
                                :
            Complainant,        :
                                :
        v.                      : EEOC #100-2005-
                                    00927X
                                : Agency #FDICEO-
                                    050002
MARTIN GRUENBERG, CHAIRMAN,     :
FEDERAL DEPOSIT INSURANCE CORP. :
                                :
            Agency.             :
                                :
- - - - - - - - - - - - - - - -x
```

Washington, D.C.

Tuesday, March 14, 2006

Deposition of

TRINA F. PETTY

a witness of lawful age, taken on behalf of the

Complainant in the above-entitled action, before Ed

Greenburg, Notary Public in and for the District of

Columbia, in the offices of Swick & Shapiro, P.C.,

1225 I Street, Northwest, Washington, D.C.,

commencing at 10:15 a.m.

Diversified Reporting Services, Inc.
202-467-9200

2 (Pages 2 to 5)

---

Page 2

APPEARANCES:
    On Behalf of the Complainant:
        DAVID SHAPIRO, ESQ.
        STEPHANIE RICHARD, ESQ.
        Swick & Shapiro
        1225 I Street, N.W., Suite 1290
        Washington, D.C.  20005
    On Behalf of the Agency:
        MICHAEL COSGROVE, ESQ.
        Federal Deposit Insurance Corporation
        3501 Fairfax Drive, Room E-9054
        Arlington, VA  22226
        (703) 562-6342

---

Page 3

CONTENTS

| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for Complainant | 4 |
| Counsel for Agency | 176 |
| FURTHER EXAMINATION BY: | |
| Counsel for Complainant | 177 |

PETTY DEPOSITION EXHIBITS:

1 - 8/24/2004 e-mail from Stacey K. Sharpe                52
2 - Employee training report for Stacey K. Sharpe        82
3 - 4/10/02 memo to Trina F. Petty from Fred
        W. Gibson                                        126
4 - 11/1/04 memo to Trina F. Petty from Fred
        W. Gibson                                        135
5 - Notification of Personnel Action                     150
6 - Vacancy announcement 2004-OIG-2694                   164

---

Page 4

1              PROCEEDINGS
2    Whereupon,
3                  TRINA PETTY
4    was called as a witness and, having been first duly
5    sworn, was examined and testified as follows:
6                  EXAMINATION
7        BY MR. SHAPIRO:
8        Q   Could you state your full name, please,
9    ma'am?
10       A   Trina Petty.
11       Q   And Ms. Petty, where do you live?
12       A   Clinton, Maryland.
13       Q   And your address?
14       A   7208 Redwood Branch Court, Clinton,
15   Maryland.
16       Q   And what is your telephone number there?
17       A   301-856-3018.
18       Q   You're currently employed, yes.
19       A   Yes.
20       Q   And where are you employed?
21       A   FDIC Office of Inspector General.
22       Q   What is your position?

---

Page 5

1        A   OIG director of human resources.
2        Q   And how long have you held that job?
3        A   Since 1999, May of 1999.
4        Q   Prior to that, were you in the office that
5    you now head?
6        A   I was in a similar position with Treasury.
7        Q   You were director of HR at Treasury?
8        A   Yes, sir.  Treasury OIG.
9        Q   And how long did you hold that job?
10       A   About two-and-a-half years.
11       Q   So, something like '97, '96?
12       A   Yes.  '97.
13       Q   And before that?
14       A   U.S. Customs Service.
15       Q   And what was your job there?
16       A   Supervisory personnel management
17   specialist.  Short name, branch chief.
18       Q   What branch were you in?
19       A   It was the Office of Enforcement, Office of
20   Investigations under Human Resources.
21           We serve as the investigations and the Air
22   and Marine program.

---

Diversified Reporting Services, Inc.
202-467-9200

Page 6

1    Q    What does the Office of Investigations do?
2    Investigates —
3    A    Interviews.  And they had the criminal
4    investigators for the U.S. Customs Service then.
5    Right now, they're under Homeland Security, so I'm
6    not sure who's doing that.
7    Q    Oh, I see.  So, you provided the personnel
8    support —
9    A    Right.
10    Q    -- for that group.
11    So, it was all -- the branch provided all
12    personnel support for that unit?
13    A    Absolutely.
14    Q    Okay.  And how long did you hold that job?
15    A    Since 1990, up until the time I went to OIG
16    for Treasury.
17    Q    And prior?
18    A    U.S. Navy personnel.
19    Q    Military personnel or civilian personnel?
20    A    Civilian.
21    Q    What did you do there?
22    A    Personnel management specialist --

Page 7

1    staffing, classification.
2    I had also worked in EEO.
3    Q    How long did you hold that job, Navy?
4    A    From the -- I started there as a high
5    school student, went to college, and then graduated
6    from college and obtained a full-time position.  So,
7    from about --
8    Q    So, you were like a youth opportunity —
9    A    Yes.
10    So, from about 1978 until the time I went
11    to the Customs, in different positions -- full
12    performance level was personnel management
13    specialist, started out as a student aide.
14    (Pause.)
15    BY MR. SHAPIRO:
16    Q    So, what is a full performance level
17    personnel management specialist back then?  What
18    grade was that?
19    A    13.  It was -- full performance at the
20    Naval Research Lab is full performance level 12, and
21    then I applied for a position that went to the 13.
22    That's when I took on the EEO role.

Page 8

1    Q    Okay.
2    So, you went to college while you were at
3    the Navy.
4    A    Yes.
5    Q    And where did you go to college?
6    A    Hampton University.
7    Q    So, this job for the Navy was down in
8    Virginia.
9    A    No.
10    I started out at the Naval Research Lab in
11    Washington, D.C., when I was in high school, and they
12    knew I was going to college, so they offered me sort
13    of like a -- I was in a co-op program, and I came
14    back on school breaks and I worked, and then, after I
15    graduated, I was offered a full-time position as a
16    personnel management specialist, GS-5, and that full
17    performance level went to the 12, and then at the
18    full performance -- at that level, I did staffing and
19    classification, and then I took on another role as
20    EEO, and then I got a 13.
21    Q    So, in your current job, do you have a job
22    series?

Page 9

1    A    Yes, 201.  I've always been in the 201.
2    Q    201.
3    So, it's the personnel generalist.
4    A    Yes.
5    Q    So, you don't have a specialty in
6    personnel.  You're a generalist.  Or is that not
7    true?
8    A    Well, it's not true, because I have a
9    background in various areas.
10    Q    I understand you've done various things.
11    A    Right.
12    Q    But you've always been a 201 personnel
13    specialist.
14    A    Yes.
15    Q    So, it's not like a classification
16    specialist or a staffing specialist or one of those
17    more focused —
18    A    Right.  Because if you have more than one
19    discipline, you have -- you're not called -- like
20    staffing and classification.
21    At the Navy, I was called personnel
22    management specialist, because I've always done more

Page 10

1 than one discipline.
2    Q   Okay.
3        So, if you had to characterize your area,
4 what would it be?  Your specialty within Personnel.
5    A   Staffing and classification.
6    Q   Staffing and classification.
7    A   Yes.
8        Those are my stronger areas.
9    Q   I got you.
10       I understand.
11   A   Okay.
12   Q   I used to work with the Civil Service
13 Commission when I first started.
14   A   So, you do understand.
15   Q   I have a working knowledge of personnel.
16   A   Okay.
17   Q   All right.
18       Now, your shop — you've only worked at the
19 OIG at FDIC, correct?
20       Okay.
21   A   For FDIC, yes.
22   Q   Yes.  And you've been head of the shop

Page 11

1 there —
2    A   Yes.
3    Q   — since you came.
4    A   I established it.  Yes.
5    Q   Okay.  And how many people are in OIG HR at
6 FDIC?
7    A   Currently, four, in addition to me, so five
8 of us, total.
9    Q   And since you've been there, what's the
10 highest number there's been, in addition to yourself,
11 in staff?
12   A   Five.  That includes me.
13   Q   So, that — so, right now, you're at your
14 highest.
15   A   I'm sorry.
16       Yes.
17   Q   Okay.
18   A   It's all — it's never been higher than
19 five.
20   Q   All right.  And has there been a period of
21 time — I don't mean a brief period where you're
22 filling a job when somebody's left — I mean — has

Page 12

1 there been a period where you've not been — that
2 you've not been at full — at full —
3    A   Other than someone left —
4    Q   Yeah, other than where somebody's left and
5 you're actively filling.
6    A   No.
7    Q   No.  Okay.  And presently, who are the
8 people?
9    A   Jan Welch, Karen Savia.
10   Q   Jan Welch?
11   A   W-e-l-c-h.
12   Q   Right.
13   A   Karen Savia, S-a-v-i-a.  Stacey Sharpe.
14 And Gloria Hill.  And myself.
15   Q   Now, you're a manager, so you're —
16   A   Yes.
17   Q   — CM —
18   A   CM-1.
19   Q   And before you were CM, what was your —
20 before the change to CM, what was your job?
21   A   CG.
22   Q   You were a CG —

Page 13

1    A   — 15.
2    Q   Okay.
3        Now, are your people divided into
4 particular areas?
5    A   Yes.
6    Q   Okay.
7        So, Ms. Welch — what is she?
8    A   Her primary area is employee relations.
9 However, Ms. Welch is — she has a staffing
10 background.  So, she assists in that area, also, and
11 when I'm out, she serves in my capacity.
12   Q   Okay.  And Ms. Savia?
13   A   She's a program analyst.  She does our
14 human capital-type work, special projects, comments
15 on OIG and FDIC policy, policy and development, and
16 she is also picking up from me the training and
17 development role.
18   Q   So, she's not a personnelist.
19   A   No.  She's a program analyst.  She has a
20 lot of human capital projects that fall in the
21 personnel — in human resources area.
22   Q   Okay.

Page 14

1    Ms. Sharpe is benefits?
2    A    Not currently. Currently, she's backing up
3  benefits.
4       Currently, she's doing staffing and
5  recruitment.
6    Q    Okay. And Ms. Hill.
7    A    She's primarily benefits, and she backs up
8  staffing and recruitment.
9       In addition to staffing and recruitment,
10  Ms. Sharpe registers people for training under
11  training and development.
12    Q    Okay.
13       When did the change occur for Ms. Sharpe,
14  from benefits to -- primarily from benefits to
15  staffing and recruitment?
16    A    She had a desk audit in -- well, let me
17  back up.
18       She was on maternity leave last year.
19       While on leave, and even prior to going on
20  leave, the person that was doing staffing and -- and
21  recruitment left.
22    Q    Who was that?

Page 15

1    A    Her name was Towanda Bynum, B-y-n-u-m. She
2  left OIG. And Ms. Sharpe expressed an interest in
3  learning staffing and recruitment.
4       So, when she came back from maternity
5  leave, I started training her that area, because we
6  need someone to pick it up, because in the meantime,
7  I was doing staffing and recruitment, and Jan was
8  filling in for me, also.
9       So, Ms. Sharpe attended some training
10  classes and was learning the area of staffing and
11  recruitment. There was a desk audit performed in --
12  I think it was October.
13    Q    Last year?
14    A    Yes. Which resulted in a promotion for Ms.
15  Sharpe and her title being changed to human resources
16  specialist, which focuses on -- her primary focus is
17  staffing and recruitment, but she also serves as a
18  benefits backup, a backup to benefits, and that's
19  stated in her position description.
20    Q    So, her change in title was from --
21    A    -- human resources specialist (benefits) to
22  human resources specialist, because now she -- we

Page 16

1  removed the paren title.
2       (Pause.)
3       BY MR. SHAPIRO:
4    Q    So, since -- since the audit -- that was a
5  result of the audit.
6    A    Yes.
7    Q    She went from a CG --
8    A    -- 11 to a CG-12.
9    Q    Okay.
10       Now, you say Towanda Bynum left. Any other
11  changes from the time Ms. Sharpe came in to HR till
12  now, other than Ms. Bynum's departure?
13    A    When Ms. Sharpe came to HR, Karen Savia was
14  not part of HR.
15    Q    Okay.
16       So, let's look at the -- let's look for a
17  second at HR as it existed on the moment before Ms.
18  Sharpe joined.
19    A    Okay.
20    Q    Okay.
21       We're just going to take a snapshot --
22    A    Okay.

Page 17

1    Q    -- of what it looked like.
2    A    Okay.
3       Let me go back to when I established the
4  group and hired people for the group. In the
5  beginning, there was Jan Welch, Towanda Bynum, Debbie
6  Gonsa, G-o-n-s-a, and Gloria Hill.
7    Q    Okay. And yourself.
8    A    And myself.
9    Q    And Welch did --
10    A    -- the same thing she's doing now.
11    Q    Which is?
12    A    Employee relations, backup to staffing and
13  recruitment.
14       She's pretty much an expert in both of
15  those areas, and she filled in for me.
16       Towanda, who is doing staffing and
17  recruitment, and her position description was
18  classified so that she was supposed to be doing
19  classification and position management, also. She
20  started -- she took a couple of training classes in
21  classification, and I was training her in that area,
22  but she really never grasped staff -- I mean

Diversified Reporting Services, Inc.
202-467-9200

| Page 18 |
|---|
| 1  classification and position management, okay? |
| 2       Debbie Gonsa was primarily benefits. |
| 3  That's all she did when she started there. |
| 4       And then Gloria Hill was an assistant. |
| 5   Q  So, she was a personnel assistant -- |
| 6   A  At that time -- |
| 7   Q  -- or an HR assistant. |
| 8   A  Yes. |
| 9       Now, let me -- |
| 10  Q  So, she was like a 7 or a 5. |
| 11  A  She was an 8. |
| 12  Q  Okay. |
| 13  Q  Now, right now, all your people that you've |
| 14  told us about that are there now are specialists -- |
| 15  A  Yes. |
| 16  Q  -- right?  You don't have an assistant. |
| 17  A  That is correct. |
| 18  Q  Except for the program analyst, who is an |
| 19  analyst. |
| 20  A  That is correct. |
| 21  Q  Different field. |
| 22  A  That is correct. |

| Page 19 |
|---|
| 1   Q  Okay. |
| 2       So, Ms. Welch, Ms. Bynum, and Ms. Gonsa |
| 3  were HR specialists. |
| 4   A  Yes. |
| 5   Q  Okay. |
| 6   A  Well, they weren't classified at the time |
| 7  as HR specialists, because we were using the old |
| 8  classification standards.  So, you had a specialty |
| 9  area. |
| 10      For example, Jan Welch was called employee |
| 11 relations specialist, Debbie Gonsa was called a |
| 12 benefits specialist, and Towanda was called a |
| 13 personnel management specialist. |
| 14  Q  So, Towanda was sort of a generalist. |
| 15  A  Yes. |
| 16  Q  Okay. |
| 17  A  And then Gloria was a human resources |
| 18 assistant. |
| 19  Q  Got you. |
| 20      Okay. |
| 21      So, that's when you started it. |
| 22  A  Yes. |

| Page 20 |
|---|
| 1   Q  That was '99. |
| 2   A  Yes. |
| 3   Q  Okay. |
| 4       So, give me before Ms. Sharpe came over -- |
| 5   A  Okay. |
| 6   Q  -- and that would have been in -- let's see |
| 7  -- |
| 8   A  Let me walk you -- as to what has occurred. |
| 9       During the time-frame -- since 9/11, I |
| 10 would say, Gloria -- Gloria Hill is a reservist.  So, |
| 11 she's been in and out of the office, up until |
| 12 recently, doing her reserve duties, spending some -- |
| 13 a lot of time serving her country. |
| 14      Debbie Gonsa left.  She works in the |
| 15 corporation's benefits center. |
| 16      She left -- I want to say 2003, 2003, |
| 17 December of 2003, Debbie Gonsa left. |
| 18  Q  Right. |
| 19      I know Ms. Gonsa. |
| 20      She works down in -- she's on the list of |
| 21 leave -- she took the early out and is going to leave |
| 22 -- |

| Page 21 |
|---|
| 1   A  Absolutely. |
| 2   Q  Right. |
| 3   A  Okay. |
| 4       Then, during -- sometime during that time- |
| 5  frame, we had a contractor, because we were |
| 6  shorthanded with Gloria out doing military and a lot |
| 7  of work going on. |
| 8       So, I had a contractor that came in that |
| 9  assisted in the benefits area. |
| 10      We had some down-sizing. |
| 11      She assisted in reviewing official |
| 12 personnel files, stuff like that. |
| 13      Debbie left in December. |
| 14      Towanda -- |
| 15  Q  Who was the -- who was the contractor? |
| 16  A  The name is B&W Technologies, and I had a |
| 17 contract employee under them. |
| 18  Q  Okay. |
| 19  A  Towanda had some medical issues, so she was |
| 20 out for a period of time -- had a contractor.  We -- |
| 21 the benefits position states that -- we advertised |
| 22 the benefits job a couple of times, was not able to |

Page 22

1  hire someone to fill that position. Towanda
2  announced that she was leaving. She was waiting for
3  her clearance to come through.
4      In the meantime, Ms. Sharpe came to work in
5  the HR group.
6      Q  So -- so, when Ms. Sharpe came, Towanda had
7  announced she was leaving.
8      A  Yes.
9      Q  Debbie Gonsa had gone.
10     A  Yes.
11     (Pause.)
12     BY MR. SHAPIRO:
13     Q  Where did -- where did Ms. Bynum go?
14     A  U.S. -- I don't think it's called U.S.
15  Customs Service now, but that's where she -- she went
16  back to --
17     Q  Homeland Security.
18     A  That's where she went.
19     Q  Okay.
20     So, you had Jan Welch and Ms. Hill.
21     A  Yes.
22     Q  And you had a vacancy where Gonsa had been

Page 23

1  and a soon-to-be vacancy where Bynum was going -- you
2  knew she was leaving.
3      A  Yes.
4      Q  Okay.
5      Now, Ms. Welch -- she's a grade --
6      A  -- 14.
7      Q  And Ms. Gonsa -- what grade was she?
8      A  12.
9      Q  And Bynum?
10     A  13.
11     Q  So, she served -- you brought her as a 13
12  and she served as a 13?
13     A  No.
14     I brought her in -- I advertised the job --
15  the job that Towanda Bynum occupied -- that job was
16  advertised as a 12/13.
17     Q  Okay. But by the time she left, she was a
18  13.
19     A  Yes, sir.
20     Q  And Gonsa was a 12.
21     A  Yes.
22     Q  And Ms. Hill, by the time Ms. Sharpe --

Page 24

1  just before Ms. Sharpe showed up, Ms. Hill was
2  already not an assistant; she was a full --
3      A  The position was advertised. I had
4  advertised a benefits specialist position.
5      Q  I'm talking about Ms. Hill --
6      A  Exactly.
7      I advertised a human resources specialist
8  position (benefits), and Ms. Hill applied for it.
9      I advertised the position at the 9/11
10  level.
11     Q  And she got the job.
12     A  Yes.
13     Q  Ms. Hill.
14     Before Ms. Sharpe came in?
15     A  I can't say exactly -- it was around the
16  same time-frame, like within a month.
17     Q  HR benefits.
18     A  Yes.
19     It was around October of that year.
20     Q  2004. And Ms. Sharpe arrived at the same
21  time, October 2004.
22     A  Yes.

Page 25

1      Q  And Ms. Sharpe then -- and the other person
2  that was there was Welch. She was there the whole
3  time.
4      A  Yes.
5      Q  She was the 14.
6      (Pause.)
7      BY MR. SHAPIRO:
8      Q  So, Ms. Sharpe replaced Gonsa.
9      A  I wouldn't say she replaced her.
10     Q  That was the vacancy. Her -- Gonsa's
11  departure was the vacancy that you filled --
12     A  Well, let me explain.
13     Q  Go ahead. Sure.
14     A  Let me back up.
15     With -- with the different people leaving
16  and things changing in the OIG, my supervisor and I
17  discussed reorganizing the human resources branch,
18  because I had already advertised the benefits job one
19  or two times, with no person occupying the position,
20  and then -- my functions were growing. I had
21  inherited training and development and some human
22  capital work, because back in the down-sizing, early

Page 26

1  out days, our admin officer left. So, a lot of the
2  duties that she performed, I inherited in human
3  resources.
4       So, we talked about reorganizing, where I
5  established a position description that would have
6  two 14s in my group and two lower-level employees.
7  The two 14s would perform the higher-level work.
8       I already had one 14 that was performing
9  the employee relations, the performance management
10 that kind of work.
11      My other 14, I envisioned performing the
12 training and development, staffing and recruitment,
13 classification, all of the higher-graded analytical-
14 type stuff.
15      We advertised that position, did the
16 interviewing, but then -- and Ms. Bynum was still
17 there.
18      This was with Ms. Bynum supposed to be
19 leaving.
20      Well, Ms. Bynum announced to us, like in
21 the summer, she was leaving, and she never went
22 anywhere. So, I couldn't -- it got to the point that

Page 27

1  I was told you can't fill another -- you can't fill
2  the position, you don't have a vacancy. So, I had to
3  go back to -- I needed someone.
4       So, that's how I got to where -- where we
5  are now.
6    Q   But you specifically — you didn't select
7  Ms. Sharpe.
8       You were told Ms. Sharpe was coming.
9    A   Right.
10   Q   And you were told that by your supervisor?
11   A   No.
12   Q   Who was your supervisor?
13   A   Well, Rex Simmons is my supervisor.
14   Q   And was then.
15   A   Yes.
16   Q   And he is the assistant IG?
17   A   For -- for management and congressional
18 relations.
19      (Pause.)
20      BY MR. SHAPIRO:
21   Q   Who told you that Ms. Sharpe would be
22 coming?

Page 28

1    A   I'm thinking -- I think it was Mr. Simmons.
2  It was between Mr. Simmons and Ms. Black.
3    Q   And who was Ms. Black?
4    A   Patricia Black. She is deputy IG.
5       (Pause.)
6       THE WITNESS: She is my second-line
7  supervisor.
8       MR. SHAPIRO: Right.
9       BY MR. SHAPIRO:
10   Q   So, they told you — or one of them told
11 you —
12   A   Right.
13   Q   — that Stacey Sharpe would be filling the
14 benefits job.
15   A   Yes.
16   Q   And the benefits job was human resource
17 specialist (benefits).
18   A   Yes.
19   Q   And that was a job that had been held most
20 recently, at that point, by Ms. Gonsa.
21   A   Yes.
22   Q   And she — Ms. Gonsa had departed how much

Page 29

1  before Ms. Sharpe came?
2    A   Ms. Gonsa departed in December of the year
3  before.
4    Q   2003.
5    A   Yes.
6    Q   So, the job was vacant for some —
7    A   Several months.
8    Q   — 10 months.
9    A   Right.
10   Q   Okay. And the time Ms. Sharpe joins, in
11 October of 2004, Ms. Bynum is still there —
12   A   Yes.
13   Q   — but has said she's leaving.
14   A   Yes.
15   Q   But it was an extended time waiting for a
16 clearance.
17   A   Yes.
18   Q   All right. To go to — to go to Homeland
19 Security.
20   A   Yes.
21   Q   All right.
22      Ms. Welch is still there, and she's sort of

Page 30

1  your deputy.
2  A  Yes.
3  Q  She acts for you when you're gone, but
4  she's employee relations.  That's her main run.
5  A  Yes.
6  Q  All right.
7     Ms. Bynum's main run is staffing and
8  classification.
9  A  Staffing and recruitment.
10  Q  Staffing and recruitment.  And Ms. Hill,
11  your newest HR specialist, is now HR specialist
12  (benefits).
13  A  Yes.  Because she was doing -- she was
14  helping the contractor, and they were doing benefits
15  when I had no one.
16  Q  When Gonsa -- that period -- that 10 months
17  when Gonsa was gone.
18  A  That is correct.
19  Q  But she is now minted as a benefits -- so,
20  you had two in benefits once she gets minted.
21  A  Yes.
22  Q  One in staffing and recruiting that was

Page 31

1  about to leave any moment.
2  A  Yes.
3  Q  And your employee relations person, your
4  highest-graded person.
5  A  Yes.
6  Q  Okay.
7     Now, you said you tried to fill the
8  benefits job -- that is, the Gonsa job -- several
9  times during the 10-month period.
10     Is that a yes?
11  A  Yes.
12  Q  Okay.
13     Did you advertise it?
14  A  Yes.
15  Q  So, there was actual advertisements for the
16  job out there.
17  A  Yes.
18  Q  FDIC-wide or wider than that?
19  A  Wider.  Washington Metropolitan Area.
20  Q  So, Government, non-Government, Washington
21  Metro.
22  A  Government.

Page 32

1  Q  Only Government.
2  A  Yes.
3  Q  So, Government-wide, Metro.
4  A  Yes.
5  Q  Okay.  And did you have applicants?
6  A  Yes.
7  Q  And did you interview applicants?
8  A  Yes.
9  Q  Couldn't find anybody you liked?
10  A  We made a selection.
11  Q  Okay.  And --
12  A  She turned us down.
13  Q  She turned you down.  Okay.
14     Did you make another selection or just the
15  one time?
16  A  That one time.
17  Q  So, you didn't --
18  A  From --
19  Q  -- deeper into the stack.
20  A  Well, we -- from the interviews -- FDIC
21  benefits are very specialized.
22     I mean you have the other Federal benefits,

Page 33

1  but we handle everything as far as benefits in our
2  office, and so, I really wanted someone that could
3  run that benefits area, and --
4  Q  And you only found one that you liked.
5  A  My supervisor and I interviewed -- there
6  were -- there was more than one, but there were some
7  other -- after doing reference checks, there were
8  some other things that were lacking in the other
9  people.
10  Q  Okay.
11     So, who did you select?
12  A  I can't remember her name.  I -- I don't
13  remember her name.  I don't recall her name.
14  Q  Well, when was the selection?  It was in
15  2004, sometime in 2004, correct?
16  A  Yes.
17  Q  All right.  And how many candidates were
18  there?
19  A  There were a number of candidates, not all
20  qualified.
21  Q  But there were a number of qualified
22  candidates, too, people who -- was it a panel?

Page 34

1    A    No, there --
2    Q    Was there a ranking panel?
3    A    No, there were -- there were not enough to
4    have a ranking panel.
5    Q    All right.
6         So --
7    A    There were less than 10.
8    Q    How many -- how many did you interview?
9    A    Oh, we interviewed all that we had.  I
10   don't remember off the top of my head.
11   Q    And you say you and your supervisor --
12   that's Mr. Simmons.
13   A    Yes.
14   Q    And you only found one that you liked.
15   A    Yes, after we did the reference checks.  I
16   did reference checks, I think, on three of them.
17   Q    I see.
18        So, there were three that you liked, but
19   two of them didn't get by the reference checks, and
20   one did.
21   A    Uh-huh.
22   Q    And you offered that --

Page 35

1    A    Yes.
2    Q    -- person the job, and she didn't take it.
3    A    Yes, that's correct.
4    Q    And where was she employed?
5    A    I think, if I remember, it was Department
6    of Labor.
7    Q    Department of Labor.  As a benefits person
8    A    Her primary was benefits, but she had
9    training, also, in her background, training and
10   development.
11   Q    Training and development.  Primarily
12   benefits.  That was her -- her specialty.
13   A    That is correct.
14   Q    And the other two who you interviewed?
15   A    Did not have the -- they didn't have the
16   two areas but knew benefits.
17   Q    They knew benefits.
18   A    Right.
19   Q    Not training.
20   A    That's correct.  And I could train them in
21   the training area.
22   Q    Okay.  And the other people that you didn't

Page 36

1    -- of the 10 or so candidate -- people who applied --
2    you said some of them were more qualified.
3    A    That's correct.
4    Q    Those were people who didn't have benefits
5    backgrounds?
6    A    They didn't have the -- and I don't
7    remember -- they may have had another human resources
8    area.
9    Q    But not benefits.
10   A    Right.
11   Q    And that's why you didn't think they were
12   qualified.
13   A    That is correct.
14   Q    Okay.  And this was all sometime in 2004 --
15   A    Yes.
16   Q    -- that this -- this recruitment action was
17   going on.
18   A    Yes.
19        MR. SHAPIRO:  Do the records exist for that
20   recruitment action?
21        MR. COSGROVE:  I have no idea.
22        THE WITNESS:  Yes.

Page 37

1    BY MR. SHAPIRO:
2    Q    They do.
3    A    Uh-huh.
4    Q    And what was that -- what was the vacancy
5    announcement --
6    A    I don't know off the top of my head.
7    Q    Let me ask you this.  Have you done a
8    recruitment since then?
9    A    No.
10   Q    All right.
11        So, that would be the last recruitment
12   action that you did in your job, right?
13   A    For --
14   Q    Have you done any recruiting?  In other
15   words, have you had a vacancy announcement where you
16   were advertising for a vacancy since 2004, since that
17   benefits job in 2004?
18   A    Not since 2004.
19        Ms. --
20   Q    Oh, yes, the one that you --
21   A    Gloria Hill.
22   Q    That was a benefits one, but that was

Page 38

1  advertised FDIC-wide or –
2      A   No, that was advertised Government-wide.
3  Let me -- I'm not sure.  I don't remember how that
4  was advertised.
5      Q   But that was also in 2004.
6      A   Yes.
7      Q   Okay.  So, you did two in 2004.
8      A   Yes.
9      Q   You didn't do any others in –
10     A   We did a -- the 14 in 2004.
11     Q   That was for Ms. –
12     A   Ms. Bynum leaving, supposedly, and me
13  reorganizing.
14     Q   Oh, I see.  But that was -- you stopped
15  that, because Ms. Bynum didn't –
16     A   Right.
17         I couldn't make a selection.
18         I -- we interviewed, but we could not make
19  a selection.
20     Q   Okay.
21         All right.
22         You say the information on that vacancy

Page 39

1  announcement and the selection process is still in
2  existence in your office.
3      A   Yes.
4      Q   And what is it called?
5          If I were to ask you -- tell me what I can
6  -- tell me how I call it so that you will know what
7  I'm talking about.
8      A   If you say any -- any human resources
9  specialist position advertised, I know what you're
10  talking about.
11     Q   I know, but I don't want "any."  I just
12  want the one that you -- that the person turned you
13  down, the benefits one.
14     A   Benefits/training announcement advertised
15  in 2004.
16     Q   And that was for a CG-11/12?
17     A   I think -- I don't remember.  I know it was
18  at least a 12.
19     Q   So, it was 12/13.
20     A   No, I don't -- I don't think so.
21     Q   Okay.
22     A   I think it was 11/12, but I'm not sure.

Page 40

1      Q   Okay.
2      A   I think it was 12, but I'm -- I don't think
3  it was 11.
4      Q   And that is the job that Ms. Sharpe now
5  holds.
6          It's not that vacancy announcement, but
7  it's that job.
8      A   Yes.
9          Well, let me correct –
10     Q   No, sorry.  She doesn't hold that anymore.
11     A   Absolutely.
12     Q   That's the job that they put her in.
13     A   Yes.
14     Q   Okay.
15     A   But –
16     Q   At the 11 level.
17     A   But let me -- let me correct you.  That is
18  not the job, per se, because I changed the -- when
19  you can't get someone to perform the duties, you have
20  to restructure it, so you have to rewrite a PD.
21     Q   I understand.
22         When you get a benefits -- a benefits job

Page 41

1  that is beginning, a first personnel job –
2      A   Uh-huh.
3      Q   -- where the person does not have a
4  personnel background –
5      A   Yes.
6      Q   All right.  And they're being trained for a
7  specialist, like benefits, (benefits) or -- what's
8  the grade level of the entry job?
9      A   An entry-level position in HR –
10     Q   In Personnel, yes, in HR.
11     A   5/7, depending on -- a 5 with a college
12  degree.  I mean a college degree will qualify you for
13  a 5.
14     Q   Right.
15     A   Some experience will qualify you for a 7.
16     Q   Some experience in personnel.
17     A   Yes.
18     Q   Good.
19         MR. SHAPIRO: Let's take five.
20         (A brief recess was taken.)
21         BY MR. SHAPIRO:
22     Q   I want to ask you about how this -- what

Page 42

```
1  was the -- what was the -- when -- when did -- when
2  did the person who you offered the benefits job, the
3  one that was advertised -- when did she turn you
4  down, in relationship to when Stacey Sharpe was --
5  came on?
6      A  I want to -- probably two, maybe three
7  months prior.
8      Q  So, if Stacey came on in October, this
9  would mean sometime during the summer.
10     A  Yes.
11     Q  Okay.
12        So, that means the advertisement of this
13  job would have been the spring/summer.
14     A  Or early -- early -- yes.
15     Q  Spring/summer, you advertised, gotten the
16  whole thing together, made a selection in the summer
17  got turned down.
18     A  Yes.
19     Q  All right.
20        When was the first time you heard that you
21  were going to get Stacy Sharpe?
22     A  Around August, because I was getting ready
```

Page 43

```
1  to go out for back surgery.
2      Q  Okay.
3        So -- and what were you told?  Were you
4  told you might get somebody or you might get Stacey
5  Sharpe or you definitely were getting somebody or you
6  definitely were getting Stacy Sharpe?
7      A  Let me explain.
8        I was getting frustrated, because we had
9  offered the job -- the lady, after a couple of days,
10  turned us down, and we needed some help, and I knew I
11  was getting ready to go out for surgery, and so, I
12  went to Rex -- we needed some options.  I -- I had
13  ran out of options.  I didn't have anything.  So, he
14  was going to talk to Pat.
15     Q  About getting you some help.
16     A  About what to do at this -- at this point.
17     Q  Now --
18     A  Because I had a contractor.
19     Q  And that was not sufficient?
20     A  Well, a contract employee -- you can't --
21  you can't give them but so much.  You can't give them
22  access to the systems, because we have secure
```

Page 44

```
1  systems.
2        I could not give her access to certain
3  things, because -- because she could have been gone
4  in a month, although I had her on an extended -- on
5  an extended contract, but I only have so much money
6  on that contract, also.
7        So, I went to Rex, saying I've run out of
8  options.  He was going to talk to Pat, and then I
9  think it was Rex that came back to me in a day or two
10  to say -- to say that Pat had presented Stacey.
11     Q  As a possibility or as --
12     A  As a possibility.
13     Q  -- it's going to happen?
14     A  No, it wasn't -- it wasn't going to happen,
15  that it was a possibility, that she had to talk to
16  Fred.
17     A  Fred or Stacey?
18     Q  I think it was Fred and Stacey -- and/or
19  Stacey.
20     Q  Okay.
21        So, there was a possibility that Stacey
22  would -- and Stacey was named at that point.
```

Page 45

```
1      A  Her name came up.
2      Q  Okay.  And this was in a conversation with
3  you and Rex.
4      A  Rex mentioned that Pat said that Stacey --
5  she brought up Stacey's name as a person -- as a
6  possibility.
7      Q  Okay.
8        Now, Stacey was, at that point, somebody --
9  you knew her.  You knew who she was.
10     A  I knew who she was.
11     Q  She wasn't a personnelist.
12     A  No.
13     Q  And certainly not a benefits person.
14     A  Correct.
15     Q  But you knew her because she worked in the
16  OIG.
17     A  Yes.
18     Q  And did she work with your people?
19     A  Not on a regular basis.  She would work --
20  I would get information from her when -- on her FOIA
21  requests.
22        When she needed information for FOIAs, she
```

Page 46

1  would come to me.
2     Q   Okay. And so, what kind of information
3  would you want in an employee? Would this be
4  recruiting, employee relations information?
5     A   No.
6     Q   What kind of information?
7     A   No. Numbers -- we may have had -- probably
8  two or three, if that many, FOIA requests.
9     Q   So, you didn't work with her -- not only
10  not regularly, but it was only a few times.
11    A   A few times, when she needed benefits
12  information, she would come down.
13    Q   Personally.
14    A   Yes.
15    Q   When she personally needed that, as anybody
16  in the -- in the organization --
17    A   Absolutely.
18    Q   -- benefits information, when they -- if
19  they wanted a desk audit, that wouldn't be benefits.
20    A   No.
21    Q   That would be classification.
22    A   That is correct.

Page 47

1     Q   All right. Okay.
2        So, you knew who she was --
3     A   Yes.
4     Q   -- and you had some slight dealings with
5  her --
6     A   Yes.
7     Q   -- professionally.
8     A   Yes.
9     Q   Okay.
10        So, what was your reaction when -- when you
11  were told -- you were pending back surgery --
12    A   Yes.
13    Q   -- going out the door --
14    A   Yes.
15    Q   -- when you were told -- when you went to
16  Rex and said, hey, I'm really at my wits end here --
17    A   Yes.
18    Q   -- I need help, and I'm leaving, and we've
19  got to find somebody.
20    A   Yes.
21    Q   All right. And he said let me talk to Ms.
22  Black.

Page 48

1     A   Uh-huh.
2     Q   And then, a few days later, before you went
3  out for surgery --
4     A   Yes.
5     Q   -- he came back and says, you know, there's
6  a possibility that -- that Stacey Sharpe might be
7  able to come down.
8     A   Yes.
9     Q   Okay. But we won't know for a little bit.
10    A   Yes.
11    Q   And did you know by the time you went out
12  for back surgery that she was or wasn't coming, or
13  was that where things stood when you went out?
14    A   Before I left, Stacey and I had met, and I
15  was under the impression she was coming.
16    Q   She had come down and asked you about the
17  job?
18    A   Yeah, we had talked.
19    Q   After Mr. -- after Mr. Simmons told you
20  what Ms. Black said --
21    A   Ms. Black met with Stacey.
22    Q   And she sent you down -- sent her down to

Page 49

1  you.
2     A   Uh-huh. To talk to me.
3     Q   And you talked about the benefits job.
4     A   I talked about the benefits job, but I also
5  -- I was a little reserved, because I knew Stacey
6  didn't have any background.
7     Q   But you were there to talk about the job,
8  and she was there to --
9     A   Yes.
10    Q   -- learn about the job, to see if she
11  wanted it.
12    A   Yes.
13    Q   Not to see if you wanted her.
14    A   Oh, absolutely not.
15    Q   You were being directed.
16    A   Yes.
17    Q   All right.
18    A   Well, not directed, no, not -- I won't -- I
19  don't want to use the word "directed." I needed some
20  help, and so, Stacey's name was offered up, and the
21  reason why it was offered up was because I was --
22  there was not a lot of work in the paralegal area.

Page 50

1   Q   They told you that. That's what Rex came
2   back with from Ms. Black.
3   A   Uh-huh.
4   Q   Okay.
5   A   Yes.
6   Q   Okay. So, Stacey came to talk to you at
7   Ms. Black's urging.
8   A   Yes.
9   Q   And you were a little reserved, because you
10  didn't think she was qualified.
11  A   Yes.
12  Q   All right.
13  A   Correct.
14  Q   But you were — she was ask — she was
15  asking you about what the job was.
16  A   Yes.
17  Q   Did you talk about the fact that you didn't
18  think she was qualified —
19  A   Yes.
20  Q   — she didn't think she was qualified?
21  A   Yes.
22  Q   All right.

Page 51

1   A   I -- I asked her for additional information
2   from her as far as her work experience, and in that
3   conversation, we talked about her education, too, and
4   that's when I learned that Stacey was working on her
5   Master's degree.
6   Q   In what?
7   A   In human resources.
8   Q   Right. But not benefits.
9   A   No.
10  Q   Right.
11      She had no work experience in benefits.
12  A   That's correct.
13  Q   Or human resources.
14  A   That is correct.
15  Q   Okay.
16      She would not have qualified for that job
17  if she was competitive — it was a competitive
18  selection, correct?
19  A   That is correct.
20  Q   Right. And if there was any personnelist
21  who understood how to do it, the personnelist would
22  have dropped the application.

Page 52

1   A   That's correct.
2   Q   It wouldn't even have gotten to a panel.
3   A   That's correct.
4   Q   Okay.
5       That's not a comment to her intelligence,
6   her ability, or anything. It's just that she doesn't
7   have the background.
8   A   Correct.
9   Q   Okay.
10      Now, at some point — when did you leave
11  for — for back surgery?
12      September?
13  A   No, August.
14  Q   Late August.
15  A   Yes. It was August.
16  Q   Okay.
17      Let me show you this, and we'll have this
18  marked for identification.
19
20  (Petty Exhibit No. 1 was marked for identification.)
21      BY MR. SHAPIRO:
22  Q   Now, what I'm showing you has been marked

Page 53

1   for identification for this deposition as Petty No.
2   1, and it is a printout of an e-mail, or at least
3   that's what it appears to be, dated August 24 at 5:20
4   p.m. It's from — it's a — we know from the
5   printout that it's a printout from your work-station,
6   because at the very top, it says "Petty, Trina F."
7       So, that means whoever printed this — it
8   was printed from your computer. That's who sent the
9   command — that's where the command came from to the
10  printer to print, correct?
11  A   Yes.
12  Q   Okay. And it is an e-mail from Ms. Sharpe,
13  dated August 24, at 5:20 p.m., to Fred Gibson, cc to
14  you —
15  A   Yes.
16  Q   — subject, "Transfer," correct?
17  A   Yes.
18  Q   Now, it's — do you recall getting this
19  document?
20  A   Yes. Because I was at home, and when I
21  accessed my e-mails, after being able to move around,
22  I was shocked.

Page 54

1    Q   Okay. So, you were in -- you had been
2  through surgery already.
3    A   Yes.
4    Q   And you accessed this e-mail from your home
5  computer.
6    A   Yes.
7    Q   It was sent to your office.
8    A   Well, my laptop.
9    Q   Your laptop.
10   A   Yes.
11   Q   Okay. And you were shocked.
12   A   Yes.
13   Q   Because she said she didn't want the job.
14   A   Yes.
15   Q   You had thought she did want the job.
16   A   Yes.
17   Q   And you wanted her, even though she wasn't
18 qualified, because it was a body.
19   A   Yes.
20   Q   And a smart -- and a smart person.
21   A   Yes.
22   Q   Okay. And you were surprised.

Page 55

1    A   Yes.
2    Q   When you say "shocked," you mean surprised
3    A   I was surprised.
4    Q   Okay.
5        She says here -- this is Ms. Sharpe
6  speaking -- "After careful consideration of the
7  proposed transfer to the benefits unit of the human
8  resources section, I have concluded that the transfer
9  under the proposed conditions would not be the best
10 utilization of my skill set. Although human
11 resources is an area of interest, I feel that the
12 optimal use of my current skills would be in the
13 employee relations and/or classifications unit of
14 which a vacancy also exists."
15       Now, she's talking about the vacancy that
16 was pending during this time, that you ended up not
17 being able to fill, in the classification and
18 staffing area, right?
19   A   Yes.
20   Q   That would be Ms. -- that would be Ms.
21 Towanda Bynum?
22   A   It was a position -- but remember, Ms.

Page 56

1  Bynum was only a 13. I reorganized the office,
2  anticipating that she would leave, and I rewrote the
3  position that would have that job, those duties.
4    Q   As a 14.
5    A   Yes.
6    Q   I understand.
7    A   But I added some more things in --
8    Q   I understand.
9    A   Okay.
10   Q   "While I understand that each employee in
11 HR will be expected to handle two different areas, I
12 was informed that my areas of responsibility would be
13 benefits and processing. Because I feel my skill, as
14 well as my interests, are better suited to employee
15 relations and/or classification, I prefer not to
16 accept a transfer to the benefits unit with in HR at
17 this time. Thank you for your consideration. I am
18 open to discuss this matter further if you so desire.
19 Stacey Sharpe."
20       Did she indicate, in your -- in your
21 conversation with her, when she came down to find out
22 about the job, what she was interested in in HR? Was

Page 57

1  she actually asking you about the job?
2    A   We were talking about benefits. We never
3  talked about --
4    Q   Okay. And that's what she was sent down to
5  find out about, what job you had.
6    A   Right. Yes. Yes.
7    Q   So, you were surprised that she turned you
8  down.
9    A   Yes.
10   Q   All right.
11       When did you come back to work?
12       I understand that you were working from
13 home a little bit --
14   A   Yes.
15   Q   -- with your laptop and stuff, but when did
16 you actually come back and --
17   A   I think it -- I think it was right after
18 Labor Day.
19       I don't -- I would have to go back --
20   Q   Okay.
21       So, when you came back --
22   A   Or before.

Page 58

1   Q   -- you had Ms. Bynum still not leaving --
2   A   Correct.
3   Q   -- still waiting for -- for a clearance.
4   A   Correct.
5   Q   So, you couldn't fill the job that you were
6   trying to fill -- the reorganized job at the 14.
7   A   Correct.
8   Q   You had Ms. Welch, who was still there, and
9   --
10  A   Right.
11  Q   She's your acting deputy.
12  A   Uh-huh.
13  Q   Right. And she --
14  A   Yes.
15  Q   -- was employee relations.
16  A   Yes.
17  Q   At a 14.
18  A   Yes.
19  Q   You had a assistant, a HR assistant, Ms.
20  Hill --
21  A   Yes.
22  Q   -- who was doing benefits, with a

Page 59

1   contractor.
2   A   And some other -- she -- she had some other
3   duties.
4   Q   No, I understand, but she was assisting a
5   contractor --
6   A   Yes.
7   Q   -- in benefits.
8   A   Uh-huh. Yes.
9   Q   And you have this contractor --
10  A   Yes.
11  Q   -- working for you.
12      All right.
13      So, you come back.
14      Tell me the next thing that happens with
15  respect to filling this benefits job.
16  A   I went back to --
17  Q   That is, HR specialist (benefits).
18  A   I went back to Rex, said, okay, what do we
19  do now?
20      I threw Gloria Hill's name out, because she
21  had been performing those duties with the contractor
22  for a long time, but -- and Rex and I threw that back

Page 60

1   and forth.
2       The problem was I still needed someone to
3   do processing.
4       You have processing in each area. You have
5   processing of benefits. You have processing of
6   staffing and recruitment certificates. The lower-
7   level functions -- those still needed --
8   Q   That's processing, lower-level functions.
9   A   That is correct. That work was not going
10  anywhere.
11  Q   Okay.
12  A   So --
13  Q   Go ahead.
14  A   So, I talked to Rex about advertising a
15  position that would encompass the -- I want to say
16  mid-range benefit work, as like a trainee under me,
17  in addition to the processing, the lower-level
18  processing-type work, and I advertised that job.
19  Q   And that's the job ultimately that Gloria
20  got.
21  A   That is correct.
22  Q   Okay.

Page 61

1       So, that job advertisement came -- started
2   out before Ms. Sharpe -- you knew you were getting
3   Ms. Sharpe.
4   A   Yes.
5   Q   Okay.
6       Now, what about filling the Sharpe job, the
7   job that Ms. Gonsa had?
8   A   That position description was not filled.
9   Q   I understand.
10  A   Ms. Sharpe came to me on a directed
11  reassignment.
12  Q   I understand that. So, when does Ms.
13  Sharpe's directed reassignment or Ms. Sharpe's name
14  surface again after she turned you down on the
15  transfer, she turned -- not you down, but she turned
16  down the transfer?
17  A   Sometime in September, and I don't remember
18  the exact date.
19  Q   But you're back to work.
20  A   Yes, I'm back to work.
21  Q   Okay. And how did that come up? You said
22  what do we now to Mr. Simmons, and you threw out Ms.

Diversified Reporting Services, Inc.
202-467-9200

Page 62

1  Hill's name --
2     A   Right.
3     Q   -- and you advertised this -- this sort of
4  training job, this --
5     A   Right.
6     Q   -- lower-level, sort of mid-level job --
7     A   Right.
8     Q   -- and -- but what -- what did -- how did
9  Ms. Sharpe's name come back into the game here?
10    A   Before -- let me back up. Before -- before
11 I can advertise anything, Mr. Simmons has to get a
12 clearance from Ms. -- Ms. Black.
13    Q   She's the acting --
14    A   She's the -- she -- I don't remember at the
15 time if she was the acting IG, but she's my second-
16 line supervisor.
17    Q   Uh-huh.
18    A   Any -- any staffing or recruitment issues -
19 - they go through her anyway.
20    Q   The deputy.
21    A   Right.
22    Q   Okay.

Page 63

1     A   They always go through her.  And so, Mr.
2  Simmons went back to Ms. Black to find out what I
3  could do, and then he came back to give me permission
4  to advertise this position, and I don't remember if
5  it was the same time-frame, but then I was told that
6  Stacey was coming to me.
7     Q   Who told you that?
8     A   He did.
9        I -- I don't remember.
10       I don't -- '
11    Q   It was either him or Ms. -- Ms. Black.
12    A   That's correct.
13    Q   But it came from Ms. Black.
14 .  A   The directive came from her, but one of
15 them told me.
16       I don't remember.
17    Q   So, they told you you could advertise for
18 this mid-level job.
19    A   Uh-huh.
20    Q   But then they told you that Ms. -- Ms.
21 Sharpe would be coming.
22    A   Yes.

Page 64

1     Q   Now, by the way, just before we go on, Ms.
2  Welch -- what race is she?
3     A   She's a white female.
4     Q   White female.  And Ms. Gonsa is a white
5  female?
6     A   Yes.
7     Q   And Ms. Bynum?
8     A   African-American female.
9     Q   And Ms. Hill.
10    A   African-American female.
11    Q   Okay.
12       Now, was this out of the blue, they all of
13 a sudden told you, either Ms. Black directly or Ms.
14 Black through Mr. Simmons, told you, by the way, Ms.
15 Sharpe will be coming, we're directing her to come,
16 whether she likes it or not?
17    A   Well, those words weren't --
18    Q   Well, she said she didn't want to come.
19    A   Right.
20    Q   That --
21    A   Yes, I was --
22    Q   This -- we see -- she does not want --

Page 65

1  thank you very much much for the offer, but it's not
2  where my -- I think my interests and my background
3  lie.
4        You certainly agree that her background was
5  not in this.
6     A   That's correct.
7     Q   Okay.  And they told you she'd be coming.
8     A   Yes.
9     Q   On a directed detail or a directed
10 reassignment.
11    A   That's correct.
12    Q   What is a directed reassignment?
13    A   A directed reassignment is -- we usually
14 use them in -- well, in my Federal Government career,
15 we've used directed reassignments when you want to --
16 when you're moving a person from one location to the
17 other and you want to pay for the person's move.  You
18 do a directed reassignment.
19    Q   When you want to pay for the -- in other
20 words, when you're moving somebody from one part of
21 the country to another.
22    A   That is correct.

Page 66

```
1    Q   Okay.
2    A   Now --
3    Q   Directed reassignment says it's not
4  volitional; it's for the convenience of the agency,
5  not necessarily the individual.
6    A   That is correct.
7    Q   Now, it could be for the convenience of the
8  individual.
9    A   It could be.
10   Q   In fact, as you said, in your Government
11 career, you've known it as a tool so that the
12 individual doesn't have to pay for the move.
13   A   That is correct.
14   Q   So, even if a person wants to move, if you
15 make it directed, then the Government picks up the --
16   A   That is correct.
17   Q   -- and that's the way you know it.
18   A   In my Customs days.
19   Q   Yeah. In your Customs days.
20   A   Yes.
21   Q   Because Customs has people all over the
22 country.
```

Page 67

```
1    A   Oh, absolutely.
2    Q   So, there are -- and sometimes people apply
3  for a job, but to move, they'd have to move
4  themselves. But if the Customs Service wants to be
5  nice about it or wants to encourage that person to
6  take the job, they'll call it a directed
7  reassignment, and therefore, they'll pick up the tab.
8    A   That is correct.
9    Q   Okay.
10       Now, have you ever had a directed
11 reassignment, since '99, when you came to the OIG?
12   A   Yes.
13   Q   Okay.
14       Now, tell me -- in your unit or --
15   A   No.
16   Q   -- elsewhere?
17   A   Elsewhere.
18   Q   Okay.
19       Now, how many? A few? More than one.
20   A   More than one.
21   Q   Okay. And was this to move investigators
22 and auditors from one place to another.
```

Page 68

```
1    A   Yes.
2    Q   Geographically move them.
3    A   Yes.
4    Q   Okay. And again, is this a tool to -- as
5  to who is going to pay for the relocation?
6    A   Yes.
7    Q   And that's the way you've known it.
8    A   Well, one of them was for the convenience
9  of the office.
10   Q   I understand. Sometimes it's bona fide for
11 the convenience of the office, and the office has to
12 pay --
13   A   Right.
14   Q   -- has to pay.
15   A   That's correct.
16   Q   Okay. But sometimes they just do it so
17 that they can get the person to want to take the job.
18   A   That's correct.
19   Q   After all, if you have to pay to move your
20 family or move yourself across country, it's
21 expensive to take a job, but if the company will pick
22 it up, makes it more encouraging, right?
```

Page 69

```
1    A   Correct.
2    Q   And that's the idea.
3    A   Correct.
4    Q   Okay.
5        Sometimes you bona fide need the person.
6  You want that person. So, you -- so, in order to
7  encourage them to take it or in order to -- because
8  it really is for the Government's convenience, they
9  have to pick up the tab.
10   A   That's correct. Especially if the person
11 has a special skill that you need.
12   Q   Right. Okay. But have you known it, a
13 directed reassignment, to be used in headquarters, in
14 other words in the same geography, where there wasn't
15 a move, a physical geographic relocation, other than
16 this one?
17   A   No, we had one -- we had one other.
18   Q   And tell me about that.
19   A   It was from one -- one group, one -- the
20 investigation group to the audit group, because a
21 manager or an executive in one group can't reassign
22 an employee to another group. So, it has to be a
```

## Page 70

1  directed reassignment.

2      A manager can't direct me from my group to

3  investigations.

4      You're talking about two different managers

5  here.

6      So, you have to direct my reassignment.

7  **Q  So, somebody above has to direct —**

8  A  That is correct.

9  **Q  But what happens if the person wants to**

10 **take — did the person in that case want to take the**

11 **job?**

12     It was just a matter of finding a way?  Or

13 was it a forced —

14 A  It was a directed reassignment.

15 **Q  I understand.  But was it forced?**

16 A  When you say "forced" —

17 **Q  Stacey Sharpe did not want to take this**

18 **job.**

19 A  I understand.

20 **Q  Okay.**

21     It had nothing to do with moving expenses

22 and who's paying for a move, because it wasn't a

## Page 71

1  geographic move.

2  A  That's correct.

3  **Q  In that sense, it was different from the**

4  **normal directed reassignment —**

5  A  Yes.

6  **Q  — which is — the consequence of which is**

7  who's going to pay for the relocation.

8  A  Yes.

9  **Q  Here there was no relocation.**

10 A  Correct.

11 **Q  Okay.**

12     That happened one other time, as far as you

13 can — you know.

14 A  In headquarters.

15 **Q  In headquarters.  And what was the — why**

16 was that done?

17     Did the person want to move?

18 A  I don't know if the person wanted to move,

19 but the person was moving from one organizational

20 segment to another.

21 **Q  Okay.**

22 A  From Investigations to the Office of

## Page 72

1  Audits.

2  **Q  And was this an organizational move, also,**

3  **Stacey's?**

4  A  Yes.

5      She was coming from the counsel's office to

6  Human Resources.

7  **Q  Okay.**

8  A  So, yes, it was —

9  **Q  But if she wanted to take the job, it**

10 wouldn't have been a directed reassignment, correct?

11 A  That is correct.  It would have been a

12 reassignment.

13 **Q  Okay.**

14     So, you can move from one area to another

15 without it being directed.

16 A  Yes.

17 **Q  So, this other one was also something where**

18 the person did not want to —

19 A  Well, I'm assuming — because I was not

20 involved in it.

21     I was involved at the tail-end, because I

22 had prepared the paperwork.

## Page 73

1  **Q  I understand.**

2      You were the servicing personnel shop.

3  A  Right.

4      So, I don't —

5  **Q  So, what organization did the person move**

6  from?

7  A  Office of Investigations.

8  **Q  To where?**

9  A  Office of Audits.

10 **Q  And what person was this?**

11 A  Annette Chandler.

12 **Q  Annette Chandler.**

13     Okay.

14     So, Ms. Chandler — and that was also

15 ordered, a directed thing?

16 A  It was a directed reassignment.

17 **Q  Why was that directed?  Was it**

18 **geographical?**

19 A  No.

20     She was in headquarters.

21     The letter states that her skills were

22 needed in the Office of Audit.

Page 74

1    Q    I see. Did she want to go?
2    A    I don't know.
3    Q    But if she wanted to go, it wouldn't have
4    had to have been directed, correct?
5    A    No.
6    Q    I'm right?
7    A    That's correct.
8    Q    Should we assume that she didn't want to
9    go; that's why it was directed?
10   A    You could make that assumption.
11   Q    Right.
12       Is that a fair assumption?
13   A    That's a fair assumption.
14   Q    Okay. And you handled the paperwork on
15   that one.
16   A    That is correct.
17   Q    But here, you were more involved, because
18   it was your unit that was getting the person.
19   A    Yes.
20   Q    Okay.
21       So, did you talk to Stacey about this after
22   you were told she would be coming on a directed

Page 75

1    reassignment?
2    A    I -- yes, I talked with Stacey after --
3    because there was a letter, and she had to sign to
4    say was she accepting the position or not, and I
5    didn't talk to her until after she signed that,
6    because I didn't know if she was coming.
7    Q    Okay.
8        Now, this letter -- you're a personnelist.
9    Why is there a letter?
10   A    Well, the letter states you are being
11   directed to X, Y, and Z --
12   Q    And so, if you don't do it, what happens?
13   A    You're removed from the service.
14   Q    You're fired.
15   A    Yes.
16   Q    For insubordination?
17   A    Yes.
18   Q    Okay.
19       So, it's just -- it's -- it's an
20   acknowledgement of receiving orders and accepting
21   orders, correct?
22   A    That is correct.

Page 76

1    Q    Okay.
2        So, she signed the letter, and that's when
3    you spoke to her again.
4    A    Yes.
5    Q    So, her choice was, at that point, accept
6    this reassignment or be fired, be terminated.
7    A    Yes.
8    Q    Okay. And terminated for misconduct,
9    refusing to --
10   A    Well, it doesn't --
11   Q    Well, but it's refusing to accept an order.
12   A    Correct.
13   Q    I mean it's not mis-performance, right?
14   A    That's correct.
15   Q    Okay.
16       Now, in your now close to six years at the
17   FDIC, aside from Ms. Chandler, was there any other --
18   A    Close to seven years.
19   Q    Right. Any other directed reassignments in
20   headquarters where it wasn't a question of who was
21   going to pay but, rather, you will go there or else?
22   Ms. Chandler and Ms. Sharpe. Any others?

Page 77

1    A    No. The other two that I remember were
2    from the field to headquarters.
3    Q    And it was a question of who was going to
4    pay the moving.
5    A    Well, the -- and the skills that were
6    needed.
7    Q    I understand about the skills needed.
8    A    But I think one -- if I remember correctly,
9    one was, you know, questioning whether they wanted to
10   come, so management directed the reassignment.
11   Q    Which means they pick up the tab.
12   A    Yes.
13   Q    Okay.
14       All right.
15       Now, in -- in Ms. Chandler's case, you
16   processed the papers --
17   A    Yes.
18   Q    -- from Investigations to Audit.
19   A    Yes.
20   Q    And the reason there was they needed her
21   skills.
22   A    She was needed in the Office of Audits. I

Page 78

1  don't remember the exact wording.
2      Q   Okay.  And in your case, it's true that Ms.
3  Sharpe didn't have the skills.
4      A   No.
5      Q   I'm correct?
6      A   That is correct.
7      Q   Okay.
8          Okay.
9          So, you didn't talk to — to Stacey Sharpe
10 from the time you got this copy till the time you
11 were told that she signed the directed reassignment.
12 Then you spoke to her.
13     A   That's correct.
14     Q   And what did you say — what was that
15 conversation?
16     A   I set up a meeting with her to let her
17 know, you know, despite the directed reassignment, I
18 welcomed her into the group, and I explained, you
19 know, how we would proceed as far as training.
20         Let's back up.
21         We used a special provision for
22 reassignment to get her into the group.

Page 79

1      Q   A special provision.
2      A   It's called in-service placement.
3      Q   That's because she — but in-service
4  placement is usually something where there's somebody
5  who wants to come to an area and management wants the
6  person in the area and they make an exception to the
7  qualification standards.
8      A   That is correct.
9      Q   But it's not usually done where somebody
10 does not want to come.
11     A   Well, I don't know, but my using in-service
12 placement --
13     Q   I understand.
14         Have you ever known in-service placement to
15 be used in connection with a directed reassignment?
16     A   No.
17     Q   Okay.
18         This is the only time, correct?
19     A   This is the only time I had used it.
20     Q   Right.  And it's the only time you've heard
21 of it being used other than where an employee wants
22 to come to an area, management is willing to have

Page 80

1  them, but they don't really qualify, so they do this
2  —
3      A   Yes.
4      Q   — in-service.
5      A   Yes.
6      Q   That's the more typical situation.
7      A   Yes.
8      Q   In fact, this is the only time you know of
9  where it was done in conjunction with a directed
10 reassignment because the employee did not want to
11 come.
12     A   Yes.
13     Q   Usually, a directed reassignment where the
14 employee doesn't want to come is because the
15 corporation wants their specific skill set for a job.
16     A   That's correct.
17     Q   And that's not what happened here.
18     A   That's correct.
19     Q   Because her specific skill set was not a
20 match.
21     A   That's correct.
22     Q   Okay.

Page 81

1          All right.
2          So, you were telling me about this use of
3  this method to get her there, but you — you were
4  actually answering my question about the conversation
5  that you had with Stacey after you heard she had
6  signed this thing, recognizing that she would come or
7  she'd lose her job.
8          Okay.
9          So, tell me about that conversation.
10     A   Because she mentioned that she wasn't
11 qualified, and so, I explained to her how we were
12 going to get her in the HR area.
13         I wanted her to feel comfortable that she
14 would get the training that was necessary, so she
15 would become qualified, and she was okay with that.
16     Q   Yeah.
17         Well, she had little choice, right?
18     A   Yes.
19     Q   Okay.
20         She was, you would say, distressed at the
21 prospect of coming to a job —
22     A   Yes.

Page 82

1    Q   — that she didn't think she knew anything
2   about.
3    A   Yes.
4    Q   And in fact, it was true, she didn't really
5   have a background in it.
6    A   That is correct.
7    Q   And this was stressing her.
8    A   I agree, yes.
9    Q   Okay.  And you wanted to try to put her at
10  ease.
11   A   Yes.
12   Q   And also tell her how you planned to have
13  this training, that you were using this as if it was
14  a voluntary thing, you were using this provision
15  where you could get special training.
16   A   Yes.
17   Q   All right.  Let me — take a look at this
18  document, Exhibit 2.
19  (Petty Exhibit No. 2 was marked for identification.)
20       MR. SHAPIRO: Okay.
21       BY MR. SHAPIRO:
22   Q   Now, what you're looking at now is an FDIC

Page 83

1   OIG employee training report, correct?
2    A   Yes.
3    Q   Part of the Professional Development
4   System, right?
5    A   That is correct.
6    Q   And it's actually the training report for
7   Stacey Sharpe.
8    A   Yes.
9    Q   Okay.
10       Now, the last entry here in this report is
11  a course in October of 2005.
12   A   Yes.
13   Q   And there may have been courses since then,
14  correct?
15       Do you know of any courses since October?
16   A   Yes.
17       She's attending two classes now.  They're
18  not listed, because they're in process.
19       This -- this is a report that shows the
20  completed classes.
21   Q   Okay.
22       So, this is circa October 2005, which is, I

Page 84

1   think you said, when she moved over into staffing,
2   correct?
3    A   She moved over in staffing prior to that.
4    Q   Okay.
5        Now, looking at --
6    A   Well, let me correct -- she was being
7   trained for that area prior -- long prior to that.
8    Q   If you look on page 2, the first course
9   that Ms. Sharpe takes before -- I mean after the
10  directed reassignment took effect -- is in November
11  of 2004, correct?
12   A   Yes.
13   Q   And that course is Basic Employee Benefits
14  for Personnelists.
15   A   Yes.
16   Q   Fundamental benefits course given for HR
17  professionals.
18   A   Yes.
19   Q   Okay.  And then — it costs $1,100, right?
20   A   Yes.
21   Q   Who does the training?  Do you send them
22  out, outside the FDIC?

Page 85

1    A   Yes.
2    Q   Okay.
3        Then there's a course in Recruitment and
4   Selection, $1,000.
5    A   Yes.
6    Q   Then there's a course in Assessment and
7   Compensation, $1,000, correct?
8    A   Yes.
9    Q   Basic HR law is the next course.
10       Look on page 1.
11   A   Yes.
12   Q   FERS Benefits Applications for
13  Personnelists, another $1,000.
14   A   Uh-huh.
15   Q   Processing Personnel Actions, $1,200.
16   A   Yes.
17   Q   I make it to be between six and seven
18  thousand dollars worth of training for that first
19  year.
20   A   I agree.
21   Q   Workers Compensation and Disability
22  Retirement; Introduction to Research Methods; entry,

Page 86

1  processing, and correction system/history correction
2  update processing.
3     A  She hasn't attended that one.
4     Q  Well, it says --
5     A  It says, "In Process - Submitted for
6  Approval."
7     Q  I see.
8        So, she didn't attend that.
9     A  No.  And some of these -- you have to look
10 at the training status to see where we are.  Some of
11 them, because of what happened in New Orleans, the
12 course was never attended, and it's sitting there
13 waiting -- we'll change the dates once she attends.
14    Q  It is true, isn't it, that this is a lot of
15 training for a first year.
16    A  Yes.
17    Q  Particularly for a person who's a GS — CG-
18 11 level, full performance HR specialist, correct?
19    A  I won't say it's a lot of training, but you
20 -- I needed to get her --
21    Q  Yes, I understand that, and that's the
22 point.  You needed to get her trained, because she

Page 87

1  was coming in without a background.
2     A  That is correct.
3     Q  So, this is a lot of training for somebody
4  who's supposed to take over a benefits job at the CG-
5  11 level.
6     A  Yes.
7     Q  Is it fair to say that you were making do -
8  - making the best of a bad situation, taking Ms.
9  Sharpe on?  It wasn't your choice.
10    A  Yes.
11    Q  You didn't have somebody.  You needed
12 somebody to help.
13       This was offered to you, and so, you took
14 it.
15    A  Yes.
16    Q  Okay.
17       Now, you tried at some point, initially, to
18 get the start date moved back.
19    A  Yes.
20    Q  Why was that?
21    A  Because the contractor was still there, and
22 I didn't have another place for Stacey to sit.

Page 88

1        So, I asked if I could change her date,
2  because Veronica, my contractor, was leaving at the
3  end of the month.
4     Q  At the end of October.
5     A  Yes.
6     Q  So, you wanted to delay Stacey moving down
7  till the end of October.
8     A  Yes.
9     Q  Did they approve that?
10    A  The start date was not changed, but Stacey
11 stayed seated up in Counsel.
12    Q  Well, that made it more difficult for her
13 to do her job, particularly if she wasn't a trained
14 benefits person.
15    A  Well, not really, because what she was
16 doing was coming down and listening to -- talking
17 with Gloria and Veronica, transitioning, picking up
18 things.
19    Q  It would have been easier if she was on the
20 same floor.
21    A  Yes, but there was not another office to
22 put her on.  It was only for a week.

Page 89

1     Q  I understand.
2        So, why was -- did they ever explain to
3  you, your boss — who did you ask, by the way, deal
4  with this on this request to put it off a week?
5     A  Mr. Simmons.
6     Q  Okay.
7        Did they ever explain to you why they
8  wouldn't put it off just a week?
9     A  Yes.  Because I had submitted her to go to
10 the basic training course, the basic benefits, and he
11 wanted her on my rolls once that course -- when the
12 course started.
13    Q  You mean to pay for the course.
14    A  Yes.
15    Q  So, it had to be — she had to be on your
16 rolls —
17    A  Well, it looked better that she was in --
18    Q  Looked better.
19    A  -- that she was in Human Resources and
20 taking this type of course.
21    Q  Uh-huh.
22       Okay.

Page 90

1        Did she continue to do work up in Counsel's
2    office during that week, or did she devote herself to
3    benefits?
4        A    I assume that she was doing benefits.  I
5    don't know if she did continue to --
6        Q    I understand.  But you were told she was
7    your employee --
8        A    Right.
9            She was my --
10       Q    -- not doing Counsel work.
11       A    That is correct.
12       Q    Okay.
13           Did she continue to do Counsel work after
14   she moved down?
15       A    No, not that I'm aware of.
16       Q    Right.
17           (Pause.)
18           MR. SHAPIRO:  All right.
19           BY MR. SHAPIRO:
20       Q    Now -- so, she came on-board, and at some
21   point, you started utilizing her in staffing.  Later
22   on.

Page 91

1        A    Yes.
2        Q    How far down the road?
3        A    Oh, it was --
4        Q    Six, seven, eight months, 10 months?
5        A    Oh, it was longer than that.
6        Q    Almost a year.
7        A    Almost a year.
8        Q    Okay.  So, sometime in the late summer,
9    early fall of 2005, you started using her in --
10   sending her over to -- to do staffing.
11       A    Stacey was on maternity leave, and when she
12   came back, yes.
13       Q    And why was that?  Why did you do that?
14       A    Because Towanda was gone, or leaving.
15       Q    So, now you had a vacancy there.
16       A    Yes.
17       Q    And you're going to fill that not at the 14
18   level.
19       A    I couldn't fill it.
20       Q    Why couldn't you fill it?
21       A    I couldn't fill it.  We were looking to
22   down-size.

Page 92

1        Q    Down-size.
2            So, you couldn't fill that job.
3        A    Right.
4        Q    So, you -- so, who does benefits now?
5        A    Gloria is the -- Ms. Hill is the primary
6    person that does benefits.
7            Stacey is her backup.
8        Q    I see.
9            Ms. Hill was bumped up in November.
10       A    She was promoted.
11       Q    To a specialist.
12       A    Yes.
13       Q    Parens "benefits."
14       A    She doesn't have a paren, because she does
15   -- I mean her primary is benefits -- I don't have any
16   parens on any of the specialists.
17       Q    So, now there are no parens.
18       A    Right.  They have a -- they have a primary
19   area, but then they assist in other areas.
20       Q    I understand.  But that was always true,
21   even when there was parens.
22       A    That is correct.

Page 93

1        Q    So, now you had a hole, if you would, in
2    staffing.
3        A    Yes.
4        Q    When did Ms. -- when did Ms. Bynum leave?
5        A    It was in the summer.  I think it was
6    around June.
7        Q    Of 2005.
8        A    Yes.
9        Q    Okay.  And Ms. -- and Stacey was on
10   maternity leave.
11       A    Yes.
12       Q    And so, when did you first discuss her
13   actually moving into the staffing area as her
14   primary?
15       A    She called, because she was doing work --
16       Q    -- from home.
17       A    -- from home, and she expressed -- she
18   called.  We -- we had regular conversations when she
19   was doing work.
20       Q    So, she found out that Bynum was finally
21   leaving.
22       A    Yes.

Page 94

1    Q   And she inquired.
2    A   Yes.
3    Q   May I go over to that work?
4    A   May I learn that area?
5    Q   Right.
6    A   Yes.
7    Q   And you said?
8    A   Let me talk it over with Rex.
9    Q   With Rex.  All right.  And what did Rex
10   say?
11   A   If I was okay with it, he didn't have a
12   problem with it, but she had to learn that area.
13   Q   Okay.
14   A   He was concerned about learning that area.
15   Q   Was he concerned about her learning
16   benefits when she came in?
17   A   Well, yes.
18   Q   Uh-huh.
19       So, you never did advertise that job again.
20   A   No.
21   Q   You just moved Stacey over to it.
22   A   When you say "moved" her over -- she was on

Page 95

1    her same position description.
2    Q   I understand.  But after a while, you
3    rewrote her position description?
4    A   After a while, I requested a desk audit,
5    and the -- and the contractor classifier rewrote the
6    PD, the position description.
7    Q   Okay.  Where benefits — benefits became
8    the secondary, the backup, and staffing and
9    recruitment became the first thing.
10   A   Yes.
11   Q   And she became your — Stacey became your
12   staffing and recruitment person.
13   A   That's correct.
14   Q   Effectively replacing Ms. Bynum.
15   A   Yes.
16   Q   Okay.  But at a 12, not a 13.
17   A   Well, let me go back.  Ms. Bynum's position
18   description, when she was there, talked about
19   classification, staffing and recruitment, and
20   position management.
21       Ms. Bynum never --
22   Q   Never did classification.

Page 96

1    A   No.
2    Q   She basically did staffing and recruitment.
3    A   Yes.
4    Q   And she backed up somebody else.
5    A   Yes.
6    Q   All right.
7        Stacey —
8    A   I won't even say "backed up," because --
9    Q   Okay.  So, Stacey is doing staffing and
10   recruitment, the same as Bynum is doing.
11   A   Not to the extent, because she is under me,
12   still learning.
13   Q   Right.  But eventually, she'll be doing it
14   —
15   A   Eventually, I -- I expect her to be able to
16   take it all on, yes.
17   Q   Right.  Just like Ms. Bynum did.
18   A   That is correct.
19   Q   Ms. Bynum was a 13.
20   A   And let me reiterate why.  Because you had
21   two functional areas there.
22   Q   Recruitment —

Page 97

1    A   -- staffing and classification.
2    Q   Now there's only one.
3    A   That is correct.  Staffing and recruitment.
4    Q   But now there's benefits backup.
5    A   Yes.
6    Q   Okay.
7        So, this is only a 12 job now?
8    A   That is correct.
9    Q   Okay.
10       So, how many people do you have now?
11   A   It's five of us total.
12   Q   Again.
13   A   Correct.
14   Q   So, you're back to the same — so, you
15   still — you couldn't recruit, but you still filled
16   the jobs.
17   A   Correct.
18   Q   You still have the same number.
19   A   Within.
20   Q   So, you haven't shrunk.
21   A   No.
22   Q   You haven't down-sized.

Page 98

1    A   No.
2        We moved people around within to
3    accommodate our needs.
4    Q   Which is always what you've done.
5    A   That's correct.
6    Q   Okay.
7        So, you didn't down-size.
8        So, when was this talk of down-sizing?
9    A   When the OIG was shrinking, we were down-
10   sizing in the OIG.
11   Q   But you didn't down-size. HR didn't down-
12   size.
13       You've always been yourself and four.
14   A   Yes, but -- yes and no. We have down-
15   sized.
16       Ms. Savia does work for me, but she also --
17   her work crosses organizational lines. She's on my
18   staff, but the work that she performs crosses other
19   areas under Rex Simmons.
20   Q   So, Savia is the program analyst.
21   A   Yes.
22   Q   Okay. But she's on your staff. You do her

Page 99

1    personnel review.
2    A   That's correct.
3    Q   You're her supervisor. You do her time and
4    attendance.
5    A   That's correct.
6        She came to me September or October of last
7    year.
8    Q   Okay.
9        So, what is your -- your organization's
10   ceiling, personnel ceiling?
11   A   I don't have a personnel ceiling. The OIG
12   has staffing. We have positions. We have -- for
13   example, our -- our number of positions that we are
14   not supposed to go over is 130 right now.
15   Q   Nationally.
16   A   Right.
17   Q   How many are in headquarters?
18   A   I don't know off the top of my head.
19   Q   Is there a requirement that so many be in
20   headquarters --
21   A   No.
22   Q   -- so many be in the field?

Page 100

1    A   No.
2    Q   Do you have a ceiling for headquarter --
3    for how many lawyers are going to be in the counsel's
4    office in headquarters?
5    A   I don't have that.
6        The -- the deputy IG and the IG decide how
7    -- based on workload, based on workload and what's
8    foreseeable in the future -- how many positions we
9    need in each area.
10   Q   Okay.
11       So -- I've heard the term -- and I must say
12   I'm confused by it --
13   A   Okay.
14   Q   -- something called core numbers.
15   A   That's our core staffing.
16   Q   Core staffing.
17   A   Correct.
18   Q   Core is c-o-r-e?
19   A   Yes.
20   Q   That kind of core?
21   A   Yes.
22   Q   Okay.

Page 101

1        So, core staffing or core numbers, I've
2    heard it said.
3    A   Same thing.
4    Q   Okay.
5        What is core staffing or core numbers?
6    A   The number of positions that we are
7    allocated in the OIG.
8    Q   All right. And within the office, within
9    the OIG and its units, do they also talk about core
10   staffing for this unit, core staffing for that unit?
11   A   Yes.
12   Q   Okay. So, core staffing is like a ceiling.
13   It's the maximum that we're going to have in this
14   function area, right?
15   A   That's correct.
16   Q   Okay.
17       Now, I know that you've worked in personnel
18   elsewhere, so I know you know the term "FTEs."
19   A   Yes.
20   Q   Right?
21   A   Yes.
22   Q   And what does "FTE" stand for?

Diversified Reporting Services, Inc.
202-467-9200

Page 102

1    A    Full-time equivalency.
2    Q    That's the number of positions. In other
3    words, two half-time positions is one FTE.
4    A    That is correct.
5    Q    One full-time position is one FTE.
6    A    That is correct.
7    Q    Fifteen full-time positions, right, and 10
8    part-time positions is 20 FTEs.
9    A    That is correct.
10   Q    Okay.
11        So, you have FTEs throughout the
12   Government, correct?
13   A    Yes.
14   Q    You have them at the OIG's office?
15   A    We don't use FTEs.
16   Q    You don't use the term.
17   A    No.
18   Q    But there is a ceiling, full-time
19   equivalent ceiling.
20        There are requirements, correct?
21   A    Yes, but we don't --
22   Q    You call them "core."

Page 103

1    A    We call them -- we call it "core staffing."
2    Q    So, in a general sort of way, core staffing
3    and FTEs are the same thing. They're the same
4    concept.
5    A    Generally.
6    Q    It's the ceiling --
7    A    The way I understand it.
8    Q    You understand that it's about the same,
9    correct?
10   A    FTE -- you're talking -- that's a budget
11   term.
12   Q    Uh-huh.
13   A    So, you use it when you're talking about
14   the fiscal budget.
15   Q    Right. But "core staffing" is a personnel
16   term.
17   A    No. "Core staffing" is an FDIC term.
18   Q    For organizationally --
19   A    Because we have a corporate budget.
20   Q    So, it's the same idea but with a corporate
21   budget --
22   A    It's the same.

Page 104

1    Q    -- rather than a Federal budget, an
2    executive agency budget.
3    A    That's correct.
4    Q    Okay.
5        Now, the number of positions in the OIG's
6    office is determined by whom? I mean the ceiling,
7    the level. Congress?
8    A    No.
9        We are approved by Congress. The budget
10   shop is under Rex Simmons.
11   Q    I understand the budget shop, but is there
12   no overriding --
13   A    We don't go over --
14   Q    I didn't say "over." I said is there no
15   overriding authority which says, FDIC OIG, you're not
16   going to have more than 147 people, period?
17   A    Yes.
18   Q    So, there is an overriding authority.
19   A    Yes.
20   Q    Who is that authority? Not FDIC. It's
21   Congress, right?
22   A    Okay.

Page 105

1    Q    All right.
2        (Pause.)
3    BY MR. SHAPIRO:
4    Q    Now, I take it, since you have a personnel
5    background, you're also familiar somewhat with RIFs -
6    -
7    A    Yes.
8    Q    -- reductions in force.
9    A    Yes.
10   Q    Now, have you had reductions in force in --
11   I know they've had them in the FDIC. Have you had
12   them in OIG?
13   A    Yes.
14   Q    Okay.
15        Now, you -- you apply RIF regulations,
16   correct?
17   A    Yes.
18   Q    When you run a RIF.
19   A    Yes.
20   Q    And when you run a RIF, you can have a RIF
21   that only affects on person losing a job, correct?
22   A    If they're -- yes.

Page 106

1    Q   I mean you have bump rights and retreat
2   rights, correct?
3    A   Yes.
4    Q   And these are highly regulated as to what
5   happens when there's a reorganization and a down-
6   sizing associated with it, correct?
7    A   Yes.
8    Q   That's what happens in RIFs, correct?
9    A   Yes.
10    Q   Sometimes people don't lose their job; they
11  just lose their grade, correct?
12    A   Yes.
13    Q   When was the last RIF that was run in the
14  OIG, FDIC OIG?
15    A   January of 2006, we just issued a RIF
16  notice to be effective April.
17    Q   In the field.
18    A   Yes.
19    Q   Where?
20    A   Atlanta.
21    Q   Okay.  And you're RIF'ing the investigation
22  section in Atlanta?

Page 107

1    A   No, the Office of Audits.
2    Q   The Office of Audits is being RIF'd.
3    A   Yes.
4    Q   In other words, they're reorganizing and
5   they're getting rid of the separate audits office in
6   Atlanta.
7    A   The Office of Audits is closing in Atlanta.
8    Q   Right.  Exactly.  And so, a lot of — some
9   of the people who were in the Office of Audits are
10  going elsewhere, correct?
11    A   Yes.
12    Q   Some have been offered jobs in a different
13  — directed reassignments, correct?
14    A   No.
15    Q   Are they transferring to other parts of the
16  country?
17    A   Some people have decided to take the buy-
18  out, early-out.
19    Q   Right.
20    A   And some applied for positions in
21  Washington.
22    Q   And were those directed?

Page 108

1    A   No.
2    Q   So, they had to pay their own way.
3    A   No, they applied under a vacancy
4   announcement.
5    Q   Right.
6        So, they had — so, if they move, they had
7   to pay their own way.
8    A   No.
9        If you're not -- the vacancy announcement
10  allowed a relocation package.
11    Q   Okay.  I see.  So, some people applied,
12  some people took the early-out, and some people lost
13  their job or will be.
14    A   One person.  Yes.
15    Q   One person will be losing her job.
16    A   Yes.
17    Q   Okay.  But this was done under the RIF
18  regulations to determine who would be losing their
19  job and who would not.
20    A   Yes.
21    Q   Okay.
22        Sometimes RIFs are used just strictly in

Page 109

1   down-sizing.
2        It's not like you're changing, getting rid
3   of an office.
4        You're just down-sizing.
5        So, you run a RIF, correct?
6    A   Yes.
7    Q   Okay.  And sometimes, there again, one
8   person moves and changes jobs, correct?
9    A   Yes.
10    Q   Or sometimes somebody gets terminated,
11  because there's no place for them.
12    A   Yes.
13    Q   And they're — determining which person
14  that is is done by the technicality of how the RIF
15  applies, competitive areas and all of that, bump
16  rights, retreat rights, competitive areas, correct?
17    A   Yes.
18    Q   The language of RIF.
19    A   Yes.
20    Q   Okay.
21        Now, aside from this RIF in 2006 that you
22  just gave notice of —

Page 110

1    A    Yes.
2    Q    — any other RIFs in OIG?
3    A    Yes.
4    Q    When was the last one before this?
5    A    It was either 2004 or 2005.  I don't
6    remember the exact year.
7    Q    And where was it?  In the field again?
8    A    No.
9    Q    Headquarters?
10   A    Yes.
11   Q    And what unit —
12   A    Well, it involved headquarters and the
13   field.
14   Q    Which headquarters unit?  Office of —
15   A    All of the headquarters units.
16   Q    All of the headquarters units.
17   A    It was the support staff.
18   Q    It was support staff, meaning clerical?
19   A    Yes.  Administrative/clerical.
20   Q    Okay.  And what happened?  You reduced the
21   size of the support staff?
22   A    Yes.

Page 111

1    Q    OIG-wide.
2    A    Yes.
3    Q    In the field and in headquarters.
4    A    Yes.
5    Q    And did you eliminate all the positions, or
6    did you just reduce the size, the numbers?
7    A    We reduced the number.
8    Q    All right.
9         Anybody lose their job in that?
10   A    Yes.
11   Q    In headquarters?
12   A    Yes.
13   Q    You went from how many to how many?
14   A    I don't remember right off the top of my
15   head.
16   Q    Okay.  But that was specific to an area of
17   work.
18   A    Yes.
19   Q    You've also — so, you've had — you can
20   use RIFs in specific geographic and work areas,
21   correct?
22   A    Yes.

Page 112

1    Q    You can also use RIFs for specific types of
2    jobs, like —
3    A    Functions.
4    Q    — clerical/administrative, right?
5    A    Yes.
6    Q    Okay.
7    A    Functions.
8    Q    Right.  You can use it for investigators or
9    auditors.
10   A    Yes.
11   Q    In addition to closing an audit office, you
12   can use just it to reduce the number of auditors —
13   A    Yes.
14   Q    — like you did with — with — with
15   administrative —
16   A    Yes.
17   Q    — and clerical.
18   A    Yes.
19   Q    Okay.  And you can limit it by geography.
20   A    Yes.
21   Q    Okay.  All — however you limit it, the RIF
22   regs apply.

Page 113

1    A    Yes.
2    Q    Competitive areas, bump rights, retreat
3    rights, all of that, correct?
4    A    Yes.
5    Q    Who is going to lose their job is left to
6    the application of these regulations.
7         You can't — you're not supposed to be able
8    to say I want to keep this one but not that one.
9    It's just an application of a system that rates
10   people competitively.
11   A    Yes.
12   Q    Okay.
13        Now, do you service all of — your unit —
14   your office services all of OIG.
15   A    Yes.
16   Q    Nationally.
17   A    Yes.
18   Q    For personnel stuff.
19   A    Yes.
20   Q    Okay.
21        So, the counsel's office at OIG — are they
22   all in headquarters?

Page 114

1    A  Yes.
2    Q  How many are there in the counsel's office?
3    A  Five.
4    Q  Okay. And they they full-up right now?
5    A  Yes.
6    Q  Okay. And two years ago, how many were in
7    the counsel's office? Also five?
8    A  Two years ago --
9    Q  We haven't had a reduction --
10   A  No.
11   Q  We haven't had a --
12   A  No.
13   Q  -- reduction in the size of the office.
14   A  That's correct. No. There were six.
15   Q  There were six people.
16   A  That's correct.
17   Q  And now there's five.
18   A  Yes.
19   Q  What person -- did they reduce, or are they
20   looking for somebody?
21   A  They reduced.
22      Stacey Sharpe came to me.

Page 115

1    Q  They reduced.
2    A  Yes.
3    Q  So, now they only -- so, why didn't we have
4    a RIF?
5    A  Because she was a directed reassignment.
6    Q  I understand. But why wasn't there a RIF?
7    Directed reassignment focuses on a person, right?
8    A  Yes.
9    Q  Correct?
10      RIF leaves it to competitive areas, retreat
11   rights, bump rights. I mean who is going to actually
12   leave the unit is left to a non-judgement sort of
13   thing, correct?
14   A  Yes.
15   Q  So, what's the idea when they reduce the
16   size of the FDIC's counsel's office, to reduce the
17   size of the office?
18   A  Yes.
19   Q  Okay.
20      So, why wasn't a RIF run?
21      MR. COSGROVE: Objection. David, you're
22   asking her to state a legal conclusion.

Page 116

1      MR. SHAPIRO: No, I'm asking her -- she's a
2    personnel management professional, and I'm asking her
3    why a RIF wasn't --
4      MR. COSGROVE: She can answer the question
5    to the best of her knowledge and belief.
6      MR. SHAPIRO: Sure.
7      MR. COSGROVE: I think it's stating a legal
8    conclusion, and I think the statement was that you
9    can do directed reassignments in lieu of reductions
10   in force.
11     MR. SHAPIRO: Uh-huh.
12     MR. COSGROVE: Now, after me having an
13   opportunity to put my objection on the record, go
14   ahead and answer the question to the extent that you
15   understand of your knowledge.
16     THE WITNESS: You can't -- management has
17   the right to do a reassignment or directed
18   reassignment or run a RIF.
19     BY MR. SHAPIRO:
20   Q  But a RIF doesn't focus on an individual.
21   Who leaves is left to a calculated system, right?
22   A  But a RIF is saying I don't need this

Page 117

1    amount -- this number of people, whereas in the OIG,
2    we did -- we needed a body someplace else in the OIG.
3    Q  As you said, a directed reassignment is
4    designed to move a person with a skill set that you
5    need to a place where you need them, correct?
6    A  That is correct.
7    Q  And that's not what happened here.
8    A  No.
9    Q  Okay.
10     All right.
11     Now, you are the servicing personnel person
12   for all of the -- you're familiar with the word --
13   the expression "NTE".
14   A  Yes.
15   Q  What does that mean?
16   A  Not to exceed.
17   Q  And that's a temporary appointment, isn't
18   it?
19   A  Yes.
20   Q  That's the way the Government -- that's the
21   technical word for a temporary appointment.
22   A  Yes.

Page 118

1    Q   Okay.
2        You're appointed for a period of time not
3    to exceed a year or not to exceed two years or not to
4    exceed 120 days or -- that's what the temporary --
5    NTE means you're not a permanent civil servant.
6    You're a temporary appointee, correct?
7    A   Well, not necessarily.
8        You may be temporary in that -- well, you
9    could do a detail --
10   Q   But a detail is the person is already a
11   permanent employee.
12   A   Right.
13   Q   I'm talking about the actual appointment.
14   A temporary appointment is an NTE.
15   A   That is --
16   Q   Okay.
17   A   Yes.  Yes.
18   Q   And to do an NTE, you don't need to fill
19   the job quite the same competitive way as you do for
20   a permanent job, correct?
21   A   For a temporary, that's correct.
22   Q   Okay.

Page 119

1        There are -- I'm using the term loosely --
2    there are sort of shortcuts to bringing somebody on
3    NTE, correct?
4    A   For a temporary --
5    Q   Yes.  Well, a temporary -- NTE is
6    temporary.
7    A   But -- no.  You have a term, too.
8    Q   Well, term employees are NTE.  The term is
9    the NTE period.
10   A   You have a temporary and you have term.
11   You have two separate things.
12   Q   Okay.  So, which one is NTE?
13   A   Both of them.
14   Q   Okay.
15       So, a term employee -- there are shortcuts
16   to bringing them on, correct?
17   A   Yes.
18   Q   And there are more shortcuts for a
19   temporary employee.
20   A   Yes.
21   Q   Both are NTE employees.
22   A   Yes.

Page 120

1    Q   Neither one require quite the same amount
2    that you would do when you're filling a permanent
3    job.
4    A   Yes.
5    Q   Okay.
6        They do not have to be filled as
7    competitively, do they?
8    A   Term, yes.
9    Q   Term has to be filled competitively?
10   A   Yes.  You advertise it, yes.
11   Q   You advertise it.
12   A   Yes.
13   Q   And -- but term -- what is the difference
14   between term and temporary?
15   A   Term, you can have up to four years.
16       A temporary is a lesser time-frame, and I
17   don't remember the -- I think it may be two years,
18   but I'm not -- don't remember the regs off the top of
19   my head.
20   Q   But that's the difference between the two -
21   -
22   A   That is correct.

Page 121

1    Q   -- the length of time.  And then the
2    biggest difference is permanent, which is no -- no
3    NTE at all.
4    A   Yes.
5    Q   Okay.
6        In a RIF -- in a RIF, NTE employees go
7    before permanent employees, correct?  They must.
8    A   Yes.
9    Q   And temporary employees go before --
10   A   Yes.
11   Q   -- the other kind of employees.
12       So, a temporary employee -- if there's --
13   if there's a down-sizing or RIF, temporary employee's
14   out before you even talk about term employees.
15   A   Yes.
16   Q   And then term employee is out before you
17   talk about permanent employees.
18   A   Yes.
19   Q   Any other category there?  Part-time before
20   you talk about full-time?
21   A   No, they're different on the RIF register.
22   They're just --

Page 122

1    Q   But they're not before — they don't have
2  to be exhausted —
3    A   No.
4    Q   — before.  But term and temporary do.
5    A   In that —
6    Q   In a RIF.
7    A   For example, if you're going to RIF
8  auditors and you have term or temporary auditors,
9  then —
10    Q   They go first.
11    A   Yes.
12    Q   Before you even start to determine the
13  rights of the permanent employees —
14    A   Yes.
15    Q   — you've got to first get rid of the
16  temporaries, then the —
17    A   In that position.
18    Q   Right.  In that position.
19    A   That's correct.
20    Q   Or in that unit.  If you do a unit-wide
21  down-size —
22    A   If you're doing a unit, right.  If you're

Page 123

1  doing the Office of Audits in Atlanta and there were
2  some temporary or term positions there, then, yes,
3  I'd need to get rid of them first.
4    Q   So, let's just make sure I understand.
5  Suppose you're getting rid of X office in Y location.
6    A   Uh-huh.
7    Q   Okay?
8        You're not getting rid of the office, but
9  you're halving its size.
10    A   Okay.
11    Q   It used to have 10 employees, and in the
12  new system, it's going to have five employees.
13        Before you even consider and set up your
14  register under the RIF, you first get rid of all the
15  temporaries.
16    A   That's correct.
17    Q   And then you get rid of all the terms.
18    A   Yes.
19    Q   And then you see where you are.
20    A   Yes.
21    Q   And if you've gotten rid of five with
22  temporaries and terms, that's the end of the RIF.

Page 124

1    A   Yes.
2    Q   Correct?  You never get to the permanent
3  employees.
4    A   Yes.
5    Q   And that's irrespective of who's good and
6  who's bad and who you like and who works harder and
7  who doesn't.  Term — temporary first, term second,
8  before you even turn your attention to permanent
9  civil servants.
10    A   Yes.
11        (Pause.)
12        BY MR. SHAPIRO:
13    Q   Now, I want you to look at this.  You're
14  familiar with Ms. Vosburg, correct?
15    A   Yes.
16    Q   And she doesn't work for you, right?
17    A   No.
18    Q   And does she work with your office at all?
19    A   Yes, she does work with Jan Welch on
20  employee relation-type cases.
21    Q   So, if there's a RIF, if there's a firing,
22  or a disciplinary action, Ms. Vosburg is the lawyer.

Page 125

1    A   Not necessarily.
2    Q   But if she's the lawyer, she works with Ms.
3  Welch.
4    A   Yes.
5    Q   Okay.
6        So, in that sense, she works — coordinates
7  —
8    A   Yes, coordinates, yes.
9    Q   And other lawyers also in that office do
10  the same sort of work?
11    A   Yes.  In the Office of Counsel?
12    Q   Yes.
13    A   Yes.
14    Q   Who?
15    A   Mike Cosgrove.
16    Q   Anyone else?
17    A   Chris Gieseler is in that office, but he
18  does other type of work.
19    Q   So, he doesn't coordinate with your office.
20    A   On FOIA requests.
21    Q   On FOIA requests.
22    A   Yes.

Page 126

1    Q   Okay.  But not on employee relations.
2    A   Personnel law-type cases.
3    Q   That's Cosgrove and Vosburg.
4    A   Yes.
5    Q   Okay.
6        MR. SHAPIRO:  Let's have this marked.
7    (Petty Exhibit No. 3 was marked for identification.)
8        BY MR. SHAPIRO:
9    Q   I'm showing you what is an April 10
10   memorandum on Office of Inspector General stationary
11   --
12   A   Uh-huh.
13   Q   -- to you, and your title there is Deputy
14   Assistant Inspector General for Human Resources.  Is
15   that your formal title?
16   A   That was then.
17   Q   It was then.
18       Okay.
19   A   Uh-huh.
20   Q   From Fred W. Gibson, Jr., Acting Counsel to
21   the Inspector General, subject "Extension of Term
22   Appointment of Adriana Rojas Vosburg."

Page 127

1    A   Uh-huh.
2    Q   See that?
3    A   Yes.
4    Q   "I hereby request that the Office of
5    Inspector . . . extend the term appointment of
6    Adriana Rojas Vosburg to the date which is four years
7    from the date of her current appointment," and then
8    it goes to seek to justify this.
9    A   Uh-huh.
10   Q   Correct?
11   A   Yes.
12   Q   Okay.
13       Now, Ms. Vosburg, in April of 2002, was a
14   term employee.
15       That's the lowest level of employment,
16   right, or is that higher than a temporary?
17   A   It's higher than a temporary.
18   Q   Okay.
19       It's higher -- but she's on a term
20   appointment.
21   A   Yes.
22   Q   And it says here -- and he wants a four-

Page 128

1    year extension, in other words a new term appointment
2    of four years, correct?
3    A   No.
4    Q   Well, what's the maximum a term employment
5    can be?
6    A   Four years before going to the Office of
7    Personnel Management.  He wanted to extend the
8    existing appointment through the four years.
9    Q   Okay.
10       So, that -- to make it the maximum term.
11   A   Yes.
12   Q   Okay.  And what would happen at the end of
13   that term?  She would lose her job?
14   A   Yes.
15   Q   And that's the end of it.
16   A   Yes.  Unless --
17   Q   -- she applies for a permanent job.
18   A   That is correct.
19   Q   Can she get another term appointment at
20   that point, at the end of her four-year term?
21   A   No.
22   Q   So --

Page 129

1    A   We would have to go to the Office of
2    Personnel Management for an exception.
3    Q   The Office of Personnel Management, U.S. --
4    A   U.S. --
5    Q   -- U.S. OPM -- for an exception -- because
6    once you have a four-year term, you either become
7    permanent or that's the end..
8    A   Yes.
9    Q   You can't keep things going in term.
10   A   I've known it to be done, but in my
11   learning, you don't continue to -- because term
12   appointments are supposedly for the term.
13   Q   Yes, I understand.
14       So -- but the theory of this is that, if
15   you're going to employee somebody long-term -- that
16   is, permanently -- you've got to give them the
17   protections of it, and you've got to make it
18   competitive --
19   A   That's correct.
20   Q   Correct?  You can't just keep somebody
21   going on the term --
22   A   That's correct.

Page 130

1    Q  — one term to the next.
2    A  That's correct.
3    Q  It's an abuse to do that.
4    A  That's correct.
5    Q  That's why you have to do it. So, the
6  maximum term is four years.
7    A  Yes.
8    Q  All right. So, did she get this maximum
9  term, this extension?
10   A  Yes.
11   Q  Okay.
12      So, that means that — when was her term to
13  run out?
14   A  I don't know off the top of my head.
15      I would have to go back and look in the --
16  in the file.
17   Q  Okay. But this says here, by way of
18  official justification for this, that she "performs a
19  substantial amount of work on behalf of the office,"
20  and it says, "We anticipate that workload demands on
21  our office will increase over the next several years,
22  as a consequence of restructuring of the OIG and

Page 131

1  conditions in the banking industry. At the same
2  time, the Office of Counsel is downsizing from seven
3  to six full time employees, we are permanently
4  reducing our workforce by one attorney, and the
5  former Counsel to the Inspector General is assuming
6  new duties as the Deputy Inspector General.
7  Accordingly, demand for Ms. Vosburg's professional
8  services will at an absolute minimum continue at
9  present levels during the three and one-half years."
10     So, I take it that she was six months into
11  her term.
12   A  I take it, yes.
13   Q  So, we're going to extend this to something
14  like the autumn or early winter or late autumn of
15  2006 or 2007. Sorry, 2005.
16   A  Right.
17   Q  And that's when the term would be up.
18  Something like November 2005.
19   A  Yes.
20   Q  And she would have to leave.
21   A  Yes.
22   Q  Okay. And then it's saying the plan here,

Page 132

1  from what Mr. Gibson says, is they're down-sizing by
2  — they're getting rid of one attorney position. "At
3  the same time, the Office of Counsel is downsizing
4  from seven to six full time employees, we are
5  permanently reducing our workforce by one attorney,"
6  and in addition, the counsel for the Inspector
7  General is assuming the new duties as deputy IG.
8    A  Uh-huh. yes.
9    Q  So —
10      (Pause.)
11      BY MR. SHAPIRO:
12   Q  Was there a RIF — was there a reduction in
13  size by one attorney in 2003-2004?
14   A  Yes. One attorney left.
15   Q  And was not replaced.
16   A  Right.
17   Q  But it was a planned reduction in size.
18   A  Yes. Well, the attorney left.
19   Q  But the plan here in 2002 was not to
20  replace him.
21   A  That's correct.
22   Q  Whoever was leaving, they weren't going to

Page 133

1  replace him.
2    A  That's correct.
3    Q  Irrespective of who left, correct? They
4  didn't know who was leaving, but whoever was going to
5  leave, they weren't going to replace him.
6    A  I can't say that -- the person left and
7  they did not fill the position.
8    Q  Who was the person who left?
9    A  We had two people to leave around that
10  time-frame, and I'm not sure who left first. I think
11  it was Larry Froehlich.
12      Larry Froehlich left.
13   Q  Okay.
14   A  Because Mike Cosgrove replaced another
15  attorney that left.
16   Q  Who was that?
17   A  Adriana -- I mean -- I'm sorry -- Bernardo.
18   Q  So, Cosgrove —
19   A  Andrea Bernardo.
20   Q  Okay.
21      So, Cosgrove came on to replace one, but
22  one person was not replaced.

Diversified Reporting Services, Inc.
202-467-9200

Page 134

1    A    That is correct.
2    Q    And that was the plan.  It was planned.
3    They said —
4    A    Yes.
5    Q    — they were going to reduce the size, and
6    it was going to be an attorney that they were going
7    to reduce.
8    A    Yes.
9    Q    Okay.
10        These things are done by planning and
11    thinking about the future?
12    A    Yes.
13    Q    Okay.
14        When did Mike Cosgrove come on-board?  Was
15    he here in 2002?
16    A    Yes.
17    Q    Okay.
18        So, he — so, he was not the job that we're
19    talking about here to be — he didn't replace the
20    person that they were getting rid of the position.
21    A    No.
22    Q    It was the next one that left.

Page 135

1    A    Yes.
2    Q    And that was who?
3    A    Larry Froehlich.
4    Q    So, that person would have left in 2003?
5    When did Mr. Froehlich leave?  After this, because
6    they said there were plans —
7    A    I don't remember right off, but Larry
8    Froehlich left around that time-frame.
9    Q    Okay.
10        Let's take a look at this document.
11    (Petty Exhibit No. 4 was marked for identification.)
12    BY MR. SHAPIRO:
13    Q    Before we look at this, let's look at the
14    other document that we just were looking at.  I just
15    want to make sure I understand this.
16        As I read this, they say there's going to
17    be increased work because of changes in the OIG staff
18    and because of "conditions in the banking industry,"
19    and then he say, "At the same time," counsel's office
20    is downsizing by one, and then it says that that one
21    is going to be a lawyer.
22    A    Let me — let me — Larry Froehlich was an

Page 136

1    executive.
2    Q    But he was a lawyer.
3    A    Yes.
4    Q    Okay.
5        So, it says here we're downsizing by one in
6    staff —
7    A    Uh-huh.
8    Q    — and the one that we're downsizing, the
9    position we're getting rid of is a lawyer position,
10    right?
11    A    Yes.
12    Q    Okay.
13        Let's turn ourselves to this next document.
14        This is two-and-a-half years later,
15    November 1, 2004, correct?
16        It's about 30 months later.
17    A    Okay.
18    Q    When I say "later," later from Exhibit No.
19    3.
20        Exhibit No. 4 is November 2004, and it is,
21    again, a memorandum to you, again from Mr. Gibson.
22    This time he's not "acting" counsel, he's counsel for

Page 137

1    the IG, and he says position — and this is regarding
2    a position announcement, and he says, "Please
3    advertise a position of CG-905-13 in the Counsel's
4    office, with promotion potential to grades 14" — I
5    take it that's an "and," even though it's a
6    typographical error — and 15.  "I understand that
7    this advertisement can be made FDIC-wide."
8        All right.
9        Now, 905 — that's the job series.
10        That's a legal job series, lawyer, correct?
11    A    Yes.
12    Q    Okay.
13        So, we're adding a lawyer here?
14        It's not a replacement of somebody who's
15    left, is it?
16    A    Well, at this — when this position was
17    advertised, no, we did not replace a lawyer.
18    Q    Okay.
19        So, he's asking for a new lawyer job,
20    right?  He's telling you to announce a new lawyer
21    job, not a vacancy that — not somebody's leaving and
22    we need to replace them, but a new job, correct?

Page 138

1    A   Yes.
2    Q   Okay.
3        Two-and-a-half years after he said that we
4    are getting -- we are down-sizing by one and we're
5    getting rid of a -- and that one is a lawyer, right?
6    A   Yes.
7    Q   Now we're adding a lawyer, correct?
8    A   Yes.
9    Q   Now, at the time, November 1, 2004 --
10       (Pause.)
11       BY MR. SHAPIRO:
12   Q   How many lawyers were on the staff?
13   A   When?
14   Q   November 1, when he writes this memo to
15   you.  Permanent staff.  Not temporary.  Not -- not --
16   not --
17   A   -- term.
18   Q   -- term.  Just permanent lawyers on the
19   staff.
20   A   Two in addition to Fred.
21   Q   Two in addition to Fred.  And those people
22   are Cosgrove?

Page 139

1    A   Yes.
2    Q   And --
3    A   -- Chris Geiseler.
4    Q   -- Chris Geiseler.  All right.  And there
5    are other lawyers who work there.
6    A   Yes.
7    Q   Who are they?
8    A   Adriana Vosburg.
9    Q   Anyone else?
10   A   No.
11   Q   Ms. Vosburg was a term.
12   A   Yes.
13   Q   At this point.
14   A   Yes.
15   Q   Okay.
16       Now, he says in that first -- that first
17   paragraph, "I understand . . . this advertisement can
18   be made FDIC-wide."
19       Now, that means that you have to be an FDIC
20   employee to apply for this vacancy, correct?
21   A   Yes.
22   Q   Okay.

Page 140

1        Do you have to be a permanent employee or
2    just have to be working at the FDIC?
3    A   Working at the FDIC.
4    Q   All right.  And not -- not for a
5    contractor.  You have to be on the rolls at the FDIC.
6    A   Yes.
7    Q   You could be term, you could be temporary,
8    but you have to be at the FDIC.
9    A   Yes.
10   Q   If you're a justice department GS-13, you
11   can't -- you can't apply for this job if it's FDIC-
12   wide, correct?
13   A   Correct.
14   Q   Okay.  Even if you're in Washington, you
15   can't apply.
16   A   Correct.
17   Q   Okay.
18   A   If you do not work for FDIC.
19   Q   That's what FDIC-wide means.
20   A   Correct.
21   Q   Okay.
22       So, that means you'd have to be a lawyer

Page 141

1    working in a legal position or not even working in a
2    legal position -- you just have to be a qualified
3    lawyer working for the FDIC.
4    A   Yes.
5    Q   Okay.
6        So, even if you were holding down the job
7    of a program manager, program -- program analyst, but
8    you happen to be an attorney, you could apply for the
9    job, if you're at the FDIC.
10   A   Yes.
11   Q   Okay.
12       It means that you -- when you advertise
13   FDIC-wide, as opposed to wider than that, it means
14   that you don't want to increase the number of
15   employees at the FDIC.
16       In other words, you're not trying to add a
17   body to the FDIC, correct?
18   A   Correct.
19   Q   Similarly, if you do it Washington, D.C.-
20   wide, right, Government -- Government only,
21   Washington, D.C.-wide, you don't want to pay for
22   somebody to move to Washington.

Page 142

1    A    Correct.
2    Q    And if you do it just Government-wide,
3  Washington, D.C., it means that not only you don't
4  want to pay anybody to move to Washington, but you
5  don't want to add to the Government's employment
6  numbers.
7         You could do it Government-wide and
8  Washington only.
9    A    Correct.
10   Q    And that means that the Government won't
11 increase its employee numbers by one if you -- if you
12 do it Government-wide, headquarters.
13   A    Correct.
14   Q    Okay.
15        So, the idea of FDIC-wide is designed to
16 not increase the FDIC's employment.
17   A    Correct.
18   Q    That's the purpose of limiting --
19   A    Correct.
20   Q    -- the area of advertisement, correct?
21   A    Correct.
22   Q    Okay.

Page 143

1         It's not -- it's not supposed to be used to
2  focus and to allow only the person you want to apply
3  for the job, to get the job.  That's -- that would be
4  abusive, correct?
5    A    Correct.
6    Q    Because if you do that, then you're
7  limiting competition, correct?
8    A    Correct.
9    Q    And you -- if it was only one lawyer in the
10 FDIC who had a GS -- or a CG-12, you wouldn't be able
11 to do FDIC-wide; you'd have to do it wider than that,
12 correct?
13   A    Correct.
14   Q    Because there has to be fair competition.
15   A    Correct.
16   Q    Otherwise, it might be fraud, waste, and
17 abuse.
18        It's similar to that.
19        You don't want -- you want it to be a real
20 competition.
21   A    Correct.
22   Q    All right.

Page 144

1         Now, he indicates in this next paragraph
2  what he wants in the ranking factors in addition to
3  the ones used previously for general lawyers, right?
4    A    Uh-huh.
5    Q    He wants some specialized ranking factors
6  here, correct?
7    A    Correct.
8    Q    That's not unusual, is it?
9    A    No.
10   Q    To add for a specific job.  If you want
11 somebody to do X kind of work, you want them to have
12 a background in X kind of work and you want the
13 competition to be limited to those people, or you
14 want to give benefit to those people, you want it to
15 be a ranking factor, correct?
16   A    Correct.
17   Q    That's proper, isn't it?
18   A    Yes.
19   Q    But if you would focus the ranking factors
20 to only one person who already has the experience,
21 that would be abusive, wouldn't it?
22   A    Correct.

Page 145

1    Q    Because it would be abusive of the
2  competitive system, correct?
3    A    Correct.
4    Q    Okay.  And as a personnel specialist,
5  that's the kind of stuff you're trained in.
6    A    Correct.
7    Q    To preserve the integrity of the personnel
8  system, the competitive personnel system, correct?
9    A    Correct.
10   Q    Okay.
11        He says, "In addition to the quality
12 ranking factors identified in that position
13 announcement" -- that was a position announcement for
14 a OIG 905-15-level job, right?  Correct?
15   A    Yes.
16   Q    Yes.
17        In addition to the ranking factors for
18 that, he wants this one -- this particular position
19 that he's asking to be announced "should include
20 knowledge of and specific experience with the
21 Inspector General Act of 1978, as amended," correct?
22   A    Correct.

Page 146

1    Q  ". . . the operations and activities of the
2  FDIC Office of Inspector General . . ."  So, he wants
3  somebody that has knowledge of the specific Office of
4  Inspector General at the FDIC to get a positive
5  ranking, used as a factor.  If you have knowledge of
6  that office, that's a benefit; that's considered a
7  positive thing, right?
8    A  Correct.
9    Q  All right.
10       So, a person should be -- a person here, so
11  far, who, in addition to being generally a level 15
12  lawyer, they're going to give benefit in ranking
13  factors to people that understand or have experience
14  or -- or specific knowledge and specific experience
15  with the Inspector General's Act, right?
16    A  Correct.
17    Q  And with knowledge of the FDIC's Office of
18  Inspector General, correct?
19    A  Correct.
20    Q  It says, "Management of litigation is not
21  necessary, but the ability to litigate cases before
22  the MSPB and the EEOC should also be considered," as

Page 147

1  well as the Federal Deposit Insurance Act, specific
2  knowledge, or "in-depth knowledge" of the Federal
3  Deposit Insurance Act, FDIC regulations and policies
4  and other laws which affect open and closed banks,
5  correct?
6    A  Correct.
7    Q  So, the person that's going to get positive
8  -- the most points on these ranking factors is
9  somebody that works in the FDIC's Inspector General's
10  counsel's office, correct?
11    A  Not --
12    Q  Has worked there.
13    A  Not necessarily.
14    Q  Well, they're going to have to be familiar
15  with the FDIC Act, the FDI Act, right?
16    A  Which a person in --
17    Q  -- FDIC would, a lawyer in FDIC.
18    A  Yes.
19    Q  Also doing MSPB and EEOC litigation should
20  be considered.
21    A  Yes.
22    Q  So, somebody in that field, right?

Page 148

1    A  Yes.
2    Q  Also somebody who has knowledge of the
3  operations and activities of the FDIC's Office of
4  Inspector General, correct?
5    A  Correct.
6    Q  Also familiarity with the Inspector
7  General's Act.
8    A  Or a similar formulation.
9    Q  Yes, I understand.
10       So, positive -- among these ranking
11  factors, it would help a lot and add to a candidate's
12  -- an applicant's ranking in this if they worked in
13  the -- as a lawyer in the FDIC's Office of Inspector
14  General, correct?
15    A  It would help.
16       However, there are people in the
17  corporation that have this knowledge and experience,
18  also, and the KSAs were not worded to this extent.  I
19  don't remember exactly, but I know they were not
20  worded to that extent.
21    Q  I understand, but that's what Mr. Gibson is
22  requesting.

Page 149

1    A  That is correct.
2    Q  Okay.
3       Good.
4       All right.
5       You did advertise this FDIC-wide, correct?
6    A  Yes.
7    Q  How many applicants were there?
8    A  I don't remember off the top of my head.
9    Q  Could it have been one?
10    A  No.
11    Q  It was more than one?
12       Are you sure?
13    A  I'm not sure.  That's why I said I don't
14  remember.
15    Q  So, it could have been one.
16    A  It could have been.
17    Q  And if there's one applicant, it doesn't
18  mean you can't fill it.
19    A  That's correct.
20    Q  Right?
21       Management can still fill it.
22    A  Correct.

Page 150

1    Q   If there's one good applicant, that's all
2  it takes.
3    A   Correct.
4       MR. SHAPIRO:  Let's have this marked for
5  identification.
6  (Petty Exhibit No. 5 was marked for identification.)
7       MR. SHAPIRO:  All right.
8       BY MR. SHAPIRO:
9    Q   Now I'm showing you -- now, I'm showing you
10  what looks to be a SF-50, correct?
11    A   Yes.
12    Q   What is known in the trade, Federal
13  personnel trade, as a notification of personnel
14  action.
15    A   Yes.
16    Q   Now, this is the action -- this is the
17  actual document which takes a personnel action,
18  correct?  We have a 52, an SF-52, which is a request
19  for personnel action.
20    A   Yes.
21    Q   That comes first.
22    A   Yes.

Page 151

1    Q   And then the SF-50 is the actual action.
2    A   Yes.
3    Q   It's the evidence of a personnel action,
4  whatever it might be.
5    A   Yes.
6    Q   Okay.
7       Now, the action that we have here involves
8  a person named Adriana R. Vosburg, correct?
9    A   Yes.
10    Q   Okay.  And the nature of the action says
11  conversion to the -- to an excepted appointment.  Is
12  that correct?
13    A   Correct.
14    Q   An excepted appointment means an
15  appointment in the excepted service, correct?
16    A   Yes.
17    Q   That is, a permanent civil service job.
18    A   Well, let's go back.
19       The term -- yes.
20       Yes.
21    Q   Yes.  From a term or a temporary job.
22    A   Yes.

Page 152

1    Q   Okay.
2       In lawyers' terms, no lawyer job, attorney
3  job, is competitive service; they're all excepted,
4  correct?
5    A   Correct.
6    Q   Okay.
7       There might be one or two in the Veterans
8  Administration that are competitive, but in general,
9  I think it's clear that attorney positions, whether
10  they're attorney-advisor, whatever it is, they're --
11  905 jobs, series 905, are excepted service.
12    A   Correct.
13    Q   Which originally meant that there was no
14  test for them.
15    A   Correct.
16    Q   No competitive test.
17    A   Correct.
18    Q   Right?  But now it has other meanings.  But
19  it does mean -- it can mean a permanent job.
20    A   Correct.
21    Q   A civil -- career civil service, what they
22  call career condition, correct?

Page 153

1    A   Yes.
2    Q   Okay.  As opposed to temporary or term.
3    A   Yes.
4    Q   Okay.
5       So, this is a conversion of something to an
6  excepted appointment, correct?
7    A   Yes.
8    Q   And the legal authority is Schedule A.  See
9  that?
10    A   Yes.
11    Q   Schedule A is where we deal with permanent
12  employees, excepted service, Schedule A employees,
13  correct?
14    A   Yes.
15    Q   There's Schedule A and then there's
16  Schedule C, correct?
17       Schedule C are political appointments;
18  Schedule A are career and career conditional
19  appointments, correct?
20    A   Correct.
21    Q   Okay.
22       So, what we have here is -- what is "WDM"?

Page 154

1  It says -- 5-C is "Code." Do you see that?
2      A   That's the nature of action title.
3      Q   Okay.
4      A   And we get that from the -- the operating
5  manual, and I don't know, off the top of my head,
6  what that code stands for.
7      Q   So, the position is going from a attorney-
8  advisor general from -- to a position of general
9  attorney, correct?
10     A   Correct.
11     Q   But it's really going from term to Schedule
12 A; that is to say, excepted service.
13     A   Correct.
14     Q   Okay.
15         Now, there's a "Remarks" column, and it
16 says, "Congratulations on your promotion." You see
17 that the grades -- one is a grade 12 and the other
18 one is a grade 13.
19         Do you see that?
20     A   Yes.
21     Q   But the reason why there's no pay plan or
22 code is that one is temporary and one is permanent.

Page 155

1      A   That's not --
2      Q   Not temporary. Sorry. Term and permanent.
3      A   That's not correct.
4      Q   Really?
5      A   The reason why there is no pay plan --
6  because that's how -- what the system does. It's
7  still a CG.
8      Q   Okay. But one is term and one is
9  permanent, correct?
10     A   Correct.
11     Q   So, what's happening here, for the purposes
12 of this form, is a newly-minted Schedule A excepted
13 service appointment is being made.
14     A   Yes.
15     Q   Right?
16     A   Yes.
17     Q   And a person is going from a term to this
18 appointment, a term appointment to this appointment,
19 correct?
20     A   Correct.
21     Q   By the way, there's also a promotion. The
22 term was a 12 grade, and the permanent is a 13 grade.

Page 156

1      A   Correct.
2      Q   Okay.
3          So, two things are happening here.
4      A   Correct.
5      Q   But the principle thing, the reason for the
6  action is a permanent career conditional appointment
7  is being made.
8      A   Correct.
9      Q   From a term.
10     A   Not career conditional. Excepted
11 appointment.
12     Q   Well, excepted is career conditional,
13 right?
14         An excepted appointment into the career
15 civil service --
16     A   That's correct.
17     Q   -- is being made from a -- from a term
18 appointment.
19     A   That's correct.
20     Q   And your signature is here, but it looks
21 like a signature stamp.
22         Is it a signature stamp?

Page 157

1      A   This is auto from the system.
2      Q   Okay.
3          So, the system provides your signature.
4      A   Yes.
5      Q   Okay.
6          Somebody has to be authorized to push the
7  button, right?
8      A   Yes.
9      Q   Somebody in your office.
10     A   No. These are the corporation -- our
11 division -- DIRM -- division of information -- they -
12 - all of our 50s are --
13     Q   I don't think it's DIRM anymore.
14     A   It's DIT.
15     Q   It's DIT, right.
16     A   There's a central location where all of the
17 50s for the corporation's HR shop and our shop are
18 printed.
19     Q   So, you didn't personally authorize this.
20 It came out of OIG, so therefore your signature is
21 the one that pops up on the 50.
22     A   That is correct.

Page 158

1    Q   All right.
2    A   All of the 50s that are generated for the
3  OIG have my signature on them.
4    Q   I understand.  Even though you might not
5  have seen it and may not have approved it.
6    A   Oh, I look at the 50s.
7    Q   Okay.
8        So, you would have looked at this before it
9  got authorized to print.
10    A   I look at the work that goes in -- that's
11  correct.
12    Q   Okay.
13        So, let me just make sure.
14        Now, you approved this, at least according
15  to the system --
16    A   Yes.
17    Q   -- on November 28, '04.
18    A   Yes.
19    Q   And that's the effective date of the
20  action.
21        One of the things about Form 50s are they
22  have an effective date.

Page 159

1    A   Yes.
2    Q   And that is the date at which the action
3  went into effect.
4    A   Yes.
5    Q   She -- Ms. Vosburg would not have been
6  entitled to GS-13-level pay -- correct? -- until
7  November 28th.
8    A   Correct.
9    Q   Even if she was doing the work, even if
10  they told her, no matter what, that date is critical
11  to that point, right?
12    A   Correct.
13    Q   Payroll office is not going to go back
14  beyond that date.
15    A   Correct.
16    Q   Right?
17        Also, when we go to calculate how long
18  she's been a permanent career or career conditional
19  appointee, that's the date that's important here.
20    A   That is correct.
21    Q   She is not going to be a career or career
22  conditional appointee before that date.

Page 160

1    A   Correct.
2    Q   Okay.
3        Good.
4        (Pause.)
5    BY MR. SHAPIRO:
6    Q   Now, I want you to look at the second page.
7        This is a candidate selection
8  recommendation, right?
9        Now, it's not necessary to have this with
10  the Form 50, is it?
11    A   No.
12    Q   But one backs up the other.  One is the
13  reason why we have the Form 50.
14    A   Yes.
15    Q   That is, the recommendation of selection.
16    A   Yes.
17    Q   The selecting official here is Fred Gibson.
18    A   Yes.
19    Q   And it's signed here not by auto-sign, by
20  the DIRM or DIT unit.
21        This is actually signed by Ms. Welch, who's
22  acting for you.

Page 161

1    A   Yes.
2    Q   November 19, '04, the date after Mr. Gibson
3  signed, right?
4    A   Yes.
5    Q   Okay.
6        Now, this says -- this has a handwritten
7  notation.
8        He wants the date -- start date to be
9  immediate.
10        He says Ms. Vosburg was the sole candidate
11  referred.
12        Was there a panel in this or was it --
13    A   No.
14    Q   So, a personnelist made the referral.
15    A   Yes.
16    Q   Okay.
17        So, there was no panel judging applicants.
18    A   No.
19    Q   Just a servicing personnelist from your
20  office.
21    A   Reviewing the qualifications and referring
22  those who are qualified.

Diversified Reporting Services, Inc.
202-467-9200

Page 162

1    Q    Doesn't tell us -- so, she was the only one
2  that the personnelist thought was qualified --
3    A    Yes.
4    Q    -- because she was the sole person
5  referred.
6    A    Yes.
7    Q    We don't know how many people applied.
8    A    I have it in the files, but --
9    Q    She may have been the only one.
10   A    That's correct.
11   Q    Okay.
12       She was the only one who was qualified for
13  the job.
14   A    Correct.
15   Q    And that's not a qualification like looking
16  at -- weighing -- this is a technical qualification.
17   A    Correct.
18   Q    Okay.
19       "I reviewed her SF-171 and concluded that
20  her direct and substantial experience in her present
21  position highly qualifies her for the selection.
22  Specifically, she has worked on litigation of the

Page 163

1  type described in the vacancy announcement, has
2  extensive and direct experience with the IG Act and
3  the" --
4    A    -- "activities" --
5    Q    -- "activities of the IG . . . particularly
6  . . ." -- so, she matched -- she matched the vacancy
7  announcement. Her experience matched the vacancy
8  announcement, didn't it?
9    A    Yes.
10   Q    Okay.
11       How do we know how many other people
12  applied for this job?
13       You could find out for us?
14   A    Yes.
15   Q    Okay.
16       Under vacancy announcement 2004-OIG-2694,
17  correct?
18   A    Correct.
19   Q    And because in this document we generated a
20  SF-50.
21   A    Yes.
22   Q    This document stands in lieu of a SF-52, a

Page 164

1  request for a personnel action.
2    A    No.
3    Q    One of those would have been generated, as
4  well.
5    A    We had an automated system in -- the
6  documentation is in the system. So, yes, we had
7  that, also.
8    Q    Okay.
9       Let's look at this document.
10  (Petty Exhibit No. 6 is marked for identification.)
11       BY MR. SHAPIRO:
12   Q    Now, what we're looking at here is a
13  vacancy announcement, correct?
14       The system prints this out.
15   A    Correct.
16   Q    You put in the -- the data, and the system
17  will spill out a vacancy announcement, correct?
18   A    Correct.
19   Q    How is it advertised?
20       Is it advertised through the intranet of
21  the FDIC, or is it actually physically posted down in
22  a office somewhere?

Page 165

1    A    Through the intranet of the FDIC.
2    Q    Okay.
3       Now, if we look at this vacancy
4  announcement, we see that it is precisely the same
5  number as the vacancy announcement that Mr. Gibson
6  filled out on the candidate selection recommendation.
7  That is, 2004-OIG-2694, correct?
8    A    Correct.
9    Q    Okay.
10       This job was advertised for 11 days. Open
11  date, 11/04/2004; closing date, 11/15/2004.
12   A    Correct.
13   Q    At that time, Ms. Sharpe was already at
14  your unit.
15   A    Yes.
16   Q    She came in October.
17   A    Yes.
18   Q    Okay.
19       Now, a person cannot go from term to
20  permanent without a competition, can they?
21   A    Correct.
22   Q    There must be a vacancy announcement and a

Page 166

1 full competition.
2    A   Correct.
3    Q   That is to say, it has to technically
4 qualify as a competition, correct?
5    A   Correct.
6    Q   Okay.
7       Now, the summary of the duties and the
8 qualifications required are a composite of what is
9 required by the rules for a GS — a CG-13-level
10 employee, or actually to the 15 level, correct?
11    A   Correct.
12    Q   Right. And the specific requirements of
13 this particular job, which management would have told
14 you about. That is to say, OIG counsel's office
15 would have told you about.
16    A   A position description tells me.
17    Q   Right. But counsel's office will help
18 write that.
19    A   That's correct.
20    Q   All right.
21       (Pause.)
22       MR. SHAPIRO: Okay.

Page 167

1       BY MR. SHAPIRO:
2    Q   And your office is responsible for summary
3 of duties, qualifications required, time in grade
4 required, all that.
5    A   Correct.
6    Q   But summary of duties and ranking —
7 quality ranking factors -- management has some play
8 in that. In other words, they participate in that.
9    A   Yes.
10    Q   They say what they want and they say what
11 the job is.
12    A   The summary of duties comes from the
13 position description. So, if it's not described in
14 the position description, then it doesn't go in the
15 vacancy announcement, and the quality ranking factors
16 are developed from a job analysis that management --
17 that my office works with management --
18    Q   And management, in this case, is Mr.
19 Gibson.
20    A   Correct.
21    Q   Uh-huh.
22       Okay.

Page 168

1       Now, Ms. Vosburg was continuing at that
2 point, in November of 2004.
3       She would have still had her term
4 appointment going.
5    A   Correct.
6    Q   That term appointment wouldn't have been
7 over for another year, somewhere around November
8 2005.
9    A   Correct.
10    Q   Correct?
11    A   Correct.
12    Q   Because she got the four-year extension
13 back in 2002, April of 2002.
14    A   Correct.
15    Q   Okay.
16       MR. SHAPIRO: We're almost done. Let's
17 take a break.
18       (A brief recess was taken.)
19       BY MR. SHAPIRO:
20    Q   I just have a few more questions, actually,
21 about when Ms. Sharpe came into your office.
22    A   Okay.

Page 169

1    Q   When she was being trained, she was
2 training in a whole new field, correct?
3    A   Yes.
4    Q   This transfer required her to be trained.
5    A   Yes.
6    Q   I mean you could not have her — she could
7 not do this job without the training you arranged
8 that first year —
9    A   Correct.
10    Q   — the benefits job.
11    A   Correct.
12    Q   Correct? And while she was being trained,
13 she also had to start doing the job, correct?
14    A   Yes.
15    Q   Sort of on-the-job training and some six,
16 seven thousand dollars' worth of outside training.
17    A   Yes.
18    Q   And it was a job that she felt not
19 qualified for —
20    A   Correct.
21    Q   — and you agreed with her.
22    A   Correct.

Page 170

1    Q   And she really wasn't interested — she
2  told you that — in benefits.
3    A   Correct.
4    Q   Correct?  Although she had some interest in
5  HR, correct?
6    A   Correct.
7    Q   Benefits was not the area in HR that she
8  was interested in.
9    A   Correct.
10    Q   And she didn't think her prior training and
11  education and experience as a paralegal was a
12  particularly good fit for benefits work in HR.
13    A   Correct.
14    Q   She thought more like employee relations,
15  staffing, the analytical areas.
16    A   Based on what she wrote there.
17    Q   Yes.  And you understood that to be true,
18  as well.
19        That's her view.
20    A   That's her view.
21    Q   Right.  And you think she does — you were
22  happy to have her interested in staffing, correct?

Page 171

1    A   Yes.
2    Q   And recruitment.
3    A   Yes.
4    Q   All right.
5        You would agree with me that that's a more
6  analytical area of HR than benefits?
7    A   No.
8    Q   All right.
9        What does it take?  It's more people-
10  oriented?
11    A   No.
12    Q   Then what's — what's the difference?
13    A   With staffing, you are reviewing -- well,
14  let's go back.
15        Benefits is more people-oriented.  You have
16  customers.  You have employees.  You're talking to
17  employees.  You're talking to retirees.  You're
18  talking to vendors.
19        Staffing and recruitment -- you're
20  reviewing applications.
21    Q   And you're dealing with management.
22    A   Eventually -- eventually, you will.

Page 172

1    Q   Well, also, writing — writing vacancy
2  announcements.
3    A   Yes.  Yes.
4    Q   You have to satisfy management.
5    A   Yes.
6    Q   Right?
7        Her area was not even staffing and
8  recruitment.  What she said at the beginning was she
9  wanted classification, which is very analytical —
10    A   Correct.
11    Q   — and employee relations, which is kind of
12  contentious.  It's — it's a contending area,
13  correct?
14    A   Correct.
15    Q   Where you sort of represent management.
16    A   In some areas, correct.
17    Q   Employee discipline, that sort of area.
18    A   Correct.
19    Q   Okay.
20        She was anxious — that is, she had anxiety
21  over this move, didn't she?
22    A   I would say so.

Page 173

1    Q   You tried to ease that anxiety, to be sure,
2  but she was very anxious about it.
3    A   Correct.
4    Q   She did not want to leave paralegal work.
5    A   Correct.
6    Q   Particularly for benefits work.
7    A   Correct.
8    Q   She would consider leaving it but leaving
9  it for classification or employee relations work.
10    A   Correct.
11    Q   In addition to her saying — did she say
12  she was anxious?
13    A   No.
14    Q   She looked like she was anxious.
15    A   Yes.
16    Q   And what was that?
17    A   The hesitation.  The --
18    Q   Nervousness?
19    A   Nervousness.
20        When we met after I came back and the
21  directed reassignment letter was signed, I met with
22  her, trying to -- because I could tell, in the

Page 174

1  meeting, she -- the prior meeting, she was very
2  forthcoming, more open.
3      Q   The prior meeting being when she was
4  examining whether she might want to come there.
5      A   Yes.
6      Q   Volitional.
7      A   Yes, more -- yes.
8      Q   She was asking questions.  She was
9  interested in what the job was about, so she could
10 make her mind up.
11     A   Yes.
12     Q   The second meeting, when you knew -- when
13 she knew she was being forced to take it, she was
14 anxious about doing the job.
15     A   I would say so.
16     Q   Anxious about changing fields.
17     A   I would say so.
18     Q   Now, you've -- I'm going to use the old
19 term -- you've been in personnel work for some time.
20     A   Yes.
21     Q   In fact, your whole career.
22     A   Yes.

Page 175

1      Q   Right?
2          It's what you chose.
3      A   Yes.
4      Q   What did you study in college?
5      A   Industrial psychology.
6      Q   Which is a personnel-related field, isn't
7  it?
8      A   Correct.
9      Q   And so, you chose to be in personnel work.
10     A   Yes.
11     Q   What about your subordinates, your other
12 subordinates?  Ms. Welch -- she's a personnel
13 professional, correct?
14     A   Correct.
15     Q   She chose the field.
16     A   Yes.
17     Q   And the same is true of the other
18 personnelists there, correct?
19     A   Yes, except Gloria Hill, who was prior
20 Gloria Betts -- she was -- when I came there, she was
21 not in human resources or personnel.
22     Q   She was in what?

Page 176

1      A   She was a secretary to -- it was a merger
2  between FDIC and RTC.  She was in --
3      Q   Clerical.
4      A   That's correct.
5      Q   So, personnel work was a step up for her.
6      A   That is correct.
7      Q   Right.
8          Stacey was the only one that was forced
9  into it.
10     A   Correct.
11     Q   Okay.
12         MR. SHAPIRO:  I don't have anything
13 further.
14         Questions?
15         MR. COSGROVE:  I've got one or two, just to
16 clarify some stuff.
17         BY MR. COSGROVE:
18     Q   An excepted service employee who is
19 selected for a term appointment as a result of
20 competition -- okay?
21         Does there need to be further competition
22 to convert that to an indefinite appointment?

Page 177

1          MR. SHAPIRO:  I object.  I think you've
2  mixed the metaphors sufficiently that -- that she
3  can't answer that question.  It's not an answerable
4  question in the form.
5          I object.
6          BY MR. COSGROVE:
7      Q   Do you understand my question?
8      A   Can you rephrase your question?
9      Q   All right.
10         Let me try it again.
11         An excepted service employee who is
12 selected as a result of the competitive process --
13 can they be converted to an indefinite appointment or
14 a career conditional appointment or a career
15 appointment without further competition?
16     A   No, because you have two different fields.
17 Excepted service is different from -- from a career
18 conditional appointment.
19     Q   Okay.  All right.
20         Can they be selected without further
21 competition to an indefinite accepted appointment?
22     A   Yes.

Page 178

1    MR. SHAPIRO: An indefinite -- are you
2  finished?
3    MR. COSGROVE: Yes.
4    BY MR. SHAPIRO:
5    Q   An indefinite excepted appointment?  Is
6  that what you said?
7    A   Yes.
8    Q   That's -- that's an excepted service
9  appointment.
10   A   Yes.
11   Q   So, once you're in the excepted service,
12  you can get an -- that is an indefinite appointment.
13   A   You can be reassigned to another --
14   Q   -- to another excepted service appointment.
15   A   Yes. Yes.
16    MR. SHAPIRO: Nothing further.
17    (Whereupon, at 1:00 p.m., the deposition
18  was concluded.)
19          *****
20    I have read the foregoing pages, which are
21  a correct transcript of the answers given by me to
22  the questions therein recorded.

Page 179

1    Deponent_____

2    Date_____

Diversified Reporting Services, Inc.
202-467-9200

**A**

ability 52:6
  146:21
able 21:22 48:7
  53:21 55:17
  96:15 113:7
  143:10
above-entitled
  1:21
absolute 131:8
absolutely 6:13
  21:1 40:11
  46:17 49:14
  67:1
abuse 130:3
  143:17
abusive 143:4
  144:21 145:1
accept 56:16
  76:5,11
accepted 177:21
accepting 75:4
  75:20
access 43:22
  44:2
accessed 53:21
  54:4
accommodate
  98:3
acknowledge...
  75:20
Act 145:21
  146:15 147:1
  147:3,15,15
  148:7 163:2
acting 58:11
  62:13,15
  126:20 136:22
  160:22
action 1:21 3:15
  36:16,20
  37:12 124:22
  150:14,16,17
  150:19 151:1
  151:3,7,10
  154:2 156:6

158:20 159:2
  164:1
**Actions** 85:15
actively 12:5
activities 146:1
  148:3 163:4,5
acts 30:3
actual 31:15
  118:13 150:17
  151:1
add 141:16
  142:5 144:10
  148:11
added 56:7
adding 137:13
  138:7
addition 11:7
  11:10 14:9
  60:17 112:11
  132:6 138:20
  138:21 144:2
  145:11,17
  146:11 173:11
additional 51:1
address 4:13
admin 26:1
Administration
  152:8
administrative
  112:15
Administrati...
  110:19
Adriana 126:22
  127:6 133:17
  139:8 151:8
advertise 31:13
  62:11 63:4,17
  94:19 120:10
  120:11 137:3
  141:12 149:5
advertised
  21:21 23:14
  23:16 24:3,4,7
  24:9 25:18
  26:15 38:1,2,4
  39:9,14 42:3

42:15 60:18
  62:3 137:17
  164:19,20
  165:10
advertisement
  42:12 61:1
  137:7 139:17
  142:20
advertisements
  31:15
advertising
  37:16 60:14
advisor 154:8
affect 147:4
African-Ame...
  64:8,10
age 1:20
agency 1:7,9 2:6
  3:4 66:4 104:2
ago 114:6,8
agree 65:4 82:8
  85:20 171:5
agreed 169:21
ahead 25:13
  60:13 116:14
aide 7:13
Air 5:21
allocated 101:7
allow 143:2
allowed 108:10
amended
  145:21
amount 117:1
  120:1 130:19
analysis 167:16
analyst 13:13
  13:19 18:18
  18:19 98:20
  141:7
analytical 26:13
  170:15 171:6
  172:9
Andrea 133:19
and/or 44:18
  55:13 56:15
Annette 73:11

73:12
announce
  137:20
announced 22:2
  22:7 26:20
  145:19
announcement
  3:16 37:5,15
  39:1,14 40:6
  108:4,9 137:2
  145:13,13
  163:1,7,8,16
  164:13,17
  165:4,5,22
  167:15
announcements
  172:2
answer 116:4
  116:14 177:3
answerable
  177:3
answering 81:4
answers 178:21
anticipate
  130:20
anticipating
  56:2
anxiety 172:20
  173:1
anxious 172:20
  173:2,12,14
  174:14,16
anybody 32:9
  46:15 111:9
  142:4
anymore 40:10
  157:13
anyway 62:19
APPEARAN...
  2:1
appears 53:3
applicant
  149:17 150:1
applicants 32:5
  32:7 149:7
  161:17

applicant's
  148:12
application
  51:22 113:6,9
applications
  85:12 171:20
applied 7:21
  24:8 36:1
  107:20 108:3
  108:11 162:7
  163:12
applies 109:15
  128:17
apply 67:2
  105:15 112:22
  139:20 140:11
  140:15 141:8
  143:2
appointed
  118:2
appointee 118:6
  159:19,22
appointment
  117:17,21
  118:13,14
  126:22 127:5
  127:7,20
  128:1,8,19
  151:11,14,15
  153:6 155:13
  155:18,18,18
  156:6,11,14
  156:18 168:4
  168:6 176:19
  176:22 177:13
  177:14,15,18
  177:21 178:5
  178:9,12,14
appointments
  129:12 153:17
  153:19
Approval 86:6
approve 88:9
approved 104:9
  158:5,14
April 106:16

126:9 127:13
168:13
**area** 10:3 13:8
13:10,21 15:5
15:10 17:21
19:9 21:9
31:19 33:3
35:21 36:8
49:22 55:11
55:18 60:4
72:14 79:5,6
79:22 81:12
84:7 92:19
93:13 94:4,12
94:14 100:9
101:14 111:16
142:20 170:7
171:6 172:7
172:12,17
**areas** 9:9 10:8
13:4 17:15
35:16 56:11
56:12 92:19
96:21 98:19
109:15,16
111:20 113:2
115:10 170:15
172:16
**Arlington** 2:8
**arranged** 169:7
**arrived** 24:20
**aside** 76:17
109:21
**asked** 48:16
51:1 88:1
**asking** 50:15
57:1 115:22
116:1,2
137:19 145:19
174:8
**Assessment**
85:6
**assist** 92:19
**assistant** 18:4,5
18:7,16 19:18
24:2 27:16

58:19,19
126:14
**assisted** 21:9,11
**assisting** 59:4
**assists** 13:10
**associated**
106:6
**assume** 74:8
90:4
**assuming** 72:19
131:5 132:7
**assumption**
74:10,12,13
**Atlanta** 106:20
106:22 107:6
107:7 123:1
**attend** 86:8
**attendance** 99:4
**attended** 15:9
86:3,12
**attending** 83:17
**attends** 86:13
**attention** 124:8
**attorney** 131:4
132:2,5,13,14
132:18 133:15
134:6 141:8
152:2,9 154:7
154:9
**attorney-advi...**
152:10
**audit** 14:16
15:11 16:4,5
46:19 69:20
73:22 77:18
95:4 112:11
**auditors** 67:22
112:9,12
122:8,8
**audits** 72:1 73:9
77:22 107:1,2
107:5,7,9
123:1
**August** 42:22
52:13,14,15
53:3,13

**authority**
104:15,18,20
153:8
**authorize**
157:19
**authorized**
157:6 158:9
**auto** 157:1
**automated**
164:5
**auto-sign**
160:19
**autumn** 131:14
131:14
**aware** 90:15
**a.m** 1:25

_____
**B**
**back** 7:17 8:14
14:17 15:4
17:3 22:16
25:14,22 27:3
43:1 44:9
47:11 48:5,12
50:2 52:11
57:11,16,19
57:21 59:13
59:16,18,22
61:19,20 62:9
62:10 63:2,3
78:20 87:18
91:12 95:17
97:14 130:15
151:18 159:13
168:13 171:14
173:20
**backed** 96:4,8
**background** 9:9
13:10 35:9
41:4 49:6 52:7
65:2,4 82:5
87:1 105:5
144:12
**backgrounds**
36:5
**backing** 14:2

**backs** 14:7
160:12
**backup** 15:18
15:18 17:12
92:7 95:8 97:4
**bad** 87:8 124:6
**banking** 131:1
135:18
**banks** 147:4
**based** 100:7,7
170:16
**basic** 84:13 85:9
89:10,10
**basically** 96:2
**basis** 45:19
**beginning** 17:5
41:1 172:8
**behalf** 1:20 2:2
2:6 130:19
**belief** 116:5
**benefit** 60:16
144:14 146:6
146:12
**benefits** 14:1,3
14:7,14,14
15:18,18,21
18:2 19:12
20:15 21:9,21
21:22 24:4,8
24:17 25:18
28:14,16,17
30:12,14,19
30:20 31:8
32:21,22 33:1
33:3 35:7,8,12
35:16,17 36:4
36:9 37:17,22
39:13 40:22
40:22 41:7,7
42:2 45:13
46:11,18,19
49:3,4 51:8,11
55:7 56:13,16
57:2 58:22
59:7,15,17
60:5 84:13,16

85:12 87:4
88:14 89:10
90:3,4 92:4,6
92:13,15
94:16 95:7,7
97:4 169:10
170:2,7,12
171:6,15
173:6
**Benefits/train...**
39:14
**Bernardo**
133:17,19
**best** 55:9 87:8
116:5
**better** 56:14
89:17,18
**Betts** 175:20
**beyond** 159:14
**biggest** 121:2
**bit** 48:9 57:13
**Black** 28:2,3,4
47:22 48:20
48:21 50:2
62:12 63:2,11
63:13 64:13
64:14
**Black's** 50:7
**blue** 64:12
**body** 54:18
117:2 141:17
**bona** 68:10 69:5
**boss** 89:3
**branch** 4:14
5:17,18 6:11
25:17
**break** 168:17
**breaks** 8:14
**brief** 11:21
41:20 168:18
**bringing** 119:2
119:16
**brought** 23:11
23:14 45:5
**budget** 103:10
103:14,19,21

104:1,2,9,11
**bump** 106:1
109:15 113:2
115:11
**bumped** 92:9
**button** 157:7
**buy** 107:17
**Bynum** 15:1
16:10 17:5
19:2 22:13
23:1,9,15
26:16,18,20
29:11 38:12
38:15 55:21
56:1 58:1 64:7
93:4,20 95:14
95:21 96:10
96:17,19
**Bynum's** 16:12
30:7 95:17
**B&W** 21:16
**B-y-n-u-m** 15:1

**— C —**

**C** 3:1 4:1
153:16,17
**calculate**
159:17
**calculated**
116:21
**call** 39:6 67:6
102:22 103:1
103:1 152:22
**called** 4:4 9:19
9:21 19:10,11
19:12 22:14
39:4 79:2
93:15,18
100:14
**candidate** 36:1
160:7 161:10
165:6
**candidates**
33:17,19,22
**candidate's**
148:11

**capacity** 13:11
**capital** 13:20
25:22
**capital-type**
13:14
**career** 65:14
66:11 152:21
152:22 153:18
153:18 156:6
156:10,12,14
159:18,18,21
159:21 174:21
177:14,14,17
**careful** 55:6
**case** 70:10
77:15 78:2
167:18
**cases** 124:20
126:2 146:21
**category** 121:19
**cc** 53:13
**ceiling** 99:10,10
99:11 100:2
101:12 102:18
102:19 103:6
104:6
**center** 20:15
**central** 157:16
**certain** 44:2
**certainly** 45:13
65:4
**certificates** 60:6
**CG** 12:21,22
16:7 86:17
87:4 155:7
**CG-11/12** 39:16
**CG-12** 16:8
143:10
**CG-13-level**
166:9
**CG-905-13**
137:3
**CHAIRMAN**
1:8
**Chandler** 73:11
73:12,14

76:17,22
**Chandler's**
77:15
**change** 12:20
14:13 15:20
86:13 88:1
**changed** 15:15
40:18 88:10
**changes** 16:11
109:8 135:17
**changing** 25:16
109:2 174:16
**characterize**
10:3
**checks** 33:7
34:15,16,19
**chief** 5:17
**choice** 76:5
81:17 87:9
**chose** 175:2,9
175:15
**Chris** 125:17
139:3,4
**circa** 83:22
**civil** 10:12
118:5 124:9
151:17 152:21
152:21 156:15
**civilian** 6:19,20
**clarify** 176:16
**classes** 15:10
17:20 83:17
83:20
**classification**
7:1 8:19 9:15
9:20 10:5,6
17:19,21 18:1
19:8 26:13
30:8 46:21
55:17 56:15
95:19,22 97:1
172:9 173:9
**classifications**
55:13
**classified** 17:18
19:6

**classifier** 95:5
**clear** 152:9
**clearance** 22:3
29:16 58:3
62:12
**clerical** 110:18
112:17 176:3
**clerical/admi...**
112:4
**Clinton** 4:12,14
**close** 76:16,18
**closed** 147:4
**closing** 107:7
112:11 165:11
**CM** 12:17,19,20
**CM-1** 12:18
**code** 154:1,6,22
**college** 7:5,6 8:2
8:5,12 41:11
41:12 175:4
**Columbia** 1:23
**column** 154:15
**come** 22:3 46:1
46:12 48:7,16
57:11,16
59:13 61:21
62:9 64:15,18
77:10 79:5,10
79:22 80:11
80:14 81:6
134:14 174:4
**comes** 150:21
167:12
**comfortable**
81:13
**coming** 27:8,22
48:12,15 63:6
63:21 64:15
65:7 72:5
74:22 75:6
81:21 87:1
88:16
**command** 53:9
53:9
**commencing**
1:25

**comment** 52:5
**comments**
13:14
**Commission**
1:1 10:13
**company** 68:21
**Compensation**
85:7,21
**competition**
143:7,14,20
144:13 165:20
166:1,4
176:20,21
177:15,21
**competitive**
51:17,17
109:15,16
113:2 115:10
118:19 129:18
145:2,8 152:3
152:8,16
177:12
**competitively**
113:10 120:7
120:9
**Complainant**
1:5,21 2:2 3:3
3:7
**completed**
83:20
**composite**
166:8
**computer** 53:8
54:5
**concept** 103:4
**concerned**
94:14,15
**concluded** 55:8
162:19 178:18
**conclusion**
115:22 116:8
**condition**
152:22
**conditional**
153:18 156:6
156:10,12

159:18,22
177:14,18
**conditions** 55:9
131:1 135:18
**confused**
100:12
**Congratulati...**
154:16
**Congress** 104:7
104:9,21
**congressional**
27:17
**conjunction**
80:9
**connection**
79:15
**consequence**
71:6 130:22
**consider** 123:13
173:8
**consideration**
55:6 56:17
**considered**
146:6,22
147:20
**contending**
172:1
**contentious**
172:12
**continue** 90:1,5
90:13 129:11
131:8
**continuing**
168:1
**contract** 21:17
43:20 44:5,6
**contractor** 21:5
21:8,15,20
30:14 43:18
59:1,5,9,21
87:21 88:2
95:5 140:5
**convenience**
66:4,7 68:8,11
69:8
**conversation**

45:2 51:3
56:21 78:15
81:4,9
**conversations**
93:18
**conversion**
151:11 153:5
**convert** 176:22
**converted**
177:13
**coordinate**
125:19
**coordinates**
125:6,8
**copy** 78:10
**core** 100:14,15
100:16,18,20
101:1,1,5,5,9
101:10,12
102:22 103:1
103:2,15,17
**CORP** 1:8
**corporate**
103:19,20
**corporation** 2:7
80:15 148:17
157:10
**corporation's**
20:15 157:17
**correct** 10:19
18:17,20,22
30:18 33:15
35:3,13,20
36:3,13 40:9
40:17 45:14
46:22 50:13
51:12,14,18
51:19 52:1,3,8
53:10,16 58:2
58:4,7 60:9,21
63:12 65:6,11
65:22 66:6,13
66:16 67:8
68:15,18 69:1
69:3,10 70:8
71:2,10 72:10

72:11 74:4,7
74:16 75:21
75:22 76:12
76:14 78:5,6
78:13 79:8,18
80:16,18,21
82:6 83:1,5,14
84:2,6,11 85:7
86:18 87:2
90:11 92:22
95:13 96:18
97:3,8,13,17
98:5 99:2,5
100:17 101:15
102:4,6,9,12
102:20 103:9
104:3 105:16
105:21 106:2
106:6,8,11
107:10,13
109:5,8,16
111:21 113:3
114:14,16
115:9,13
117:5,6 118:6
118:20,21
119:3,16
120:22 121:7
122:19 123:16
124:2,14
127:10 128:2
128:18 129:19
129:20,22
130:2,4
132:21 133:2
133:3 134:1
136:15 137:10
137:22 138:7
139:20 140:12
140:13,16,20
141:17,18
142:1,9,13,17
142:19,20,21
143:4,5,7,8,12
143:13,15,21
144:6,7,15,16

144:22 145:2
145:3,6,8,9,14
145:21,22
146:8,16,18
146:19 147:5
147:6,10
148:4,5,14
149:1,5,19,22
150:3,10,18
151:8,12,13
151:15 152:4
152:5,12,15
152:17,20,22
153:6,13,16
153:19,20
154:9,10,13
155:3,9,10,19
155:20 156:1
156:4,8,16,19
157:22 158:11
159:6,8,12,15
159:20 160:1
162:10,14,17
163:17,18
164:13,15,17
164:18 165:7
165:8,12,21
166:2,4,5,10
166:11,19
167:5,20
168:5,9,10,11
168:14 169:2
169:9,11,12
169:13,20,22
170:3,4,5,6,9
170:13,22
172:10,13,14
172:16,18
173:3,5,7,10
175:8,13,14
175:18 176:4
176:6,10
178:21
**correction** 86:1
86:1
**correctly** 77:8

**Cosgrove** 2:7
36:21 115:21
116:4,7,12
125:15 126:3
133:14,18,21
134:14 138:22
176:15,17
177:6 178:3
**costs** 84:19
**counsel** 3:3,4,7
88:11 90:10
90:13 125:11
126:20 131:2
131:5 132:3,6
136:22,22
**counsel's** 72:5
90:1 100:3
113:21 114:2
114:7 115:16
135:19 137:3
147:10 166:14
166:17
**country** 20:13
65:21 66:22
68:20 107:16
**couple** 17:20
21:22 43:9
**course** 83:11
84:8,13,16
85:3,6,9 86:12
89:10,11,12
89:13,20
**courses** 83:13
83:15
**Court** 4:14
**co-op** 8:13
**criminal** 6:3
**critical** 159:10
**crosses** 98:17,18
**current** 8:21
55:12 127:7
**currently** 4:18
11:7 14:2,2,4
**customers**
171:16
**Customs** 5:14

6:4 7:11 22:15
66:18,19,21
67:4
c-o-r-e 100:18

**D**

**D** 4:1
**data** 164:16
**date** 61:18
87:18 88:1,10
127:6,7
158:19,22
159:2,10,14
159:19,22
161:2,8,8
165:11,11
179:13
**dated** 53:3,13
**dates** 86:13
**David** 2:3
115:21
**day** 44:9 57:18
**days** 26:1 43:9
48:2 66:18,19
118:4 165:10
**deal** 89:3
153:11
**dealing** 171:21
**dealings** 47:4
**Debbie** 17:5
18:2 19:11
20:14,17
21:13 22:9
**December**
20:17 21:13
29:2
**decide** 100:6
**decided** 107:17
**deeper** 32:19
**definitely** 43:5
43:6
**degree** 41:12,12
51:5
**delay** 88:6
**demand** 131:7
**demands**

130:20
**departed** 28:22
29:2
**department**
35:5,7 140:10
**departure**
16:12 25:11
**depending**
41:11
**Deponent**
179:11
**Deposit** 1:8 2:7
147:1,3
**deposition** 1:18
3:8 53:1
178:17
**deputy** 28:4
30:1 58:11
62:20 100:6
126:13 131:6
132:7
**described** 163:1
167:13
**description**
15:19 17:17
26:5 61:8 95:1
95:3,6,18
166:16 167:13
167:14
**designed** 117:4
142:15
**desire** 56:18
**desk** 14:16
15:11 46:19
95:4
**despite** 78:17
**detail** 65:9
118:9,10
**determine**
108:18 122:12
**determined**
104:6
**determining**
109:13
**developed**
167:16

**development**
13:15,17
14:11 25:21
26:12 35:10
35:11 83:3
**devote** 90:2
**difference**
120:13,20
121:2 171:12
**different** 7:11
18:21 25:11
56:11 70:4
71:3 107:12
121:21 177:16
177:17
**difficult** 88:12
**direct** 70:2,6,7
162:20 163:2
**directed** 49:15
49:18,19
61:10,13 65:9
65:9,12,13,15
65:18 66:3,15
67:6,10 69:13
70:1,14 71:4
72:10,15
73:15,16,17
74:4,9,22
75:11 76:19
77:10 78:11
78:17 79:15
80:9,13 84:10
107:13,22
115:5,7 116:9
116:17 117:3
173:21
**directing** 64:15
**directive** 63:14
**directly** 64:13
**director** 5:1,7
**DIRM** 157:11
157:13 160:20
**Disability** 85:21
**disciplinary**
124:22
**discipline** 9:19

10:1 172:17
**discuss** 56:18
93:12
**discussed** 25:17
**distressed** 81:20
**District** 1:22
**DIT** 157:14,15
160:20
**divided** 13:3
**division** 157:11
157:11
**document** 53:19
82:18 135:10
135:14 136:13
150:17 163:19
163:22 164:9
**documentation**
164:6
**doing** 6:6 14:4
14:20 15:7
17:10,16,18
20:12 21:6
30:13,14 33:7
58:22 88:16
90:4,10 93:15
93:19 96:9,10
96:13 122:22
123:1 147:19
159:9 169:13
174:14
**dollars** 85:18
169:16
**door** 47:13
**downsizing**
131:2 132:3
135:20 136:5
136:8
**down-size** 91:22
92:1 98:7,11
122:21
**down-sized**
97:22
**down-sizing**
21:10 25:22
98:8 109:1,4
121:13 132:1

138:4
**Drive** 2:8
**dropped** 51:22
**duly** 4:4
**duties** 20:12
26:2 40:19
56:3 59:3,21
131:6 132:7
166:7 167:3,6
167:12
**D.C** 1:13,24 2:5
8:11 141:19
141:21 142:3

**E**

**E** 3:1 4:1,1
**early** 20:21
25:22 42:14
42:14 91:9
131:14
**early-out**
107:18 108:12
**ease** 82:10
173:1
**easier** 88:19
**Ed** 1:21
**education** 51:3
170:11
**EEO** 7:2,22
8:20
**EEOC** 1:6
146:22 147:19
**effect** 84:10
159:3
**effective** 106:16
158:19,22
**Effectively**
95:14
**eight** 91:4
**either** 63:11
64:13 110:5
129:6
**eliminate** 111:5
**employed** 4:18
4:20 35:4
**employee** 3:10

13:8 17:12
19:10 21:17
26:9 30:4 31:3
43:20 46:3,4
55:13 56:10
56:14 58:15
69:22 79:21
80:10,14 83:1
84:13 90:7
118:11 119:15
119:19 121:12
121:16 124:20
126:1 127:14
129:15 139:20
140:1 142:11
166:10 170:14
172:11,17
173:9 176:18
177:11
employees 26:6
119:8,21
121:6,7,9,11
121:14,17
122:13 123:11
123:12 124:3
131:3 132:4
141:15 153:12
153:12 171:16
171:17
employee's
121:13
employment 1:1
127:15 128:4
142:5,16
encompass
60:15
encourage 67:5
69:7
encouraging
68:22
ended 55:16
Enforcement
5:19
entitled 159:6
entry 41:8
83:10 85:22

entry-level 41:9
envisioned
26:11
EQUAL 1:1
equivalency
102:1
equivalent
102:19
error 137:6
Especially
69:10
ESQ 2:3,3,7
established 11:4
17:3 26:5
eventually
96:13,15
171:22,22
evidence 151:3
exact 61:18 78:1
110:6
exactly 24:6,15
107:8 148:19
EXAMINATI...
3:2,6 4:6
examined 4:5
examining
174:4
example 19:10
99:13 122:7
exceed 117:16
118:3,3,4
excepted 151:11
151:14,15
152:3,11
153:6,12
154:12 155:12
156:10,12,14
176:18 177:11
177:17 178:5
178:8,11,14
exception 79:6
129:2,5
executive 69:21
104:2 136:1
exhausted
122:2

Exhibit 52:20
82:18,19
126:7 135:11
136:18,20
150:6 164:10
EXHIBITS 3:8
exist 36:19
existed 16:17
existence 39:2
existing 128:8
exists 55:14
expect 96:15
expected 56:11
expenses 70:21
expensive 68:21
experience
41:15,16 51:2
51:11 144:20
145:20 146:13
146:14 148:17
162:20 163:2
163:7 170:11
expert 17:14
explain 25:12
43:7 89:2,7
explained 78:18
81:11
expressed 15:2
93:17
expression
117:13
extend 127:5
128:7 131:13
extended 29:15
44:4,5
extension
126:21 128:1
130:9 168:12
extensive 163:2
extent 96:11
116:14 148:18
148:20
e-mail 3:9 53:2
53:12 54:4
e-mails 53:21
E-9054 2:8

F
F 1:19 3:12,13
53:6
fact 50:17 66:10
80:8 82:4
174:21
factor 144:15
146:5
factors 144:2,5
144:19 145:12
145:17 146:13
147:8 148:11
167:7,15
fair 74:12,13
87:7 143:14
Fairfax 2:8
fall 13:20 91:9
familiar 105:5
117:12 124:14
147:14
familiarity
148:6
family 68:20
far 33:1 51:2
71:12 78:19
91:2 146:11
FDI 147:15
FDIC 4:21
10:19,21 11:6
13:15 32:20
76:17 82:22
84:22 103:17
104:15,20
105:11 106:14
139:19 140:2
140:3,5,8,11
140:18 141:3
141:9,15,17
143:10 146:2
146:4 147:3
147:15,17,17
164:21 165:1
176:2
FDICEO 1:7
FDIC's 115:16
142:16 146:17

147:9 148:3
148:13
FDIC-wide
31:18 38:1
137:7 139:18
140:19 141:13
142:15 143:11
149:5
Federal 1:8 2:7
32:22 65:14
104:1 147:1,2
150:12
feel 55:11 56:13
81:13
felt 169:18
female 64:3,4,5
64:8,10
FERS 85:12
fide 68:10 69:5
field 1:1 18:21
77:2 99:22
106:17 110:7
110:13 111:3
147:22 169:2
175:6,15
fields 174:16
177:16
Fifteen 102:7
file 130:16
files 21:12
162:8
fill 22:1 27:1,1
31:7 55:17
58:5,6 91:17
91:19,20,21
92:2 118:18
133:7 149:18
149:21
filled 17:15
25:11 61:13
97:15 120:6,9
165:6
filling 11:22
12:5 15:8
28:13 59:15
61:6 120:2

**finally** 93:20
**find** 32:9 47:19
  56:21 57:5
  63:2 163:13
**finding** 70:12
**finished** 178:2
**fired** 75:14 76:6
**firing** 124:21
**first** 4:4 10:13
  41:1 42:20
  84:8 85:18
  86:15 93:12
  95:9 122:10
  122:15 123:3
  123:14 124:7
  133:10 139:16
  139:16 150:21
  169:8
**fiscal** 103:14
**fit** 170:12
**five** 11:7,12,19
  41:19 97:11
  114:3,7,17
  123:12,21
**floor** 88:20
**focus** 15:16
  116:20 143:2
  144:19
**focused** 9:17
**focuses** 15:16
  115:7
**FOIA** 45:20
  46:8 125:20
  125:21
**FOIAs** 45:22
**follows** 4:5
**force** 105:8,10
  116:10
**forced** 70:13,15
  70:16 174:13
  176:8
**foregoing**
  178:20
**foreseeable**
  100:8
**form** 155:12

158:21 160:10
160:13 177:4
**formal** 126:15
**former** 131:5
**formulation**
  148:8
**forth** 60:1
**forthcoming**
  174:2
**found** 33:4
  34:14 93:20
**four** 11:7 98:13
  120:15 127:6
  127:22 128:2
  128:6,8 130:6
**four-year**
  128:20 129:6
  168:12
**frame** 21:5
**fraud** 143:16
**Fred** 3:12,13
  44:16,17,18
  53:13 126:20
  138:20,21
  160:17
**Froehlich**
  133:11,12
  135:3,5,8,22
**frustrated** 43:8
**FTE** 101:22
  102:3,5
  103:10
**FTEs** 101:18
  102:8,11,15
  103:3
**full** 4:8 7:11,16
  7:19,20 8:16
  8:18 12:2,2
  24:2 86:18
  131:3 132:4
  166:1
**full-time** 7:6
  8:15 102:1,5,7
  102:18 121:20
**full-up** 114:4
**function** 101:14

**functional**
  96:21
**functions** 25:20
  60:7,8 112:3,7
**Fundamental**
  84:16
**further** 3:6
  56:18 176:13
  176:21 177:15
  177:20 178:16
**future** 100:8
  134:11

_____
       **G**
_____
**G** 4:1
**game** 62:9
**Geiseler** 139:3,4
**general** 4:21
  103:2 126:10
  126:14,21
  131:5,6 132:7
  144:3 145:21
  146:2,4,18
  148:4,14
  152:8 154:8,8
**generalist** 9:3,6
  19:14
**generally** 103:5
  146:11
**General's**
  146:15 147:9
  148:7
**generated** 158:2
  163:19 164:3
**geographic**
  69:15 71:1
  111:20
**geographical**
  73:18
**Geographically**
  68:2
**geography**
  69:14 112:19
**getting** 42:22
  43:5,6,8,11,15
  53:18 61:2

74:18 107:5
109:2 123:5,8
132:2 134:20
136:9 138:4,5
**Gibson** 3:12,14
  53:13 126:20
  132:1 136:21
  148:21 160:17
  161:2 165:5
  167:19
**Gieseler** 125:17
**give** 20:4 43:21
  43:21 44:2
  63:3 129:16
  144:14 146:12
**given** 84:16
  178:21
**Gloria** 12:14
  17:6 18:4
  19:17 20:10
  20:10 21:6
  37:21 59:20
  60:19 88:17
  92:5 175:19
  175:20
**go** 8:5 17:3
  22:13 25:13
  27:3 29:18,18
  43:1,11 57:19
  60:13 62:19
  63:1 64:1 74:1
  74:3,9 76:21
  89:9 94:3
  95:17 99:14
  104:13 116:13
  121:6,9
  122:10 129:1
  130:15 151:18
  159:13,17
  165:19 167:14
  171:14
**goes** 127:8
  158:10
**going** 8:12
  14:19 16:21
  20:21 21:7

23:1 36:17
42:21 43:14
44:8,13,14
47:13 60:9
68:5 71:7
76:21 77:3
81:12 91:17
100:3 101:13
104:16 107:10
113:5 115:11
122:7 123:12
128:6 129:9
129:15,21
131:13 132:22
133:4,5 134:5
134:6,6
135:16,21
146:12 147:7
147:14 154:7
154:11 155:17
159:13,21
168:4 174:18
**Gonsa** 17:6 18:2
  19:2,11 20:14
  20:17,19 22:9
  22:22 23:7,20
  25:8 28:20,22
  29:2 30:16,17
  31:8 61:7 64:4
**Gonsa's** 25:10
**good** 41:18
  124:5 149:3
  150:1 160:3
  170:12
**gotten** 42:15
  52:2 123:21
**Government**
  31:20,22 32:1
  65:14 66:10
  66:15 102:12
  117:20 141:20
  141:20 142:10
**Government's**
  69:8 142:5
**Government-...**
  32:3 38:2

142:2,7,12
**grade** 7:18 23:5
  23:7 41:8
  106:11 154:17
  154:18 155:22
  155:22 167:3
**grades** 137:4
  154:17
**graduated** 7:5
  8:15
**grasped** 17:22
**Greenburg** 1:22
**group** 6:10 17:4
  17:4 22:5 26:6
  69:19,20,20
  69:21,22 70:2
  78:18,22
**growing** 25:20
**GRUENBERG**
  1:8
**GS** 86:17
  143:10 166:9
**GS-13** 140:10
**GS-13-level**
  159:6
**GS-5** 8:16
**G-o-n-s-a** 17:6

**H**
**half-time** 102:3
**halving** 123:9
**Hampton** 8:6
**handle** 33:1
  56:11
**handled** 74:14
**handwritten**
  161:6
**happen** 44:13
  44:14 128:12
  141:8
**happened** 71:12
  80:17 86:11
  110:20 117:7
**happening**
  155:11 156:3
**happens** 59:14

70:9 75:12
  106:5,8
**happy** 170:22
**harder** 124:6
**head** 5:5 10:22
  34:10 37:6
  99:18 111:15
  120:19 130:14
  149:8 154:5
**headquarter**
  100:2
**headquarters**
  69:13 71:14
  71:15 73:20
  76:20 77:2
  99:17,20
  100:4 110:9
  110:12,14,15
  110:16 111:3
  111:11 113:22
  142:12
**heard** 42:20
  79:20 81:5
  100:11 101:2
**held** 5:2 28:19
**help** 43:10,15
  47:18 49:20
  87:12 148:11
  148:15 166:17
**helping** 30:14
**hesitation**
  173:17
**hey** 47:16
**high** 7:4 8:11
**higher** 11:18
  127:16,17,19
**higher-graded**
  26:13
**higher-level**
  26:7
**highest** 11:10
  11:14
**highest-graded**
  31:4
**highly** 106:4
  162:21

**Hill** 12:14 14:6
  17:6 18:4
  20:10 22:20
  23:22 24:1,5,8
  24:13 30:10
  37:21 58:20
  64:9 92:5,9
  175:19
**Hill's** 59:20
  62:1
**hire** 22:1
**hired** 17:4
**hold** 5:9 6:14
  7:3 40:10
**holding** 141:6
**holds** 40:5
**hole** 93:1
**home** 53:20
  54:4 57:13
  93:16,17
**Homeland** 6:5
  22:17 29:18
**HR** 5:7 11:5
  16:11,13,14
  16:17 18:7
  19:3,7 22:5
  24:17 30:11
  30:11 41:9,10
  56:11,16,22
  58:19 59:17
  81:12 84:16
  85:9 86:18
  98:11 157:17
  170:5,7,12
  171:6
**human** 5:1,20
  13:14,20,21
  15:15,21,22
  19:17 24:7
  25:17,21 26:2
  28:16 36:7
  39:8 51:7,13
  55:7,10 72:6
  89:19 126:14
  175:21

**I**
**idea** 36:21 69:2
  103:20 115:15
  142:15
**identification**
  52:18,20 53:1
  82:19 126:7
  135:11 150:5
  150:6 164:10
**identified**
  145:12
**IG** 27:16 28:4
  62:15 100:6,6
  132:7 137:1
  163:2,5
**immediate**
  161:9
**important**
  159:19
**impression**
  48:15
**include** 145:19
**includes** 11:12
**increase** 130:21
  141:14 142:11
  142:16
**increased**
  135:17
**indefinite**
  176:22 177:13
  177:21 178:1
  178:5,12
**indicate** 56:20
**indicates** 144:1
**individual** 66:5
  66:8,12
  116:20
**Industrial**
  175:5
**industry** 131:1
  135:18
**information**
  38:22 45:20
  45:22 46:2,4,6
  46:12,18 51:1
  157:11

**informed** 56:12
**inherited** 25:21
  26:2
**initially** 87:17
**inquired** 94:1
**Inspector** 4:21
  126:10,14,21
  127:5 131:5,6
  132:6 145:21
  146:2,4,15,18
  147:9 148:4,6
  148:13
**insubordinati...**
  75:16
**Insurance** 1:8
  2:7 147:1,3
**integrity** 145:7
**intelligence**
  52:5
**interest** 15:2
  55:11 170:4
**interested** 56:22
  170:1,8,22
  174:9
**interests** 56:14
  65:2
**interview** 32:7
  34:8
**interviewed**
  33:5 34:9
  35:14 38:18
**interviewing**
  26:16
**interviews** 6:3
  32:20
**intranet** 164:20
  165:1
**Introduction**
  85:22
**Investigates** 6:2
**investigation**
  69:20 106:21
**investigations**
  5:20,21 6:1
  70:3 71:22
  73:7 77:18

investigators
6:4 67:21
112:8
involved 72:20
72:21 74:17
110:12
involves 151:7
in-depth 147:2
in-service 79:2
79:3,11,14
80:4
irrespective
124:5 133:3
issued 106:15
issues 21:19
62:18

**J**

Jan 12:9,10
15:7 17:5
19:10 22:20
124:19
January 106:15
job 5:2,9,15
6:14 7:3 8:7
8:21,21 11:22
12:20 21:22
23:14,15,15
24:11 25:18
28:14,16,19
29:6 31:8,8,16
35:2 37:12,17
40:4,7,12,18
40:22 41:1,8
42:2,13 43:9
48:17 49:3,4,7
49:10 50:15
51:16 54:13
54:15 56:3,22
57:1,5 58:5,6
59:15 60:18
60:19 61:1,6,7
62:4,6 63:18
67:3,6 68:17
68:21 70:11
70:18 72:9

80:15 81:7,21
87:4 88:13
92:2 94:19
97:7 105:21
106:10 108:13
108:15,19
111:9 113:5
118:19,20
120:3 128:13
128:17 134:18
137:9,10,19
137:21,22
140:11 141:6
141:9 143:3,3
144:10 145:14
151:17,21
152:2,3,19
162:13 163:12
165:10 166:13
167:11,16
169:7,10,13
169:18 174:9
174:14
jobs 97:16
107:12 109:8
112:2 152:11
joined 16:18
joins 29:10
Jr 126:20
judging 161:17
June 93:6
justice 140:10
justification
130:18
justify 127:8

**K**

K 1:4 3:9,10
Karen 12:9,13
16:13
keep 113:8
129:9,20
kind 26:10 46:2
46:6 100:20
121:11 144:11
144:12 145:5

172:11
knew 8:12 23:2
35:16,17
43:10 45:9,9
45:10,15 47:2
49:5 61:2 82:1
174:12,13
know 20:19
37:6 39:6,9,11
39:17 48:5,9
48:11 53:4
66:17 71:13
71:18 74:2
75:6 77:9
78:17,17,19
79:11 80:8
83:15 90:5
99:18 101:17
101:18,18
105:11 130:14
133:4 148:19
154:5 162:7
163:11
knowledge
10:15 116:5
116:15 145:20
146:3,5,14,17
147:2,2 148:2
148:17
known 66:11
68:7 69:12
79:14 129:10
150:12
KSAs 148:18

**L**

Lab 7:20 8:10
Labor 35:6,7
57:18
lacking 33:8
lady 43:9
language
109:18
laptop 54:8,9
57:15
Larry 133:11

133:12 135:3
135:7,22
late 52:14 91:8
131:14
law 85:9
lawful 1:20
laws 147:4
lawyer 124:22
125:2 135:21
136:2,9
137:10,13,17
137:19,20
138:5,7
140:22 141:3
143:9 146:12
147:17 148:13
152:2
lawyers 100:3
125:9 138:12
138:18 139:5
144:3 152:2
law-type 126:2
learn 49:10 94:4
94:12
learned 51:4
learning 15:3
15:10 94:14
94:15 96:12
129:11
leave 14:18,19
14:20 15:5
20:21,21 31:1
52:10 56:2
91:11 93:4,10
115:12 131:20
133:5,9 135:5
173:4
leaves 115:10
116:21
leaving 22:2,7
23:2 25:15
26:19,21
29:13 38:12
47:18 58:1
88:2 91:14
93:21 132:22

133:4 137:21
173:8,8
left 11:22 12:3,4
14:21 15:2
16:10 20:14
20:16,17
21:13 23:17
26:1 48:14
113:5 115:12
116:21 132:14
132:18 133:3
133:6,8,10,12
133:15 134:22
135:4,8
137:15
legal 115:22
116:7 137:10
141:1,2 153:8
length 121:1
lesser 120:16
letter 73:21
75:3,8,9,10
76:2 173:21
let's 16:16,16
20:6 41:19
78:20 123:4
126:6 135:10
135:13 136:13
150:4 151:18
164:9 168:16
171:14
level 7:12,16,20
8:17,18 24:10
40:16 41:8
60:7 86:18
87:5 91:18
104:7 127:15
146:11 166:10
levels 131:9
lie 65:3
lieu 116:9
163:22
liked 32:9 33:4
34:14,18
likes 64:16
limit 112:19,21

**limited** 144:13
**limiting** 142:18
  143:7
**line** 62:16
**lines** 98:17
**list** 20:20
**listed** 83:18
**listening** 88:16
**litigate** 146:21
**litigation**
  146:20 147:19
  162:22
**little** 48:9 49:5
  50:9 57:13
  81:17
**live** 4:11
**location** 65:16
  123:5 157:16
**long** 5:2,9 6:14
  7:3 59:22 84:7
  159:17
**longer** 91:5
**long-term**
  129:15
**look** 16:16,16
  82:17 84:8
  85:10 86:9
  124:13 130:15
  135:10,13,13
  158:6,10
  160:6 164:9
  165:3
**looked** 17:1
  89:17,18
  158:8 173:14
**looking** 82:22
  84:5 91:21
  114:20 135:14
  162:15 164:12
**looks** 150:10
  156:20
**loosely** 119:1
**lose** 81:7 106:10
  106:11 111:9
  113:5 128:13
**losing** 105:21

108:15,18
**lost** 108:12
**lot** 13:20 20:13
  21:6 26:1
  49:22 86:14
  86:19 87:3
  107:8 148:11
**lower** 60:6
**lower-level** 26:6
  60:8,17 62:6
**lowest** 127:15

**M**

**main** 30:4,7
**making** 87:7,8
**management**
  5:16 6:22 7:12
  7:17 8:16 9:22
  17:19 18:1
  19:13 26:9
  27:17 77:10
  79:5,22 95:20
  116:2,16
  128:7 129:2,3
  146:20 149:21
  166:13 167:7
  167:16,17,18
  171:21 172:4
  172:15
**manager** 12:15
  69:21 70:2
  141:7
**managers** 70:4
**manual** 154:5
**March** 1:14
**Marine** 5:22
**marked** 52:18
  52:20,22
  82:19 126:6,7
  135:11 150:4
  150:6 164:10
**MARTIN** 1:8
**Maryland** 4:12
  4:15
**Master's** 51:5
**match** 80:20

**matched** 163:6
  163:6,7
**maternity** 14:18
  15:4 91:11
  93:10
**matter** 56:18
  70:12 159:10
**maximum**
  101:13 128:4
  128:10 130:6
  130:8
**ma'am** 4:9
**mean** 11:21,22
  17:22 32:22
  41:12 42:9
  55:2 76:13
  84:9 89:13
  92:15 104:6
  106:1 115:11
  117:15 133:17
  149:18 152:19
  152:19 169:6
**meaning** 110:18
**meanings**
  152:18
**means** 42:12
  53:7 77:11
  118:5 130:12
  139:19 140:19
  140:22 141:12
  141:13 142:3
  142:10 151:14
**meant** 152:13
**medical** 21:19
**meeting** 78:16
  174:1,1,3,12
**memo** 3:12,13
  138:14
**memorandum**
  126:10 136:21
**mentioned** 45:4
  81:10
**merger** 176:1
**met** 48:14,21
  173:20,21
**metaphors**

177:2
**method** 81:3
**Methods** 85:22
**Metro** 31:21
  32:3
**Metropolitan**
  31:19
**MICHAEL** 2:7
**mid-level** 62:6
  63:18
**mid-range**
  60:16
**Mike** 125:15
  133:14 134:14
**military** 6:19
  21:6
**mind** 174:10
**minimum** 131:8
**minted** 30:19,20
**misconduct**
  76:8
**mis-performa...**
  76:13
**mixed** 177:2
**moment** 16:17
  31:1
**money** 44:5
**month** 24:16
  44:4 88:3
**months** 29:7,8
  30:16 42:7
  91:4,4 131:10
  136:16
**move** 53:21
  65:17 66:12
  66:14 67:3,3
  67:21 68:2,19
  68:20 69:15
  70:22 71:1,17
  71:18 72:2,14
  73:5 108:6
  117:4 141:22
  142:4 172:21
**moved** 84:1,3
  87:18 90:14
  94:21,22 98:2

**moves** 109:8
**moving** 65:16
  65:20 70:21
  71:19 77:4
  88:6 93:13
**MSPB** 146:22
  147:19

**N**

**N** 3:1,1 4:1
**name** 4:8 5:17
  15:1 21:16
  33:12,13,13
  45:1,5 49:20
  59:20 61:13
  62:1,9
**named** 44:22
  151:8
**Nationally**
  99:15 113:16
**nature** 151:10
  154:2
**Naval** 7:20 8:10
**Navy** 6:18 7:3
  8:3,7 9:21
**necessarily** 66:5
  118:7 125:1
  147:13
**necessary** 81:14
  146:21 160:9
**need** 15:6 47:18
  69:5,11 100:9
  116:22 117:5
  117:5 118:18
  123:3 137:22
  176:21
**needed** 27:3
  43:10,12
  45:22 46:11
  46:15 49:19
  60:2,7 73:22
  77:6,7,20,22
  86:20,22
  87:11 117:2
**needs** 98:3
**Neither** 120:1

**Nervousness**
173:18,19
**never** 11:18
17:22 26:21
57:2 86:12
94:19 95:21
95:22 124:2
**new** 86:11
123:12 128:1
131:6 132:7
137:19,20,22
169:2
**newest** 30:11
**newly-minted**
155:12
**nice** 67:5
**non-Govern...**
31:20
**non-judgement**
115:12
**normal** 71:4
**Northwest** 1:24
**Notary** 1:22
**notation** 161:7
**notice** 106:16
109:22
**notification**
3:15 150:13
**November**
84:10 92:9
131:18 136:15
136:20 138:9
138:14 158:17
159:7 161:2
168:2,7
**NTE** 117:13
118:5,14,18
119:3,5,8,9,12
119:21 121:3
121:6
**number** 4:16
11:10 33:19
33:21 97:18
99:13 101:6
102:2 104:5
111:7 112:12

117:1 141:14
165:5
**numbers** 46:7
100:14 101:1
101:5 111:6
142:6,11
**N.W** 2:4

---

**O**

**O** 3:1 4:1
**object** 177:1,5
**objection**
115:21 116:13
**obtained** 7:6
**occupied** 23:15
**occupying**
25:19
**occur** 14:13
**occurred** 20:8
**October** 15:12
24:19,21
29:11 42:8
83:11,15,22
88:4,7 99:6
165:16
**offer** 65:1
**offered** 8:12,15
34:22 42:2
43:9 49:20,21
87:13 107:12
**office** 1:1 4:21
5:4,19,19 6:1
20:11 33:2
39:2 54:7 56:1
68:9,11,11
71:22 72:5
73:7,9,22
77:22 88:21
90:2 100:4
101:8 102:14
104:6 107:1,2
107:5,7,9
109:13 110:14
112:11 113:14
113:21 114:2
114:7,13

115:16,17
123:1,5,8
124:18 125:9
125:11,17,19
126:10 127:4
128:6 129:1,3
130:19,21
131:2 132:3
135:19 137:4
146:2,3,6,17
147:10 148:3
148:13 157:9
159:13 161:20
164:22 166:14
166:17 167:2
167:17 168:21
**officer** 26:1
**offices** 1:23
**official** 21:11
130:18 160:17
**Oh** 6:7 34:9
37:20 38:14
49:14 67:1
91:3,5 158:6
**OIG** 5:1,8 6:15
10:19 11:5
13:15 15:2
25:16 45:16
67:11 83:1
98:9,10 99:11
101:7,9
104:15 105:12
106:14,14
110:2 113:14
113:21 117:1
117:2 130:22
135:17 145:14
157:20 158:3
166:14
**OIG's** 102:14
104:5
**OIG-wide**
111:1
**okay** 6:14 8:1
10:2,11,16,20
11:5,17 12:7

13:2,6,12,22
14:6,12 16:9
16:15,19,20
16:22 17:2,7
18:1,12 19:1,5
19:16,20 20:3
20:5 21:3,18
22:19 23:4,17
29:10 31:6,12
32:5,11,13
33:10 35:22
36:14 38:7,20
39:21 40:1,14
42:11 43:2
44:20 45:2,7
46:2 47:1,9
48:9 50:4,6
51:15 52:4,9
52:16 53:12
54:1,11,22
55:4 56:9 57:4
57:20 59:18
60:11,22 61:5
61:21 62:22
64:11 65:7
66:1 67:9,13
67:18,21 68:4
68:16 69:4,12
70:20 71:11
71:21 72:7,13
73:13 74:14
74:20 75:7,18
76:1,8,15
77:13 78:2,7,8
79:17 80:22
81:8,15,19
82:9,20 83:9
83:21 84:4,19
85:2 87:16
89:6,22 90:12
91:8 93:9
94:11,13 95:7
95:16 96:9
97:6,9 98:6,22
99:8 100:10
100:13,22

101:4,12,16
102:10 104:4
104:22 105:14
106:21 108:11
108:17,21
109:7,20
110:20 111:16
112:6,19,21
113:12,20
114:4,6
115:19 117:9
118:1,16,22
119:12,14
120:5 121:5
123:7,10
125:5 126:1,5
126:18 127:12
127:18 128:9
128:12 130:11
130:17 131:22
133:13,20
134:9,13,17
135:9 136:4
136:12,17
137:12,18
138:2 139:15
139:22 140:14
140:17,21
141:5,11
142:14,22
145:4,10
149:2 151:6
151:10 152:1
152:6 153:2,4
153:21 154:3
154:14 155:8
156:2 157:2,5
158:7,12
160:2 161:5
161:16 162:11
162:18 163:10
163:15 164:8
165:2,9,18
166:6,22
167:22 168:15
168:22 172:19

176:11,20
177:19
old 19:7 174:18
once 30:20
86:13 89:11
129:6 178:11
ones 144:3
one-half 131:9
on-board 90:20
134:14
on-the-job
169:15
open 56:18
147:4 165:10
174:2
operating 154:4
operations
146:1 148:3
OPM 129:5
opportunity 1:1
7:8 116:13
opposed 141:13
153:2
optimal 55:12
options 43:12
43:13 44:8
order 69:6,7
76:11
ordered 73:15
orders 75:20,21
organization
46:16 73:5
organizational
71:19 72:2
98:17
organizationa...
103:18
organization's
99:9
oriented 171:10
originally
152:13
Orleans 86:11
outside 84:22
169:16
overriding

104:12,15,18

**P**

P 4:1
package 108:10
page 3:2 84:8
85:10 160:6
pages 178:20
panel 33:22
34:2,4 52:2
161:12,17
papers 77:16
paperwork
72:22 74:14
paragraph
139:17 144:1
paralegal 49:22
170:11 173:4
paren 16:1
92:14
parens 92:13,16
92:17,21
part 16:14
65:20 83:3
participate
167:8
particular 13:4
145:18 166:13
particularly
86:17 88:13
163:5 170:12
173:6
parts 107:15
part-time 102:8
121:19
Pat 43:14 44:8
44:10 45:4
Patricia 28:4
Pause 7:14 16:2
22:11 25:6
27:19 28:5
90:17 105:2
124:11 132:10
138:10 160:4
166:21
pay 65:17,19

66:12 68:5,12
68:14,19 71:7
76:21 77:4
89:13 108:2,7
141:21 142:4
154:21 155:5
159:6
paying 70:22
Payroll 159:13
PD 40:20 95:6
pending 47:11
55:16
people 11:5
12:8 13:3
14:10 17:4
18:13 25:15
33:9,22 35:22
36:1,4 45:18
66:21 67:2
97:10 98:2
104:16 106:10
107:9,17
108:11,12,12
113:10 114:15
117:1 133:9
138:21 144:13
144:14 146:13
148:16 162:7
163:11 171:9
people-oriented
171:15
perform 26:7
40:19
performance
7:12,16,19,20
8:17,18 26:9
86:18
performed
15:11 26:2
performing
26:8,11 59:21
performs 98:18
130:18
period 11:20,21
12:1 21:20
30:16 31:9

104:16 118:2
119:9
permanent
118:5,11,20
120:2 121:2,7
121:17 122:13
124:2,8
128:17 129:7
138:15,18
140:1 151:17
152:19 153:11
154:22 155:2
155:9,22
156:6 159:18
165:20
permanently
129:16 131:3
132:5
permission 63:3
person 14:20
25:1,19 31:3,4
35:2,7 39:12
41:3 42:2 45:5
45:13 54:20
65:16 66:14
67:5 68:17
69:5,6,10 70:9
70:10 71:17
71:18,19
72:18 73:5,10
74:18 79:6
86:17 88:14
92:6 95:12
105:21 108:14
108:15 109:8
109:13 114:19
115:7 117:4
117:11 118:10
133:6,8,22
134:20 135:4
143:2 144:20
146:10,10
147:7,16
151:8 155:17
162:4 165:19
personally

46:13,15
157:19
personnel 3:15
5:16 6:7,12,18
6:19,19,22
7:12,17 8:16
9:3,6,12,21
10:4,15 13:21
18:5 19:13
21:12 41:1,4
41:10,16 73:2
85:15 99:1,10
99:11 101:17
103:15 105:4
113:18 116:2
117:11 126:2
128:7 129:2,3
145:4,7,8
150:13,13,17
150:19 151:3
164:1 174:19
175:9,12,21
176:5
personnelist
13:18 45:11
51:20,21 75:8
161:14,19
162:2
personnelists
84:14 85:13
175:18
personnel-rel...
175:6
person's 65:17
Petty 1:19 3:8
3:12,13 4:3,10
4:11 52:20
53:1,6 82:19
126:7 135:11
150:6 164:10
physical 69:15
physically
164:21
pick 15:6 67:7
68:21 69:9
77:11

picking 13:16
88:17
picks 66:15
place 67:22
87:22 109:11
117:5
placement 79:2
79:4,12,14
plan 131:22
132:19 134:2
154:21 155:5
planned 82:12
132:17 134:2
planning
134:10
plans 135:6
play 167:7
please 4:8 137:2
point 26:22
28:20 43:16
44:22 45:8
52:10 76:5
86:22 87:17
90:21 128:20
139:13 159:11
168:2
points 147:8
policies 147:3
policy 13:15,15
political 153:17
pops 157:21
position 4:22
5:6 7:6,21
8:15 15:19
17:17,19 18:1
21:21 22:1
24:3,4,8,9
25:19 26:5,15
27:2 39:9 41:9
55:22 56:3
60:15 61:8
63:4 75:4 95:1
95:3,6,17,20
102:5 122:17
122:18 132:2
133:7 134:20

136:9,9 137:1
137:2,3,16
141:1,2
145:12,13,18
154:7,8
162:21 166:16
167:13,14
positions 7:11
99:12,13
100:8 101:6
102:2,3,7,8
104:5 107:20
111:5 123:2
152:9
positive 146:4,7
147:7 148:10
possibility
44:11,12,15
44:21 45:6
48:6
posted 164:21
potential 137:4
precisely 165:4
prefer 56:15
prepared 72:22
present 131:9
162:20
presented 44:10
presently 12:7
preserve 145:7
pretty 17:14
previously
144:3
primarily 14:7
14:14 18:2
35:11
primary 13:8
15:16 35:8
92:5,15,18
93:14
principle 156:5
print 53:10
158:9
printed 53:7,8
157:18
printer 53:10

printout 53:2,5
53:5
prints 164:14
prior 5:4 6:17
14:19 42:7
84:3,7,7
170:10 174:1
174:3 175:19
probably 42:6
46:7
problem 60:2
94:12
proceed 78:19
process 39:1
83:18 86:5
177:12
processed 77:16
processing
56:13 60:3,4,5
60:5,8,17
85:15 86:1,2
processing-type
60:18
professional
83:3 116:2
131:7 175:13
professionally
47:7
professionals
84:17
program 5:22
8:13 13:13,19
18:18 98:20
141:7,7,7
projects 13:14
13:20
promoted 92:10
promotion
15:14 137:4
154:16 155:21
proper 144:17
proposed 55:7,9
prospect 81:21
protections
129:17
provided 6:7,11

provides 157:3
provision 78:21
79:1 82:14
psychology
175:5
Public 1:22
purpose 142:18
purposes
155:11
push 157:6
put 40:12 82:9
88:22 89:4,8
116:13 164:16
P.C 1:23
p.m 53:4,13
178:17

Q
qualification
79:7 162:15
162:16
qualifications
161:21 166:8
167:3
qualified 33:20
33:21 36:2,12
50:10,18,20
51:16 54:18
81:11,15
141:2 161:22
162:2,12
169:19
qualifies 162:21
qualify 41:12
41:15 80:1
166:4
quality 145:11
167:7,15
question 76:20
77:3 81:4
116:4,14
177:3,4,7,8
questioning
77:9
questions
168:20 174:8

176:14 178:22
quite 118:19
120:1

R
R 4:1 151:8
race 64:2
ran 43:13
ranking 34:2,4
144:2,5,15,19
145:12,17
146:5,12
147:8 148:10
148:12 167:6
167:7,15
rates 113:9
reaction 47:10
read 135:16
178:20
ready 42:22
43:11
real 143:19
really 17:22
33:2 47:16
69:8 80:1 82:4
88:15 154:11
155:4 170:1
reason 49:21
77:20 154:21
155:5 156:5
160:13
reassign 69:21
reassigned
178:13
reassignment
61:11,13
65:10,12,13
65:18 66:3
67:7,11 69:13
70:1,6,14 71:4
72:10,12
73:16 75:1
76:6 77:10
78:11,17,22
79:15 80:10
80:13 84:10

115:5,7
116:17,18
117:3 173:21
reassignments
65:15 76:19
107:13 116:9
recall 33:13
53:18
receiving 75:20
recess 41:20
168:18
recognizing
81:6
recommendat...
160:8,15
165:6
record 116:13
recorded
178:22
records 36:19
recruit 97:15
recruiting
30:22 37:14
46:4
recruitment
14:5,8,9,15,21
15:3,7,11,17
17:13,17
26:12 30:9,10
36:16,20 37:8
37:11 60:6
62:18 85:3
95:9,12,19
96:2,10,22
97:3 171:2,19
172:8
reduce 111:6
112:12 114:19
115:15,16
134:5,7
reduced 110:20
111:7 114:21
115:1
reducing 131:4
132:5
reduction 114:9

114:13 132:12
132:17
reductions
105:8,18
116:9
Redwood 4:14
reference 33:7
34:15,16,19
referral 161:14
referred 161:11
162:5
referring
161:21
refusing 76:9
76:11
regarding 137:1
register 121:21
123:14
registers 14:10
regs 112:22
120:18
regular 45:19
93:18
regularly 46:10
regulated 106:4
regulations
105:15 108:18
113:6 147:3
reiterate 96:20
relations 13:8
17:12 19:11
26:9 27:18
30:4 31:3 46:4
55:13 56:15
58:15 126:1
170:14 172:11
173:9
relationship
42:4
relation-type
124:20
relocation 68:5
69:15 71:7,9
108:10
Remarks
154:15

remember
33:12,13
34:10 35:5
36:7 38:3
39:17 55:22
61:17 62:14
63:4,9,16 77:1
77:8 78:1
110:6 111:14
120:17,18
135:7 148:19
149:8,14
removed 16:1
75:13
reorganization
106:5
reorganized
56:1 58:6
reorganizing
25:17 26:4
38:13 107:4
rephrase 177:8
replace 132:20
133:1,5,21
134:19 137:17
137:22
replaced 25:8,9
132:15 133:14
133:22
replacement
137:14
replacing 95:14
report 3:10 83:1
83:6,10,19
represent
172:15
request 89:4
127:4 150:18
164:1
requested 95:4
requesting
148:22
requests 45:21
46:8 125:20
125:21
require 120:1

required 166:8
166:9 167:3,4
169:4
requirement
99:19
requirements
102:20 166:12
Research 7:20
8:10 85:22
reserve 20:12
reserved 49:5
50:9
reservist 20:10
resource 28:16
resources 5:1
5:20 13:21
15:15,21,22
19:17 24:7
25:17 26:3
36:7 39:8 51:7
51:13 55:8,11
72:6 89:19
126:14 175:21
respect 59:15
responsibility
56:12
responsible
167:2
restructure
40:20
restructuring
130:22
result 16:5
176:19 177:12
resulted 15:14
retirees 171:17
Retirement
85:22
retreat 106:1
109:16 113:2
115:10
review 99:1
reviewed
162:19
reviewing 21:11
161:21 171:13

171:20
rewrite 40:20
rewrote 56:2
95:3,5
Rex 27:13 43:12
44:7,9 45:3,4
47:16 50:1
59:18,22
60:14 94:8,9,9
98:19 104:10
RICHARD 2:3
rid 107:5 109:2
122:15 123:3
123:5,8,14,17
123:21 132:2
134:20 136:9
138:5
RIF 105:15,18
105:20,20
106:13,15
108:17 109:5
109:14,18,21
112:21 115:4
115:6,10,20
116:3,18,20
116:22 121:6
121:6,13,21
122:6,7
123:14,22
124:21 132:12
RIFs 105:5
106:8 108:22
110:2 111:20
112:1
RIF'd 107:2
RIF'ing 106:21
right 6:5,9 9:11
9:18 10:17
11:13,20
12:12 18:13
18:16 20:18
21:2 27:9 28:8
28:12 29:9,18
29:21 30:6
33:17 34:5
35:18 36:10

37:10,12
38:16,21 41:6
41:14 42:19
47:1,21 49:17
50:12,22 51:8
51:10,20
55:18 57:6,10
57:17 58:10
58:13 59:12
62:2,5,7,21
64:19 68:13
68:22 69:12
73:3 74:6,11
76:13,19
77:14 79:20
81:1,17 82:17
83:4 84:19
90:8,16,18
92:3,18 94:5,9
96:6,13,17
99:14,16
101:8,14,20
102:7 103:15
104:21 105:1
107:8,19
108:5 111:8
111:14 112:4
112:8 114:4
115:7 116:17
116:21 117:10
118:12 122:18
122:22 124:16
127:16 130:8
131:16 132:16
135:7 136:10
137:8,20
138:5 139:4
140:4 141:20
143:22 144:3
145:14 146:7
146:9,15
147:15,22
149:4,20
150:7 152:18
155:15 156:13
157:7,15

158:1 159:11
159:16 160:8
161:3 166:12
166:17,20
170:21 171:4
171:8 172:6
175:1 176:7
177:9,19
**rights** 106:1,2
109:16,16
113:2,3
115:11,11
122:13
**road** 91:2
**Rojas** 126:22
127:6
**role** 7:22 8:19
13:17
**rolls** 89:11,16
140:5
**Room** 2:8
**RTC** 176:2
**rules** 166:9
**run** 30:4,7 33:3
44:7 105:18
105:20 106:13
109:5 115:20
116:18 130:13

—————— S ——————
**S** 3:1 4:1
**satisfy** 172:4
**Savia** 12:9,13
13:12 16:13
98:16,20
**saying** 44:7
116:22 131:22
173:11
**says** 48:5 53:6
55:5 66:3 86:4
86:5 104:15
127:22 130:17
130:20 132:1
135:20 136:5
137:1,2
139:16 145:11

146:20 151:10
154:1,16
161:6,10
**Schedule** 153:8
153:11,12,15
153:16,17,18
154:11 155:12
**school** 7:5 8:11
8:14
**se** 40:18
**seated** 88:11
**second** 16:17
62:15 124:7
160:6 174:12
**secondary** 95:8
**second-line**
28:6
**secretary** 176:1
**section** 55:8
106:22
**secure** 43:22
**Security** 6:5
22:17 29:19
**see** 6:7 20:6
34:17 38:14
49:10,13
64:22 74:1
86:7,10 92:8
108:11 123:19
127:2 153:8
154:1,16,19
165:4
**seek** 127:8
**seen** 158:5
**segment** 71:20
**select** 27:6
33:11
**selected** 176:19
177:12,20
**selecting** 160:17
**selection** 32:10
32:14 33:14
38:17,19 39:1
42:16 51:18
85:4 160:7,15
162:21 165:6

**send** 84:21
**sending** 91:10
**sense** 71:3 125:6
**sent** 48:22,22
53:8 54:7 57:4
**separate** 107:5
119:11
**September**
52:12 61:17
99:6
**series** 8:22
137:9,10
152:11
**servant** 118:5
**servants** 124:9
**serve** 5:21
**served** 23:11,12
**serves** 13:11
15:17
**service** 5:14 6:4
10:12 22:15
67:4 75:13
113:13 151:15
151:17 152:3
152:11,21
153:12 154:12
155:13 156:15
176:18 177:11
177:17 178:8
178:11,14
**services** 113:14
131:8
**servicing** 73:2
117:11 161:19
**serving** 20:13
**set** 55:10 78:16
80:15,19
117:4 123:13
**seven** 76:18
85:17 91:4
131:2 132:4
169:16
**SF-171** 162:19
**SF-50** 150:10
151:1 163:20
**SF-52** 150:18

163:22
**Shapiro** 1:23
2:3,4 4:7 7:15
16:3 22:12
25:7 27:20
28:8,9 36:19
37:1 41:19,21
52:21 82:20
82:21 90:18
90:19 105:3
116:1,6,11,19
124:12 126:6
126:8 132:11
135:12 138:11
150:4,7,8
160:5 164:11
166:22 167:1
168:16,19
176:12 177:1
178:1,4,16
**Sharpe** 1:4 3:9
3:10 12:13
14:1,10,13
15:2,9,15
16:11,13,18
20:4 22:4,6
23:22 24:1,14
24:20 25:1,8
27:7,8,21
28:13 29:1,10
40:4 42:4,21
43:5,6 48:6
53:12 55:5
56:19 61:2,3,6
61:10 63:21
64:15 70:17
76:22 78:3,9
83:7 84:9 87:9
114:22 165:13
168:21
**Sharpe's** 61:13
61:13 62:9
**she'd** 65:7 81:7
**she'll** 96:13
**shocked** 53:22
54:11 55:2

**shop** 10:18,22
73:2 104:10
104:11 157:17
157:17
**Short** 5:17
**shortcuts** 119:2
119:15,18
**shorthanded**
21:6
**show** 52:17
**showed** 24:1
**showing** 52:22
126:9 150:9,9
**shows** 83:19
**shrinking** 98:9
**shrunk** 97:20
**sign** 75:3
**signature**
156:20,21,22
157:3,20
158:3
**signed** 75:5
76:2 78:11
81:6 160:19
160:21 161:3
173:21
**similar** 5:6
143:18 148:8
**Similarly**
141:19
**Simmons** 27:13
28:1,2 34:12
48:19 61:22
62:11 63:2
64:14 89:5
98:19 104:10
**sir** 5:8 23:19
**sit** 87:22
**sitting** 86:12
**situation** 80:6
87:8
**six** 76:16 85:17
91:4 114:14
114:15 131:3
131:10 132:4
169:15

**size** 98:12
110:21 111:6
114:13 115:16
115:17 123:9
132:13,17
134:5
**sized** 98:15
**sizing** 98:10
106:6
**skill** 55:10
56:13 69:11
80:15,19
117:4
**skills** 55:12
73:21 77:5,7
77:21 78:3
**slight** 47:4
**smart** 54:20,20
**snapshot** 16:21
**sole** 161:10
162:4
**somebody** 43:4
43:5 45:8
47:19 65:20
70:7 79:4,9
87:3,11,12
96:4 109:10
114:20 119:2
129:15,20
137:14 141:22
144:11 146:3
147:9,22
148:2 157:6,9
**somebody's**
11:22 12:4
137:21
**someplace**
117:2
**somewhat**
105:5
**soon-to-be** 23:1
**sorry** 11:15
40:10 131:15
133:17 155:2
**sort** 8:12 19:14
29:22 62:3,6

103:2 115:12
119:2 125:10
169:15 172:15
172:17
**speaking** 55:6
**special** 13:14
69:11 78:21
79:1 82:15
**specialist** 5:17
6:22 7:13,17
8:16 9:13,16
9:16,22 15:16
15:21,22
19:11,12,13
24:4,7 28:17
30:11,11 39:9
41:7 59:17
86:18 92:11
145:4
**specialists**
18:14 19:3,7
92:16
**specialized**
32:21 144:5
**specialty** 9:5
10:4 19:8
35:12
**specific** 80:15
80:19 111:16
111:20 112:1
144:10 145:20
146:3,14,14
147:1 166:12
**specifically** 27:6
162:22
**spending** 20:12
**spill** 164:17
**spoke** 76:3
78:12
**spring/summer**
42:13,15
**Stacey** 1:4 3:9
3:10 12:13
28:13 42:4,8
43:4 44:10,17
44:18,19,21

44:22 45:4,8
48:6,14,21
49:5 50:6 51:4
56:19 63:6
70:17 74:21
75:2 78:9 81:5
83:7 87:22
88:6,10 91:11
92:7 93:9
94:21 95:11
96:7,9 114:22
176:8
**Stacey's** 45:5
49:20 72:3
**stack** 32:19
**Stacy** 42:21
43:6
**staff** 11:11
17:22 98:18
98:22 110:17
110:18,21
135:17 136:6
138:12,15,19
**staffing** 7:1
8:18 9:16,20
10:5,6 13:9
14:4,8,9,15,20
15:3,7,10,17
17:12,16
26:12 30:7,9
30:10,22
55:18 60:6
62:18 84:1,3
90:21 91:10
93:2,13 95:8
95:12,19 96:2
96:9 97:1,3
99:12 100:15
100:16 101:1
101:5,10,10
101:12 103:1
103:2,15,17
170:15,22
171:13,19
172:7
**stamp** 156:21

156:22
**stand** 101:22
**standards** 19:8
79:7
**stands** 154:6
163:22
**start** 87:18
88:10 122:12
161:8 169:13
**started** 7:4,13
8:10 10:13
15:5 17:20
18:3 19:21
61:1 89:12
90:21 91:9
**state** 4:8 115:22
**stated** 15:19
**statement** 116:8
**states** 1:1 21:21
73:21 75:10
**stating** 116:7
**stationary**
126:10
**status** 86:10
**stayed** 88:11
**step** 176:5
**STEPHANIE**
2:3
**stood** 48:13
**stopped** 38:14
**Street** 1:24 2:4
**stressing** 82:7
**strictly** 108:22
**stronger** 10:8
**student** 7:5,13
**study** 175:4
**stuff** 21:12
26:14 57:15
113:18 145:5
176:16
**subject** 53:16
126:21
**submitted** 86:5
89:9
**subordinates**
175:11,12

**substantial**
130:19 162:20
**sudden** 64:13
**sufficient** 43:19
**sufficiently**
177:2
**Suite** 2:4
**suited** 56:14
**summary** 166:7
167:2,6,12
**summer** 26:21
42:9,16 91:8
93:5
**supervisor**
25:16 27:10
27:12,13 28:7
33:5 34:11
62:16 99:3
**Supervisory**
5:16
**support** 6:8,12
110:17,18,21
**Suppose** 123:5
**supposed** 17:18
26:18 87:4
99:14 113:7
143:1
**supposedly**
38:12 129:12
**sure** 6:6 25:13
38:3 39:22
116:6 123:4
133:10 135:15
149:12,13
158:13 173:1
**surface** 61:14
**surgery** 43:1,11
47:11 48:3,12
52:11 54:2
**surprised** 54:22
55:2,3 57:7
**Swick** 1:23 2:4
**sworn** 4:5
**system** 83:4
113:9 116:21
123:12 145:2

145:8,8 155:6
157:1,3
158:15 164:5
164:6,14,16
**systems** 43:22
44:1
**system/history**
86:1
**S-a-v-i-a** 12:13

**T**

**T** 3:1,1
**tab** 67:7 69:9
77:11
**tail-end** 72:21
**take** 16:21 35:2
41:19 67:6
68:17,21 69:7
70:10,10,17
72:9 82:17
87:4 96:16
105:4 107:17
131:10,12
135:10 137:5
168:17 171:9
174:13
**taken** 1:20
41:20 168:18
**takes** 84:9 150:2
150:17
**talk** 43:14 44:8
44:15 47:21
49:2,7 50:6,17
74:21 75:5
78:9 94:8 98:8
101:9 121:14
121:17,20
**talked** 26:4
48:18 49:3,4
51:3 57:3
60:14 75:2
95:18
**talking** 24:5
39:7,10 55:15
57:2 70:4
88:16 103:10

103:13 118:13
134:19 171:16
171:17,18
**technical**
117:21 162:16
**technicality**
109:14
**technically**
166:3
**Technologies**
21:16
**telephone** 4:16
**tell** 39:5,6 59:14
67:14 69:18
81:9 82:12
162:1 173:22
**telling** 81:2
137:20
**tells** 166:16
**temporaries**
122:16 123:15
123:22
**temporary**
117:17,21
118:4,6,8,14
118:21 119:4
119:5,6,10,19
120:14,16
121:9,12,13
122:4,8 123:2
124:7 127:16
127:17 138:15
140:7 151:21
153:2 154:22
155:2
**term** 100:11
101:18 102:16
103:11,16,17
119:1,7,8,8,10
119:15 120:8
120:9,13,14
120:15 121:14
121:16 122:4
122:8 123:2
124:7,7
126:21 127:5

127:14,19
128:1,4,10,13
128:19,20
129:6,9,11,12
129:21 130:1
130:6,9,12
131:11,17
138:17,18
139:11 140:7
151:19,21
153:2 154:11
155:2,8,17,18
155:22 156:9
156:17 165:19
168:3,6
174:19 176:19
**terminated** 76:6
76:8 109:10
**terms** 123:17,22
152:2
**test** 152:14,16
**testified** 4:5
**thank** 56:17
65:1
**theory** 129:14
**they'd** 67:3
**thing** 17:10
42:16 59:14
73:15 81:6
82:14 95:9
101:3 103:3
115:13 146:7
156:5
**things** 9:10
25:16 33:8
44:3 48:13
56:7 88:18
119:11 129:9
134:10 156:3
158:21
**think** 15:12
22:14 28:1
34:16 35:5
36:11 39:17
39:20,22 40:2
40:2 44:9,18

50:10,18,20
57:17,17 65:2
77:8 82:1 84:1
93:5 116:7,8
120:17 133:10
152:9 157:13
170:10,21
177:1
**thinking** 28:1
134:11
**thought** 54:15
162:2 170:14
**thousand** 85:18
169:16
**three** 34:16,18
42:6 46:8
131:9
**threw** 59:20,22
61:22
**till** 16:11 78:10
88:7
**time** 6:15 7:10
11:21 16:11
18:6 19:6
20:13 21:4,20
23:17,22
24:21 25:3
29:10,15
32:15,16
42:20 48:11
55:16 56:17
59:22 62:15
71:12 78:10
78:10 79:18
79:19,20 80:8
99:3 118:2
121:1 131:2,3
132:3,4
135:19 136:22
138:9 165:13
167:3 174:19
**times** 21:22
25:19 31:9
46:10,11
**time-frame** 20:9
24:16 63:5

120:16 133:10
135:8
**title** 15:15,20
   16:1 126:13
   126:15 154:2
**told** 18:14 27:1
   27:8,10,21
   28:10,10 43:3
   43:4 47:11,15
   48:19 50:1
   63:5,7,15,17
   63:20 64:13
   64:14 65:7
   74:22 78:11
   90:6 159:10
   166:13,15
   170:2
**tool** 66:11 68:4
**top** 34:10 37:6
   53:6 99:18
   111:14 120:18
   130:14 149:8
   154:5
**total** 11:8 97:11
**Towanda** 15:1
   16:10 17:5,16
   19:12,14
   21:14,19 22:1
   22:6 23:15
   55:21 91:14
**trade** 150:12,13
**train** 35:20
**trained** 41:6
   84:7 86:22
   88:13 145:5
   169:1,4,12
**trainee** 60:16
**training** 3:10
   13:16 14:10
   14:11 15:5,9
   17:20,21
   25:21 26:12
   35:9,9,11,19
   35:21 62:4
   78:19 81:14
   82:13,15 83:1

83:6 84:21
85:18 86:10
86:15,19 87:3
89:10 169:2,7
169:15,16
170:10
**transcript**
   178:21
**transfer** 53:16
   55:7,8 56:16
   61:15,16
   169:4
**transferring**
   107:15
**transitioning**
   88:17
**Treasury** 5:6,7
   5:8 6:16
**tried** 31:7 87:17
   173:1
**Trina** 1:19 3:12
   3:13 4:3,10
   53:6
**true** 9:7,8 78:2
   82:4 86:14
   92:20 170:17
   175:17
**try** 82:9 177:10
**trying** 58:6
   141:16 173:22
**Tuesday** 1:14
**turn** 42:3 124:8
   136:13
**turned** 32:12,13
   39:12 42:17
   43:10 57:7
   61:14,15,15
**two** 25:19 26:6
   26:6,7 30:20
   34:19 35:14
   35:16 38:7
   42:6 44:9 46:8
   56:11 70:4
   77:1 83:17
   96:21 102:3
   114:6,8 118:3

119:11 120:17
120:20 133:9
138:20,21
152:7 156:3
176:15 177:16
**two-and-a-half**
   5:10 136:14
   138:3
**type** 26:14
   89:20 125:18
   163:1
**types** 112:1
**typical** 80:6
**typographical**
   137:6
_____
              **U**
**Uh-huh** 34:21
   37:3 41:2 48:1
   49:2 50:3
   58:12 59:8
   62:17 63:19
   85:14 89:21
   94:18 103:12
   116:11 123:6
   126:12,19
   127:1,9 132:8
   136:7 144:4
   167:21
**ultimately**
   60:19
**understand**
   9:10 10:10,14
   40:21 56:6,8
   56:10 57:12
   59:4 61:9,12
   68:10 70:15
   70:19 73:1
   77:7 79:13
   86:21 89:1
   90:6 92:20
   95:2 103:7,8
   104:11 115:6
   116:15 123:4
   129:13 135:15
   137:6 139:17

146:13 148:9
148:21 158:4
177:7
**understood**
   51:21 170:17
**unit** 6:12 55:7
   55:13 56:16
   67:14 74:18
   101:10,10
   110:11,14
   113:13 115:12
   122:20,22
   160:20 165:14
**UNITED** 1:1
**units** 101:9
   110:15,16
**unit-wide**
   122:20
**University** 8:6
**unusual** 144:8
**update** 86:2
**urging** 50:7
**use** 49:19 55:12
   65:14 81:2
   102:15,16
   103:13 111:20
   112:1,8,12
   174:18
**usually** 65:13
   79:4,9 80:13
**utilization**
   55:10
**utilizing** 90:21
**U.S** 5:14 6:4,18
   22:14,14
   129:3,4,5
_____
              **V**
**v** 1:6
**VA** 2:8
**vacancy** 3:16
   22:22 23:1
   25:10,11 27:2
   37:4,15,16
   38:22 40:6
   55:14,15

91:15 108:3,9
137:21 139:20
163:1,6,7,16
164:13,17
165:3,5,22
167:15 172:1
**vacant** 29:6
**various** 9:9,10
**vendors** 171:18
**Veronica** 88:2
   88:17
**Veterans** 152:7
**view** 170:19,20
**Virginia** 8:8
**volitional** 66:4
   174:6
**voluntary** 82:14
**Vosburg** 124:14
   124:22 126:3
   126:22 127:6
   127:13 139:8
   139:11 151:8
   159:5 161:10
   168:1
**Vosburg's**
   131:7
_____
              **W**
**W** 3:12,14
   126:20
**waiting** 22:2
   29:15 58:3
   86:13
**walk** 20:8
**want** 20:16
   39:11,12
   41:22 42:6
   46:3 49:19
   54:13,15
   60:15 64:18
   64:22 65:15
   65:17,19
   68:17 69:6
   70:10,17
   71:17 72:18
   74:1,8 79:10

80:10,14
113:8 124:13
135:15 141:14
141:21 142:4
142:5 143:2
143:19,19
144:10,11,12
144:14,14
160:6 167:10
173:4 174:4
**wanted** 33:2
46:19 49:11
49:13 54:17
71:18 72:9
74:3 77:9
81:13 82:9
88:6 89:11
128:7 172:9
**wants** 66:14
67:4,5 70:9
79:5,5,21
80:15 127:22
144:2,5
145:18 146:2
161:8
**Washington** 1:1
1:13,24 2:5
8:11 31:19,20
107:21 140:14
141:19,21,22
142:3,4,8
**wasn't** 44:14,14
45:11 48:12
54:17 69:14
70:22 76:20
81:10 87:9
88:13 115:6
115:20 116:3
170:1
**waste** 143:16
**way** 64:1,14
66:17 68:7
70:12 89:3
103:2,7 108:2
108:7 117:20
118:19 130:17

155:21
**WDM** 153:22
**week** 88:22 89:4
89:8 90:2
**weighing**
162:16
**Welch** 12:9,10
13:7,9 17:5,9
19:2,10 22:20
23:5 25:2
29:22 58:8
64:2 124:19
125:3 160:21
175:12
**welcomed** 78:18
**went** 6:15 7:5
7:10,21 8:2,17
16:7 22:15,18
26:21 43:12
44:7 47:15
48:2,11,13
59:16,18 63:2
111:13 159:3
**weren't** 19:6
64:17 132:22
133:5
**we'll** 52:17
86:13
**we're** 16:21
64:15 101:13
131:13 134:18
136:5,8,9
137:13 138:4
138:7 164:12
168:16
**we've** 47:18
65:15
**white** 64:3,4,4
**wide** 140:12
141:20,21
**wider** 31:18,19
141:13 143:11
**willing** 79:22
**winter** 131:14
**witness** 1:20 4:4
28:6 36:22

116:16
**wits** 47:16
**word** 49:19
117:12,21
**worded** 148:18
148:20
**wording** 78:1
**words** 37:15
64:17 65:20
69:14 102:3
107:4 128:1
141:16 167:8
**work** 10:12
13:14 21:7
22:4 25:22
26:7,10 45:18
45:19 46:9
49:22 51:2,11
57:11 60:9,16
60:18 61:19
61:20 90:1,10
90:13 93:15
93:19 94:3
98:16,17,18
111:17,20
124:16,18,19
125:10,18
130:19 135:17
139:5 140:18
144:11,12
158:10 159:9
170:12 173:4
173:6,9
174:19 175:9
176:5
**worked** 7:2
8:14 10:18
45:15 101:17
147:12 148:12
162:22
**Workers** 85:21
**workforce**
131:4 132:5
**working** 10:15
51:4 57:12
59:11 140:2,3

141:1,1,3
**workload** 100:7
100:7 130:20
**works** 20:14,20
124:6 125:2,6
147:9 167:17
**work-station**
53:5
**worth** 85:18
169:16
**wouldn't** 25:9
46:19 52:2
72:10 74:3
89:8 143:10
144:21 168:6
**write** 166:18
**writes** 138:14
**writing** 172:1,1
**wrote** 170:16
**W-e-l-c-h** 12:11

**X**

**x** 1:3,10 75:11
123:5 144:11
144:12

**Y**

**Y** 75:11 123:5
**Yeah** 12:4 48:18
66:19 81:16
**year** 14:18
15:13 24:19
29:2 85:19
86:15 91:6,7
99:7 110:6
118:3 128:1
168:7 169:8
**years** 5:10
76:16,18
114:6,8 118:3
120:15,17
127:6 128:2,6
128:8 130:6
130:21 131:9
136:14 138:3
**youth** 7:8

**Z**

**Z** 75:11

**$**

**$1,000** 85:4,7,13
**$1,100** 84:19
**$1,200** 85:15

**#**

**#100-2005** 1:6

**0**

**00927X** 1:6
**04** 158:17 161:2
**050002** 1:7

**1**

**1** 3:9 52:20 53:2
85:10 136:15
138:9,14
179:11
**1:00** 178:17
**10** 29:8 30:16
34:7 36:1 91:4
102:7 123:11
126:9
**10-month** 31:9
**10:15** 1:25
**11** 16:8 40:3,16
86:18 87:5
165:10
**11/04/2004**
165:11
**11/1/04** 3:13
**11/12** 39:22
**11/15/2004**
165:11
**12** 7:20 8:17
23:8,20 39:18
40:2 95:16
97:7 154:17
155:22
**12/13** 23:16
39:19
**120** 118:4
**1225** 1:24 2:4

**126** 3:12
**1290** 2:4
**13** 7:19,21 8:20
  23:10,11,12
  23:18 56:1
  95:16 96:19
  154:18 155:22
**130** 99:14
**135** 3:14
**14** 1:14 23:6
  25:5 26:8,11
  38:10 56:4
  58:6,17 91:17
  137:4
**14s** 26:6,7
**147** 104:16
**15** 13:1 137:6
  146:11 166:10
**150** 3:15
**164** 3:16
**176** 3:4
**177** 3:7
**19** 161:2
**1978** 7:10
  145:21
**1990** 6:15
**1999** 5:3,3

**2**
**2** 3:10 82:18,19
  84:8 179:13
**20** 102:8
**20005** 2:5
**2002** 127:13
  132:19 134:15
  168:13,13
**2003** 20:16,16
  20:17 29:4
  135:4
**2003-2004**
  132:13
**2004** 24:20,21
  29:11 33:15
  33:15 36:14
  37:16,17,18
  38:5,7,10

39:15 84:11
110:5 136:15
136:20 138:9
168:2
**2004-OIG-2694**
  3:16 163:16
  165:7
**2005** 83:11,22
  91:9 93:7
  110:5 131:15
  131:18 168:8
**2006** 1:14
  106:15 109:21
  131:15
**2007** 131:15
**201** 9:1,1,2,12
**22226** 2:8
**24** 53:3,13
**28** 158:17
**28th** 159:7

**3**
**3** 3:12 126:7
  136:19
**30** 136:16
**301-856-3018**
  4:17
**3501** 2:8

**4**
**4** 3:3,13 135:11
  136:20
**4/10/02** 3:12

**5**
**5** 3:15 18:10
  41:11,13
  150:6
**5-C** 154:1
**5/7** 41:11
**5:20** 53:3,13
**50** 157:21
  160:10,13
**50s** 157:12,17
  158:2,6,21
**52** 3:9 150:18

**562-6342** 2:9

**6**
**6** 3:16 164:10

**7**
**7** 18:10 41:15
**703** 2:9
**7208** 4:14

**8**
**8** 18:11
**8/24/2004** 3:9
**82** 3:11

**9**
**9/11** 20:9 24:9
**905** 137:9
  152:11,11
**905-15-level**
  145:14
**96** 5:11
**97** 5:11,12
**99** 20:1 67:11