UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

```
- - - - - - - - - - - - - - -x
                              :
STACEY K. SHARPE,             :
                              :
           Complainant,       :
                              :
      v.                      : EEOC #100-2005-00927X
                              : Agency #FDICEO-050002
MARTIN GRUENBERG, CHAIRMAN,   :
FEDERAL DEPOSIT INSURANCE CORP.:
                              :
           Agency.            :
                              :
- - - - - - - - - - - - - - -x
```

Washington, D.C.

Tuesday, March 14, 2006

Deposition of

CHRISTIAN A. GIESELER

a witness of lawful age, taken on behalf of the Complainant

in the above-entitled action, before Ed Greenburg, Notary

Public in and for the District of Columbia, in the offices of

Swick & Shapiro, P.C., 1225 I Street, Northwest, Washington,

D.C., commencing at 2:11 p.m.

Page 2

APPEARANCES:

On Behalf of the Complainant:

    DAVID SHAPIRO, ESQ.
    STEPHANIE RICHARD, ESQ.
    Swick & Shapiro
    1225 I Street, N.W., Suite 1290
    Washington, D.C.  20005

On Behalf of the Agency:

    MICHAEL COSGROVE, ESQ.
    Federal Deposit Insurance Corporation
    3501 Fairfax Drive, Room E-9054
    Arlington, VA  22226
    (703) 562-6342

Page 3

C O N T E N T S

EXAMINATION BY:              PAGE
  Counsel for Complainant           4

Page 4

1          P R O C E E D I N G S
2   Whereupon,
3          CHRISTIAN GIESELER
4   was called as a witness and, having been first duly sworn,
5   was examined and testified as follows:
6          EXAMINATION
7    BY MR. SHAPIRO:
8   **Q**  Could you state your full name, please, sir?
9   A  Christian Allen Geiseler.
10  **Q**  Your home address?
11  A  2634 Skidmore, S-k-i-d-m-o-r-e, Circle, Vienna,
12  Virginia 22180.
13  **Q**  And your telephone number there?
14  A  703-849-0008.
15  **Q**  You're currently employed, sir?
16  A  Yes, sir.
17  **Q**  And where are you employed?
18  A  The Federal Deposit Insurance Corporation.
19  **Q**  The Office of Inspector General?
20  A  That is correct.
21  **Q**  And how long have you been employed there?
22  A  Since October of 1989.

Page 5

1  **Q**  And what is your position?
2  A  Attorney advisor.
3  **Q**  That's a 905 series job?
4  A  Yes.
5  **Q**  CG-905-15?
6  A  Yes.
7  **Q**  And when you first came in, what was your grade?
8  A  13. At that point in time, I was an auditor,
9  audit specialist, was the title when I -- when I came on-
10  board.
11  **Q**  Were you a lawyer?
12  A  I passed my -- the bar exam in 1981, and when I
13  came to Washington, I first started working as an auditor
14  with the Federal Home Loan Bank Board, and then -- then I
15  went to the FDIC, and then I joined the legal staff in
16  December of 1991.
17    (Pause.)
18    BY MR. SHAPIRO:
19  **Q**  So, you were first with the FDIC legal staff, not
20  the OIG legal staff.
21  A  I was first with -- first with the audit side in
22  the FDIC Inspector General's office, and then I moved -- we

Page 6

1 call it the legal staff -- in -- in December '91, when the
2 counsel there -- legal staff, and then, several years later,
3 it switched to Office of Counsel.
4    Q    So, when did you start holding an attorney job?
5    A    In December 1991.
6        Let me correct that -- or -- just for the record.
7        I started working in the legal staff in -- in
8 December of 1991.
9        I didn't switch my position description until
10 about four years ago, and I'd have to check the date to get
11 it exactly correct, but I did have -- my -- my job title was
12 -- in the -- '91 through perhaps 2000, was senior audit
13 specialist, legal staff.  So, I -- I would get involved in
14 certain legal matters, not representing the agency before a
15 court, but I do research, etcetera, etcetera.
16    Q    But you weren't a 905 until -- about four years
17 ago.
18    A    About four years ago.
19    Q    So, 2001-2002?
20    A    In that range.
21        I was looking for my -- my position description or
22 my -- my personnel files, and they are -- they're still boxed

Page 7

1 up as part of our move.
2    Q    Okay.
3        So, was there anybody else like you who was
4 technically not in a lawyer position in the OIG legal staff?
5    A    Well, I'm -- I'm an attorney now.
6    Q    Now.  But when you were -- in 2000 --
7    A    In the -- in the '90s, basically --
8    Q    Or were you the only one?
9    A    I was the only one.
10    Q    Okay.
11        How many lawyers are there now?
12    A    There's four, including myself, and then the
13 counsel.
14    Q    So, four lawyers plus the counsel?
15    A    Including counsel.
16    Q    That would be Fred Gibson --
17    A    Correct.
18    Q    Christian Geiseler.  That's you.  And you're a 15.
19    A    Correct.
20    Q    Then there's Mike Cosgrove?
21    A    That's right.
22    Q    And he's a 15.

Page 8

1    A    I believe that to be true.
2    Q    And who else?
3    A    Adriana Vosburg.
4    Q    And what grade is she?
5    A    I'm not sure.
6    Q    She is the most junior of the lawyers in the
7 office?
8    A    Yes.
9    Q    All right.  And you're the most senior, other than
10 Ms. Gibson?
11    A    Senior as in being with -- with the OIG office or
12 --
13    Q    Yes, OIG counsel.
14    A    Yes.
15    Q    Okay.  And when did Mr. Cosgrove get there?
16    A    I can't remember for sure.
17    Q    Okay.
18        Other than -- now, Ms. Vosburg -- did she replace
19 anybody who had left when she came in?
20    A    I wouldn't say she replaced anybody.  I think she
21 just was an additional person on staff.
22    Q    Okay.  And Mr. Cosgrove -- did he replace

Page 9

1 somebody?
2    A    Let's see.
3        When -- I believe when Larry Froehlich left, then
4 Mike came on-board to replace him.
5    Q    And you've been there since '91.
6    A    Correct.
7    Q    Okay.
8        Did you replace anybody?
9    A    No.
10        They were building staff at that time.
11        (Pause.)
12    BY MR. SHAPIRO:
13    Q    So, Ms. Vosburg is the newest of the lawyers.
14    A    Correct.
15    Q    The most recent to join the staff.
16    A    Correct.
17    Q    When did she join the staff?
18    A    It was several years ago.  I can't remember her
19 exact start date.
20    Q    Okay.
21        Let me ask you this.  Is the staff divided up into
22 subject areas?  Certain kinds of work is done by certain

Page 10

1  people --
2    A  Well --
3    Q  -- generally?
4    A  I'd say, to some extent, that's true.
5      For example, Mike Cosgrove handles personnel
6  cases.
7      I handle FOIA matters, ethics matters.
8      Adriana does a lot of, you know, research and
9  advice and counsel and some -- and some litigation, as well.
10   Q  She does research for you and for Cosgrove?
11   A  No, you know, as clients raise issue or as Fred
12 might have her research matters.
13   Q  Do you do any litigation?
14   A  Occasionally.
15   Q  What kind of litigation do you do?
16   A  One case -- I assisted counsel on a -- on a FOIA
17 lawsuit. Another case -- I started working on an EEOC
18 matter. Other than that -- it was enforcement of a Inspector
19 General subpoena.
20   Q  Okay. But generally speaking, your area is ethics
21 and the FOIA, Privacy Act?
22   A  I do -- I mean, again, I do research and advice

Page 11

1  and counsel, as well, but you know, that's kind of what we
2  all do, but then my -- I guess within -- within the office --
3  the FOIA and ethics would be my specialties.
4    Q  Okay.
5      Now, generally speaking, you run the FOIA --
6    A  Correct.
7    Q  -- program. And can you tell us -- do you have
8  assistance in that? Does somebody work with you on that?
9    A  Generally not.
10   Q  Okay. Who does the processing of FOIA, rides
11 roughshod over the processing?
12   A  That would be me. I'm pretty much it from start
13 to finish, other than, you know, memorandums that -- that go
14 from our office to the FDIC's FOIA/privacy group, which
15 actually respond to the requester. I'll draft a response for
16 Mr. Gibson's signature, and then, you know, discussion, if
17 need be.
18   Q  Okay.
19      Do you have a paralegal working with you?
20   A  No.
21   Q  Have you ever?
22   A  Yes.

Page 12

1    Q  In the FOIA matters.
2    A  Right.
3    Q  Who was that?
4    A  That was Ms. Sharpe.
5    Q  Is that what she did? She was your paralegal for
6  FOIA?
7    A  She was -- she would be there for the office, and
8  if I had a FOIA case, then I would have her assist me on
9  that.
10   Q  And how would she assist you? What would she do?
11   A  Okay. The initial process -- I would get the --
12 the requests generally through e-mail -- the last, you know -
13 - through e-mail --
14   Q  The last eight years or so. Who would you get it
15 from?
16   A  From the FDIC's FOIA/Privacy Act group.
17   Q  Okay.
18   A  What they're called now.
19      Occasionally, we'll get -- we'll get requests in
20 directly from the requester, sent to our office, but then we
21 still have to send it to the -- the FOIA/PA group, and then
22 they send it back with official cover letters.

Page 13

1      Okay.
2      Ms. Sharpe would be -- I would -- I would have her
3  set up a file folder for the request, enter an entry in our
4  work flow tracking system. In many cases, I would have her
5  send by e-mail the FOIA request to those groups within FDIC -
6  - within the Inspector General's office that I felt might
7  have responsive records, and Ms. Sharpe would also --
8  depending on circumstances, she would review the responsive
9  records and do the initial effort at redactions, and also in
10 drafting the memorandum of our response to the FOIA/PA group.
11      (Pause.)
12      BY MR. SHAPIRO:
13   Q  How many FOIA requests do you get a year,
14 FOIA/Privacy Act?
15   A  Right.
16      I'd say, for the last five years or so, maybe six
17 or seven.
18      This year is a little bit different, because we
19 had requests for, you know, about six at one time, but
20 generally, it's -- the numbers have been in that range.
21   Q  Per year. Six to seven per year?
22   A  Right. In the last -- in the last several years.

Diversified Reporting Services, Inc.
202-467-9200

Page 14

1    Q  In the last five years, you said.
2    A  Yeah.
3    Q  Okay.  But you just had an up -- up-tick in that
4  because there's a requester who made six requests.
5    A  Right.
6    Q  So, would you say it was -- except for this --
7  this recent up-tick, would you say it's fairly stable --
8    A  Yes.
9    Q  -- amount of work over the last five years?
10   A  Correct.
11   Q  Since, say, 2000.
12   A  Right.
13     In 2000 -- in 2000, it -- I think we were coming
14  down off our -- the high workload that our office faced in
15  the late '90s, but it -- it ratcheted down fairly
16  precipitously.
17   Q  And down to this five to six --
18   A  Right.
19   Q  -- six to seven a year.
20   A  Yeah.
21   Q  Okay.  So, by 2001, it was six to seven a year or
22  so?

Page 15

1    A  Or maybe 2002, but --
2    Q  That's the idea.
3    A  Yeah.
4    Q  Okay.  And it's been fairly stable until recently
5  --
6    A  Right.
7    Q  -- when this person made a --
8    A  Right.
9    Q  And that's enough to keep you busy with FOIA
10  stuff.
11   A  Well --
12   Q  What percentage of your work is FOIA/Privacy Act?
13   A  Well, depending on the -- nature of the
14  request and how many records are responsive --
15   Q  I mean over a year, what percentage?
16   A  1 or 2 percent.
17   Q  Of your work.
18   A  Yeah.
19   Q  And what's -- what's the rest made up of?
20   A  Research, advice and counsel.  We -- we review
21  audit reports that the auditors draft and see if they have
22  their concepts straight and their statutory citations correct

Page 16

1  and all that type of stuff.
2    Q  Uh-huh.  And what about your ethics -- are you the
3  ethics officer?
4    A  Within FDIC, there's -- there's an ethics office
5  within FDIC, and then they delegate ethics -- ethics-related
6  responsibilities to the various divisions and offices within
7  FDIC.  As to OIG, I work with two other counselors, and what
8  we do in the -- the late fall is to review the financial
9  disclosure forms that most of the employees file, and then --
10  we review them, sign them, and then respond to any questions
11  that the ethics office poses.  In addition, employees come to
12  me for ethics advice, and I counsel them, and that happens
13  maybe once a month or so.
14   Q  Did you work with Ms. Sharpe on any other matters
15  besides FOIA/Privacy Act?
16   A  Yes.  There were cases -- probably -- well, when
17  she first started with -- with our office, she and I would --
18  would work a lot on proposed legislation in Congress or
19  proposed regulations by the FDIC, with the idea of reviewing
20  those, summarizing them, what's the impact, what's the
21  meaning of this regulation, this statute on FDIC or OIG.
22   Q  And what would she do?

Page 17

1    A  She would get the bills, review them, summarize
2  them, and then -- you know -- and I -- and I would review her
3  work.
4    Q  Legislative histories, that sort of thing.
5    A  A lot of these were in a proposed state.  So, I
6  don't know if we'd go to the extent that we'd to the, you
7  know, Congressional Record-type legislative history, but we
8  would generally take the bill and -- and summarize it as it
9  was at that time.
10   Q  And see where it would impact the FDIC and that
11  sort of thing.
12   A  Uh-huh.
13   Q  And the OIG.
14   A  Yeah.  And the OIG.  Right.
15   Q  She would do the drafting of this, and you would
16  review her work.
17   A  Right.
18   Q  I take it that work still goes on.
19   A  Actually, that work diminished as -- I think
20  because our office got more involved with -- with working
21  with the audit teams -- the time available to review
22  legislation diminished.

Page 18

1    Q   Who does the legislative review now?
2    A   It's more ad hoc. We try to -- we tried to be
3    more regularized in the '90s, but then, when -- that emphasis
4    went away, and we were more advice and counsel-oriented to
5    our -- the groups of auditors -- the audit advice and counsel
6    became a more prominent role for us.
7    Q   For the lawyers.
8    A   For the lawyers.
9    Q   So, who watches out for legislation and keeps an
10   eye on that stuff and writes reports and that sort of thing?
11   A   Again, it's ad hoc. You know, if Fred wants Mike
12   to look at a bill or me to look at bills, or Adriana, he --
13   or himself --
14   Q   Nobody doing it on a regular basis.
15   A   I think that's a fair statement.
16   Q   Okay.
17       Did you work on anything else with Ms. Sharpe?
18   A   Some subpoenas.
19   Q   Subpoena enforcement? That sort of thing?
20   A   Mostly in the drafting of the subpoena.
21   Q   She would draft, you would review?
22   A   Right.

Page 19

1    Q   Okay. And who does that now?
2    A   Adriana, I think, and Mike are doing more subpoena
3    than I have been lately, or Fred, Fred Gibson, and -- and our
4    secretary -- legal assistant is her proper title -- I think
5    she is primarily the one that will make the first cut at
6    filling out the subpoena form.
7    Q   Your legal assistant.
8    A   Legal assistant.
9    Q   Who is that?
10   A   Teresa Fewell.
11   Q   All right.
12       So, Ms. Fewell — she's been there quite some
13   time.
14   A   That's correct.
15   Q   She was there when Stacy Sharpe was there.
16   A   Yes, a number of years. She was there before I
17   was there.
18   Q   All right.
19       So, she was a legal assistant. What — what was
20   her title when Stacey was there?
21   A   For a number of years, it was still legal
22   assistant.

Page 20

1    Q   And what is she now?
2    A   And still is.
3    Q   All right. And what is her career field?
4    A   I'm not sure.
5    Q   All right.
6        Is she a paralegal? Does she do the same job that
7    a paralegal does?
8    A   Well, again, you have to define what -- what
9    roles, you know, a paralegal would do.
10   Q   She does the same jobs that Stacey used to do.
11   A   Well, I don't -- not really. She does -- Teresa
12   does not do the legislative research in the sense of you
13   know, summarizing bills. I mean it's possible she might do
14   some research to -- to go to Thomas and, you know, look up
15   H.R. 44 and print it out, but in terms of sitting down and
16   writing a summary of what this could do, that's not within
17   her -- her field of endeavor.
18   Q   But that's what Stacey used to do.
19   A   Stacey would do that, yeah, but that was -- that
20   was like late '90s, 2000, 2001, before the emphasis in our --
21   in our work changed.
22   Q   Well, what did she do in 2003?

Page 21

1    A   Well, I mean she assisted me with several FOIAs,
2    the FOIAs that were -- that came in, and other than that, I -
3    - I didn't have that many assignments for her that I can
4    recall.
5        I think that's pretty much -- left those
6    assignments to -- to Fred Gibson, her boss.
7    Q   So, she never reported to you.
8    A   No. I was never -- I never had a reporting
9    relationship.
10   Q   All right.
11       The only thing she really did for you was
12   FOIA/Privacy.
13       She would do the first cut at — organize things
14   and get — get the package in and do the first cut at -- at
15   redaction.
16   A   Well --
17   Q   And the legislative history.
18   A   The legislative history and some subpoena work.
19   Q   About how much time of hers did you take up with
20   her?
21   A   That's -- that's hard for me to -- to answer in
22   that -- I mean I would know how much --

Page 22

1    Q   What percentage of your work involved her?
2    A   I would say like, in the late '90s, the 2000,
3    2001, she did a lot of work for me, I'd say.  Maybe 20
4    percent of the stuff that I was doing, perhaps.  That's --
5    that's a wild -- that's a wild guess.
6    Q   What did you say?
7    A   I think about 20 percent in that period of the
8    late '90s, 2000, 2001.
9    Q   And thereafter, it tailed off.
10   A   Then it tailed off.
11   Q   To what percent?  10 percent?  5 percent?
12   A   Maybe even less than that.
13   Q   Okay.
14       What else did she do?  Do you know?
15   A   Well, she told me, in some cases, when, you know,
16   like we were working -- well, I'll try to get yours on -- on
17   Monday, because on Friday, I summarize certain articles for
18   Gaston Gianni, who was then Inspector General, but other than
19   that, you know, what she was doing didn't concern me.
20   Q   So, you didn't -- so, you didn't check it out,
21   because it didn't concern you.
22   A   Right.  Exactly.

Page 23

1    Q   Okay.
2        Who assists you in the FOIA stuff now?
3    A   No one.  Myself.
4    Q   Ms. Vosburg doesn't do any FOIA?
5    A   No.
6    Q   Okay.
7        Did you ever give assignments to Ms. Vosburg when
8    she was a law clerk?
9    A   She assisted me on some EEOC litigation, but that
10   was more Pat Black, who was then counsel.  That was more her
11   -- you know, her, you know, having -- have Ms. Vosburg assist
12   me, but --
13   Q   Oh, so, Black would have -- would assign Vosburg
14   to assist you.
15   A   Right.
16   Q   Okay.
17       I didn't have -- you know, she wasn't, you know,
18   my paralegal type of thing, you know.  She'd be for the
19   office -- or my intern.  I mean she was -- she was there to
20   assist the office as needed.
21       I'm trying to think what else -- from time to
22   time, we may have conferred on some -- certain audit reports.

Page 24

1        We'd both review the same audit report and -- and
2    then compare our -- our comments and stuff, but that's -- but
3    that's because Fred Gibson wanted it that way, rather than,
4    you know, her reporting to me, and that's -- that was her
5    assignment.
6    Q   When you had to take -- do some FOIA work now, do
7    you ever have the legal assistant work with you on that,
8    Teresa?
9    A   No.  I generally -- even to the extent of copying
10   the records and the -- the cover letter and the -- the forms
11   to go with it, I generally take care of that myself.
12   Q   You do that yourself.  So, that sort of
13   secretarial/paralegal work -- you do it now all yourself.
14   A   You could characterize it like that, and I do it,
15   yes.
16   Q   Okay.
17       Do you recall calling on Ms. Sharpe, after she
18   left the counsel's office and went down to HR, to do some --
19   do some FOIA work for you?
20   A   I don't think so.
21   Q   Do you recall calling her, getting her to do some
22   stuff?

Page 25

1    A   I don't recall.
2    Q   Could that have happened?
3    A   Could it have happened?  I'm trying to think if
4    maybe I called her about something she had worked on with me
5    at the time, but I don't ever recall like newly assigning her
6    something once she went down to the -- the HR office.
7    Q   How did you find out she was going to HR?
8    A   I'm trying to think.  Either Fred announced it or
9    she may have mentioned it to me.  I think Fred announced it,
10   but --
11   Q   Fred Gibson.
12   A   Fred Gibson.
13   Q   At a staff meeting?
14   A   Perhaps.  I don't recall for sure.
15   Q   There were -- was hiring of new auditors in the
16   Chicago office and headquarters in 2004.  Are you aware of
17   that?
18   A   They were hiring auditors in 2004 in Chicago.
19   That seems unusual since they're going to be winding that
20   office down.
21   Q   Now.  But in 2004, weren't they hiring in Chicago?
22   A   I'm not aware.

Page 26

1    Q    How about in headquarters?

2    A    During what period? 2004?

3    Q    Uh-huh.

4    A    I can't recall exactly what their hiring plans

5   are, because I mean, at the time, they announced vacancy

6   announcements, but that may be people getting a promotion. I

7   don't know if it -- if I would pay attention enough to know

8   that's -- they're trying to bring in new bodies or not.

9    Q    Isn't it true that, over the course of time that

10  she was there, she took over more and more of the FOIA work

11  as it became more -- more standardized work, she took over

12  more and more of the processing?

13   A    I wouldn't characterize it that way.  What I would

14  say is that, as she got FOIA training -- that was late '90s,

15  early 2000 --

16   Q    Well, she was taking college courses in paralegal

17  work, wasn't she?

18   A    I'm not -- I'm not aware of that.

19   Q    Because she got the FOIA training at the FDIC.

20   A    Actually, by the Department of Justice, and I

21  think, in one case, she went -- the group is called ASAP, and

22  I think she went to a conference there, and they would go

Page 27

1   over Privacy Act and FOIA issues.

2    Q    How to do the exemptions --

3    A    How to do the exemptions.

4    Q    -- what the exemptions mean, how to recognize, how

5   to --

6    A    Right.  And -- and I'd say that, as she got --

7   when we were doing more of the FOIA work, in around 2000, you

8   know, plus or minus a couple years, as she got more

9   experience, I would give her more, you know, difficult

10  documents to work with.

11   Q    Do you still work with difficult documents now?

12   A    I haven't had a really, you know, difficult case -

13  - and by that, I mean something like an investigative file,

14  where they want everything in the investigative file, which -

15  - they're much more sensitive, and there's Privacy Act

16  exclusions and exemptions to consider.

17   Q    You haven't had one of those in a while.

18   A    Yeah, it's been a while.

19   Q    But that's the kind of thing you were giving to --

20  increasingly giving to Ms. Sharpe, to do the initial cut at -

21  -

22   A    Yeah.  Well, again, we're -- the level of

Page 28

1   difficulty depends on what the requester seeks, you know.

2         Sometimes her -- you know, Stacey is making an

3   inquiry, do you have any responsive records, and she'd send

4   an e-mail to the -- the groups within -- within OIG, and they

5   have nothing responsive.  So, she'd send an e-mail back to

6   the FOIA group saying we have no responsive records, but --

7   but I'm saying that, over time, like in the time-frame 2000,

8   2001, as more -- you know, if we got more complicated

9   requests, then I would have her do the first cut, rather than

10  myself doing the first cut.

11   Q    When you first came on, did you come on as a

12  permanent employee?

13   A    Yes.

14   Q    Okay.

15        How about Mr. Cosgrove?  Did he come on as a

16  permanent employee?

17   A    I believe that, but I don't know that.

18   Q    How about -- how about Ms. Vosburg?

19   A    As I understand it, she -- she was -- she was an

20  intern, and then became a -- a term employee, and that --

21  and I believe she's now a permanent employee.

22   Q    When did that happen?

Page 29

1    A    That I don't know.

2    Q    She's the last lawyer hired in your office, right?

3    A    I -- I believe so.  And going back to the earlier

4   question, I believe she came on as -- as an attorney

5   approximately the same time that Mike Cosgrove came on, but I

6   -- again, I'd have to --

7    Q    What was her appointment?  Temporary at that

8   point?  Term?

9    A    When she first came on?

10   Q    Yeah, as a lawyer.

11   A    I believe it was for a one-year term, not to

12  exceed.

13   Q    Uh-huh.

14   A    And there may have been --

15   Q    Was that extended?

16   A    At least once, as I understand it.

17   Q    And when did she come on as a career -- career

18  conditional employee?

19   A    That I don't know.

20   Q    Okay.

21        Was there an announcement made that she was now a

22  career employee?

Page 30

1    A  Not that I recall.
2    Q  Okay.
3        You have staff meetings, the counsel's office at
4    the OIG, correct?
5    A  From time to time, yeah.
6    Q  And I guess Fred is now the counsel, and that's
7    who runs the staff meeting now?
8    A  Correct.
9    Q  And what about before Fred?  Who was that counsel?
10   A  It was Patricia Black.
11   Q  Who's now the deputy?
12   A  Deputy, yeah, or acting.  Deputy.  Deputy
13   Inspector General.
14   Q  Okay.
15       How long have you been a four-lawyer office?
16   A  Last three or four years, roughly.
17   Q  Since Ms. Vosburg came on.
18   A  Approximately so.
19   Q  Okay.
20       Let me ask you this.
21       For a while, you were a three-lawyer office,
22   before Ms. Vosburg.

Page 31

1    A  There was -- I guess there would have been a short
2    time after Larry Froehlich left and before Mike came on --
3    that would have put us one down.
4    Q  Well, at that point in time --
5    A  But then --
6    Q  When Pat Black was in the office?
7    A  Yeah, Pat would have been there.
8    Q  I mean Pat moved up.
9    A  Right.
10   Q  Right?  And Froehlich left, and Mike Cosgrove
11   came.
12   A  Right.
13   Q  Right.
14       So, when Pat moved up --
15   A  I guess, at that point in time -- you know, at
16   this point in time, with the comings and goings, I can't --
17   Q  Do you recall any other lawyers there besides Pat
18   Black, Froehlich, and the four lawyers who are still there?
19   Anybody else from the office?
20   A  Other than Froehlich, no.  Right.  That would be a
21   fair statement.
22       I mean we had another attorney that worked -- when

Page 32

1    -- when Larry was -- Larry Froehlich was -- was counsel,
2    years ago, there was another attorney that -- or two other
3    attorneys that -- that worked with our office.
4        Then they went on to other endeavors.
5    Q  And they were in addition to you and Fred.
6    A  Well, see, until '96, there was the separation
7    within -- there was the RTC IG and --
8    Q  Which one were you?
9    A  I was the FDIC IG counsel.
10   Q  Okay.  And who was the counsel there?
11   A  That was -- it was Larry Froehlich, and then Tom
12   Coogan and myself, and Linda Rego.
13       Then the --
14   Q  -- merger --
15   A  There was the merger in '96, and there was Pat,
16   Fred, Larry, and myself, and I'm trying to think if there was
17   anybody else at that time.  I can't recall.
18       Coogan left around -- he left around '96 or '97.
19       So, those -- those -- that was -- that was the
20   legal staff counsel's office at that time, and then Froehlich
21   went on, and Mike came on, and -- and Adriana came on.
22   Q  Okay.

Page 33

1        Adriana Vosburg.
2    A  Vosburg.
3    Q  Do you know of any other lawyer who came on as an
4    NTE, as an NTE?
5    A  Fred Gibson was NTE.
6    Q  And that was back in the '90s.
7    A  That was back in the '90s.
8    Q  And how long was he an NTE?
9    A  Until he was made permanent, before or shortly
10   after the merger.
11   Q  Which is '96.
12   A  Right.
13   Q  Ms. Vosburg was the last lawyer hired.
14   A  I believe that's -- as an attorney.
15       I mean --
16   Q  That's what I'm --
17   A  Again, there's -- there's overlap, perhaps,
18   between Mike and her, but -- it would have been a short time
19   --
20   Q  Adriana, when she came on, was NTE, not permanent
21   like Mike.
22   A  Yeah.

Page 34

1   Q   Okay.
2       Now, in addition to lawyers, you had Stacey Sharp
3   on your staff as a paralegal.
4   A   Correct.
5   Q   And you had Teresa —
6   A   Correct.
7   Q   — Teresa —
8   A   -- Fewell.
9   Q   — Fewell, and she was —
10  A   F-e-w-e-l-l.
11  Q   Right.  And she was legal assistant.
12  A   Legal assistant -- and before that, she may have
13  been -- it might have been secretary -- that might have been
14  her position title, but then there was an analysis done of
15  the -- of the secretarial force, and there were some
16  upgrades.
17  Q   Uh-huh.
18      So, she's no longer a secretary.
19  A   Correct.
20      I think -- I think she got a different position
21  number, you know, job --
22  Q   What is she now?

Page 35

1   A   -- job series.
2       I don't know.
3   Q   Legal assistant?
4   A   She's a legal assistant, but I'm not sure what job
5   series that is.
6   Q   Uh-huh.
7       Does she take courses, training?
8   A   Teresa?
9   Q   Yeah.  For paralegal?
10  A   I don't know.
11  Q   Nobody told you.  If she does, nobody told you.
12  A   Yeah.
13  Q   Okay.
14      Does she work with you on any matters?
15  A   I'd say very rarely.
16  Q   Does she do FOIA work?
17  A   No.
18  Q   Does she do the -- what work do you know that she
19  does?
20      What does she do?
21  A   She does a lot of administrative work.
22  Q   Administrative work, like clerical, secretarial

Page 36

1   support, administrative —
2   A   Filing.  You know, somebody needs to order
3   something, she'd work on that.
4   Q   Order something, like a book or —
5   A   That type of thing.
6   Q   So, clerical -- clerical support.
7   A   Correct.
8   Q   She still does that, even though she's no longer a
9   secretary/administrative type, she's now some sort of legal
10  assistant.
11  A   Yeah.
12      Again, I don't know what the -- you know, the job
13  duties of a legal assistant are and how they're -- how
14  they're, you know, stated on their position description.
15  Q   Any of the duties — from what you observe, does
16  she do any of the duties that Ms. Sharpe used to do?
17  A   Well, Ms. Sharpe would assist on subpoenas, but
18  generally, that was -- the subpoenas would be like -- like a
19  legal duty that -- that Teresa has worked on for many years.
20  Stacey assisted her in those regards.
21  Q   Uh-huh.
22  A   I'm trying to think whether their duties --

Page 37

1   whether there's some overlap.
2       Well, Stacey got involved in doing -- I know
3   Stacey got involved in some efforts, either filing or
4   tracking some opinions that we get from the legal division on
5   various -- or that we'd write on -- on various matters.
6   Q   Who — who did that before Teresa?  Stacey?
7   A   Well, Stacey was -- was doing that.
8       Now, before Stacey was doing it, I guess Teresa
9   would do it.
10      I mean there was a filing system, and if we got an
11  opinion or wrote an opinion, then we would -- we would mark -
12  - or Teresa would mark, you know, the right file designation
13  and then file it.
14  Q   She would have to use analytical skills, legal —
15  paralegal skills to do that?
16  A   No.
17  Q   Oh, so, it's just a filing of things.
18  A   Right.  3.14 might have been the designation for a
19  legal division opinion.  I'm just throwing that number out.
20  Q   Okay.
21      So, it's not excising or summarizing the opinions.
22  A   No.

Page 38

1    Q   Who did that?
2        I mean I take it somebody kept a running tab on
3    the legal opinions and --
4    A   I don't know if it was ever documented. We would
5    just have a file, and you know, you'd throw opinions into it
6    as they, you know, came through the door, or we drafted them.
7    Q   Okay.
8        Now, I want to take you back to OIG's meetings
9    that you had, the Office of Inspector General counsel's
10   office meetings --
11   A   Uh-huh.
12   Q   -- under both Ms. -- Ms. Black and --
13   A   -- Mr. Gibson.
14   Q   -- Mr. Gibson.
15       I'm particularly interested in the Black era.
16   A   Okay.
17   Q   Okay?  For now.
18       You recall staff meetings that she would run?
19   A   Yes.
20   Q   Okay.
21       Did you ever hear of a concept called core number?
22   A   Right.

Page 39

1    Q   What is that, as you understood it?
2    A   As FDIC tried to down-size itself from the large
3    number of personnel that worked --
4    Q   Because of the -- because of the merger.
5    A   Yeah. Well, the -- yeah.
6        There was a lot of hiring that was done in the
7    wake of the bank failures in the late '80s, and then -- then
8    we took on RTC employees who had been -- let me back up.
9        Initially, the RTC was staffed by FDIC attorneys
10   who were assigned there, and then those corporations did
11   their own hiring, up until about 1992, and then there was --
12   there was -- you know, we realized the banking crisis was
13   winding down, hiring would therefore slow, and then the
14   decision was, you know, what number is the correct number for
15   the number of employees at FDIC, and so, they came up with
16   the concept of the core staffing levels.
17   Q   So, did the counsel's office have a core number?
18   A   Yes.
19   Q   Okay. And Ms. Black would tell you what the core
20   number was?  She would talk about the core number?
21   A   Right. And -- now, I had done -- done some
22   analyses during those years on budget matters, and then we

Page 40

1    would --
2    Q   Budget matters for the counsel's office.
3    A   Correct.
4    Q   Okay.
5    A   And within that, I think we were trying to figure
6    out what -- what workload would be desirable within OIG and
7    how many attorneys you would need to -- to accomplish those
8    functions. So, in some cases, we would say, well, the
9    desired core staffing for counsel's office would be seven
10   attorneys.
11   Q   Seven attorneys or seven people?
12   A   Seven positions. That's a better way of saying
13   it.
14   Q   Okay.
15   A   Seven positions. And then, at other times, we
16   were told your core staffing is your current staffing.
17   Q   So, you can't get any bigger.
18   A   Right.
19   Q   And you don't want to get any smaller.
20   A   If we could avoid that, yeah, unless, again, as --
21   as time went on and the workload dropped, then, you know,
22   obviously, if we weren't keeping everybody busy, then you'd

Page 41

1    say, well, you might have a surplus, and --
2    Q   But your core staffing -- you recall the core
3    staffing being seven people?
4    A   It was -- it never was official. I think I came
5    up with that figure as a proposed core staffing that, you
6    know, given certain level work and types of work --
7    Q   When was that?
8    A   Those analyses would have been done in the mid- to
9    late '90s.
10   Q   Okay.
11       Do you recall Ms. Black saying that you're going
12   to go from seven to six core staffing?  Do you recall that?
13   Or we're going to lose an attorney. We're going to -- we're
14   going to reduce by one attorney.
15   A   No, never that. I mean we may have been -- we may
16   have come up with the theoretical number of seven, as what's
17   sticking in my mind, and then -- right. But we never reached
18   that level.
19   Q   Never got that high.
20   A   We might have been six or seven, maybe six people,
21   and I think we were pushing that maybe we needed another
22   attorney, but then, again, in -- that was in the late '90s,

Page 42

1   2000, but then, as the workload diminished FDIC-wide, then --
2   and there was a push to -- for OIG to reduce its staffing,
3   then the core staffing concept kind of went away.
4        It was like, well, you know, these are the fixed
5   numbers now.
6        Q   So, the fixed numbers became less.
7        A   Compared to the -- to the mid- to late '90s, yes.
8        Q   Yes.
9            So, you went down a lawyer.
10       A   Yeah, I'd say that -- that would be the case after
11   --
12       Q   After 2002. Froehlich --
13       A   Right. Yeah, Froehlich left and --
14       Q   Cosgrove replaced Froehlich, but then -- you used
15   to have Black, Gibson -- Black, Froehlich, Gibson, yourself --
16   -
17       A   Right.
18       Q   -- right? And one other. Five lawyers.
19       A   I'm trying to think -- yeah.
20       Q   And that lawyer left. One lawyer left.
21       A   Yeah. When Froehlich and we picked up Cosgrove
22   and -- and Vosburg came on --

Page 43

1        Q   Hold on a second. Let me ask a question.
2        A   Okay.
3        Q   You had another person who left that didn't get
4    replaced, somebody who had been FDIC counsel with you.
5        A   Right.
6        Q   Who's that?
7        A   That was Larry Froehlich.
8        Q   There was another person, as well, who you
9    mentioned.
10       A   Well, there was -- well, Tom Coogan, but he was --
11   that was the mid-'90s.
12       Q   He left in the mid-'90s.
13       A   Right.
14       Q   Okay.
15           So, Froehlich left. That's the first thing that
16   happened.
17       A   Yeah.
18       Q   And Cosgrove replaced Froehlich.
19       A   Right.
20       Q   And Black left Counsel's office.
21       A   Right. I'm trying to remember the time-frames
22   when Pat left as counsel and became Deputy IG, and I can't

Page 44

1    remember when that was, exactly.
2        Q   It was after Froehlich left, though.
3        A   Yes.
4        Q   Okay. And after Cosgrove was present.
5        A   I believe so.
6        Q   Okay. And when Black left, you had a temporary
7    employee, Ms. Vosburg. She was a term employee.
8        A   Again, I don't know when she became permanent.
9        Q   I understand. But at the beginning, she was term,
10   after she finished her law clerkship.
11       A   Right. And then --
12       Q   Then she became a full-time term employee. She
13   was a lawyer.
14       A   Right.
15       Q   But she was a term employee. She didn't have a
16   permanent -- right?
17       A   That's correct.
18       Q   All right. And then, at some point -- and at that
19   point, when she was there, before she became a full lawyer --
20       A   Uh-huh.
21       Q   -- Fred was in charge, and you and Cosgrove were
22   the only other lawyers, and she became the fourth lawyer as

Page 45

1    term, because then Black -- Black moved out.
2        A   Yeah. Black was there when -- when Vosburg came
3    on.
4        Q   Right. As a term employee.
5        A   Right.
6        Q   But when Black left, she didn't become a permanent
7    employee. She stayed a term employee.
8        A   Again, I don't know -- I can't remember when --
9    when Black left as counsel, and I don't know when Vosburg
10   became permanent.
11       Q   Was there an announcement made that Ms. Vosburg is
12   now a permanent employee?
13       A   Not to my knowledge.
14       Q   When Vosburg became a permanent employee, was
15   Stacey still there? Do you know? Or you can't -- you don't
16   --
17       A   Again, I don't know when Vosburg became permanent,
18   so I -- you know --
19       Q   Okay. But the core number was the ceiling, the
20   size of that office.
21           That's what core numbers meant, the core number,
22   number of employees --

Diversified Reporting Services, Inc.
202-467-9200

Page 46

1    A   Yeah, that would be -- well, it was -- it was --
2  again, it was a target number that they wanted to get to.
3    Q   Or that they didn't want to go over.
4    A   I guess you could characterize it that way, but
5  generally, it was, you know, what are your core numbers, you
6  know.
7    Q   Do you recall Ms. Black saying nobody is going to
8  be -- we're not going to reduce any further, we're at the
9  core number?
10      We're neither going to grow nor reduce, we're at
11 the core number.  Do you recall her saying that when she was
12 counsel?
13   A   Not when she was counsel, no.
14   Q   If you were above your target core numbers, you'd
15 have to reduce, correct?
16   A   I'm not sure how -- how the overages over core
17 were handled.  I mean it could be any number of ways -- just
18 wait for attrition -- I mean the legal division itself was --
19 was over its core, and they had to do a lot of RIF'ing and
20 buy-outs, etcetera, etcetera.
21   Q   But if you -- if you had to bring -- if you wanted
22 to bring somebody else on, you were at your core number and

Page 47

1  you couldn't do it.  You'd have to reduce to bring somebody
2  else on.  You didn't want to go over your core number.
3    A   I'd say, as a theoretical matter, yeah, that would
4  be true.
5      I mean if somebody needed another position, then
6  they'd say, well, okay, well, then we'll have to take it from
7  somebody else, but I mean --
8    Q   Uh-huh.
9    A   Because as -- as FDIC was -- was most concerned,
10 it would -- it would be the total OIG numbers, and then
11 within OIG --
12   Q   Well, that's what FDIC would be concerned -- but
13 within OIG, the different offices would have their core
14 target.
15   A   Yeah.  In essence, yeah.
16   Q   Being at your core means you're -- you have the
17 authorized number of people that you're supposed to have.
18   A   I guess you could say that.
19   Q   In order to bring somebody on above the core,
20 there would have to be some sort of manipulation.  Somebody
21 else would have to leave or would transfer to another spot or
22 --

Page 48

1    A   Yeah.  I mean if they decided, well, okay, we need
2  to adjust your core numbers and this is, you know, how we're
3  going to do it, and then if they wanted -- if there was a
4  need to bring somebody else on --
5    Q   You'd have to move somebody else out or to another
6  -- I don't mean necessarily fire -- I mean just -- just move
7  them to another unit where they had a need for people, so
8  that you wouldn't go over the core number --
9    A   Again, the --
10   Q   -- that you were designated to have.
11   A   Again, the concept of core numbers -- the
12 importance of that, at least as far as I was concerned, since
13 I didn't have to, you know, cut the numbers -- that kind of
14 diminished in 2000, 2001, and 2002, you know, and maybe after
15 that, but I mean that's when FDIC was trying to get its
16 numbers down to where they thought it needed to be.
17   Q   They still have that problem in certain places,
18 don't they, in the FDIC?
19      They're still having buy-outs and --
20   A   They're offering early-out authority.  That's
21 through the end of this year.
22   Q   Yes, because they still have to reduce some.

Page 49

1    A   Again, I don't know if -- if it's because they
2  have to or because they want to or they just want to maybe --
3    Q   And FDIC governs how many people are to be in OIG
4    A   That is really a matter of negotiation --
5    Q   Uh-huh.
6    A   -- between the Inspector General and, you know,
7  the -- the budget -- and the chairman's office.
8    Q   Do you know what an FTE is?  Have you ever heard
9  that?
10   A   Yeah, I've heard the expression before.
11   Q   Do you know what it stands for?
12   A   Basically it's --
13   Q   It's like a core number.
14   A   Well, I wouldn't necessarily -- it's a different
15 concept than a core number --
16   Q   It's budgetary, isn't it?
17   A   It's, yeah, budgetary.
18   Q   A full-time equivalent position.
19   A   Right.
20   Q   So -- and that's what core numbers are, too.
21      It's how many people you're going to have in each
22 unit.

Page 50

1   A   Right, yeah.
2   Q   Before 2002, there would be weekly staff meetings.
3      Isn't that right?  At OIG —
4   A   Yes.
5   Q   — counsel.
6   A   Yeah, Pat would generally have weekly -- on a
7  regular -- I mean, on a general basis, yeah, it was weekly.
8   Q   Uh-huh.  Were there any RIFs in Counsel's office?
9   A   RIFs.
10   Q   Reductions in force.
11   A   Right.
12      I don't think so.
13   Q   Did you ever threaten a RIF?
14      Was there ever a RIF threatened to affect Counsel?
15   A   Not that I recall.
16   Q   I mean they've had RIFs in FDIC counsel's office.
17   A   Right.  You know, in the legal division, yeah.
18  But --
19   Q   In order to get them to reach a new authorized
20  strength.
21   A   Right.
22   Q   Do you recall, during the time that there were

Page 51

1  RIFs in FDIC counsel's office, Ms. Black saying, well, don't
2  have to worry about that here, because we're at our core
3  number, you don't have to worry about reducing?
4   A   I can't specifically recall a conversation --
5   Q   I'm just guessing, but I remember those RIF times
6  at the FDIC legal division, for reasons that are not relevant
7  here, and I remember — I'm guessing that there was a lot of
8  anxiety even in the OIG counsel's office over RIFs, because
9  ·there was — there was a high anxiety level, generally, over
10  the RIFs in the legal division at FDIC.  Do you recall that?
11   A   I don't recall there being any threat of RIF at
12  FDIC counsel.
13      So, I didn't have that anxiety.
14   Q   The FDIC counsel.
15   A   I mean -- I'm sorry -- OIG counsel.
16   Q   Yes, I understand that, but the reason why was
17  because management assured everybody that there wouldn't be
18  RIFs, that we were at our core number.
19   A   I don't recall the, you know, specific time where
20  that was said.
21      It may have been said.  I just don't recall if
22  that was -- if that was the case.  I --

Page 52

1   Q   But for some reason, there was less anxiety over
2  at OIG counsel —
3   A   Right.
4   Q   — than there was at FDIC legal division.
5   A   Yeah, because we never got a RIF notice saying
6  here's your -- I mean your -- your 90-day, your 120-day
7  warning, and stuff like that.
8   Q   I understand that, but there was anxiety in
9  Counsel's office even — in legal division — even before the
10  RIF notices went out, because there was anxiety that RIFs
11  were coming.
12   A   Right.
13   Q   And that anxiety was dissipated in OIG counsel's
14  office, correct?
15   A   Yeah, because we were never told that we needed
16  to.
17   Q   In fact, you were told that you wouldn't need to.
18      Do you recall that?
19      You were assured —
20      MR. COSGROVE:  David, I'm going to object.  I mean
21  you've asked about five times --
22      MR. SHAPIRO:  I'm trying to get him to -- when

Page 53

1  somebody doesn't remember, I can stand on my had, spit wooden
2  nickels, it's perfectly okay, if I'm just trying to his
3  memory.
4      That's -- that's permitted.
5      BY MR. SHAPIRO:
6   Q   So, I'm just trying to jog your memory.  I mean
7  anxiety level high in Counsel -- in — in FDIC legal
8  division, but it wasn't high in OIG counsel's office, and I'm
9  asking you, do you recall that you guys were kind of assured,
10  you folks over in Counsel's office, that you were at your
11  core number and there wouldn't be a need to reduce?
12   A   I don't recall any conversations to that effect.
13      It may have happened.
14      I just don't recall it.
15   Q   But you do recall that there wasn't the anxiety in
16  Counsel's office —
17   A   I didn't —
18   Q   — at the time that there was high anxiety in the
19  legal division.
20   A   Correct.
21      I didn't -- I didn't experience anxiety, because -
22  -

Page 54

1    Q    Yeah, but I'm not really talking so much about
2    whether you experienced it.
3        I'm talking about the feeling in this small
4    office. I mean you can tell when an office is filled with
5    anxiety over -- over stability of the work and stability of
6    the jobs.
7    A    Well, we've been pretty stable over the -- over
8    the -- over the years.
9        So, I don't know if I've ever experienced that
10    type of anxiety.
11    MR. SHAPIRO: We're almost done. Let me take a
12    couple of minutes and see.
13        (A brief recess was taken.)
14    BY MR. SHAPIRO:
15    Q    Did you meet with anybody in preparation for this
16    deposition?
17    A    Mike just told me where the office was -- in legal
18    confidence, where the office is.
19    Q    Anybody else? Did you meet with anybody else
20    about this?
21    A    No.
22    Q    Okay.

Page 55

1        Did you review any documents in preparation for
2    this deposition?
3    A    Yes.
4    Q    What documents did you review?
5    MR. SHAPIRO: I'm allowed to --
6    MR. COSGROVE: I don't think you are.
7        I think I'm going to assert privilege.
8    MR. SHAPIRO: I'm allowed to know what documents
9    - I can't know what you discussed with him, but I can know
10    documents. That's plainly clear, what a witness reviews in
11    preparation for a deposition is not privileged.
12    THE WITNESS: Counsel?
13    MR. COSGROVE: I don't know if he's right or not,
14    but thinking about what it is that I gave you, the hell with
15    it. I'm not going to worry about it. So, I'll withdraw the
16    objection.
17    THE WITNESS: Okay.
18        I looked at excerpts of OIG semiannual reports
19    that went back to October of 1999.
20    BY MR. SHAPIRO:
21    Q    FDIC semiannual --
22    A    OIG.

Page 56

1    Q    OIG's --
2    A    -- semiannual reports, excerpts.
3    Q    What excerpts did you look at?
4    A    They showed the office statistics, how many FOIAs
5    were done, how many -- subpoenas issued -- FOIA requests that
6    were received, how many -- how much regulation and
7    legislation was reviewed. These are publicly available
8    documents.
9    Q    Okay.
10        Anything else?
11        Any other documents that you reviewed besides the
12    semiannual reports?
13    A    I looked at our -- some of our -- our work flow
14    tracking documents.
15    Q    Which work flow tracking documents?
16    A    Counsel -- counsel's office has a system of access
17    --
18    MR. COSGROVE: Could we go off the record for a
19    second?
20        (A discussion was held off the record.)
21    THE WITNESS: And I looked at -- for the period of
22    2000 to 1998 -- the work flow tracking documents that --

Page 57

1    matters that Stacey and I worked on.
2    BY MR. SHAPIRO:
3    Q    For 1998 to 2000.
4    A    Correct.
5    Q    Anything else?
6    A    That's all.
7    MR. SHAPIRO: I don't have any further questions.
8    MR. COSGROVE: Nothing.
9    MR. SHAPIRO: Good.
10    Thank you very much, sir.
11    (Whereupon, at 3:10 p.m., the interview was
12    concluded.)
13    *****
14    I have read the foregoing pages, which are a
15    correct transcript of the answers given by me to the
16    questions therein recorded.
17    Deponent_____
18    Date_____

**A**

above-entitled 1:20
access 56:16
accomplish 40:7
Act 10:21 12:16 13:14 15:12 16:15 27:1,15
acting 30:12
action 1:20
ad 18:2,11
addition 16:11 32:5 34:2
additional 8:21
address 4:10
adjust 48:2
administrative 35:21,22 36:1
Adriana 8:3 10:8 18:12 19:2 32:21 33:1,20
advice 10:9,22 15:20 16:12 18:4,5
advisor 5:2
affect 50:14
age 1:19
agency 1:6,8 2:16 6:14
ago 6:10,17,18 9:18 32:2
Allen 4:9
allowed 55:5,8
amount 14:9
analyses 39:22 41:8
analysis 34:14
analytical 37:14
announced 25:8 25:9 26:5
announcement 29:21 45:11
announcements 26:6

answer 21:21
answers 57:15
anxiety 51:8,9 51:13 52:1,8 52:10,13 53:7 53:15,18,21 54:5,10
anybody 7:3 8:19,20 9:8 31:19 32:17 54:15,19,19
APPEARAN... 2:6
appointment 29:7
approximately 29:5 30:18
area 10:20
areas 9:22
Arlington 2:21
articles 22:17
ASAP 26:21
asked 52:21
asking 53:9
assert 55:7
assign 23:13
assigned 39:10
assigning 25:5
assignment 24:5
assignments 21:3,6 23:7
assist 12:8,10 23:11,14,20 36:17
assistance 11:8
assistant 19:4,7 19:8,19,22 24:7 34:11,12 35:3,4 36:10 36:13
assisted 10:16 21:1 23:9 36:20
assists 23:2
assured 51:17

52:19 53:9
attention 26:7
attorney 5:2 6:4 7:5 29:4 31:22 32:2 33:14 41:13,14,22
attorneys 32:3 39:9 40:7,10 40:11
attrition 46:18
audit 5:9,21 6:12 15:21 17:21 18:5 23:22 24:1
auditor 5:8,13
auditors 15:21 18:5 25:15,18
authority 48:20
authorized 47:17 50:17
available 17:21 56:7
avoid 40:20
aware 25:16,22 26:18

**B**

back 12:22 28:5 29:3 33:6,7 38:8 39:8 55:19
bank 5:14 39:7
banking 39:12
bar 5:12
basically 7:7 49:12
basis 18:14 50:7
beginning 44:9
behalf 1:19 2:8 2:16
believe 8:1 9:3 28:17,21 29:3 29:4,11 33:14 44:5
better 40:12
bigger 40:17

bill 17:8 18:12
bills 17:1 18:12 20:13
bit 13:18
Black 23:10,13 30:10 31:6,18 38:12,15 39:19 41:11 42:15,15 43:20 44:6 45:1,1,2,6,9 46:7 51:1
board 5:10,14
bodies 26:8
book 36:4
boss 21:6
boxed 6:22
brief 54:13
bring 26:8 46:21,22 47:1 47:19 48:4
budget 39:22 40:2 49:7
budgetary 49:16,17
building 9:10
busy 15:9 40:22
buy-outs 46:20 48:19

**C**

C 3:10 4:1
call 6:1
called 4:4 12:18 25:4 26:21 38:21
calling 24:17,21
care 24:11
career 20:3 29:17,17,22
case 10:16,17 12:8 26:21 27:12 42:10 51:22
cases 10:6 13:4 16:16 22:15

40:8
ceiling 45:19
certain 6:14 9:22,22 22:17 23:22 41:6 48:17
CG-905-15 5:5
CHAIRMAN 1:7
chairman's 49:7
changed 20:21
characterize 24:14 26:13 46:4
charge 44:21
check 6:10 22:20
Chicago 25:16 25:18,21
Christian 1:18 4:3,9 7:18
Circle 4:11
circumstances 13:8
citations 15:22
clear 55:10
clerical 35:22 36:6,6
clerk 23:8
clerkship 44:10
clients 10:11
college 26:16
Columbia 1:21
come 16:11 28:11,15 29:17 41:16
coming 14:13 52:11
comings 31:16
commencing 1:23
comments 24:2
COMMISSI... 1:1
compare 24:2

Compared 42:7
Complainant
  1:5,19 2:8
  3:15
complicated
  28:8
concept 38:21
  39:16 42:3
  48:11 49:15
concepts 15:22
concern 22:19
  22:21
concerned 47:9
  47:12 48:12
concluded
  57:12
conditional
  29:18
conference
  26:22
conferred 23:22
confidence
  54:18
Congress 16:18
Congressional
  17:7
consider 27:16
conversation
  51:4
conversations
  53:12
Coogan 32:12
  32:18 43:10
copying 24:9
core 38:21
  39:16,17,19
  39:20 40:9,16
  41:2,2,5,12
  42:3 45:19,21
  45:21 46:5,9
  46:11,14,16
  46:19,22 47:2
  47:13,16,19
  48:2,8,11
  49:13,15,20
  51:2,18 53:11

CORP 1:7
Corporation
  2:19 4:18
corporations
  39:10
correct 4:20 6:6
  6:11 7:17,19
  9:6,14,16 11:6
  14:10 15:22
  19:14 30:4,8
  34:4,6,19 36:7
  39:14 40:3
  44:17 46:15
  52:14 53:20
  57:4,15
Cosgrove 2:18
  7:20 8:15,22
  10:5,10 28:15
  29:5 31:10
  42:14,21
  43:18 44:4,21
  52:20 55:6,13
  56:18 57:8
counsel 3:15 6:2
  6:3 7:13,14,15
  8:13 10:9,16
  11:1 15:20
  16:12 18:5
  23:10 30:6,9
  32:1,9,10 43:4
  43:22 45:9
  46:12,13 50:5
  50:14 51:12
  51:14,15 52:2
  53:7 55:12
  56:16
counselors 16:7
counsel's 24:18
  30:3 32:20
  38:9 39:17
  40:2,9 43:20
  50:8,16 51:1,8
  52:9,13 53:8
  53:10,16
  56:16
counsel-orien...

  18:4
couple 27:8
  54:12
course 26:9
courses 26:16
  35:7
court 6:15
cover 12:22
  24:10
crisis 39:12
current 40:16
currently 4:15
cut 19:5 21:13
  21:14 27:20
  28:9,10 48:13

**D**

D 4:1
date 6:10 9:19
  57:18
David 2:10
  52:20
December 5:16
  6:1,5,8
decided 48:1
decision 39:14
define 20:8
delegate 16:5
Department
  26:20
depending 13:8
  15:13
depends 28:1
Deponent 57:17
Deposit 1:7 2:19
  4:18
deposition 1:17
  54:16 55:2,11
deputy 30:11,12
  30:12,12
  43:22
description 6:9
  6:21 36:14
designated
  48:10
designation

37:12,18
desirable 40:6
desired 40:9
different 13:18
  34:20 47:13
  49:14
difficult 27:9,11
  27:12
difficulty 28:1
diminished
  17:19,22 42:1
  48:14
directly 12:20
disclosure 16:9
discussed 55:9
discussion
  11:16 56:20
dissipated
  52:13
District 1:21
divided 9:21
division 37:4,19
  46:18 50:17
  51:6,10 52:4,9
  53:8,19
divisions 16:6
documented
  38:4
documents
  27:10,11 55:1
  55:4,8,10 56:8
  56:11,14,15
  56:22
doing 18:14
  19:2 22:4,19
  27:7 28:10
  37:2,7,8
door 38:6
down-size 39:2
draft 11:15
  15:21 18:21
drafted 38:6
drafting 13:10
  17:15 18:20
Drive 2:20
dropped 40:21

duly 4:4
duties 36:13,15
  36:16,22
duty 36:19
D.C 1:12,23
  2:14

**E**

E 3:10 4:1,1
earlier 29:3
early 26:15
early-out 48:20
Ed 1:20
EEOC 1:6
  10:17 23:9
effect 53:12
effort 13:9
efforts 37:3
eight 12:14
either 25:8 37:3
emphasis 18:3
  20:20
employed 4:15
  4:17,21
employee 28:12
  28:16,20,21
  29:18,22 44:7
  44:7,12,15
  45:4,7,7,12,14
employees 16:9
  16:11 39:8,15
  45:22
EMPLOYM...
  1:1
endeavor 20:17
endeavors 32:4
enforcement
  10:18 18:19
enter 13:3
entry 13:3
EQUAL 1:1
equivalent
  49:18
era 38:15
ESQ 2:10,11,18
essence 47:15

etcetera 6:15,15
   46:20,20
ethics 10:7,20
   11:3 16:2,3,4
   16:5,11,12
ethics-related
   16:5
everybody
   40:22 51:17
exact 9:19
exactly 6:11
   22:22 26:4
   44:1
exam 5:12
EXAMINATI...
   3:13 4:6
examined 4:5
example 10:5
exceed 29:12
excerpts 55:18
   56:2,3
excising 37:21
exclusions
   27:16
exemptions
   27:2,3,4,16
experience 27:9
   53:21
experienced
   54:2,9
expression
   49:10
extended 29:15
extent 10:4 17:6
   24:9
eye 18:10
e-mail 12:12,13
   13:5 28:4,5
E-9054 2:20

**F**

faced 14:14
fact 52:17
failures 39:7
fair 18:15 31:21
Fairfax 2:20

fairly 14:7,15
   15:4
fall 16:8
far 48:12
FDIC 5:15,19
   5:22 13:5 16:4
   16:5,7,19,21
   17:10 26:19
   32:9 39:2,9,15
   43:4 47:9,12
   48:15,18 49:3
   50:16 51:1,6
   51:10,12,14
   52:4 53:7
   55:21
FDICEO-050...
   1:6
FDIC's 11:14
   12:16
FDIC-wide
   42:1
Federal 1:7
   2:19 4:18 5:14
feeling 54:3
felt 13:6
Fewell 19:10,12
   34:8,9
field 1:1 20:3,17
figure 40:5 41:5
file 13:3 16:9
   27:13,14
   37:12,13 38:5
files 6:22
filing 36:2 37:3
   37:10,17
filled 54:4
filling 19:6
financial 16:8
find 25:7
finish 11:13
finished 44:10
fire 48:6
first 4:4 5:7,13
   5:19,21,21
   16:17 19:5
   21:13,14 28:9

28:10,11 29:9
   43:15
five 13:16 14:1
   14:9,17 42:18
   52:21
fixed 42:4,6
flow 13:4 56:13
   56:15,22
FOIA 10:7,16
   10:21 11:3,5
   11:10 12:16,8
   13:5,13 15:9
   23:2,4 24:6,19
   26:10,14,19
   27:1,7 28:6
   35:16 56:5
FOIAs 21:1,2
   56:4
FOIA/PA 12:21
   13:10
FOIA/privacy
   11:14 12:16
   13:14 15:12
   16:15 21:12
folder 13:3
folks 53:10
follows 4:5
force 34:15
   50:10
foregoing 57:14
form 19:6
forms 16:9
   24:10
four 6:10,16,18
   7:12,14 30:16
   31:18
fourth 44:22
four-lawyer
   30:15
Fred 7:16 10:11
   18:11 19:3,3
   21:6 24:3 25:8
   25:9,11,12
   30:6,9 32:5,16
   33:5 44:21
Friday 22:17

Froehlich 9:3
   31:2,10,18,20
   32:1,11,20
   42:12,13,14
   42:15,21 43:7
   43:15,18 44:2
FTE 49:8
full 4:8 44:19
full-time 44:12
   49:18
functions 40:8
further 46:8
   57:7
F-e-w-e-l-l
   34:10

**G**

G 4:1
Gaston 22:18
Geiseler 4:9
   7:18
general 4:19
   10:19 22:18
   30:13 38:9
   49:6 50:7
generally 10:3
   10:20 11:5,9
   12:12 13:20
   17:8 24:9,11
   36:18 46:5
   50:6 51:9
General's 5:22
   13:6
getting 24:21
   26:6
Gianni 22:18
Gibson 7:16
   8:10 19:3 21:6
   24:3 25:11,12
   33:5 38:13,14
   42:15,15
Gibson's 11:16
GIESELER
   1:18 4:3
give 23:7 27:9
given 41:6

57:15
giving 27:19,20
go 11:13 17:6
   20:14 24:11
   26:22 41:12
   46:3 47:2 48:8
   56:18
goes 17:18
going 25:7,19
   29:3 41:11,13
   41:13,14 46:7
   46:8,10 48:3
   49:21 52:20
   55:7,15
goings 31:16
Good 57:9
governs 49:3
grade 5:7 8:4
Greenburg 1:20
group 11:14
   12:16,21
   13:10 26:21
   28:6
groups 13:5
   18:5 28:4
grow 46:10
GRUENBERG
   1:7
guess 11:2 22:5
   30:6 31:1,15
   37:8 46:4
   47:18
guessing 51:5,7
guys 53:9

**H**

handle 10:7
handled 46:17
handles 10:5
happen 28:22
happened 25:2
   25:3 43:16
   53:13
happens 16:12
hard 21:21
headquarters

25:16 26:1
**hear** 38:21
**heard** 49:8,10
**held** 56:20
**hell** 55:14
**high** 14:14
  41:19 51:9
  53:7,8,18
**hired** 29:2
  33:13
**hiring** 25:15,18
  25:21 26:4
  39:6,11,13
**histories** 17:4
**history** 17:7
  21:17,18
**hoc** 18:2,11
**Hold** 43:1
**holding** 6:4
**home** 4:10 5:14
**HR** 24:18 25:6
  25:7
**H.R** 20:15

**I**
**idea** 15:2 16:19
**IG** 32:7,9 43:22
**impact** 16:20
  17:10
**importance**
  48:12
**including** 7:12
  7:15
**increasingly**
  27:20
**initial** 12:11
  13:9 27:20
**Initially** 39:9
**inquiry** 28:3
**Inspector** 4:19
  5:22 10:18
  13:6 22:18
  30:13 38:9
  49:6
**Insurance** 1:7
  2:19 4:18

**interested** 38:15
**intern** 23:19
  28:20
**interview** 57:11
**investigative**
  27:13,14
**involved** 6:13
  17:20 22:1
  37:2,3
**issue** 10:11
**issued** 56:5
**issues** 27:1

**J**
**job** 5:3 6:4,11
  20:6 34:21
  35:1,4 36:12
**jobs** 20:10 54:6
**jog** 53:6
**join** 9:15,17
**joined** 5:15
**junior** 8:6
**Justice** 26:20

**K**
**K** 1:4
**keep** 15:9
**keeping** 40:22
**keeps** 18:9
**kept** 38:2
**kind** 10:15 11:1
  27:19 42:3
  48:13 53:9
**kinds** 9:22
**know** 10:8,11
  11:1,13,16
  12:12 13:19
  17:2,6,7 18:11
  20:9,13,14
  21:22 22:14
  22:15,19
  23:11,11,17
  23:17,18 24:4
  26:7,7 27:8,9
  27:12 28:1,2,8
  28:17 29:1,19

31:15 33:3
  34:21 35:2,10
  35:18 36:2,12
  36:12,14 37:2
  37:12 38:4,5,6
  39:12,14
  40:21 41:6
  42:4 44:8 45:8
  45:9,15,17,18
  46:5,6 48:2,13
  48:14 49:1,6,8
  49:11 50:17
  51:19 54:9
  55:8,9,9,13
**knowledge**
  45:13

**L**
**large** 39:2
**Larry** 9:3 31:2
  32:1,1,11,16
  43:7
**late** 14:15 16:8
  20:20 22:2,8
  26:14 39:7
  41:9,22 42:7
**lately** 19:3
**law** 23:8 44:10
**lawful** 1:19
**lawsuit** 10:17
**lawyer** 5:11 7:4
  29:2,10 33:3
  33:13 42:9,20
  42:20 44:13
  44:19,22
**lawyers** 7:11,14
  8:6 9:13 18:7
  18:8 31:17,18
  34:2 42:18
  44:22
**leave** 47:21
**left** 8:19 9:3
  21:5 24:18
  31:2,10 32:18
  32:18 42:13
  42:20,20 43:3

43:12,15,20
  43:22 44:2,6
  45:6,9
**legal** 5:15,19,20
  6:1,2,7,13,14
  7:4 19:4,7,8
  19:19,21 24:7
  32:20 34:11
  34:12 35:3,4
  36:9,13,19
  37:4,14,19
  38:3 46:18
  50:17 51:6,10
  52:4,9 53:7,19
  54:17
**legislation**
  16:18 17:22
  18:9 56:7
**legislative** 17:4
  17:7 18:1
  20:12 21:17
  21:18
**letter** 24:10
**letters** 12:22
**Let's** 9:2
**level** 27:22 41:6
  41:18 51:9
  53:7
**levels** 39:16
**Linda** 32:12
**litigation** 10:9
  10:13,15 23:9
**little** 13:18
**Loan** 5:14
**long** 4:21 30:15
  33:8
**longer** 34:18
  36:8
**look** 18:12,12
  20:14 56:3
**looked** 55:18
  56:13,21
**looking** 6:21
**lose** 41:13
**lot** 10:8 16:18
  17:5 22:3

35:21 39:6
  46:19 51:7

**M**
**making** 28:2
**management**
  51:17
**manipulation**
  47:20
**March** 1:13
**mark** 37:11,12
**MARTIN** 1:7
**matter** 10:18
  47:3 49:4
**matters** 6:14
  10:7,7,12 12:1
  16:14 35:14
  37:5 39:22
  40:2 57:1
**mean** 10:22
  15:15 20:13
  21:1,22 23:19
  26:5 27:4,13
  31:8,22 33:15
  37:10 38:2
  41:15 46:17
  46:18 47:5,7
  48:1,6,6,15
  50:7,16 51:15
  52:6,20 53:6
  54:4
**meaning** 16:21
**means** 47:16
**meant** 45:21
**meet** 54:15,19
**meeting** 25:13
  30:7
**meetings** 30:3
  38:8,10,18
  50:2
**memorandum**
  13:10
**memorandums**
  11:13
**memory** 53:3,6
**mentioned** 25:9

43:9
**merger** 32:14
32:15 33:10
39:4
**MICHAEL**
2:18
**mid** 41:8 42:7
43:11,12
**Mike** 7:20 9:4
10:5 18:11
19:2 29:5 31:2
31:10 32:21
33:18,21
54:17
**mind** 41:17
**minus** 27:8
**minutes** 54:12
**Monday** 22:17
**month** 16:13
**move** 7:1 48:5,6
**moved** 5:22
31:8,14 45:1

————————
**N**
N 3:10,10 4:1
**name** 4:8
**nature** 15:13
**necessarily** 48:6
49:14
**need** 11:17 40:7
48:1,4,7 52:17
53:11
**needed** 23:20
41:21 47:5
48:16 52:15
**needs** 36:2
**negotiation**
49:4
**neither** 46:10
**never** 21:7,8,8
41:4,15,17,19
52:5,15
**new** 25:15 26:8
50:19
**newest** 9:13
**newly** 25:5

**nickels** 53:2
**Northwest** 1:22
**Notary** 1:20
**notice** 52:5
**notices** 52:10
**NTE** 33:4,4,5,8
33:20
**number** 4:13
19:16,21
34:21 37:19
38:21 39:3,14
39:14,15,17
39:20,20
41:16 45:19
45:21,22 46:2
46:9,11,17,22
47:2,17 48:8
49:13,15 51:3
51:18 53:11
**numbers** 13:20
42:5,6 45:21
46:5,14 47:10
48:2,11,13,16
49:20
N.W 2:13

————————
**O**
O 3:10 4:1
**object** 52:20
**objection** 55:16
**observe** 36:15
**obviously** 40:22
**Occasionally**
10:14 12:19
**October** 4:22
55:19
**offering** 48:20
**office** 1:1 4:19
5:22 6:3 8:7
8:11 11:2,14
12:7,20 13:6
14:14 16:4,11
16:17 17:20
23:19,20
24:18 25:6,16
25:20 29:2

30:3,15,21
31:6,19 32:3
32:20 38:9,10
39:17 40:2,9
43:20 45:20
49:7 50:8,16
51:1,8 52:9,14
53:8,10,16
54:4,4,17,18
56:4,16
**officer** 16:3
**offices** 1:21
16:6 47:13
**official** 12:22
41:4
**Oh** 23:13 37:17
**OIG** 5:20 7:4
8:11,13 16:7
16:21 17:13
17:14 28:4
30:4 40:6 42:2
47:10,11,13
49:3 50:3 51:8
51:15 52:2,13
53:8 55:18,22
**OIG's** 38:8 56:1
**okay** 7:2,10
8:15,17,22 9:7
9:20 10:20
11:4,10,18
12:11,17 13:1
14:3,21 15:4
18:16 19:1
22:13 23:1,6
23:16 24:16
28:14 29:20
30:2,14,19
32:10,22 34:1
35:13 37:20
38:7,16,17,20
39:19 40:4,14
41:10 43:2,14
44:4,6 45:19
47:6 48:1 53:2
54:22 55:17
56:9

**once** 16:13 25:6
29:16
**one-year** 29:11
**on-board** 9:4
**opinion** 37:11
37:11,19
**opinions** 37:4
37:21 38:3,5
**OPPORTUN...**
1:1
**order** 36:2,4
47:19 50:19
**organize** 21:13
**overages** 46:16
**overlap** 33:17
37:1

————————
**P**
P 4:1
**package** 21:14
**PAGE** 3:13
**pages** 57:14
**paralegal** 11:19
12:5 20:6,7,9
23:18 26:16
34:3 35:9
37:15
**part** 7:1
**particularly**
38:15
**passed** 5:12
**Pat** 23:10 31:6,7
31:8,14,17
32:15 43:22
50:6
**Patricia** 30:10
**Pause** 5:17 9:11
13:11
**pay** 26:7
**people** 10:1
26:6 40:11
41:3,20 47:17
48:7 49:3,21
**percent** 15:16
22:4,7,11,11
22:11

**percentage**
15:12,15 22:1
**perfectly** 53:2
**period** 22:7
26:2 56:21
**permanent**
28:11,16,21
33:9,20 44:8
44:16 45:6,10
45:12,14,17
**permitted** 53:4
**person** 8:21
15:7 43:3,8
**personnel** 6:22
10:5 39:3
**picked** 42:21
**places** 48:17
**plainly** 55:10
**plans** 26:4
**please** 4:8
**plus** 7:14 27:8
**point** 5:8 29:8
31:4,15,16
44:18,19
**poses** 16:11
**position** 5:1 6:9
6:21 7:4 34:14
34:20 36:14
47:5 49:18
**positions** 40:12
40:15
**possible** 20:13
**precipitously**
14:16
**preparation**
54:15 55:1,11
**present** 44:4
**pretty** 11:12
21:5 54:7
**primarily** 19:5
**print** 20:15
**Privacy** 10:21
27:1,15
**privilege** 55:7
**privileged**
55:11

probably 16:16
problem 48:17
process 12:11
processing
  11:10,11
  26:12
program 11:7
prominent 18:6
promotion 26:6
proper 19:4
proposed 16:18
  16:19 17:5
  41:5
Public 1:21
publicly 56:7
push 42:2
pushing 41:21
put 31:3
P.C 1:22
p.m 1:23 57:11

_____
Q
_____
question 29:4
  43:1
questions 16:10
  57:7,16
quite 19:12

_____
R
_____
R 4:1
raise 10:11
range 6:20
  13:20
rarely 35:15
ratcheted 14:15
reach 50:19
reached 41:17
read 57:14
realized 39:12
really 20:11
  21:11 27:12
  49:4 54:1
reason 51:16
  52:1
reasons 51:6
recall 21:4

24:17,21 25:1
25:5,14 26:4
30:1 31:17
32:17 38:18
41:2,11,12
46:7,11 50:15
50:22 51:4,10
51:11,19,21
52:18 53:9,12
53:14,15
received 56:6
recess 54:13
recognize 27:4
record 6:6
  56:18,20
recorded 57:16
records 13:7,9
  15:14 24:10
  28:3,6
Record-type
  17:7
redaction 21:15
redactions 13:9
reduce 41:14
  42:2 46:8,10
  46:15 47:1
  48:22 53:11
reducing 51:3
Reductions
  50:10
regards 36:20
Rego 32:12
regular 18:14
  50:7
regularized
  18:3
regulation
  16:21 56:6
regulations
  16:19
relationship
  21:9
relevant 51:6
remember 8:16
  9:18 43:21
  44:1 45:8 51:5

51:7 53:1
replace 8:18,22
  9:4,8
replaced 8:20
  42:14 43:4,18
report 24:1
reported 21:7
reporting 21:8
  24:4
reports 15:21
  18:10 23:22
  55:18 56:2,12
representing
  6:14
request 13:3,5
  15:14
requester 11:15
  12:20 14:4
  28:1
requests 12:12
  12:19 13:13
  13:19 14:4
  28:9 56:5
research 6:15
  10:8,10,12,22
  15:20 20:12
  20:14
respond 11:15
  16:10
response 11:15
  13:10
responsibilities
  16:6
responsive 13:7
  13:8 15:14
  28:3,5,6
rest 15:19
review 13:8
  15:20 16:8,10
  17:1,2,16,21
  18:1,21 24:1
  55:1,4
reviewed 56:7
  56:11
reviewing 16:19
reviews 55:10

RICHARD
  2:11
rides 11:10
RIF 50:13,14
  51:5,11 52:5
  52:10
RIFs 50:8,9,16
  51:1,8,10,18
  52:10
RIF'ing 46:19
right 7:21 8:9
  12:2 13:15,22
  14:5,12,18
  15:6,8 17:14
  17:17 18:22
  19:11,18 20:3
  20:5 21:10
  22:22 23:15
  27:6 29:2 31:9
  31:10,12,13
  31:20 33:12
  34:11 37:12
  37:18 38:22
  39:21 40:18
  41:17 42:13
  42:17,18 43:5
  43:13,19,21
  44:11,14,16
  44:18 45:4,5
  49:19 50:1,3
  50:11,17,21
  52:3,12 55:13
role 18:6
roles 20:9
Room 2:20
roughly 30:16
roughshod
  11:11
RTC 32:7 39:8
  39:9
run 11:5 38:18
running 38:2
runs 30:7

_____
S
_____
S 3:10 4:1

saying 28:6,7
  40:12 41:11
  46:7,11 51:1
  52:5
second 43:1
  56:19
secretarial
  34:15 35:22
secretarial/pa...
  24:13
secretary 19:4
  34:13,18
secretary/ad...
  36:9
see 9:2 15:21
  17:10 32:6
  54:12
seeks 28:1
semiannual
  55:18,21 56:2
  56:12
send 12:21,22
  13:5 28:3,5
senior 6:12 8:9
  8:11
sense 20:12
sensitive 27:15
sent 12:20
separation 32:6
series 5:3 35:1,5
set 13:3
seven 13:17,21
  14:19,21 40:9
  40:11,11,12
  40:15 41:3,12
  41:16,20
Shapiro 1:22
  2:10,12 4:7
  5:18 9:12
  13:12 52:22
  53:5 54:11,14
  55:5,8,20 57:2
  57:7,9
Sharpe 1:4 12:4
  13:2,7 16:14
  18:17 19:15

24:17 27:20
34:2 36:16,17
she'd 23:18
  28:3,5 36:3
short 31:1 33:18
shortly 33:9
showed 56:4
side 5:21
sign 16:10
signature 11:16
sir 4:8,15,16
  57:10
sitting 20:15
six 13:16,19,21
  14:4,17,19,21
  41:12,20,20
size 45:20
Skidmore 4:11
skills 37:14,15
slow 39:13
small 54:3
smaller 40:19
somebody 9:1
  11:8 36:2 38:2
  43:4 46:22
  47:1,5,7,19,20
  48:4,5 53:1
sorry 51:15
sort 17:4,11
  18:10,19
  24:12 36:9
  47:20
speaking 10:20
  11:5
specialist 5:9
  6:13
specialties 11:3
specific 51:19
specifically 51:4
spit 53:1
spot 47:21
stability 54:5,5
stable 14:7 15:4
  54:7
Stacey 1:4
  19:20 20:10

20:18,19 28:2
34:2 36:20
37:2,3,6,7,8
45:15 57:1
Stacy 19:15
staff 5:15,19,20
  6:1,2,7,13 7:4
  8:21 9:10,15
  9:17,21 25:13
  30:3,7 32:20
  34:3 38:18
  50:2
staffed 39:9
staffing 39:16
  40:9,16,16
  41:2,3,5,12
  42:2,3
stand 53:1
standardized
  26:11
stands 49:11
start 6:4 9:19
  11:12
started 5:13 6:7
  10:17 16:17
state 4:8 17:5
stated 36:14
statement 18:15
  31:21
STATES 1:1
statistics 56:4
statute 16:21
statutory 15:22
stayed 45:7
STEPHANIE
  2:11
sticking 41:17
straight 15:22
Street 1:22 2:13
strength 50:20
stuff 15:10 16:1
  18:10 22:4
  23:2 24:2,22
  52:7
subject 9:22
subpoena 10:19

18:19,20 19:2
19:6 21:18
subpoenas
  18:18 36:17
  36:18 56:5
Suite 2:13
summarize 17:1
  17:8 22:17
summarizing
  16:20 20:13
  37:21
summary 20:16
support 36:1,6
supposed 47:17
sure 8:5,16 20:4
  25:14 35:4
  46:16
surplus 41:1
Swick 1:22 2:12
switch 6:9
switched 6:3
sworn 4:4
system 13:4
  37:10 56:16
S-k-i-d-m-o-r-e
  4:11

_____
                T
T 3:10,10
tab 38:2
tailed 22:9,10
take 17:8,18
  21:19 24:6,11
  35:7 38:2,8
  47:6 54:11
taken 1:19
  54:13
talk 39:20
talking 54:1,3
target 46:2,14
  47:14
teams 17:21
technically 7:4
telephone 4:13
tell 11:7 39:19
  54:4

temporary 29:7
  44:6
Teresa 19:10
  20:11 24:8
  34:5,7 35:8
  36:19 37:6,8
  37:12
term 28:20 29:8
  29:11 44:7,9
  44:12,15 45:1
  45:4,7
terms 20:15
testified 4:5
Thank 57:10
theoretical
  41:16 47:3
they'd 47:6
thing 17:4,11
  18:10,19
  21:11 23:18
  27:19 36:5
  43:15
things 21:13
  37:17
think 8:20
  14:13 17:19
  18:15 19:2,4
  21:5 22:7
  23:21 24:20
  25:3,8,9 26:21
  26:22 32:16
  34:20,20
  36:22 40:5
  41:4,21 42:19
  50:12 55:6,7
thinking 55:14
Thomas 20:14
thought 48:16
threat 51:11
threaten 50:13
threatened
  50:14
three 30:16
three-lawyer
  30:21
throw 38:5

throwing 37:19
time 5:8 9:10
  13:19 17:9,21
  19:13 21:19
  23:21,22 25:5
  26:5,9 28:7
  29:5 30:5,5
  31:2,4,15,16
  32:17,20
  33:18 40:21
  50:22 51:19
  53:18
times 40:15
  51:5 52:21
time-frame 28:7
time-frames
  43:21
title 5:9 6:11
  19:4,20 34:14
told 22:15 35:11
  35:11 40:16
  52:15,17
  54:17
Tom 32:11
  43:10
total 47:10
tracking 13:4
  37:4 56:14,15
  56:22
training 26:14
  26:19 35:7
transcript
  57:15
transfer 47:21
tried 18:2 39:2
true 8:1 10:4
  26:9 47:4
try 18:2 22:16
trying 23:21
  25:3,8 26:8
  32:16 36:22
  40:5 42:19
  43:21 48:15
  52:22 53:2,6
Tuesday 1:13
two 16:7 32:2

type 16:1 23:18
  36:5,9 54:10
types 41:6

─────────
**U**

Uh-huh 16:2
  17:12 26:3
  29:13 34:17
  35:6 36:21
  38:11 44:20
  47:8 49:5 50:8
understand
  28:19 29:16
  44:9 51:16
  52:8
understood
  39:1
unit 48:7 49:22
UNITED 1:1
unusual 25:19
upgrades 34:16
up-tick 14:3,7
use 37:14

─────────
**V**

v 1:6
VA 2:21
vacancy 26:5
various 16:6
  37:5,5
Vienna 4:11
Virginia 4:12
Vosburg 8:3,18
  9:13 23:4,7,11
  23:13 28:18
  30:17,22 33:1
  33:2,13 42:22
  44:7 45:2,9,11
  45:14,17

─────────
**W**

wait 46:18
wake 39:7
want 27:14 38:8
  40:19 46:3
  47:2 49:2,2

wanted 24:3
  46:2,21 48:3
wants 18:11
warning 52:7
Washington 1:1
  1:12,22 2:14
  5:13
wasn't 23:17
  26:17 53:8,15
watches 18:9
way 24:3 26:13
  40:12 46:4
ways 46:17
weekly 50:2,6,7
went 5:15 18:4
  24:18 25:6
  26:21,22 32:4
  32:21 40:21
  42:3,9 52:10
  55:19
weren't 6:16
  25:21 40:22
we'll 12:19,19
  47:6
we're 27:22
  41:13,13,13
  46:8,8,10,10
  48:2 51:2
  54:11
we've 54:7
wild 22:5,5
winding 25:19
  39:13
withdraw 55:15
witness 1:19 4:4
  55:10,12,17
  56:21
wooden 53:1
work 9:22 11:8
  13:4 14:9
  15:12,17 16:7
  16:14,18 17:3
  17:16,18,19
  18:17 20:21
  21:18 22:1,3
  24:6,7,13,19

26:10,11,17
  27:7,10,11
  35:14,16,18
  35:21,22 36:3
  41:6,6 54:5
  56:13,15,22
worked 25:4
  31:22 32:3
  36:19 39:3
  57:1
working 5:13
  6:7 10:17
  11:19 17:20
  22:16
workload 14:14
  40:6,21 42:1
worry 51:2,3
  55:15
wouldn't 8:20
  26:13 48:8
  49:14 51:17
  52:17 53:11
write 37:5
writes 18:10
writing 20:16
wrote 37:11

─────────
**X**

x 1:3,9

─────────
**Y**

yeah 14:2,20
  15:3,18 17:14
  20:19 27:18
  27:22 29:10
  30:5,12 31:7
  33:22 35:9,12
  36:11 39:5,5
  40:20 42:10
  42:13,19,21
  43:17 45:2
  46:1 47:3,15
  47:15 48:1
  49:10,17 50:1
  50:6,7,17 52:5
  52:15 54:1

year 13:13,18
  13:21,21
  14:19,21
  15:15 48:21
years 6:2,10,16
  6:18 9:18
  12:14 13:16
  13:22 14:1,9
  19:16,21 27:8
  30:16 32:2
  36:19 39:22
  54:8

─────────
**#**

#100-2005-00...
  1:6

─────────
**1**

1 15:16
10 22:11
120-day 52:6
1225 1:22 2:13
1290 2:13
13 5:8
14 1:13
15 7:18,22
1981 5:12
1989 4:22
1991 5:16 6:5,8
1992 39:11
1998 56:22 57:3
1999 55:19

─────────
**2**

2 15:16
2:11 1:23
20 22:3,7
2000 6:12 7:6
  14:11,13,13
  20:20 22:2,8
  26:15 27:7
  28:7 42:1
  48:14 56:22
  57:3
20005 2:14
2001 14:21

20:20 22:3,8
  28:8 48:14
2001-2002 6:19
2002 15:1 42:12
  48:14 50:2
2003 20:22
2004 25:16,18
  25:21 26:2
2006 1:13
22180 4:12
22226 2:21
2634 4:11

─────────
**3**

3.14 37:18
3:10 57:11
3501 2:20

─────────
**4**

4 3:15
44 20:15

─────────
**5**

5 22:11
562-6342 2:22

─────────
**7**

703 2:22
703-849-0008
  4:14

─────────
**8**

80s 39:7

─────────
**9**

90s 7:7 14:15
  18:3 20:20
  22:2,8 26:14
  33:6,7 41:9,22
  42:7 43:11,12
90-day 52:6
905 5:3 6:16
91 6:1,12 9:5
96 32:6,15,18
  33:11
97 32:18